**PUBLIC REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| FMS INVESTMENT CORP., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civil Action Nos. 18-204C, *et al.* |
| THE UNITED STATES, ) | Judge Thomas C. Wheeler |
| ) | |
| Defendant, ) | ▮ |
| and ) | |
| ) | |
| PERFORMANT RECOVERY, INC., *et al.*, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

### DEFENDANT-INTERVENOR PERFORMANT RECOVERY, INC'S
### MOTION TO DISQUALIFY PILLSBURY WINTHROP SHAW PITTMAN LLP AS
### COUNSEL FOR CONTINENTAL SERVICE GROUP, INC

Pursuant to Rule 7(b) of the United States Court of Federal Claims ("RCFC") and

Rules 1.7(a), 1.10(a), and 1.16(a) of the American Bar Association Model Rules of Professional

Conduct ("ABA Model Rules"), Defendant-Intervenor Performant Recovery, Inc. ("Performant

Recovery"), through its undersigned counsel, respectfully moves to disqualify Pillsbury

Winthrop Shaw Pittman LLP ("Pillsbury") as counsel for plaintiff Continental Service Group,

Inc. ("ConServe") in the above-captioned consolidated bid protests.

As set forth in the accompanying memorandum of points and authorities, Pillsbury's

representation of ConServe in this bid protest presents a concurrent conflict of interest because

Performant Recovery, also a current client of Pillsbury, is an awardee and defendant-intervenor

in this matter.  Performant Recovery, therefore, respectfully requests that the Court grant this motion and order Pillsbury to withdraw as counsel for ConServe.

Dated: March 2, 2018                           Respectfully submitted,


*Of Counsel*:                                  /s/ Michael McGill
                                               Michael McGill
Thomas L. McGovern III                         HOGAN LOVELLS US LLP
Christine Reynolds                             555 Thirteenth Street NW
Thomas A. Pettit                               Washington, DC 20004
HOGAN LOVELLS US LLP                           Telephone:  (202) 637-8862
                                               Facsimile:  (202) 637-5910
                                               michael.mcgill@hoganlovells.com

                                               *Counsel of Record for Performant Recovery, Inc.*

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

|  |  |  |
|---|---|---|
| FMS INVESTMENT CORP., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action Nos. 18-204C, *et al.* |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant, | ) | ██████████████████ |
| and | ) | |
| | ) | |
| PERFORMANT RECOVERY, INC., *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-INTERVENOR PERFORMANT RECOVERY, INC'S MOTION TO DISQUALIFY PILLSBURY WINTHROP SHAW PITTMAN LLP AS COUNSEL FOR CONTINENTAL SERVICE GROUP, INC

Dated: March 2, 2018                    Respectfully submitted,

*Of Counsel*:                                  /s/ Michael McGill
                                                      Michael McGill
Thomas L. McGovern III                HOGAN LOVELLS US LLP
Christine Reynolds                        555 Thirteenth Street NW
Thomas A. Pettit                           Washington, DC 20004
HOGAN LOVELLS US LLP               Telephone:  (202) 637-8862
                                                      Facsimile:  (202) 637-5910
                                                      michael.mcgill@hoganlovells.com

                                                      *Counsel of Record for Performant Recovery, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................ 2

    A.  Pillsbury's relationship with Performant ............................................................ 2

    B.  The Department's award and the protests before this Court................................. 4

    C.  Pillsbury's actions adverse to Performant and Performant's communications with Pillsbury regarding its concurrent conflict of interest........................................................ 4

ARGUMENT..................................................................................................................... 10

CONCLUSION AND RELIEF REQUESTED ............................................................. 14

# TABLE OF AUTHORITIES

## CASES

*Cont'l Serv. Grp., Inc. v. United States*,
   No. 18-cv-246 (Fed. Cl. filed Feb. 16, 2018) ............................................................. 6

*Edmonds ex rel. Edmonds v. Sec'y of Dep't of Health & Human Servs.*,
   No. 04-87V (Fed. Cl. Mar. 22, 2012) ....................................................................... 10

*In Re Butterfield*,
   851 A.2d 513 (D.C. Ct. App. 2004). ........................................................................ 12

## MODEL RULES OF PROFESSIONAL CONDUCT (AMERICAN BAR ASSOCIATION)

R. 1.7 ................................................................................................................................. 13

R. 1.7(a)(1) ............................................................................................................. 10, 12, 15

R. 1.7(b)(4) ...................................................................................................................... 11

R. 1.10(a) .......................................................................................................................... 11

R. 1.16 ............................................................................................................................... 11

R. 1.16(a)(1) ..................................................................................................................... 11

## D.C. RULES OF PROFESSIONAL CONDUCT

R. 1.7(b)(1) ....................................................................................................................... 12

R. 1.10(a) .......................................................................................................................... 13

## INTRODUCTION

Performant Recovery, Inc. ("Performant Recovery") and its parent company, Performant Financial Corporation ("Performant Financial"), are current clients of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). 1/  Pillsbury does not provide merely run-of-the-mill counsel to Performant—Blair White, a senior Pillsbury partner and member of the firm's board, essentially serves as Performant's general counsel, 2/ and he and other Pillsbury lawyers have regularly advised Performant Financial and its subsidiaries, including Performant Recovery, on a broad range of legal matters over the past six years.

Performant Recovery is one of two awardees in the U.S. Department of Education (the "Department") competition at issue in these bid protests.  Continental Service Group, Inc. ("ConServe") is an unsuccessful offeror protesting the Department's awards to Performant Recovery and the other awardee, Windham Professionals, Inc. ("Windham").  Pillsbury's representation of ConServe in this matter is directly adverse to Performant's interests.

Performant expressed its concerns directly to Pillsbury in mid-January after a Pillsbury lawyer was quoted in the Washington Post making disparaging remarks about Performant in connection with the Department's award.  Before Pillsbury filed ConServe's complaint, Hogan Lovells, Performant Recovery's counsel in this matter, brought this issue to Pillsbury's attention, and we gave Pillsbury a reasonable opportunity to find replacement counsel for its second client, ConServe.  Yet despite Performant's repeated expressions of concern with Pillsbury's ongoing involvement in this litigation adverse to Performant's interests and its requests that Pillsbury

---

1/      References to "Performant" refer to the Performant corporate family generally.  Specific members of that corporate family are identified by name as appropriate.

2/      Performant Financial and its family of companies ██████████████████████ ███████████████ extensively on Pillsbury for a broad range of legal advice.

address the conflict, Pillsbury has refused to even explain its position, let alone alleviate the conflict.

As explained in detail below, Pillsbury suffers from a concurrent conflict of interest that is contrary to applicable rules of professional conduct.  Pillsbury's filing of a lawsuit seeking to deprive Performant of its contract award is a blatant breach of the firm's duty of loyalty to its client.  Because Pillsbury has failed to resolve that conflict, we are forced to ask this Court to address the issue.  Accordingly, Performant Recovery respectfully requests the Court to disqualify Pillsbury as counsel for ConServe in this matter.

## BACKGROUND

### A.     Pillsbury's relationship with Performant

On September 28, 2011, Performant Recovery's parent company, Performant Financial, and Pillsbury executed an engagement letter setting forth the terms and conditions of Pillsbury's representation. 3/  The parties contemplated that Pillsbury would represent Performant Financial with respect to its planned initial public offering ███████████████████████████ 4/ The engagement letter expressly extended Pillsbury's representation to three of Performant Financial's wholly-owned subsidiaries:  DCS Business Services, Inc.; Diversified Collection Services, Inc.; and Vista Financial, Inc. 5/  In 2012, Diversified Collection Services, Inc. was

---

3/      Ex. A, Pillsbury-Performant Engagement Letter, at 000001-000008.
4/      *Id*. at 000002.
5/      *Id.* ("[W]e will also treat as clients the following three wholly-owned subsidiaries . . . .").

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

2

███████████████████████████████████████████████

renamed Performant Recovery, Inc. 6/  Pillsbury knows that Performant Recovery is one of the entities identified in its engagement letter, as Pillsbury advised Performant Financial and Performant Recovery in connection with the name change from Diversified Collection Services, Inc.  Thus, it is indisputable that Pillsbury's engagement letter with Performant expressly identified Performant Financial and its subsidiaries, including Performant Recovery, an awardee here, as Pillsbury clients and established an attorney-client relationship between Pillsbury and those entities.  The engagement letter did not include any advance waiver of potential conflicts of interest.

Through Blair White and numerous other attorneys, Pillsbury advises Performant Financial and its subsidiaries on a broad range of legal matters, including investments and corporate transactions. 7/  This work includes attending all meetings of Performant Financial's board of directors, which, at various times, have involved discussions ███████████ ███████. Pillsbury's representation also has involved discussions and advice regarding ██ ███████████████████████████████████████████████████████████████████ ██████████████ 8/

███████████████████████████████████████████████████████████████████████ ██████████████████████████████████

6/      Ex. B, Performant Securities and Exchange Comm'n ("SEC") Form 10-Q filed Nov. 13, 2012, at 000016 ("Effective August 13, 2012, we changed the name of our wholly owned subsidiary from DCS Business Services, Inc. (DCSBS) to Performant Business Services, Inc., and DCSBS' wholly owned subsidiaries from Diversified Collection Services, Inc. (DCS), and Vista Financial, Inc. (VFI), to Performant Recovery, Inc., and Performant Technologies, Inc., respectively.").  Pillsbury advised Performant Financial and Performant Recovery in connection with this and other SEC filings.

7/      *See* Ex. C, Jan. 26, 2018 Invoice from Pillsbury to Performant, at 000056-000065 (showing that Pillsbury continues to represent Performant in a variety of matters).

8/      *See, e.g.*, Ex. D, Performant SEC Form 10-Q filed Nov. 13, 2017, at 000083 (referencing statements about Performant's "opportunities and expectations for growth in the ***student lending***,

███████████████████████████████████████████████████████████████████████ ████████████████████████████████████

**B.      The Department's award and the protests before this Court**

On January 11, 2018, the Department awarded Performant Recovery and Windham

contracts for debt-collection services under solicitation number ED-FSA-16-R-0009 (the "RFP").

Shortly thereafter, several disappointed offerors filed bid protest actions in this Court challenging

the Department's evaluations and award decisions.  To date, 18 competitors have filed protests,

which the Court has consolidated into the above-captioned case.

ConServe is one of the 18 unsuccessful competitors challenging the award to Performant

Recovery in these consolidated cases.  Pillsbury filed a complaint on ConServe's behalf seeking

to enjoin and ultimately displace the awards to Performant Recovery and Windham.  Pillsbury

partner Todd Canni is lead counsel for ConServe.

**C.      Pillsbury's actions adverse to Performant and Performant's communications
         with Pillsbury regarding its concurrent conflict of interest**

Shortly after the Department awarded Performant Recovery a contract, Mr. Canni made

the following statements that were reported in the Washington Post in mid-January:

> It simply does not make sense that the agency would choose to work with
> lower-rated [companies] with marginal ratings that do not have an
> exceptional past performance record.  While we continue to await more
> facts, we are deeply troubled by the optics and appearance issues
> associated with the agency's award decisions . . . . It is beyond dispute that
> the [agency's] decisions have, at a minimum, created the appearance of a
> conflict of interest.  ***Given the fact that Performant was not a highly***

---

healthcare and other markets") (emphasis added), 000084-000085 (explaining Performant's
student loan recovery operations with, *inter alia*, the Department of Education and associated
financial information), 000087-000088 (same), 000091 (same), 000099 (discussing legal
proceedings related to Performant's student loan recovery operations and Performant's
relationship with the Department of Education, which is characterized as one of Performant's
"three largest clients"), 000100 (explaining Performant's relationship with the Department of
Education, the role of Performant's contracts with the Department of Education in Performant's
operations, the potential impact of losing business from the Department of Education, and the
prior round of bid protests).

> *rated [company] and, in fact, was rated fairly low . . . the agency will be*
> *under intense scrutiny and will need to explain how suddenly these*
> *ratings changed so significantly to allow Performant to leap frog over so*
> *many other qualified [companies].* 9/

Upon learning of these reports in the media, Performant was outraged that a Pillsbury lawyer was attempting to undermine the Department's award to Performant Recovery.  On January 15, 2018, Jeffrey Haughton, Chief Operating Officer for Performant Financial and Performant Recovery, promptly contacted Pillsbury to express his and the companies' disappointment with Mr. Canni's disparaging public statements.  Pillsbury was thus made aware of the conflict of interest no later than January 15, 2018, but it declined to address the issue, notwithstanding Mr. Haughton's concerns.

On February 12, 2018, despite its knowledge of the conflict of interest, Pillsbury, through Mr. Canni, submitted a pre-filing notice of its intent to file a bid protest and motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") in this Court on ConServe's behalf. 10/  This pre-filing notice indicated that the anticipated protest would challenge the Department's award decisions under the RFP, including its award to Performant Recovery. 11/

On February 15, after reviewing Pillsbury's pre-filing notice, undersigned counsel contacted Mr. Canni via e-mail and reminded him that Performant is a current client of Pillsbury. 12/  We requested to speak with Mr. Canni regarding his representation of ConServe

---

9/      Danielle Douglas-Gabriel, *Educ. Dep't awards debt-collection contract to company with ties to DeVos*, The Washington Post, Jan. 12, 2018, https://www.washingtonpost.com/news/grade-point/wp/2018/01/11/education-dept-awards-debt-collection-contract-to-company-with-ties-to-devos/?utm_term=.95932b0a0f31 (emphasis added).

10/     Ex. E, ConServe Pre-Filing Notice, at 000121-000123.

11/     *Id*.

12/     Ex. F, Feb. 15, 2018 E-mail from M. McGill to T. Canni, at 000124-000125.

in this litigation and arranged a conference call, which took place the following day,

February 16.  Jack McKay, another Pillsbury partner, joined the call, during which we informed

Mr. Canni and Mr. McKay that Performant views Pillsbury's representation of ConServe in this

matter as a concurrent conflict of interest and that Performant has not waived, and does not

intend to waive, that conflict.  Mr. McKay confirmed Pillsbury's longstanding representation of

Performant and acknowledged that Performant has not provided Pillsbury with an advance

conflicts waiver or otherwise waived the conflict.  At Mr. McKay's request, we agreed to

participate in a follow-up conversation between Mr. McKay and Hogan Lovells' Associate

General Counsel, Al Turnbull, the following week.

To our surprise, however, within minutes after our call with Mr. Canni and Mr. McKay

ended, we received notice that Mr. Canni had filed ConServe's bid protest complaint and its

motion for a TRO and PI in this Court and submitted protective order applications for six

Pillsbury attorneys. 13/  ConServe's complaint challenges Performant Recovery's award and

alleges, among other things, that there is an improper financial connection between Performant

and Department Secretary Elisabeth DeVos.  For example, ConServe's complaint:

- Characterizes Performant Recovery's award as "illegal"; 14/

- Criticizes the Department for awarding a contract to Performant Recovery over ConServe

  because ConServe's proposal and past performance were allegedly superior to

  Performant Recovery's; 15/ and

---

13/     *Cont'l Serv. Grp., Inc. v. United States*, No. 18-cv-246 (Fed. Cl. filed Feb. 16, 2018)
(consolidated with No. 18-cv-204 *et al.* (Fed. Cl.)).
14/     ConServe Compl. ¶ 3.
15/     *See, e.g.*, *id.* ¶¶ 82-106 (alleging conflicts of interest and bias), ¶ 139 (comparing
ConServe's and the awardees' CPCS scores), ¶ 144 ████████████████████████
████████████████████████████████████████████████████████████████

- Claims that the adjectival ratings assigned to Performant Recovery were improperly inflated and that the alleged inflation "must have been the result of disparate treatment" based on Secretary DeVos's alleged former indirect investments in an affiliate of Performant Recovery. 16/

Further, the motion for a TRO and PI filed by Pillsbury on ConServe's behalf asked the Court to enjoin Performant Recovery's performance of its awarded contract. 17/  The request for an injunction, which led the Department to voluntarily stay performance of Performant's contract, necessarily harms Performant's business and financial interests, and the relief that ConServe ultimately seeks, which would result in the termination of Performant Recovery's contract, would severely harm Performant's business and financial interests.

Additionally, on February 21, 2018, Mr. Canni represented ConServe during oral arguments held before this Court on the plaintiffs' motions for injunctive relief with respect to the Department's planned recall of certain accounts.  During that hearing, Mr. Canni made numerous statements directly challenging Performant Recovery's award and ability to perform the contract.  Mr. Canni filed ConServe's protest and made these allegations adverse to Performant at the hearing despite having full knowledge of his firm's concurrent conflict of interest.

---

█████████████████████████████████████████████████████

████████████████ Mr. Canni has made similar comments to the media.  For example, a January 23, 2018 Bloomberg BNA article cited in ConServe's complaint quotes Mr. Canni as stating that Performant "was not a highly rated offeror unlike our client Continental Services Group Inc."  *Daniel Seiden*, *DeVos Ties to Contractor Rebutted as New Protest is Pondered*, Bloomberg BNA Fed. Contracts Rep. (Jan. 23, 2018), http://news.bna.com/fcln/FCLNWB/split_display.adp?fedfid=127269572&vname=fcrnotallissues&split=0.
16/      ConServe Compl. ¶¶ 82-106 (alleging that the Department was biased in favor of Performant because Secretary DeVos allegedly has financial interests in Performant).
17/      ConServe Mot. for TRO and PI at 1.

Notwithstanding Pillsbury's filing of the complaint and the TRO and PI motion on ConServe's behalf, undersigned counsel has attempted to work with Pillsbury to coordinate Pillsbury's withdrawal from this matter without involving the Court.  To date, Pillsbury has failed to meaningfully respond, providing a series of non-substantive communications that do not explain Pillsbury's refusal to withdraw as counsel for ConServe (despite Pillsbury's acknowledgment that Performant has not waived the conflict) and that appear to be attempts to delay the filing of this motion and the ultimate resolution of the conflict.  For example, during the February 16 conference call, Mr. McKay refused to engage in a substantive discussion, asking instead to speak with someone "who deals with these issues."  Based on that request, undersigned counsel agreed to have such a conversation with Hogan Lovells' Associate General Counsel, but Mr. McKay stated in a February 19 e-mail that he would need to delay that conversation until the afternoon of February 21 at the earliest—five days after Mr. McKay made the request. 18/  Due to Pillsbury's subsequent filing of the ConServe complaint and motion for TRO and PI and the firm's delays in scheduling a call to discuss, we sent a letter to Pillsbury on February 21 formally explaining Performant's position on Pillsbury's conflict of interest. 19/  In that letter, Performant demanded that Mr. Canni and Pillsbury (1) refrain from making any further public statements criticizing the Department's award to Performant Recovery or otherwise disparaging Performant, and (2) immediately withdraw from representing ConServe in this matter. 20/  Performant requested that Pillsbury respond to these demands no later than Friday, February 23, 2018.

---

18/      Ex. G, Feb. 19, 2018 E-mail from J. McKay to A. Turnbull, at 000126-000127.
19/      Ex. H, Feb. 21, 2018 Letter from M. McGill to T. Canni, at 000128-000132.
20/      *See id*. at 000131.

Pillsbury subsequently retained Tom Mason of Harris, Wiltshire & Grannis LLP as counsel. 21/  Undersigned counsel has since attempted to engage Mr. Mason, requesting that he provide a written explanation to justify Pillsbury's refusal to address the conflict of interest. Despite at least two offers to schedule a conference call to discuss Pillsbury's position on the substance of the conflict of interest, neither Pillsbury nor its counsel has tried to explain Pillsbury's position or its refusal to address the conflict.  Indeed, Mr. Mason expressly stated that Pillsbury had no interest in "discuss[ing] the rules or substance." 22/  On February 27, Mr. Mason sent a letter via e-mail to undersigned counsel indicating nothing more than his "belie[f] that the analysis" in Performant's February 21 letter was "incomplete and inconsistent," 23/ a remarkable statement considering Pillsbury's acknowledgment of Performant as a current client and the absence of a waiver.  Due to the urgency of the matter, later that same day, undersigned counsel notified Mr. Mason that, unless Pillsbury withdrew from this matter or provided a substantive response explaining why it is not required to do so, Performant Recovery would be forced to raise the issue with this Court.  On Thursday, March 1, Mr. Mason sent a brief email stating that Pillsbury "declines to withdraw from its representation of ConServe." 24/  Given Pillsbury's refusal to withdraw as ConServe's counsel or even to attempt to explain its position, Performant Recovery is forced to file this motion to protect its interests and avoid further prejudice.

---

21/     Ex. I, Harris, Wiltshire & Grannis LLP Notice of Representation, at 000133-000134.

22/     Ex. J, Feb. 25, 2018 E-mail from T. Mason to M. McGill, at 000135-000137.

23/     Ex. K, Feb. 27, 2018 Letter from T. Mason to M. McGill, at 000138-000140.

24/     Mr. Mason's email also suggested that Hogan Lovells was not "willing to meet with us and hear our views concerning the relevant legal principles and authorities."  That suggestion is curious given that we had offered repeatedly in writing to schedule a call to discuss Mr. Mason's and Pillsbury's view on the substantive issues and whatever justification Pillsbury might have for its conflict of interest and refusal to timely withdraw.  It was Mr. Mason and Pillsbury who proposed a meeting that would not involve any discussion of the underlying substantive issues.

**ARGUMENT**

The American Bar Association Model Rules of Professional Conduct (the "ABA Model Rules") provide the ethical standards governing attorneys admitted to this Court's bar. 25/ Pursuant to Rule 1.7(a)(1) of the ABA Model Rules, Pillsbury's representation of ConServe in this bid protest is directly adverse to its current clients, Performant Recovery and Performant Financial, thus creating a concurrent conflict of interest. Under Rule 1.10, that conflict of interest is imputed to Mr. Canni. As explained further below, this Court should disqualify Pillsbury from representing ConServe in this bid protest due to this conflict and Pillsbury's breach of the duty of loyalty that it owes to Performant.

ABA Model Rule 1.7(a) addresses concurrent conflicts of interest as follows:

> Except as provided in paragraph (b), a lawyer **shall not** represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . the representation of one client will be directly adverse to another client . . . . 26/

Pursuant to paragraph (b) of that rule, a lawyer may represent a client notwithstanding a conflict of interest only where, *inter alia*, "each affected client gives informed consent, confirmed in writing." 27/

ABA Model Rule 1.10(a) provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be

---

25/    *See, e.g.*, *Edmonds ex rel. Edmonds v. Sec'y of Dep't of Health & Human Servs.*, No. 04-87V, slip op. at 12, n.32 (Fed. Cl. Mar. 22, 2012) ("Although the United States Court of Federal Claims no longer explicitly incorporates the ABA Model Rules of Professional Conduct, the rules continue to provide guidance regarding counsel's ethical obligations to the court . . . .").
26/    Model Rules of Prof'l Conduct ("ABA Model Rules") r. 1.7(a)(1) (Am. Bar Ass'n 2016) (emphasis added).
27/    *Id.* r. 1.7(b)(4).

prohibited from doing so by Rules 1.7 or 1.9 . . . ." 28/  This rule allows representation only if the conflict arises from "a personal interest of the disqualified lawyer" or "arises out of the disqualified lawyer's association with a prior firm." 29/  Further, ABA Model Rule 1.16 provides that "a lawyer shall not represent a client or, **where representation has commenced, shall withdraw from the representation**, if . . . the representation will result in violation of the rules of professional conduct or other law." 30/

It is readily apparent that Pillsbury's representation of ConServe in this protest creates a conflict of interest due to the firm's concurrent representation of Performant.  It is undisputed that Performant is a current client of Pillsbury.  Mr. Canni's and Pillsbury's actions are directly adverse to Performant.  As explained above, Pillsbury, on ConServe's behalf, moved this Court to enjoin Performant Recovery's performance under the contract at issue, harming Performant's business and financial interests, and its complaint directly attacks Performant Recovery's award. For example, in ConServe's complaint, Pillsbury describes Performant Recovery's award as "illegal" and characterizes Performant Recovery's proposal as inferior to ConServe's proposal, arguing that ConServe, not Performant Recovery, should have received an award.  ConServe's prayer for relief also asks this Court to "[d]eclare that ED's evaluation of proposals under the instant procurement was arbitrary and capricious under the APA as a result of the foregoing statutory and regulatory breaches and evaluation flaws," which would invalidate Performant Recovery's award. 31/  Also troubling is Mr. Canni's decision to use the media to publicly attack Performant Recovery based on the allegation that Secretary DeVos indirectly acquired an interest

---

28/     *Id.* r. 1.10(a).
29/     *Id.*
30/     *Id.* r. 1.16(a)(1).
31/     ConServe Compl. at 89.

in a fund that previously held debt in one of Performant Recovery's corporate affiliates,

Performant Business Services.  This is all the more problematic in light of Pillsbury's historical

and ongoing role in advising Performant on a variety of investment matters and Performant

Recovery's student debt collection operations, including its relationship with the Department.

***Indeed, Pillsbury advised Performant Financial on the issuance of the debt that Pillsbury now***

***alleges created a conflict of interest that tainted the award to Performant Recovery and on the***

***refinancing of that debt***.

*In re Butterfield*, 32/ a District of Columbia Court of Appeals decision, is instructive. 33/

There, the attorney in question filed a bid protest on behalf of Raytheon Corp. ("Raytheon").

Raytheon's protest challenged the Federal Aviation Administration's award of a contract to

Lockheed Martin, which was also represented by the attorney's firm "in unrelated matters." 34/

As the Board on Professional Responsibility (the "Board") found, the firm's and attorney's

representation of Raytheon in that bid protest created a conflict of interest in violation of D.C.

Rule of Professional Conduct 1.7(b), which was imputed to all other firm lawyers pursuant to

Rule 1.10(a).  The Board explained that "Rule 1.10(a) implements the important principle that

for conflict purposes, ***a firm is viewed as one lawyer***, *i.e.*, no lawyer in a firm may ethically

represent a client which any other lawyer in the firm would be prohibited from representing." 35/

---

32/      851 A.2d 513 (D.C. Ct. App. 2004).

33/      That case was analyzed under Rule 1.7(b)(1) of the D.C. Rules of Professional Conduct.
That rule, which is substantively identical to ABA Model Rule 1.7(a)(1), states:  "Except as
permitted by paragraph (c) below, a lawyer ***shall not*** represent a client with respect to a matter if
. . . [t]hat matter involves a specific party or parties and a position to be taken by that client in
that matter is adverse to a position taken or to be taken by another client in the same matter even
though that client is unrepresented or represented by a different lawyer." (emphasis added).

34/      Ex. L, Rep. and Recommendation of the Bd. on Prof'l Responsibility, at 000141-000177.

35/      *Id.* at 000161 (emphasis added).

Underscoring the ethics violation, the Board characterized the case as "a ***straightforward*** law firm conflict of interest situation." 36/

The situation here is just as straightforward as that in *Butterfield*, given that Pillsbury, through its representation of an unsuccessful offeror in this procurement, directly challenges a contract awarded to another of its clients. The applicable rules of professional conduct dictate that, because Pillsbury has an undeniable concurrent conflict of interest that Performant has not waived, Pillsbury must immediately withdraw from representing ConServe in this litigation. 37/ Pillsbury, however, has refused to do so.

Pillsbury was on notice ***over six weeks ago***—when Performant's Chief Operations Officer Jeff Haughton spoke with Pillsbury partner Blair White in mid-January following the Washington Post's reporting of Mr. Canni's disparaging remarks about Performant—that Performant would object to Pillsbury's representation of another client in a bid protest challenging the Department's award to Performant Recovery. Yet rather than find replacement counsel for its other client, ConServe, Pillsbury has chosen to forge ahead despite the obvious conflict of interest, 38/ taking positions in this litigation that are highly prejudicial to Performant.

---

36/   *Id.* at 000142 (emphasis added).

37/   ABA Model Rules r. 1.7 cmt. 4 ("If a conflict arises after representation has been undertaken, the lawyer ordinarily ***must*** withdraw from the representation, unless the lawyer has obtained the informed consent of the client . . . .") (emphasis added).

38/   Insofar as Pillsbury contends that withdrawing at this point would prejudice ConServe, that situation is of Pillsbury's own making due to its failure to timely identify the conflict of interest and then its subsequent failure to promptly address the obvious ethical violation when it was brought to Pillsbury's attention. (The situation is also of ConServe's own making, assuming that Pillsbury satisfied its duty to promptly notify ConServe of the conflict, which should have happened long ago, and ConServe at least acquiesced to Pillsbury's decision to not withdraw.) Moreover, it is unclear what, if any, prejudice ConServe would suffer given the current posture of the case, the Government's agreement to stay performance of the contracts pending resolution of the litigation, the availability of other competent bid protest counsel, and the fact that there are

Given Pillsbury's flaunting of the professional duties that it owes to Performant and its refusal to timely alleviate the conflict, Performant is compelled to ask the Court to address the issue.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Performant Recovery respectfully requests that this Court disqualify Pillsbury from representing ConServe in this case.

Dated: March 2, 2018                          Respectfully submitted,


*Of Counsel*:                                 /s/ Michael McGill
                                              Michael McGill
Thomas L. McGovern III                        HOGAN LOVELLS US LLP
Christine Reynolds                            555 Thirteenth Street NW
Thomas A. Pettit                              Washington, DC 20004
HOGAN LOVELLS US LLP                          Telephone:  (202) 637-8862
                                              Facsimile:  (202) 637-5910
                                              michael.mcgill@hoganlovells.com

                                              *Counsel of Record for Performant Recovery, Inc.*

---

17 other plaintiffs pressing largely the very same issues as ConServe, as reflected in this Court's decision to consolidate the protests.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| FMS INVESTMENT CORP., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civil Action Nos. 18-204C, *et al.* |
| THE UNITED STATES, ) | Judge Thomas C. Wheeler |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| PERFORMANT RECOVERY, INC., *et al.*, ) | |
| ) | |
| Defendant-Intervenors. ) | |

## <u>ORDER</u>

Pursuant to Rule 7(b) of the United States Court of Federal Claims and Rules 1.7(a)(1),

1.10(a), and 1.16(a) of the American Bar Association's Model Rules of Professional

Responsibility, Defendant-Intervenor Performant Recovery, Inc. ("Performant Recovery") has

moved for disqualification of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") as counsel for

plaintiff Continental Service Group, Inc. ("ConServe") in the above-captioned bid protests.

Having considered Performant Recovery's motion, as well as all other relevant materials, it is

hereby

ORDERED that Performant Recovery's motion for disqualification of Pillsbury as

counsel for ConServe in this litigation be and hereby is GRANTED.

_____
Thomas C. Wheeler, Judge

Dated:_____

**TABLE OF CONTENTS**

A.      Pillsbury-Performant Engagement Letter…………………………………………….. 000001

B.      Performant SEC Form 10-Q Filed Nov. 13, 2012………………………………… 000009

C.      Jan. 26, 2018 Invoice from Pillsbury to Performant………………………………..000056

D.      Performant SEC Form 10-Q Filed Nov. 13, 2017………………………………… 000066

E.      ConServe Pre-Filing Notice…………………………………………………………...000121

F.      Feb. 15, 2018 E-mail from M. McGill to T. Canni……………………………………000124

G.      Feb. 19, 2018 E-mail from J. McKay to A. Turnbull……………………………… 000126

H.      Feb. 21, 2018 Letter from M. McGill to T. Canni…………………………………000128

I.      Harris, Wiltshire & Grannis LLP Notice of Representation………………………..000133

J.      Feb. 25, 2018 E-mail from T. Mason to M. McGill……………………………….. 000135

K.      Feb. 27, 2018 Letter from T. Mason to M. McGill……………………………………000138

L.      Report and Recommendation of the Board on Professional Responsibility………..000141

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT A

# Pillsbury-Performant Engagement Letter

EXHIBIT REDACTED IN ITS ENTIRETY AND
REMOVED FROM PUBLICLY AVAILABLE VERSION

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT B

# Performant SEC Form 10-Q
# Filed Nov. 13, 2012

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## FORM 10-Q

---

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from         to**

**Commission File Number: 001-35628**

---

# PERFORMANT FINANCIAL CORPORATION
**(Exact name of registrant as specified in its charter)**

---

| Delaware | 20-0484934 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**Performant Financial Corporation**
**333 North Canyons Parkway**
**Livermore, CA 94551**
**(925) 960-4800**
**(Address, including zip code and telephone number, including area code of registrant's principal executive offices)**

---

Indicate by check mark whether the registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐  No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act). (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐  No ☒

The number of shares of Common Stock outstanding as of November 12, 2012 was 45,320,606.

Table of Contents

**PERFORMANT FINANICAL CORPORATION**
**QUARTERLY REPORT ON FORM 10-Q**
**FOR THE QUARTER ENDED SEPTEMBER 30, 2012**
**INDEX**

|  |  |  | **Page** |
|---|---|---|---|
| **PART I - Financial Information** | | | |
| Item 1. | Consolidated Financial Statements | | |
| | Consolidated Balance Sheets December 31, 2011 and September 30, 2012 (unaudited) | | 3 |
| | Consolidated Statements of Operations Three and Nine months ended September 30, 2011 and 2012 (unaudited) | | 4 |
| | Consolidated Statement of Changes in Redeemable Preferred Stock and Shareholders' (Deficit) Equity Nine months ended September 30, 2012 (unaudited) | | 5 |
| | Consolidated Statements of Cash Flows Nine months ended September 30, 2011 and 2012 (unaudited) | | 6 |
| | Notes to Consolidated Financial Statements Three and Nine months ended September 30, 2011 and 2012 (unaudited) | | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 14 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | | 26 |
| Item 4. | Disclosure Controls and Procedures | | 26 |
| **PART II - Other Information** | | | 26 |
| Item 1. | Legal Proceedings | | 26 |
| Item 1A. | Risk Factors | | 26 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 35 |
| Item 3. | Defaults Upon Senior Securities | | 37 |
| Item 4. | Mine Safety Disclosures | | 37 |
| Item 5. | Other Information | | 37 |
| Item 6. | Exhibits | | 38 |
| Signatures | | | 39 |
| Exhibit Index | | | 40 |

2

**Table of Contents**

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Balance Sheets
(In thousands)
(Unaudited)

| | December 31, 2011 (Restated) | September 30, 2012 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  20,004 | $  32,204 |
| Trade accounts receivable, net of allowance for doubtful accounts of $77 and $64, respectively and estimated allowance for appeals of $484 and $1,112, respectively | 19,398 | 24,132 |
| Deferred income taxes | 5,348 | 5,132 |
| Prepaid expenses and other current assets | 3,292 | 2,451 |
| Income tax receivable | — | 800 |
| Debt issuance costs, current portion | 595 | 1,140 |
| Total current assets | 48,637 | 65,859 |
| Property, equipment, and leasehold improvements, net | 14,915 | 18,237 |
| Identifiable intangible assets, net | 36,516 | 37,177 |
| Goodwill | 81,572 | 81,572 |
| Debt issuance costs | — | 4,112 |
| Other assets | 659 | 671 |
| Total assets | $ 182,299 | $ 207,628 |
| **Liabilities, Redeemable Preferred Stock and Stockholders' (Deficit) Equity** | | |
| Liabilities: | | |
| Current liabilities: | | |
| Current maturities of notes payable | $    8,134 | $   11,040 |
| Accrued salaries and benefits | 7,138 | 6,344 |
| Accounts payable | 60 | 1,578 |
| Other current liabilities | 8,475 | 8,213 |
| Income taxes payable | 470 | — |
| Deferred revenue | 2,214 | 2,499 |
| Estimated liability for appeals | 450 | 3,655 |
| Total current liabilities | 26,941 | 33,329 |
| Notes payable, net of current portion | 87,051 | 139,489 |
| Line of credit, drawn | 8,198 | — |
| Deferred compensation | 1,761 | — |
| Deferred income taxes | 14,647 | 14,604 |
| Other liabilities | 1,158 | 2,890 |
| Total liabilities | 139,756 | 190,312 |
| Commitments and contingencies | | |
| Redeemable preferred stock | | |
| Series A convertible preferred stock, $0.0001 par value. Authorized, 18,000 and zero shares; issued and outstanding, 5,296 and zero shares at December 31, 2011 and September 30, 2012, respectively | 58,248 | — |
| Stockholder's (deficit) equity: | | |
| Due from stockholders | (2,266) | — |
| Common stock, $0.0001 par value. Authorized, 60,000 and 500,000 shares at December 31, 2011 and September 30, 2012, respectively; issued and outstanding 37,667 and 45,321 shares at December 31, 2011 and September 30, 2012, respectively | 4 | 4 |
| Additional paid-in capital | 19,371 | 35,186 |
| Accumulated deficit | (32,814) | (17,874) |
| Total stockholders' (deficit) equity | (15,705) | 17,316 |
| Total liabilities, redeemable preferred stock, and stockholders' (deficit) equity | $ 182,299 | $ 207,628 |

*The number of Series A convertible preferred shares outstanding, Series A Convertible Preferred Stock, the number of common shares outstanding, Common stock, and Additional paid-in capital have been restated to give effect to the two-for-one split. See Note 1 for additional information.*

*See accompanying notes to consolidated financial statements.*

3

**Table of Contents**

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Operations
(In thousands)
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2012 | 2011 | 2012 |
| Revenues | $42,009 | $53,400 | $120,333 | $154,099 |
| Operating expenses: | | | | |
| Salaries and benefits | 16,456 | 21,003 | 50,437 | 59,426 |
| Other operating expenses | 13,613 | 18,240 | 35,193 | 53,053 |
| Total operating expenses | 30,069 | 39,243 | 85,630 | 112,479 |
| Income from operations | 11,940 | 14,157 | 34,703 | 41,620 |
| Debt extinguishment costs | — | — | — | (3,679) |
| Interest expense | (3,366) | (3,175) | (10,213) | (9,329) |
| Interest income | 31 | 2 | 94 | 64 |
| Income before provision for income taxes | 8,605 | 10,984 | 24,584 | 28,676 |
| Provision for income taxes | 3,439 | 4,601 | 9,839 | 11,698 |
| Net income | $ 5,166 | $ 6,383 | $ 14,745 | $ 16,978 |
| Accrual for preferred stock dividends | 1,660 | — | 4,785 | 2,038 |
| Net income available to common shareholders | $ 3,506 | $ 6,383 | $ 9,960 | $ 14,940 |
| Net income per share attributable to common shareholders (see Note 1) | | | | |
| Basic | $   0.08 | $   0.14 | $   0.23 | $   0.34 |
| Diluted | $   0.08 | $   0.13 | $   0.22 | $   0.32 |
| Weighted average shares (see Note 1) | | | | |
| Basic | 42,962 | 44,337 | 42,962 | 43,519 |
| Diluted | 45,024 | 47,811 | 44,646 | 47,164 |

*Net income per share attributable to common shareholders and weighted average shares outstanding have been restated to give effect to the two-for-one split. See Note 1 for additional information*

*See accompanying notes to consolidated financial statements.*

4

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Changes in Redeemable Preferred Stock and Stockholders' (Deficit) Equity
For the Nine Months Ended September 30, 2012
(In thousands)
(Unaudited)

| | Redeemable Preferred Stock Series A Convertible Preferred Stock | | Series A Convertible Preferred Stock | | Due From Stockholders | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | Shares | Amount | | | |
| Balance, December 31, 2011 (as Reported) | — | $ — | 5,296 | $ 58,248 | $ (2,266) | 37,667 | $ 4 | $ 19,371 | $ (32,814) | $ 42,543 |
| Adjustment | 5,296 | 58,248 | (5,296) | (58,248) | — | — | — | — | — | (58,248) |
| Balance, December 31, 2011 (as Restated) | 5,296 | $ 58,248 | — | $ — | $ (2,266) | 37,667 | $ 4 | $ 19,371 | $ (32,814) | $(15,705) |
| Increase in redemption value of Series A preferred stock | — | 2,038 | — | — | — | — | — | — | (2,038) | (2,038) |
| Conversion of Series A Preferred Stock to Series B Preferred Stock which was immediately redeemed for cash | — | (60,286) | — | — | — | — | — | — | — | — |
| Conversion of Series B Preferred Stock to common stock | (5,296) | — | — | — | — | 5,296 | — | — | — | — |
| Exercise of stock options | — | — | — | — | — | 213 | — | 137 | — | 137 |
| Issuance of stock | — | — | — | — | — | 2,243 | — | 15,640 | — | 15,640 |
| Purchase of treasury stock | — | — | — | — | — | (98) | — | (1,225) | — | (1,225) |
| Interest on notes receivable from stockholders | — | — | — | — | (57) | — | — | — | — | (57) |
| Repayment of note receivable from stockholders | — | — | — | — | 2,323 | — | — | — | — | 2,323 |
| Stock-based compensation expense | — | — | — | — | — | — | — | 883 | — | 883 |
| Income tax benefit from employee stock options | — | — | — | — | — | — | — | 380 | — | 380 |
| Net income | — | — | — | — | — | — | — | — | 16,978 | 16,978 |
| Balance, September 30, 2012 | — | $ — | — | $ — | $ — | 45,321 | $ 4 | $ 35,186 | $ (17,874) | $ 17,316 |

*The number of Series A convertible preferred shares outstanding. Series A convertible preferred stock, the number of common shares outstanding, Common stock, and Additional paid-in capital have been restated to give effect to the two-for-one stock split. See Note 1 for additional information.*

*See accompanying notes to consolidated financial statements.*

5

000014

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
(In thousands)
(Unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2011 | 2012 |
| **Cash flows from operating activities:** | | |
| Net income | $ 14,745 | $ 16,978 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Loss on disposal of asset | — | 52 |
| Depreciation and amortization | 5,712 | 7,002 |
| Write-off of unamortized debt issuance costs | — | 335 |
| Deferred income taxes | — | 173 |
| Stock-based compensation | 83 | 883 |
| Interest expense from debt issuance costs and amortization of discount note payable | 947 | 946 |
| Interest income on notes receivable from stockholders | (80) | (57) |
| Changes in operating assets and liabilities: | | |
| Trade accounts receivable | (3,216) | (4,734) |
| Prepaid expenses and other current assets | 1,937 | 841 |
| Income tax receivable | — | (800) |
| Other assets | 30 | (12) |
| Accrued salaries and benefits | 1,141 | (794) |
| Accounts payable | 363 | 1,518 |
| Other current liabilities | 4,434 | (1,262) |
| Income taxes payable | — | (90) |
| Deferred revenue | — | 285 |
| Estimated liability for appeals | — | 3,205 |
| Other liabilities | (91) | 306 |
| Net cash provided by operating activities | 26,005 | 24,775 |
| **Cash flows from investing activities:** | | |
| Purchase of property, equipment, and leasehold improvements | (4,237) | (7,355) |
| Purchase of perpetual software license and computer equipment | — | (837) |
| Net cash used in investing activities | (4,237) | (8,192) |
| **Cash flows from financing activities:** | | |
| Borrowing under notes payable | — | 156,000 |
| Borrowing under line of credit | — | 4,500 |
| Redemption of preferred stock | — | (60,286) |
| Repayment of notes payable | (11,074) | (100,656) |
| Repayment of line of credit | — | (12,698) |
| Debt issuance costs paid | — | (3,061) |
| Proceeds from exercise of stock options | — | 137 |
| Proceeds from issuance of stock | — | 12,844 |
| Receipt from stockholders | — | 2,323 |
| Payment to stockholders | — | (1,761) |
| Purchase of treasury stock | — | (1,225) |
| Payment of purchase obligation | — | (500) |
| Net cash used in financing activities | (11,074) | (4,383) |
| Net increase in cash and cash equivalents | 10,694 | 12,200 |
| Cash and cash equivalents at beginning of year | 11,078 | 20,004 |
| Cash and cash equivalents at end of year | $ 21,772 | $ 32,204 |
| Supplemental disclosures of cash flow information: | | |
| Cash paid for income taxes | $ 9,425 | $ 12,415 |
| Cash paid for interest | 8,489 | 8,358 |
| Cash paid as debt extinguisment | — | 3,344 |
| Supplemental disclosure of non-cash investing and financing activities: | | |
| Obligation to sellers of perpetual license | $ — | $ 3,250 |
| Issuance of common stock as part of debt issuance costs | — | 2,796 |

*See accompanying notes to consolidated financial statements.*

000015

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**

Notes To Consolidated Financial Statements

For the Three and Nine Months Ended September 30, 2011 and 2012

(Unaudited)

1.   **Organization and Description of Business**

(a)   *Basis of Presentation and Organization*

The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. Generally Accepted Accounting Principles, or U.S. GAAP, for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and notes required by U.S. GAAP for complete financial statements. In the opinion of management, the unaudited interim financial statements furnished herein include all adjustments necessary (consisting only of normal recurring adjustments) for a fair presentation of our and our subsidiaries' financial position at September 30, 2012, the results of our operations for the three and nine months ended September 30, 2011 and 2012 and cash flows for the nine months ended September 30, 2011 and 2012. Interim financial statements are prepared on a basis consistent with our annual financial statements. The financial statements included herein should be read in conjunction with the consolidated financial statements for the years ended December 31, 2009, 2010 and 2011 and notes included in our Registration Statement on Form S-1, which is referred to as our Registration Statement.

We are a leading provider of technology-enabled recovery and analytics services in the United States. Our services help identify, restructure and recover delinquent or defaulted assets and improper payments for both government and private clients in a broad range of markets. Our clients typically operate in complex and regulated environments and outsource their recovery needs in order to reduce losses on billions of dollars of defaulted student loans, improper healthcare payments and delinquent state tax and federal treasury receivables. We generally provide our services on an outsourced basis, where we handle many or all aspects of the clients' recovery processes.

Our consolidated financial statements include the operations of Performant Financial Corporation (PFC), its wholly owned subsidiary Performant Business Services, Inc., and its wholly owned subsidiaries Performant Recovery, Inc. (Recovery), and Performant Technologies, Inc. Effective August 13, 2012, we changed the name of our wholly owned subsidiary from DCS Business Services, Inc. (DCSBS) to Performant Business Services, Inc., and DCSBS' wholly owned subsidiaries from Diversified Collection Services, Inc. (DCS), and Vista Financial, Inc. (VFI), to Performant Recovery, Inc., and Performant Technologies, Inc., respectively. PFC is a Delaware corporation headquartered in California and was formed in 2003. Performant Business Services, Inc. is a Nevada corporation founded in 1997. Recovery is a California corporation founded in 1976. Performant Technologies, Inc. is a California corporation that was formed in 2004. All significant intercompany balances and transactions have been eliminated in consolidation.

We are managed and operated as one business, with a single management team that reports to the Chief Executive Officer.

The preparation of the consolidated financial statements in conformity with U.S. GAAP, requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities, primarily accounts receivable, intangible assets, estimated liability for appeals, accrued expenses, and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting periods. Our actual results could differ from those estimates.

As more fully described in Note 1 to the financial statements included in our Registration Statement, the accompanying financial statements have been restated to correct an error in the balance sheet presentation of the Company's Series A Convertible Preferred Stock. The purpose of the restatement is to classify the balances outside of permanent equity, as they are redeemable at the option of the holders. The following financial statement line items were affected (in thousands):

| December 31, 2011 | As originally reported | As adjusted | Effect of the change |
|---|---|---|---|
| Redeemable preferred stock | $    — | $ 58,248 | $ 58,248 |
| Total stockholders equity/deficit | 42,543 | (58,248) | (15,705) |

7

000016

Table of Contents

**(b)**   *Stock Split*

On July 26, 2012, the Company effected a two-for-one stock split of the Company's shares of Common Stock. Accordingly, all per share amounts, average shares outstanding, shares outstanding, and equity based compensation presented in the consolidated financial statements and notes have been adjusted retroactively to reflect the stock split. Shareholders' deficit has been retroactively adjusted to give effect to the stock split for all periods presented by reclassifying the par value of the additional shares issued in connection with the stock split to additional paid-in capital. Concurrently with the stock split, the authorized Common Stock was increased from 25,000,000 shares to 60,000,000 shares. On August 15, 2012, the authorized Common Stock was increased to 500,000,000 shares and the authorized preferred stock was increased to 50,000,000 shares.

**(c)**   *Revenues, Accounts Receivable, and Estimated Liability for Appeals*

Revenue is recognized upon the collection of defaulted loan and debt payments. Loan rehabilitation revenue is recognized when the rehabilitated loans are sold (funded) by clients. Incentive revenue is recognized upon receipt of official notification of incentive award from customers. Under the Company's RAC contract with CMS, the Company recognizes revenues when the healthcare provider has paid CMS for a given claim or offset. Providers have the right to appeal a claim and may pursue additional appeals if the initial appeal is found in favor of CMS. The Company accrues an estimated liability for appeals based on the amount of commissions received which are subject to appeal and which the Company estimates are probable of being returned to providers following successful appeal. At December 31, 2011, a total of $0.9 million was presented as an allowance against accounts receivable, representing the Company's estimate of claims that may be overturned. Of this amount, $0.5 million was related to amounts in accounts receivable and $0.5 million was related to commissions which had already been received. The Company has changed the presentation in its financial statements of its estimated liability with respect to commissions which have been received, from an allowance against accounts receivable to a liability captioned "estimated liability for appeals" at December 31, 2011. The $0.5 million balance at December 31, 2011, and the $3.7 million balance as of September 30, 2012, represents the Company's best estimate of the probable amount of losses related to appeals of claims for which commissions were previously collected and recognized as revenues at such dates. In addition to the $3.7 million amount accrued at September 30, 2012, the Company estimates that it is reasonably possible that it could be required to pay an additional amount up to approximately $1.5 million as a result of potentially successful appeals. To the extent that required payments by the Company exceed the amount accrued, revenues in the applicable period would be reduced by the amount of the excess.

**2.   Acquisition**

In February 2012, we purchased a perpetual software license and computer equipment from HOPS, a non-public Florida company, in a transaction valued at $3.7 million. The purchase agreement calls for a total of $4.0 million in cash payments to be made over an approximate 3 year period, beginning with an initial payment of $0.8 million which was made in February 2012, followed by quarterly payments of $0.3 million. As part of the transaction valuation, these payments were discounted to a present value using an estimate of our incremental borrowing rate. The purchase is being treated as a business combination for accounting purposes; the following table summarizes the estimated fair values of the assets acquired at the acquisition date (in thousands):

|  | February 1, 2012 |
|---|---|
| Computer equipment | $      280 |
| Identifiable intangible assets | 3,400 |
| Total identifiable assets acquired | $   3,680 |

The following table summarizes the fair values of the intangible assets acquired from HOPS (in thousands):

|  | February 1, 2012 |
|---|---|
| Perpetual license | $   3,250 |
| Customer relationships | 150 |
| Total | $   3,400 |

The acquired intangible assets will be amortized over their estimated useful lives, which are 5 and 4 years for the perpetual license and customer relationships, respectively.

8

Table of Contents

The following represents our pro forma Consolidated Statements of Income as if HOPS had been included in our consolidated results for the three and nine months ending September 30, 2011 (in thousands, except per share data):

| (unaudited) | For the Three Months Ended September 30, 2011 | | For the Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
| Total revenue | $ | 42,323 | $ | 121,275 |
| Net income available to common shareholders | $ | 3,174 | $ | 8,964 |
| Earnings per share attributable to common shareholders | | | | |
| Basic | $ | 0.07 | $ | 0.21 |
| Diluted | $ | 0.07 | $ | 0.20 |

**3.   Property, Equipment, and Leasehold Improvements**

Property, equipment, and leasehold improvements consist of the following at December 31, 2011 and September 30, 2012 (in thousands):

| | December 31, 2011 | | September 30, 2012 | |
|---|---|---|---|---|
| Land | $ | 1,767 | $ | 1,767 |
| Building and leasehold improvements | | 4,797 | | 5,019 |
| Furniture, equipment, and automobile | | 3,612 | | 4,125 |
| Computer hardware and software | | 31,197 | | 37,803 |
| Total | | 41,373 | | 48,714 |
| Less accumulated depreciation and amortization | | (26,458) | | (30,477) |
| Total | $ | 14,915 | $ | 18,237 |

Depreciation and amortization expense of property, equipment and leasehold improvements was $1.2 million and $1.5 million for the three months ended September 30, 2011 and 2012, respectively, and $3.4 million and $4.3 million for the nine months ended September 30, 2011 and 2012, respectively.

**4.   Identifiable Intangible Assets**

Identifiable intangible assets consist of the following at December 31, 2011 and September 30, 2012 (in thousands):

| December 31, 2011 | Gross Amounts | Accumulated Amortization | Net |
|---|---|---|---|
| Amortizable intangibles: | | | |
| Customer contracts and related relationships | $62,046 | $ (25,530) | $36,516 |
| Covenants not to compete | 3,600 | (3,600) | — |
| Total intangible assets | $65,646 | $ (29,130) | $36,516 |

| September 30, 2012 | Gross Amounts | Accumulated Amortization | Net |
|---|---|---|---|
| Amortizable intangibles: | | | |
| Customer contracts and related relationships | $62,198 | $ (27,838) | $34,360 |
| Covenants not to compete | 3,600 | (3,600) | — |
| Perpetual license | 3,250 | (433) | 2,817 |
| Total intangible assets | $69,048 | $ (31,871) | $37,177 |

9

Table of Contents

For the three and nine months ended September 30, 2011, amortization expense related to intangible assets amounted to $0.8 million and $2.3 million respectively. For the three and nine months ended September 30, 2012, amortization expense related to intangible assets amounted to $0.9 million and $2.7 million, respectively.

The estimated aggregate amortization expense for each of the five following fiscal years is as follows (in thousands):

| Year Ending December 31, | Amount |
|---|---|
| Remainder of 2012 | $ 933 |
| 2013 | 3,731 |
| 2014 | 3,731 |
| 2015 | 3,731 |
| 2016 | 3,696 |
| Thereafter | 21,355 |
| Total | $37,177 |

**5.   Credit Agreement**

On March 19, 2012 we recapitalized, entering into a credit agreement (the Agreement) consisting of a Term A Loan of $57.0 million, a Term B Loan of $79.5 million, and a revolving credit facility of $11.0 million. In connection with the recapitalization, our old credit facility, scheduled to mature in 2012, was extinguished, and our indebtedness on the old facility was paid in full. On June 28, 2012, the Agreement was amended to increase the Term B Loan to $99 million. Payments under the Agreement are as follows (in thousands):

| Year Ending December 31, | Amount |
|---|---|
| Remainder of 2012 | $ 2,760 |
| 2013 | 11,040 |
| 2014 | 11,040 |
| 2015 | 11,040 |
| 2016 | 11,040 |
| Thereafter | 103,609 |
| Total | $150,529 |

Proceeds from the new Term A, Term B, and revolving credit facility borrowings were used along with $14.5 million of our cash to repay our old notes payable and line of credit in the amount of $103.4 million and to redeem 3,897,000 shares of Series A Convertible Preferred Stock plus accrued dividends for a total of $44.0 million. Fees paid in conjunction with the credit agreement totaled $6.5 million, including an agency fee for $1.5 million to an entity associated with our majority stockholder, and an agreement to grant 215,000 shares of Common Stock valued at approximately $2.8 million to an investment bank acting as advisor.

Proceeds from the additional Term B borrowings were used to redeem the remaining 1,399,000 shares of Series A Convertible Preferred Stock outstanding plus accrued dividends for a total of $16.3 million. Fees paid in conjunction with the credit agreement totaled $0.8 million, including an agency fee for $0.2 million to an entity associated with our majority stockholder. Remaining proceeds of $2.3 million were used along with existing cash to pay off the line of credit balance of $4.5 million.

The Term A Loan is charged interest either at Prime (subject to a 2.50% floor) +4.25% or LIBOR (subject to a 1.50% floor) +5.25%, which was 6.75% at September 30, 2012. The Term A loan requires quarterly payments of $2.5 million beginning in June 2012, with the remaining outstanding principal balance due March 19, 2017.

The Term B loan is charged interest at Prime +4.75% (subject to a 2.50% floor) or LIBOR (subject to a 1.50% floor) +5.75% which was 7.25% at September 30, 2012. The Term B loan requires quarterly payments of $0.2 million beginning in June 2012, with the outstanding principal balance due March 19, 2018.

10

Table of Contents

We have a line of credit under the Agreement which allows for borrowings of up to $11 million. Borrowings accrue interest at Prime + 4.25% or LIBOR + 5.25%, which was 7.5% at September 30, 2012. Both the Prime and the LIBOR alternatives are subject to minimum rate floors. There were no outstanding borrowings under this line of credit at September 30, 2012, and a letter of credit outstanding in the amount of $1.4 million, leaving remaining borrowing capacity under the line of credit of $9.6 million at September 30, 2012. The line of credit expires in March 19, 2017.

The Agreement contains certain restrictive financial covenants, which require, among other things, that we meet a minimum fixed charge coverage ratio and maximum total debt to EBITDA ratio.

During our March 19, 2012 recapitalization, debt issuance costs of $5.0 million were capitalized, including $1.5 million of agent fees paid to an entity associated with our majority stockholder, and $0.8 million paid to third parties for legal and other services and a grant of 215,044 shares of Common Stock issued as compensation to an investment bank acting as financial advisor valued at approximately $2.8 million, based upon a price of $13 per share. These costs are being amortized to expense over the life of the new loans.

We capitalized an additional $0.8 million related to our June 28, 2012 amendment to the Agreement, which included $0.2 million of agent fees paid to an entity associated with our majority stockholders, and $0.04 million paid to third parties for legal and other services. Debt issuance costs are being amortized to interest expense over the life of the new loans. Accumulated amortization of debt issuance costs amounted to $0.6 million at September 30, 2012.

Debt extinguishment costs of $3.7 million were expensed, including $3.3 million of fees paid to lenders, and $0.3 million of unamortized debt issuance costs associated with the old credit facility.

**6.   Commitments under Operating Leases**

We lease office facilities and certain equipment. In January 2012, we renewed two of our facilities leases and entered into a new lease agreement for approximately 6,000 square feet in Livermore, California.

Future minimum rental commitments under non-cancelable leases as of September 30, 2012 are as follows (in thousands):

| Year Ending December 31, | Amount |
|---|---|
| Remainder of 2012 | $   413 |
| 2013 | 1,620 |
| 2014 | 1,643 |
| 2015 | 1,272 |
| 2016 | 838 |
| Thereafter | 628 |
| Total | $6,414 |

Lease expense was $0.5 million and $1.5 million respectively, for the three and nine months ended September 30, 2011, and $0.6 million and $1.9 million for the three and nine months ended September 30, 2012, respectively.

**7.   Capital Stock**

**(a)   Redemption of Series A Preferred Stock**

On March 19, 2012, we recapitalized. As part of the recapitalization, 3,897,000 shares of Series A Convertible Preferred Stock were converted into conversion units, which consisted of one share of Series B Preferred Stock and one share of Common Stock. The Series B Preferred shares plus accrued dividends were redeemed for cash of $44 million, and 3,897,000 shares of Common Stock were issued to the holders of the redeemed Series A Convertible Preferred Stock.

In June 2012, the remaining 1,399,000 shares of Series A Convertible Preferred Stock were converted into conversion units of one share of Series B Preferred Stock and one share of Common Stock. The shares Series B Preferred Stock plus accrued dividends were redeemed for cash of $16.3 million and 1,399,000 shares of Common Stock were issued to the holders of the redeemed Series A Convertible Preferred Stock.

11

000020

Table of Contents

*(b)    Issuance of Shares of Common Stock as Compensation*

As part of the March 19, 2012 recapitalization, the Company issued to its financial advisor as compensation in connection with the debt portion of the recapitalization 215,044 shares of Common Stock valued at approximately $2.8 million based upon a price of $13 per share. This amount represents debt issuance costs and is being amortized to expense over the 5 to 6 year life of the loans described in Note 5.

*(c)    Initial Public Offering*

In August 2012, we completed our initial public offering (IPO) in which we issued and sold 1,924,000 shares of Common Stock at a public offering price of $9.00 per share. We received net proceeds of $12.8 million after deducting underwriter discounts and commissions of $1.0 million and other offering expenses of approximately $3.4 million. In addition, a financial advisor to the Company was paid $0.9 million through the issuance of 103,500 shares of Common Stock valued at $9.00 per share.

**8.    Stock-based Compensation**

Total stock-based compensation expense charged as salaries and benefits expense in the consolidated statements of operations was $0.03 million and $0.08 million, respectively, for the three and nine months ended September 30, 2011 and $0.8 million and $0.9 million, respectively for the three and nine months ended September 30, 2012.

Options have been granted, exercised, and canceled as follows:

| | Outstanding Options | Weighted Average Exercise Price per Share | Weighted Average Remaining Contractual Life |
|---|---|---|---|
| Outstanding at December 31, 2011 | 5,664,750 | $    0.80 | 5.2 |
| Granted | 2,464,109 | 10.40 | |
| Forfeited | (2,700) | 1.31 | |
| Exercised | (213,440) | 0.64 | |
| Outstanding at September 30, 2012 | 7,912,719 | $    3.79 | 6.1 |
| Exercisable at September 30, 2012 | 4,791,943 | $    0.61 | 4.0 |

The Company's board of directors and stockholders approved the 2012 Stock Incentive Plan, or the 2012 Plan, in July 2012. The 2012 Plan became effective immediately prior to the Company's August 9, 2012 effective date, and will expire on July 19, 2022, unless extended by approval of the Company's board of directors and stockholders. The 2012 Plan provides for the granting of incentive stock options within the meaning of Section 422 of the Code to employees and the granting of nonstatutory stock options, restricted stock, stock appreciation rights, stock unit awards and cash-based awards to employees, non-employee directors and consultants. The Company has reserved 4,300,000 shares of common stock under the 2012 Plan.

On August 10, 2012, the Company's board of directors awarded a total of 2,364,000 options to employees. We estimated the fair value of the August 10, 2012 grant to be $11.4 million using a Black-Scholes option pricing model, and the following assumptions:

| | |
|---|---|
| Expected dividend yield | — |
| Risk-free interest rate | 1.01% |
| Expected volatility | 48.3% |
| Expected life | 6.5 |

The estimated value of the August 10, 2012 grant is being amortized to salaries and benefits expense over a five year period.

**9.    Income Taxes**

Our effective income tax rate changed slightly from 40.0% for the nine months ended September 30, 2011 to 40.8% for the nine months ended September 30, 2012.

We file income tax returns with the U.S. federal government and various state jurisdictions. We are no longer subject to U.S. federal income tax examinations for years before 2008. We operate in a number of state and local jurisdictions, most of which have never audited our records. Accordingly, we are subject to state and local income tax examinations based upon the various statutes of limitations in each jurisdiction. We are currently being examined by the IRS and California.

**10.    Earnings per Share**

Basic income per share is calculated by dividing net income available to holders of Common Stock by the sum of the weighted average number of shares of Common Stock outstanding during the period plus the weighted average number of shares of Series A Convertible Preferred Stock outstanding during the period. The shares of Series A Convertible Preferred Stock are included in the basic denominator because they can be converted into shares of Common Stock for no cash consideration, and are thus considered outstanding shares of Common Stock in computing basic earnings per share. Diluted income per share is calculated by dividing net income available to common shareholders by the weighted average number of shares of Common Stock and dilutive common share equivalents outstanding during the period. Common share equivalents consist of stock options and restricted stock units. The Company excluded from the calculation of diluted earnings per share for the three months and nine months ended September 30, 2012 options to purchase 2,364,000 shares whose combined exercise price, unamortized fair value and excess tax benefits were greater in each of those periods than the average price for the Company's common stock because their effect would be anti-dilutive.

12

Table of Contents

The following table reconciles the basic to diluted weighted average shares outstanding using the treasury stock method (shares in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2011 | 2012 | 2011 | 2012 |
|---|---|---|---|---|
| Weighted average shares outstanding - basic | 42,962 | 44,337 | 42,962 | 43,519 |
| Diluted effect of stock options | 2,062 | 3,474 | 1,684 | 3,645 |
| Weighted average shares outstanding - diluted | 45,024 | 47,811 | 44,646 | 47,164 |

**11.   Related Party Transactions**

Our notes payable, both before and after the recapitalization of March 19, 2012, are held by a number of lenders, some of whom also invested in our stock. As a result, these entities are considered related parties. Interest expense under these arrangements totaled $3.4 million and $10.2 million for the three and nine months ended September 30, 2011, respectively, and $3.1 million and $9.2 million for the three and nine months ended September 30, 2012, respectively, and debt extinguishment expense associated with the recapitalization totaled $3.7 million for the nine months ended September 30, 2012.

In an agreement dated April 13, 2012, the Company and an affiliate of Parthenon Capital Partners terminated an existing advisory services agreement, which called for quarterly payments of $0.1 million. As part of the April 13, 2012 termination agreement, the Company agreed to pay Parthenon Capital $1.3 million in equal quarterly installments of $0.1 million beginning in April 2012, provided that the remaining balance will become due and payable immediately upon the closing of an IPO or the sale of the Company. The Company paid two quarterly installments of $0.1 million and paid the remaining balance of $1.1 million on August 15, 2012, the date the IPO closed. The Company accrued expense of $1.3 million in the second quarter of 2012 to account for the termination agreement. In addition, the agreement specifies that the affiliate will be due a fee equal to 1% of the aggregate gross proceeds of an IPO offering or 1% of the aggregate consideration paid in connection with the sale of the Company, as applicable. The Company expensed and paid $0.9 million to Parthenon Capital Partners in August 2012 upon successful closing of the IPO.

**12.   Subsequent Events**

We have evaluated subsequent events through the date these consolidated financial statements were issued and there are no other events that have occurred that would require adjustments or disclosure to our consolidated financial statements.

13

Table of Contents

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion in conjunction with our condensed consolidated financial statements (unaudited) and related notes included elsewhere in this report. This report on Form 10-Q contains forward-looking statements that involve risks and uncertainties. The words "believe," "may," "will," "estimate," "continue," "anticipate," "design," "intend," "expect" and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in "Risk Factors" under Item 1A of Part II of this report. In light of these risks, uncertainties and assumptions, the forward-looking events and trends discussed in this report may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward-looking statements include, but are not limited to, statements about: our opportunities and expectations for growth in the student lending, healthcare and other markets; anticipated trends and challenges in our business and competition in the markets in which we operate; our client relationships and future growth opportunities; the adaptability of our technology platform to new markets and processes; our ability to invest in and utilize our data and analytics capabilities to expand our capabilities; our belief that we benefit from a significant degree of revenue visibility; our growth strategy of expanding in our existing markets and considering strategic alliances or acquisitions; our ability to meet our liquidity and working capital needs; maintaining, protecting and enhancing our intellectual property; our expectations regarding future expenses; expected future financial performance; and our ability to comply with and adapt to industry regulations and compliance demands. The forward-looking statements in this report speak only as of the date hereof. We expressly disclaim any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.*

### Overview

We provide technology-enabled recovery and related analytics services in the United States. Our services help identify and recover delinquent or defaulted assets and improper payments for both government and private clients in a broad range of markets. Our clients typically operate in complex and regulated environments and outsource their recovery needs in order to reduce losses on billions of dollars of defaulted student loans, improper healthcare payments and delinquent state tax and federal treasury and other receivables. We generally provide our services on an outsourced basis, where we handle many or all aspects of our clients' recovery processes.

Our revenue model is generally success-based as we earn fees on the aggregate amount of funds that we enable our clients to recover. Our services do not require any significant upfront investments by our clients and offer our clients the opportunity to recover significant funds otherwise lost. Because our model is based upon the success of our efforts and the dollars we enable our clients to recover, our business objectives are aligned with those of our clients and we are generally not reliant on their spending budgets. Furthermore, our business model does not require significant capital expenditures and we do not purchase loans or obligations. We believe we benefit from a significant degree of revenue visibility due to predictable recovery outcomes in a substantial portion of our business.

### Recent Developments

On November 13, 2012, we announced that we received notification that, due to the effects of Hurricane Sandy, we must temporarily suspend certain Medicare audit and recovery activities in three of the twelve states where we are the prime Medicare audit contractor. We will be unable to submit requests for medical records from healthcare providers in the states of New York, New Jersey and Connecticut and will not be permitted to submit claims to providers in these states for at least 30 days. Providers located within designated Federal disaster areas will receive this relief for a period of at least 60 days. We do not believe the temporary suspension of audit and recovery activities will have a material impact on our expected fourth quarter and 2012 full year results due to our understanding that claims made prior to November 7, 2012 will continue to be processed. However, we also expect that there may be a delay in the recognition of some revenues that would have otherwise been recorded during the first quarter of 2013.

This report corrects an error in our earnings press release dated on November 5, 2012 with respect to the number of diluted common shares outstanding for the three months and nine months ended September 30, 2012. The actual number of diluted common shares for the three months and nine months ended September 30, 2012 are 47,811 thousand and 47,146 thousand, respectively rather than 48,674 thousand and 47,133 thousand, respectively. This error did not impact any other amounts in the unaudited consolidated financial statements reported in the earnings press release.

### Sources of Revenues

We derive our revenues from services for clients in a variety of different markets. These markets include our two largest markets, student lending and healthcare, as well as our other markets which include but are not limited to delinquent state taxes and federal Treasury and other receivables.

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| | | | *(in thousands)* | | |
| Student Lending | $ 84,056 | $103,672 | $122,253 | $ 91,578 | $ 98,232 |
| Healthcare | — | 1,821 | 21,549 | 14,406 | 39,093 |
| Other | 25,776 | 18,026 | 19,172 | 14,349 | 16,774 |
| Total Revenues | $109,832 | $123,519 | $162,974 | $120,333 | $154,099 |

14

000023

Table of Contents

### Student Lending

We derive the majority of our revenues from the recovery of student loans. These revenues are contract-based and consist primarily of contingency fees based on a specified percentage of the amount we enable our clients to recover. Our contingency fee percentage for a particular recovery depends on the type of recovery facilitated. We also receive incremental performance incentives based upon our performance as compared to other contractors with the Department of Education, which are comprised of additional inventory allocation volumes and incentive fees.

We believe the size and the composition of our student loan inventory at any point provides us with a significant degree of revenue visibility for our student loan revenues. Based on data compiled from over two decades of experience with the recovery of defaulted student loans, at the time we receive a placement of student loans, we are able to make a reasonably accurate estimate of the recovery outcomes likely to be derived from such placement and the revenues we are likely able to generate based on the anticipated recovery outcomes.

There are five potential outcomes to the student loan recovery process from which we generate revenues. These outcomes include: full repayment, recurring payments, rehabilitation, loan restructuring and wage garnishment. Of these five potential outcomes, our ability to rehabilitate defaulted student loans is the most significant component of our revenues in this market. Generally, a loan is considered successfully rehabilitated after the student loan borrower has made nine consecutive qualifying monthly payments and our client has notified us that it is recalling the loan. Once we have structured and implemented a repayment program for a defaulted borrower, we (i) earn a percentage of each periodic payment collected up to and including the final periodic payment prior to the loan being considered "rehabilitated" by our clients, and (ii) if the loan is "rehabilitated," then we are paid a one-time percentage of the total amount of the remaining unpaid balance. The fees we are paid vary by recovery outcome as well as by contract. For non-government-supported student loans we are generally only paid contingency fees on two outcomes: full repayment or recurring repayments. The table below describes our typical fee structure for each of these five outcomes.

#### Student Loan Recovery Outcomes

| Full Repayment | Recurring Payments | Rehabilitation | Loan Restructuring | Wage Garnishment |
|---|---|---|---|---|
| • Repayment in full of the loan | • Regular structured payments, typically according to a renegotiated payment plan | • After a defaulted borrower has made nine consecutive recurring payments, the loan is eligible for rehabilitation | • Restructure and consolidate a number of outstanding loans into a single loan, typically with one monthly payment and an extended maturity | • If we are unable to obtain voluntary repayment, payments may be obtained through wage garnishment after certain administrative requirements are met |
| • We are paid a percentage of the full payment that is made | • We are paid a percentage of each payment | • We are paid based on a percentage of the overall value of the rehabilitated loan | • We are paid based on a percentage of overall value of the restructured loan | • We are paid a percentage of each payment |

For certain guaranty agency, or GA, clients, we have entered into Master Service Agreements, or MSAs. Under these agreements, clients provide their entire inventory of outsourced loans or receivables to us for recovery on an exclusive basis, rather than just a portion, as with traditional contracts that are split among various service providers. In certain circumstances, we engage subcontractors to assist in the recovery of a portion of the client's portfolio. We also receive success fees for the recovery of loans under MSAs and our revenues under MSA arrangements include fees earned by the activities of our subcontractors. As of September 30, 2012, we had four MSA clients in the student loan market.

### Healthcare

We derive revenues from the healthcare market primarily from our Recovery Audit Contractor, or RAC, contract, under which we are the prime contractor responsible for detecting improperly paid Part A and Part B Medicare claims in 12 states in the Northeastern United States. Revenues earned under the RAC contract are driven by the identification of improperly paid Medicare claims through both automated and manual review of such claims. We are paid contingency fees by the Centers for Medicare and Medicaid Services, or CMS, based on a percentage of the dollar amount of claims recovered by CMS as a result of our efforts. We recognize revenue when the provider pays CMS or incurs an offset against future Medicare claims. The revenues we recognize are net of our estimate of claims that will be overturned by appeal following payment by the provider.

15

000024

Table of Contents

To accelerate our ability to provide Medicare audit and recovery services across our region following our award of the RAC contract, we outsourced certain aspects of our healthcare recovery process to three different subcontractors. Two of these subcontractors provide a specific service to us in connection with our claims recovery process, and one subcontractor is engaged to provide all of the audit and recovery services for claims within a portion of our region. According to CMS, the geographic area allocated to this subcontractor represented approximately 17% of the total Medicare spending in our region in 2009. We recognize all of the revenues generated by the claims recovered through these subcontractor relationships, and we recognize the fees that we pay to these subcontractors in our expenses.

### Other

We also derive revenues from the recovery of delinquent state taxes, and federal Treasury and other receivables, default aversion services for certain clients including financial institutions and the licensing of hosted technology solutions to certain clients. For our hosted technology services, we license our system and integrate our technology into our clients' operations, for which we are paid a licensing fee. Our revenues for these services include contingency fees, fees based on dedicated headcount to our clients and hosted technology licensing fees.

## Operating Metrics

We monitor a number of operating metrics in order to evaluate our business and make decisions regarding our corporate strategy. These key metrics include Placement Volume, Placement Revenue as a Percentage of Placement Volume, Net Claim Recovery Volume and Claim Recovery Fee Rate.

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| | 2009 | 2010 | 2011 | 2011 | 2012 |
| | | | (dollars in thousands) | | |
| **Student Lending:** | | | | | |
| Placement Volume | $4,920,506 | $5,294,971 | $6,241,483 | $4,747,518 | $3,600,495 |
| Placement Revenue as a percentage of Placement Volume | 1.71% | 1.96% | 1.96% | 1.93% | 2.73% |
| **Healthcare:** | | | | | |
| Net Claim Recovery Volume | $    — | $  15,494 | $  188,573 | $  125,689 | $  343,794 |
| Claim Recovery Fee Rate | — | 11.76% | 11.43% | 11.46% | 11.37% |

*Placement Volume.* Our Placement Volume represents the dollar volume of defaulted student loans first placed with us during the specified period by public and private clients for recovery. Placement Volume allows us to measure and track trends in the amount of inventory our clients in the student lending market are placing with us during any period. The revenues associated with the recovery of a portion of these loans may be recognized in subsequent accounting periods, which assists management in estimating future revenues and in allocating resources necessary to address current Placement Volumes.

*Placement Revenue as a Percentage of Placement Volume.* Placement Revenue as a Percentage of Placement Volume is calculated by dividing revenues recognized during the specified period by Placement Volume first placed with us during that same period. This metric is subject to some level of variation from period to period based upon certain timing differences including, but not limited to, the timing of placements received by us within a period and the fact that a significant portion of revenues recognized in a current period is often generated from the Placement Volume received in prior periods. However, we believe that this metric provides a useful indication of the revenues we are generating from Placement Volumes on an ongoing basis and provides management with an indication of the relative efficiency of our recovery operations from period to period.

*Net Claim Recovery Volume.* Our Net Claim Recovery Volume measures the dollar volume of improper Medicare claims that we have recovered for CMS during the applicable period net of any amount that we have reserved to cover appeals by healthcare providers. We are paid recovery fees as a percentage of this recovered claim volume. We calculate this metric by dividing our claim recovery revenues by our Claim Recovery Fee Rate. This metric shows trends in the volume of improper payments within our region and allows management to measure our success in finding these improper payments, over time.

*Claim Recovery Fee Rate.* Our Claim Recovery Fee Rate represents the weighted-average percentage of our fees compared to amounts recovered by CMS. This percentage primarily depends on the method of recovery and, in some cases, the type of improper payment that we identify. This metric helps management measure the amount of revenues we generate from Net Claim Recovery Volume.

16

Table of Contents

## Costs and Expenses

We generally report two categories of operating expenses: salaries and benefits and other operating expense. Salaries and benefits expenses consist primarily of salaries and performance incentives paid and benefits provided to our employees. Other operating expense includes expenses related to our use of subcontractors, other production related expenses, including costs associated with data processing, retrieval of medical records, printing and mailing services, amortization and other outside services, as well as general corporate and administrative expenses. In addition to our main components of operating expenses, in 2011 we incurred a $13.4 million impairment expense to write off the carrying amount of the trade name intangible asset due to our plan to retire our Diversified Collection Services, Inc. trade name, which we report as impairment of trade name. We expect a significant portion of our expenses to increase as we grow our business. However, we expect certain expenses, including our corporate and general administrative expenses, to grow at a slower rate than our revenues. As a result, and over the long term, we expect our overall expenses to modestly decline as a percentage of revenues.

We also expect to incur additional professional fees and other expenses resulting from future expansion and the compliance requirements of operating as a public company, including increased audit and legal expenses, investor relations expenses, increased insurance expenses, particularly for directors' and officers' liability insurance, and the costs of complying with Section 404 of the Sarbanes-Oxley Act. While these costs may initially increase as a percentage of our revenues, we expect that in the future these expenses will increase at a slower rate than our overall business volume, and that they will eventually represent a smaller percentage of our revenues.

## Factors Affecting Our Operating Results

Our results of operations are influenced by a number of factors, including allocation of placement volume, claim recovery volume, contingency fees, regulatory matters, effects of client concentration and macroeconomic factors.

### *Allocation of Placement Volume*

Our clients have the right to unilaterally set and increase or reduce the volume of defaulted student loans or other receivables that we service at any given time. In addition, many of our recovery contracts for student loans and other receivables are not exclusive, with our clients retaining multiple service providers to service portions of their portfolios. Accordingly, the number of delinquent student loans or other receivables that are placed with us may vary from time to time, which may have a significant effect on the amount and timing of our revenues. We believe the major factors that influence the number of placements we receive from our clients in the student loan market include our performance under our existing contracts and our ability to perform well against competitors for a particular client. To the extent that we perform well under our existing contracts and differentiate our services from those of our competitors, we may receive a relatively greater number of placements under these existing contracts and may improve our ability to obtain future contracts from these clients and other potential clients. Further, delays in placement volume, as well as acceleration of placement volume, from any of our large clients may cause our revenues and operating results to vary from quarter to quarter.

Typically we are able to anticipate with reasonable accuracy the timing and volume of placements of defaulted student loans and other receivables based on historical patterns and regular communication with our clients. Occasionally, however, placements are delayed due to factors outside of our control. For example, a technology system upgrade at the Department of Education, which began in September 2011, has significantly decreased the volume of student loan placements by the Department of Education to all recovery vendors, including us, since that time. As a result, the dollar amount of placements that we received from the Department of Education in the nine months ended September 30, 2012 was 45% lower than in the comparable nine months ended September 30, 2011. While it is expected that we and the other Department of Education recovery vendors will receive substantially larger than normal placements once this situation is resolved, the large majority of the revenues from these placements will be delayed because we do not begin to earn rehabilitation revenues from a given placement until at least nine months after receipt of the placement. In addition, since September 2011, the Department of Education has not been able to process a portion of rehabilitated student loans and accordingly we have not been able to recognize a significant amount of the revenues associated with rehabilitation of loans for this client. However, the Department of Education has continued to pay us based on invoices submitted and we have recorded these cash receipts as deferred revenues on our balance sheet. This has led to deferred revenues of $2.5 million as of September 30, 2012. The Department of Education started processing a portion of rehabilitated student loans beginning in April 2012, and we recognized $2.8 million in deferred revenues during the three months ended September 30, 2012 related to loans that were rehabilitated during the current and prior periods.

The amount of placement volume that we receive is also dependent on the client relationships that we maintain. We analyze the profitability of each of our student lending clients, and sometimes determine that our resources servicing a specific client should be allocated elsewhere. As a result of this process, we decided to terminate an unprofitable contract with a commercial bank, which we do not expect will have a significant effect on revenues or net income in future periods. Our decision to terminate this contract, together with the decrease in placements from the Department of Education, as discussed above, account for substantially all of the 24% decrease in Placement Volume in the nine months ended September 30, 2012 compared to the prior year period.

17

000026

Table of Contents

*Claim Recovery Volume*

While we are entitled to review Medicare records for all Part A and Part B claims in our region, we are not permitted to identify an improper claim unless that particular type of claim has been pre-approved by CMS to ensure compliance with applicable Medicare payment policies, as well as national and local coverage determinations. The growth of our revenues is determined primarily by the aggregate volume of Medicare claims in our region and our ability to identify improper payments within these claims. However, the long-term growth of these revenues will also be affected by the scope of the issues pre-approved by CMS.

Further, our claim recovery volume is currently impacted by a system adjustment that is being implemented by CMS for its Periodic Interim Payment providers, or PIP providers. PIP providers are reimbursed for Medicare claims through different processes than other healthcare providers, and CMS is in the process of making certain system adjustments in order to allow these claims to be processed. Prior to April 2012, we were not permitted to audit Medicare claims for these PIP providers, which we estimated to account for approximately 20% of Medicare claims in our region. Since April 2012, we have identified improper payments to PIP providers, but these payments have not yet been processed by CMS. As a result, we have not recognized any revenues from identified improper payments to PIP providers, but we have incurred expenses related to these claims. We estimate that this delayed our recognition of more than $2 million in revenues in the three months ended September 30, 2012. CMS remains in the process of implementing the necessary changes to its systems that would allow these claims to be processed. While we believe that this delay in processing is temporary, we are uncertain of when processing will begin and the failure of CMS to process these claims will adversely affect our revenues until this is resolved.

*Contingency Fees*

Our revenues consist primarily of contract-based contingency fees. The contingency fee percentages that we earn are set by our clients or agreed upon during the bid process, and may change from time to time either under the terms of existing contracts or pursuant to the terms of contract renewals. For example, we have been advised that our contractual arrangement with the Department of Education may be modified as a result of the Department of Education's decision to have its recovery vendors promote income based repayment, or IBR, to defaulted student loans. The IBR program provides flexibility on the required monthly payment for student loan borrowers at an amount intended to be affordable based on a borrower's income and family size. As a result of the increased application of the IBR program to defaulted student loans, we expect that there will be an increase in the number of loans that become eligible for rehabilitation because more defaulted student loan borrowers will be able to make qualifying payments. In this connection, we have been advised that the Department of Education may make certain changes to its contractual arrangements with its recovery vendors, although the nature of the changes remains uncertain. Any changes in the contingency fee percentages or other compensation terms that we are paid under existing and future contracts could have a significant impact on our revenues.

*Regulatory Matters*

Each of the markets which we serve is highly regulated. Accordingly, changes in regulations that affect the types of loans, receivables and claims that we are able to service or the manner in which any such delinquent loans, receivables and claims can be recovered will affect our revenues and results of operations. For example, the passage of the Student Aid and Fiscal Responsibility Act, or SAFRA, in 2010 had the effect of transferring the origination of all government-supported student loans to the Department of Education, thereby ending all student loan originations guaranteed by the GAs. Loans guaranteed by the GAs represented approximately 70% of government-supported student loans originated in 2009. While the GAs will continue to service existing outstanding student loans for years to come, this legislation will over time shift the portfolio of student loans that we manage toward the Department of Education, and further concentrate our sources of revenues and increase our reliance on our relationship with the Department of Education. In addition, our entry into the healthcare market was facilitated by passage of the Tax Relief and Health Care Act of 2006, which mandated CMS to contract with private firms to audit Medicare claims in an effort to increase the recovery of improper Medicare payments. Any changes to the regulations that affect the student loan industry or the recovery of defaulted student loans or the Medicare program generally or the audit and recovery of Medicare claims could have a significant impact on our revenues and results of operations.

*Client Concentration*

Our revenues from the student loan market depend on our ability to maintain our contracts with some of the largest providers of student loans. In 2011, four providers of student loans each accounted for more than 10% of our revenues during such period and they collectively accounted for 61% of our total revenues during this period. Our contracts with these clients entitle them to unilaterally terminate their contractual relationship with us at any time without penalty. If we lose one of our significant clients, including if one of our significant clients is consolidated by an entity that does not use our services, if the terms of compensation for our services change or if there is a reduction in the level of placements provided by any of these clients, our revenues could decline.

Our contract with CMS for the recovery of improper Medicare payments began generating significant revenues during 2011 and represented 25% of our total revenues in the three months ended September 30, 2012. This contract expires

Table of Contents

in 2014 and we expect that CMS will issue a request for proposals for the new RAC contract prior to December 31, 2012. We expect that this process will be competitive, and we believe that CMS will announce the award of new RAC contracts in early 2013. While we believe our performance under the existing agreement and the experience we have gained in performing this contract position us well to renew the agreement, failure to renew the agreement or renewal on substantially less favorable terms could significantly harm our revenues and results of operations.

### Macroeconomic Factors

Certain macroeconomic factors influence our business and results of operations. These include the increasing volume of student loan originations in the U.S. as a result of increased tuition costs and student enrollment, the default rate of student loan borrowers, the growth in Medicare expenditures resulting from increasing healthcare costs, as well as the fiscal budget tightening of federal, state and local governments as a result of general economic weakness and lower tax revenues.

### Critical Accounting Policies

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. In many instances, we could have reasonably used different accounting estimates, and in other instances changes in the accounting estimates are reasonably likely to occur from period-to-period. Accordingly, actual results could differ significantly from the estimates made by our management. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

### Revenue Recognition

The majority of our contracts are contingency fee based. We recognize revenues on these contingency fee based contracts when third-party payors remit payments to our clients or remit payments to us on behalf of our clients, and, consequently, the contingency is deemed to have been satisfied. Under our RAC contract with CMS, we recognize revenues when the healthcare provider has paid CMS for a given claim or incurs an offset against future Medicare claims. Providers have the right to appeal a claim and may pursue additional appeals if the initial appeal is found in favor of CMS. We accrue an estimated liability for appeals based on the amount of commissions received which are subject to appeal and which we estimate may be returned to providers following successful appeal. This estimated liability for appeals is an offset to revenues on our income statement. Our estimates are based on our historical experience with appeals activity under our CMS contract since January 2010. During the three months ended September 30, 2012, we reserved an amount equal to 15% of gross revenues from our CMS contract, and for the nine months ended September 30, 2012, we reserved an amount equal to 13% of gross revenues from our CMS contract. We have increased our estimated liability for appeal in 2012 due to recent trends in our historical data related to the likelihood of successful appeals. Commencing on December 31, 2011, we established a separate line item in the current liabilities section of our balance sheet entitled "Estimated liability for appeals" to reflect our estimate of this liability. The $3.7 million balance as of September 30, 2012, represents our best estimate of the probable amount of losses related to appeals of claims for which commissions were previously collected and recognized as revenues. We estimate that it is reasonably possible that we could be required to pay up to an additional approximately $1.5 million as a result of potentially successful appeals. To the extent that required payments by us related to successful appeals exceed the amount accrued, revenues in the applicable period would be reduced by the amount of the excess. We similarly accrue an allowance against accounts receivable related to commissions yet to be collected, based on the same estimates used to establish the estimated liability for appeals of commissions received. Our inability to correctly estimate the estimated liabilities and allowance against accounts receivable could adversely affect our revenues in future periods.

### Goodwill

We periodically review the carrying value of intangible assets not subject to amortization, including goodwill, to determine whether an impairment may exist. GAAP requires that goodwill and certain intangible assets not subject to amortization be assessed annually for impairment using fair value measurement techniques.

Specifically, goodwill impairment is determined using a two-step test. The first step of the goodwill impairment test is used to identify potential impairment by comparing the fair value of a reporting unit with its book value, including goodwill. If the fair value of the reporting unit exceeds its book value, goodwill is considered not impaired and the second step of the impairment test is unnecessary. If the book value of the reporting unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the book value of that goodwill. If the book value of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. The implied fair value of goodwill is determined in the same manner as the amount of

19

Table of Contents

goodwill recognized in a business combination. That is, the fair value of the reporting unit is allocated to all of the assets and liabilities of that unit as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid to acquire the reporting unit. In September 2011, the Financial Accounting Standards Board, or FASB, issued Accounting Standards Update, or ASU, 2011-08, *Intangibles—Goodwill and Other (Topic 350): Testing Goodwill for Impairment*. This ASU permits an entity to make a qualitative assessment of whether it is more likely than not that a reporting unit's fair value is less than its carrying amount before applying the two-step goodwill impairment test. If an entity concludes it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, it need not perform the two-step impairment test. The ASU permits early adoption, and based on our qualitative assessment we concluded that we are not required to perform the two-step impairment test at December 31, 2011.

### Impairments of Depreciable Intangible Assets

We evaluate depreciable intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Depreciable intangible assets consist of client contracts and related relationships, and are being amortized over their estimated useful life, which is generally 20 years. We evaluate the client contracts intangible at the individual contract level. The recoverability of such assets is measured by a comparison of the carrying amount of the assets to future undiscounted net cash flows expected to be generated by the assets. If the assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. There was no impairment expense for depreciable intangible assets in 2010 or 2011. In 2009, an impairment charge of $2.6 million was recognized to account for our decision to discontinue a relationship with a client.

## Results of Operations

### Three Months Ended September 30, 2011 compared to the Three Months Ended September 30, 2012

The following table represents our historical operating results for the periods presented:

| | Three Months Ended September 30, | |
| | 2011 | 2012 |
| | (in thousands) | |
|---|---|---|
| **Consolidated Statement of Operations Data:** | | |
| Revenues | $42,009 | $53,400 |
| Operating expenses: | | |
| Salaries and benefits | 16,456 | 21,003 |
| Other operating expense | 13,613 | 18,240 |
| Total operating expenses | 30,069 | 39,243 |
| Income from operations | 11,940 | 14,157 |
| Interest expense | (3,366) | (3,175) |
| Interest income | 31 | 2 |
| Income before provision for income taxes | 8,605 | 10,984 |
| Provision for income taxes | 3,439 | 4,601 |
| Net income | $ 5,166 | $ 6,383 |
| Accrual for preferred stock dividends | 1,660 | — |
| Net income available to common shareholders | $ 3,506 | $ 6,383 |

### Revenues

Total revenues were $53.4 million for the three months ended September 30, 2012, an increase of $11.4 million or 27.1%, compared to total revenues of $42.0 million for the three months ended September 30, 2011. This increase in revenues is primarily due to an increase of $8.4 million in revenues received from CMS under our RAC contract as a result of higher claim recovery volumes and an increase of $2.0 million generated from a new default-aversion service contract in the other markets that we serve. Revenues from student lending increased by 2.5% during the quarter to $33.0 million from $32.2 million in the prior year period.

20

Table of Contents

### Salaries and Benefits

Salaries and benefits expense was $21.0 million for the three months ended September 30, 2012, an increase of $4.5 million, or 27.6%, compared to salaries and benefits expense of $16.4 million for the three months ended September 30, 2011. This increase is primarily due to hiring of new employees to provide services under our RAC contract with CMS, an increase in expenses associated with the engagement of additional software engineers to assist in the integration of a newly acquired software license and an increase in expenses associated with the hiring of additional administrative employees.

### Other Operating Expense

Other operating expense was $18.2 million for the three months ended September 30, 2012, an increase of $4.6 million, or 34.0%, compared to other operating expense of $13.6 million for the three months ended September 30, 2011. This increase is primarily due to (i) an additional $2.8 million of subcontractor fees incurred in connection with increased services provided under the RAC contract and MSA contracts and (ii) $0.9 million paid to an affiliate of Parthenon Capital Partners (such entity and its affiliates individually and collectively referred to as "Parthenon Capital Partners") at the closing of our initial public offering in connection with the termination of an advisory services agreement. In addition, we incurred $0.3 million in additional payments to healthcare providers for the retrieval of medical records in accordance with the RAC contract due to an increase in the amount of Medicare claims we audited during the three months ended September 30, 2012. Payments to healthcare providers for the retrieval of medical records are incurred in the ordinary course of business under the RAC contract in order to complete our audit process and are directly correlated to the amount of Medicare claims we audit. We expect these payments for the retrieval of medical records to increase over time as the amount of Medicare claims we audit under the RAC contract increases.

### Income from Operations

As a result of the factors described above, income from operations was $14.2 million for the three months ended September 30, 2012, compared to $12.0 million for the three months ended September 30, 2011, representing an increase of $2.2 million, or 18.6%.

### Interest Expense

Interest expense was $3.2 million for the three months ended September 30, 2012 compared to $3.4 million for the three months ended September 30, 2011, representing a decrease of 5.7% due to lower interest rates under the new credit agreement as compared to the interest rates under our old credit agreement.

### Income Taxes

Income tax expense was $4.6 million for the three months ended September 30, 2012 compared to $3.4 million for the three months ended September 30, 2011, representing an increase of 38.8% consistent with the increase in income before provision for income taxes. Our effective income tax increased to 41.9% for the three months ended September 30, 2012 from 40.0% for the three months ended September 30, 2011.

### Net Income

As a result of the factors described above, net income was $6.4 million for the three months ended September 30, 2012, which represented an increase of $1.2 million compared to net income of $5.2 million for the three months ended September 30, 2011.

21

Table of Contents

*Nine Months Ended September 30, 2011 compared to the Nine Months Ended September, 2012*

The following table represents our historical operating results for the periods presented:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2012 |
| | (in thousands) | |
| **Consolidated Statement of Operations Data:** | | |
| Revenues | $ 120,333 | $ 154,099 |
| Operating expenses: | | |
|     Salaries and benefits | 50,437 | 59,426 |
|     Other operating expense | 35,193 | 53,053 |
| Total operating expenses | 85,630 | 112,479 |
|     Income from operations | 34,703 | 41,620 |
| Debt extinguishment costs | — | (3,679) |
| Interest expense | (10,213) | (9,329) |
| Interest income | 94 | 64 |
|     Income before provision for income taxes | 24,584 | 28,676 |
| Provision for income taxes | 9,839 | 11,698 |
|     Net income | $ 14,745 | $ 16,978 |
| Accrual for preferred stock dividends | 4,785 | 2,038 |
|     Net income available to common shareholders | $ 9,960 | $ 14,940 |

### Revenues

Total revenues were $154.1 million for the nine months ended September 30, 2012, an increase of $33.8 million, or 28.1%, compared to total revenues of $120.3 million for the nine months ended September 30, 2011. This increase in revenues is primarily due to an increase of $24.7 million in revenues received from CMS under our RAC contract as a result of higher claim recovery volumes and an increase of $2.5 million generated from a new default-aversion service contract in the other markets we serve. Revenues from student lending increased by $ 6.4 million, or 6.9%, to $98.2 million from $91.8 million in the comparable prior year period.

### Salaries and Benefits

Salaries and benefits expense was $59.4 million for the nine months ended September 30, 2012, an increase of $9.0 million, or 17.8%, compared to salaries and benefits expense of $50.4 million for the nine months ended September 30, 2011. This increase is primarily due to hiring of new employees to provide services under our RAC contract with CMS, an increase in expenses associated with the engagement of additional software engineers to assist in the integration of a newly acquired software license and an increase in expenses associated with the hiring of additional administrative employees.

### Other Operating Expense

Other operating expense was $53.0 million for the nine months ended September 30, 2012, an increase of $17.9 million, or 51.0%, compared to other operating expense of $35.2 million for the nine months ended September 30, 2011. This increase is primarily due to (i) an additional $9.6 million of subcontractor fees incurred in connection with increased services provided under the RAC contract and MSA contracts and (ii) a $1.3 million expense incurred as the result of the termination of an advisory services agreement with Parthenon Capital Partners, and an additional $0.9 million paid to Parthenon Capital Partners at the closing of our initial public offering also as a result of the termination of the advisory services agreement. In addition, the Company incurred an increase of $1.6 million in payments to healthcare providers for the retrieval of medical records in accordance with the RAC contract due to an increase in the amount of Medicare claims we audited during the nine months ended September 30, 2012.

### Income from Operations

As a result of the factors described above, income from operations was $41.6 million for the nine months ended September 30, 2012, compared to $34.7 million for the nine months ended September 30, 2011, representing an increase of $6.9 million, or 20.0%.

### Debt Extinguishment Costs

As a result of the entry into our new credit facility and the repayment of all amounts owed under our then existing credit facility in March 2012, we incurred debt extinguishment costs of $3.7 million, comprised of approximately $3.3 million in fees paid to the lenders in connection with our new credit facility and approximately $0.3 million of unamortized debt issuance costs associated with our old credit facility.

### Interest Expense

Interest expense was $9.3 million for the nine months ended September 30, 2012 compared to $10.2 million for the nine months ended September 30, 2011 representing a decrease of 8.7% due to lower interest rates under the new credit agreement as compared to the interest rates under our old credit agreement.

000031

Table of Contents

*Income Taxes*

Income tax expense was $11.7 million for the nine months ended September 30, 2012 compared to $9.8 million for the nine months ended September 30, 2011 representing an increase of 18.9% consistent with the increase in income before provision for income taxes. Our effective income tax increased to 40.8% for the nine months ended September 30, 2012 from 40.0% for the nine months ended September 30, 2011.

*Net Income*

As a result of the factors described above, net income was $17.0 million for the nine months ended September 30, 2012, which represented an increase of $2.2 million compared to net income of $14.7 million for the nine months ended September 30, 2011. Excluding the debt extinguishment costs incurred in March 2012, net income would have been $20.7 million for the nine months ended September 30, 2012.

## Adjusted EBITDA and Adjusted Net Income

To provide investors with additional information regarding our financial results, we have disclosed in the table below and in this report adjusted EBITDA and adjusted net income, both of which are non-GAAP financial measures. We have provided a reconciliation below of adjusted EBITDA to net income and adjusted net income to net income, the most directly comparable GAAP financial measure to these non-GAAP financial measures.

We have included adjusted EBITDA and adjusted net income in this report because they are key measures used by our management and board of directors to understand and evaluate our core operating performance and trends and to prepare and approve our annual budget. Accordingly, we believe that adjusted EBITDA and adjusted net income provide useful information to investors and analysts in understanding and evaluating our operating results in the same manner as our management and board of directors.

Our use of adjusted EBITDA and adjusted net income has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and adjusted EBITDA does not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- adjusted EBITDA does not reflect interest expense on our indebtedness;

- adjusted EBITDA does not reflect changes in, or cash requirements for, our working capital needs;

- adjusted EBITDA does not reflect tax payments;

- adjusted EBITDA and adjusted net income do not reflect the potentially dilutive impact of equity-based compensation;

- adjusted EBITDA and adjusted net income do not reflect the impact of certain non-operating expenses resulting from matters we do not consider to be indicative of our core operating performance; and

- other companies may calculate adjusted EBITDA and adjusted net income differently than we do, which reduces its usefulness as a comparative measure.

Because of these limitations, you should consider adjusted EBITDA and adjusted net income alongside other financial performance measures, including net income and our other GAAP results. The following tables present a reconciliation of adjusted EBITDA and adjusted net income for each of the periods indicated:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Reconciliation of Adjusted EBITDA:** | **2011** | **2012** | **2011** | **2012** |
| Net income | $ 5,166 | $ 6,383 | $14,745 | $16,978 |
| Provision for income taxes | 3,439 | 4,601 | 9,839 | 11,698 |
| Interest expense | 3,366 | 3,175 | 10,213 | 9,329 |
| Interest income | (31) | (2) | (94) | (64) |
| Debt extinguishment costs[(1)] | — | — | — | 3,679 |
| Depreciation and amortization | 1,953 | 2,445 | 5,712 | 7,002 |
| Non-core operating expenses[(3)] | 1,856 | — | 2,438 | 47 |
| Advisory fee[(4)] | 109 | 932 | 326 | 2,641 |
| Stock based compensation | 28 | 734 | 83 | 883 |
| Adjusted EBITDA | $15,886 | $18,268 | $43,262 | $52,193 |

23

000032

Table of Contents

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2012 | 2011 | 2012 |
| **Reconciliation of Adjusted Net Income:** | | | | |
| Net income | $ 5,166 | $ 6,383 | $14,745 | $16,978 |
| Debt extinguishment costs[1] | — | — | — | 3,679 |
| Non–core operating expenses[2] | 1,856 | — | 2,438 | 47 |
| Advisory fee[3] | 109 | 931 | 327 | 2,640 |
| Stock based compensation | 28 | 734 | 83 | 883 |
| Amortization of intangibles[4] | 760 | 932 | 2,282 | 2,741 |
| Deferred financing amortization costs[5] | 307 | 344 | 946 | 865 |
| Tax adjustments[6] | (1,224) | (1,177) | (2,430) | (4,341) |
| Adjusted net income | $ 7,002 | $ 8,147 | $18,391 | $23,492 |

(1)  Represents debt extinguishment costs comprised of approximately $3.3 million of fees paid to lenders in connection with our new credit facility and approximately $0.3 million of unamortized debt issuance costs in connection with our old credit facility.

(2)  Represents professional fees and settlement costs related to strategic corporate development activities and a $1.2 million legal settlement in 2011.

(3)  Represents expenses incurred under an advisory services agreement with Parthenon Capital Partners, which was terminated in April 2012. See Note 11 "Related Party Transactions."

(4)  Represents amortization of capitalized expenses related to the acquisition of Performant by an affiliate of Parthenon Capital Partners in 2004, the impairment expense to reduce the carrying amount of the intangible asset due to our decision to terminate a client contract in 2009 and an acquisition in the first quarter of 2012 to enhance our analytics capabilities.

(5)  Represents amortization of capitalized financing costs related to debt offerings conducted in 2009, 2010 and 2012.

(6)  Represents tax adjustments assuming a marginal tax rate of 40%.

**Liquidity and Capital Resources**

Our principal sources of liquidity are cash flows from operations, term loans, and the proceeds received from our recent initial public offering, or IPO. Cash and cash equivalents, which totaled $32.2 million as of September 30, 2012, consist primarily of cash on deposit with banks. We expect that operating cash flows will continue to be a primary source of liquidity for our operating needs. There are currently no borrowings outstanding under our revolving credit facility other than a $1.4 million letter of credit. Due to our operating cash flows, our existing cash and cash equivalents and availability under our revolving credit facility, we believe that we have the ability to meet our working capital and capital expenditure needs for the foreseeable future.

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2012 |
| | (in thousands) | |
| Net cash provided by operating activities | $ 26,005 | $24,775 |
| Net cash used in investing activities | (4,237) | (8,192) |
| Net cash used in financing activities | (11,074) | (4,383) |

*Cash flows from operating activities*

Operating activities provided $24.8 million of cash during the nine months ended September 30, 2012, a decrease of $1.2 million, compared to cash provided by operating activities of $26.0 million for the nine months ended September 30, 2011. Net income for the nine months ended September 30, 2012 was $17.0 million compared to $14.7 million for the same period in 2011. The $1.2 million decrease in cash from operating activities despite the $2.3 million increase in net income during the nine months ended September 30, 2012 is due largely to three factors. First, higher revenue levels for the nine months ended September 30, 2012 led to $1.5 million of higher growth in accounts receivable as compared to the accounts receivable in the comparable period in 2011. Second, cash used to purchase prepaid contracts and services in the nine months ended September 30, 2012 increased, with the 2012 year-to-date reduction in prepaids being $1.1 million lower than the corresponding reduction in prepaid contracts and services in the comparable period in 2011. Third, cash used to pay accrued salary and benefits equaled $0.8 million in the nine months ended September 30, 2012, as compared to $1.1 million in accrued salary and benefits for the comparable period in 2011.

*Cash flows from investing activities*

Investing activities resulted in cash outflow of $8.2 million during the nine months ended September 30, 2012. The primary uses of cash associated with investing activities were $7.1 million for the acquisition of computer equipment and software, to enhance our technology platform and improve our telecommunications systems and $0.8 million for the purchase of a perpetual software license.

*Cash flows from financing activities*

For the nine months ended September 30, 2012, our primary financing activities were $156 million in proceeds from term loans, $12.8 million of net proceeds from our IPO which completed in August 2012, and $4.5 million in revolving credit facility borrowings. These proceeds were offset by $100.7 million used for the repayment of our old notes payable and repayment of principal on our new term loans, $12.7 million used for the repayment of our old and new lines of credit, $60.3 million used to redeem 3.9 million shares of preferred stock, and $3.1 million used for debt issuance costs.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements.

24

Table of Contents

*Long-term Debt*

On March 19, 2012, we, through our wholly owned subsidiary, entered into a $147.5 million credit agreement with Madison Capital Funding LLC as administrative agent, ING Capital LLC as syndication agent, and other lenders party thereto. The senior credit facility consists of (i) a $57.0 million term A loan, (ii) a $79.5 million term B loan, and (iii) a $11.0 million revolving credit facility, which had a borrowing capacity of $9.6 million as of June 30, 2012. On June 28, 2012, we increased the amount of our borrowings under our term B loan by $19.5 million. We may also request the lenders to increase the size of the term B loan or other term loans by up to an additional $10.5 million at any time prior to March 19, 2014.

All borrowings under the credit agreement bear interest at a rate per annum equal to an applicable margin plus, at our option, either (i) a base rate determined by reference to the highest of (a) the prime rate published in the Wall Street Journal or another national publication, (b) the federal funds rate plus 0.5%, and (c) 2.5% or (ii) a London Interbank Offered Rate, or Libor, rate determined by reference to the highest of (a) a Libor rate published in Reuters or another national publication and (b) 1.5%. The term A loan and the revolving credit facility have an applicable margin of 4.25% for base rate loans and 5.25% for Libor rate loans. The term B loan has an applicable margin of 4.75% for base rate loans and 5.75% for Libor rate loans. The minimum per annum interest rate that we are required to pay is 6.75% for the term A loan and revolving credit facility and 7.25% for the term B loan. Interest is due at the end of each month for base rate loans and at the end of each Libor period for Libor rate loans unless the Libor period is greater than 3 months, in which case interest is due at the last day of each 3-month interval of such Libor period.

The credit agreement requires us to prepay the two term loans on a prorated basis and then to prepay the revolving credit facility under certain circumstances: (i) with 100% of the net cash proceeds of any asset sale or other disposition of assets by us or our subsidiaries where the net cash proceeds exceed $1 million, (ii) with a percentage of our annual excess cash flow each year where such percentage ranges from 25%-75% depending on our total debt to EBITDA ratio reduced by any voluntary prepayments that are made on our term loans during the same period and (iii) with any net cash proceeds from a qualified initial public offering by us, less net proceeds applied to redeem any outstanding preferred equity or convertible debt, to pay a common shareholder dividend not to exceed $20 million or, if we comply with an adjusted EBITDA ratio set forth in the agreement, to our cash balances in an amount not to exceed $75 million. We applied the proceeds from our recent initial public offering to our cash balances.

We have to abide by certain negative covenants for our credit agreement, which limit the ability for our subsidiaries and us to:

- incur additional indebtedness;

- create or permit liens;

- pay dividends or other distributions to our equity holders;

- purchase or redeem certain equity interests of our equity holders, including any warrants, options and other security rights;

- pay management fees or similar fees to any of our equity holders;

- make any redemption, prepayment, defeasance, repurchase or any other payment with respect to any subordinated debt;

- consolidate or merge;

- sell assets, including the capital stock of our subsidiaries;

- enter into transactions with our affiliates;

- enter into different business lines; and

- make investments.

The credit agreement also requires us to meet certain financial covenants, including maintaining a fixed charge coverage ratio and a total debt to EBITDA ratio as such terms are defined in our credit agreement. These financial covenants are tested at the end of each quarter beginning on September 30, 2012. The table below further describes these financial covenants, as well as our current status under these covenants as of September 30, 2012.

| Financial Covenant | Covenant Requirement | Actual Ratio at September 30, 2012 |
|---|---|---|
| Fixed charge coverage ratio (minimum) | 1.20 to 1.0 | 1.9 |
| Total debt to EBITDA ratio (maximum) | 3.25 to 1.0 | 2.17 |

25

Table of Contents

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not hold or issue financial instruments for trading purposes. We conduct all of our business in U.S. currency and therefore do not have any direct foreign currency risk. We do have exposure to changes in interest rates with respect to the borrowings under our senior secured credit facility, which bear interest at a variable rate based on the prime rate or LIBOR. For example, if the interest rate on our borrowings increased 100 basis points (1%) from the credit facility floor of 1.5%, our annual interest expense would increase by approximately $1.5 million. In July 2012, we entered into an interest rate cap agreement per the terms of our senior secured credit agreement. The interest rate cap agreement is effective beginning in October 2012, and matures in October 2014, with a total notional amount of $75 million and a cap on LIBOR at 2.0%. If the LIBOR rate were to increase by 100 basis points (1.0%) above the credit facility floor of 1.5% for a year, we would receive a payment from the interest rate cap of approximately $0.4 million.

While we currently hold our excess cash in an operating account, in the future we may invest all or a portion of our excess cash in short-term investments, including money market accounts, where returns may reflect current interest rates. As a result, market interest rate changes impact our interest expense and interest income. This impact will depend on variables such as the magnitude of interest rate changes and the level of our borrowings under our credit facility or excess cash balances.

## ITEM 4. DISCLOSURE CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We maintain a system of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

Management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of September 30, 2012. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were functioning effectively at the reasonable assurance level as of September 30, 2012. This conclusion takes into account the remedial measures implemented during the three months ended September 30, 2012, as discussed below.

### Changes in Internal Control over Financial Reporting

In June 2012, our independent registered public accounting firm determined that we had incorrectly accounted for our mandatorily redeemable preferred stock, which required audit adjusting entries for the three-year period ended December 31, 2011. Our failure to detect this error was deemed to be a deficiency in internal control and this deficiency was considered to be a material weakness. Subsequent to June 30, 2012, we implemented additional internal control policies and procedures that we believe have remediated this material weakness. As of the date of this filing, management has implemented the following corrective actions:

- We have established new processes that require thoroughly researching and analyzing all new accounting policies and revisiting accounting policies set for existing transactions when changes in the business or reporting requirements occur or are expected to occur.

- We have developed relationships with outside consultants with specialized knowledge in technical accounting and have engaged such consultants when necessary to bolster our technical accounting expertise.

There was no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the three months ended September 30, 2012, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting, other than those noted above.

## PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

We are involved in various legal proceedings that arise from our normal business operations. These actions generally derive from our student loan recovery services, and generally assert claims for violations of the Fair Credit Reporting Act or similar federal and state consumer credit laws. While litigation is inherently unpredictable, we believe that none of these legal proceedings, individually or collectively, will have a material adverse effect on our business, our financial condition or our results of operations.

## ITEM 1A. RISK FACTORS

*If any of the following risks actually occurs, our business, financial condition and results of operations could be harmed. In that case, the trading price of our common stock could decline and you might lose all or part of your investment in our common stock. The risks and uncertainties described below are not the only ones we face. You should also refer to the other information set forth in this Form 10-Q, including under "Managements' Discussion and Analysis of Financial Condition and Results of Operations". Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.*

### Risks Related to Our Business

***Revenues generated from our five largest clients represented 74% of our revenues for the year ended December 31, 2011, and any termination of or deterioration in our relationship with any of these clients would result in a decline in our revenues.***

We derive a substantial majority of our revenues from a limited number of clients, including the Department of Education, CMS and three GAs. Revenues from our five largest clients represented 74% of our revenues for the year ended December 31, 2011. We expect that our revenues will become increasingly concentrated with our major clients as a result of rising business volumes under our RAC contract, which accounted for approximately 25% of our revenues in the nine months ended September 30, 2012, compared to approximately 13% of our revenues in 2011. If we lose one of these clients or if the terms of our relationships with any of these clients become less favorable to us, our revenues would decline, which would harm our business, financial condition and results of operations.

000036

Table of Contents

*Many of our contracts with our clients for the recovery of student loans and other receivables are not exclusive and do not commit our clients to provide specified volumes of business and, as a consequence, there is no assurance that we will be able to maintain our revenues and operating results.*

Substantially all of our existing contracts for the recovery of student loan and other receivables, which represented approximately 75% of our revenues in 2011, enable our clients to unilaterally terminate their contractual relationship with us at any time without penalty, potentially leading to loss of business or renegotiation of terms. Our contracts generally are subject to a periodic rebidding process at the end of the contract term. Further, most of our contracts in these markets allow our clients to unilaterally change the volume of loans and other receivables that are placed with us at any given time. In addition, most of our contracts are not exclusive, with our clients retaining multiple service providers with whom we must compete for placements of loans or other obligations. Therefore, despite our contractual relationships with our clients, our contracts do not provide assurance that we will generate a minimum amount of revenues or that we will receive a specific volume of placements.

Our revenues and operating results would be negatively affected if our student loans and receivables clients, which include four of our five largest clients in 2011, do not renew their agreements with us upon contract expiration, reduce the volume of student loan placements provided to us, modify the terms of service, including the success fees we are able to earn upon recovery of defaulted student loans, or any of these clients establish more favorable relationships with our competitors. For example, we have been advised that our contractual arrangement with the Department of Education may be modified as a result of the Department of Education's decision to have its recovery vendors promote IBR to defaulted student loans. The IBR program provides flexibility on the required monthly payment for student loan borrowers at an amount intended to be affordable based on a borrower's income and family size. As a result of the increased application of the IBR program to defaulted student loans, we expect that there will be an increase in the number of loans that become eligible for rehabilitation because more defaulted student loan borrowers will be able to make qualifying payments. In this connection, we have been advised that the Department of Education may make certain changes to its contractual arrangements with its recovery vendors, although the nature of the changes remains uncertain. Any changes in the contingency fee percentages or other compensation terms that we are paid under existing and future contracts could have a significant impact on our revenues.

*We face significant competition in all of the markets in which we operate and an inability to compete effectively in the future could harm our relationships with our clients, which would impact our ability to maintain our revenues and operating results.*

We operate in very competitive markets. In providing our services to the student loan and other receivables markets, we face competition from many other companies. Initially, we compete with these companies to be one of typically several firms engaged to provide recovery services to a particular client and, if we are successful in being engaged, we then face continuing competition from the client's other retained firms based on the client's benchmarking of the recovery rates of its several vendors. Those recovery vendors who produce the highest recovery rates from a client often will be allocated additional placements and in some cases additional success fees. Accordingly, maintaining high levels of recovery performance, and doing so in a cost-effective manner, are important factors in our ability to maintain and grow our revenues and net income and the failure to achieve these objectives could harm our business, financial condition and results of operations.

Similarly, we faced a highly competitive bidding process to become one of the four prime RAC contractors that provide recovery services for improper Medicare payments. This contract expires in 2014 and we expect that CMS will issue a request for proposals for the new RAC contract prior to December 31, 2012. We expect that this process will be competitive, and we believe that CMS will announce the award of new RAC contracts in early 2013. The failure to retain this contract or a significant adverse change in the terms of this contract, which generated approximately 25% of our revenues in the nine months ended September 30, 2012, would seriously harm our ability to maintain or increase our revenues and operating results.

Some of our current and potential competitors in the markets in which we operate may have greater financial, marketing, technological or other resources than we do. The ability of any of our competitors and potential competitors to adopt new and effective technology to better serve our markets may allow them to gain market strength. Increasing levels of competition in the future may result in lower recovery fees, lower volumes of contracted recovery services or higher costs for resources. Any inability to compete effectively in the markets that we serve could adversely affect our business, financial condition and results of operations.

*The U.S. federal government accounts for a significant portion of our revenues, and any loss of business from, or change in our relationship with, the U.S. federal government would result in a significant decrease in our revenues and operating results.*

We have historically derived and are likely to continue to derive a significant portion of our revenues from the U.S. federal government. For the year ended December 31, 2011, revenues under contracts with the U.S. federal government accounted for approximately 27% of our total revenues. Furthermore, federal government revenues increased to

27

000037

Table of Contents

approximately 41% in the nine months ended September 30, 2012, primarily as a result of increasing revenues from our RAC contract with CMS. In addition, fees payable by the U.S. federal government are expected to become a larger percentage of our total revenues over the next several years as a result of the recent legislation that has transferred responsibility for all new student loan origination to the Department of Education. The continuation and exercise of renewal options on existing government contracts and any new government contracts are, among other things, contingent upon the availability of adequate funding for the applicable federal government agency. Changes in federal government spending could directly affect our financial performance. For example, the Obama Administration's proposed budget for the year ending September 30, 2013, included a proposal designed to redirect federal government spending to an alternative federal program by decreasing the amount that GAs are compensated when they rehabilitate defaulted loans. The loss of business from the U.S. federal government, or significant policy changes or financial pressures within the agencies of the U.S. federal government that we serve would result in a significant decrease in our revenues, which would adversely affect our business, financial condition and results of operations.

*Future legislative changes affecting the markets in which we operate could impair our business and operations.*

The two principal markets in which we provide our recovery services, government-supported student loans and the Medicare program, are a subject of significant legislative and regulatory focus and we cannot anticipate how future changes in government policy may affect our business and operations. For example, SAFRA significantly changed the structure of the government-supported student loan market by assigning responsibility for all new government-supported student loan originations to the Department of Education, rather than originations by private institutions and backed by one of 30 government-supported GAs. This legislation, and any future changes in the legislation and regulations that govern these markets, may require us to adapt our business to the new circumstances and we may be unable to do so in a manner that does not adversely affect our business and operations.

*Our business relationship with the Department of Education has accounted for a significant portion of our revenues and will take on increasing importance to our business as a result of SAFRA. Our failure to maintain this relationship would significantly decrease our revenues.*

The majority of our historical revenues from the student loan market have come from our relationships with the GAs. As a result of SAFRA, the Department of Education will ultimately become the sole source of revenues in this market, although the GAs will continue to service their existing student loan portfolios for many years to come. As a result, over time, defaults on student loans originated by the Department of Education will predominate and our ability to maintain the revenues we had previously received from a number of GA clients will depend on our relationship with a single client, the Department of Education. While we have 22 years of experience in performing student loan recovery services for the Department of Education, we are one of 17 unrestricted recovery service providers on the current Department of Education contract. In 2011, student loan recovery work for the Department of Education generated revenues of $17.9 million, or approximately 11% of our total revenues. The Department of Education is expected to initiate a contract re-compete process prior to December 31, 2012, and is expected to award the contracts during the beginning of 2013. If our relationship with the Department of Education terminates or deteriorates or if the Department of Education, ultimately as the sole holder of defaulted student loans, requires its contractors to agree to less favorable terms, our revenues would significantly decrease, and our business, financial condition and results of operations would be harmed.

*We could lose clients as a result of consolidation among the GAs, which would decrease our revenues.*

As a result of SAFRA, which terminated the ability of the GAs to originate government-supported student loans, some have speculated that there may be consolidation among the 30 GAs. If GAs that are our clients are combined with GAs with whom we do not have a relationship, we could suffer a loss of business. We currently have relationships with 12 of the 32 GAs and three of our GA clients were each responsible for more than 10% of our total revenues in 2011. The consolidation of our GA clients with others and the failure to provide recovery services to the consolidated entity could decrease our revenues, which could negatively impact our business, financial condition and results of operations.

*Our ability to derive revenues under our RAC contract will depend in part on the number and types of potentially improper claims that we are allowed to pursue by CMS, and our results of operations may be harmed if the scope of claims that we are allowed to pursue is limited.*

While we are the prime contractor responsible for review of Medicare records for all Part A and Part B claims in our region pursuant to the terms of our RAC contract with CMS, we are not permitted to seek the recovery of an improper claim unless that particular type of claim has been pre-approved by CMS to ensure compliance with applicable Medicare payment policies, as well as national and local coverage determinations. While the revenues we earn under our contract with CMS are determined primarily by the aggregate volume of Medicare claims in our region and our ability to successfully

28

Table of Contents

identify improper payments within these claims, the long-term growth of the revenues we derive under our RAC contract will also depend in part on CMS expanding the scope of potentially improper claims that we are allowed to pursue under our RAC contract. If we are unable to continue to identify improper claims within the types of claims that we are permitted to pursue from time to time or if CMS does not expand the scope of potentially improper claims that we are allowed to pursue, our results of operations could be adversely affected.

Further, the improper claims approved by CMS and identified by us may be challenged by affected parties. For example, in November 2012 the American Hospital Association and four hospitals filed a lawsuit against Kathleen Sebelius, the Secretary of the Department of Health and Human Services. The lawsuit claims, among other things, that CMS is acting improperly in completely denying payment for claims initially made under Medicare Part A (inpatient) that should have been made under Medicare Part B (outpatient) rather than remitting the difference between the Part A and Part B payments. If healthcare providers are able to limit the scope of improper claims in this lawsuit or other future legal proceedings, our revenues will be harmed as the amount that we are paid is based on the amount that we help CMS recover.

***Our results of operations may fluctuate on a quarterly or annual basis and cause volatility in the price of our stock.***

Our revenues and operating results could vary significantly from period-to-period and may fail to match our past performance because of a variety of factors, some of which are outside of our control. Any of these factors could cause the price of our common stock to fluctuate. Factors that could contribute to the variability of our operating results include:

- the amount of defaulted student loans and other receivables that our clients place with us for recovery;

- the timing of placements of student loans and other receivables which are entirely in the discretion of our clients;

- our ability to successfully identify improper Medicare claims and the number and type of potentially improper claims that CMS authorizes us to pursue under our RAC contract;

- the loss or gain of significant clients or changes in the contingency fee rates or other significant terms of our business arrangements with our significant clients;

- technological and operational issues that may affect our clients and regulatory changes in the markets we service; and

- general industry and macroeconomic conditions.

For example, a technology system upgrade at the Department of Education, which began in September 2011, has significantly decreased the volume of student loan placements by the Department of Education to all recovery vendors, including us, since this period. As a result, the dollar amount of placements that we received from the Department of Education in the nine months ended September 30, 2012 was 45% lower than in the comparable nine months ended September 30, 2011. While it is expected that we and the other Department of Education recovery vendors will receive substantially larger than normal placements once this situation is resolved, the large majority of the revenues from these placements will be delayed because we do not begin to earn rehabilitation revenues from a given placement until at least nine months after receipt of the placement. In addition, since September 2011, the Department of Education has not been able to process a significant portion of rehabilitated student loans and accordingly we have not been able to recognize a significant amount of the revenues associated with rehabilitation of loans for this client. However, the Department of Education has continued to pay us based on invoices submitted and we have recorded these cash receipts as deferred revenues on our balance sheet. This has led to deferred revenues of $2.5 million as of September 30, 2012. While the Department of Education started processing a portion of rehabilitated student loans beginning in April 2012, and we recognized revenues during the three months ended September 30, 2012 related to loans that were rehabilitated during the current and prior periods, a portion of the revenues associated with the rehabilitation of these student loans remains to be processed.

Further, our claim recovery volume is currently impacted by a system adjustment that is being implemented by CMS for its PIP providers. PIP providers are reimbursed for Medicare claims through different processes than other healthcare providers, and CMS is in the process of making certain system adjustments in order to allow these claims to be processed. Prior to April 2012, we were not permitted to audit Medicare claims for these PIP providers, which we estimate to account for approximately 20% of Medicare claims in our region. Since April 2012, we have identified improper payments to PIP providers, but these payments have not yet been processed by CMS. As a result, we have not recognized any revenues from identified improper payments to PIP providers, but we have incurred expenses related to these claims. We estimate that this delayed our recognition of more than $2 million in revenues in the three months ended September 30, 2012. CMS remains in the process of implementing the necessary changes to its systems that would allow these claims to be processed. While we believe that this delay in processing is temporary, we are uncertain of when processing will begin and the failure of CMS to process these claims will adversely affect our revenues until this is resolved. Because our revenues are dependent on many factors, some of which are outside of our control, we may experience significant fluctuations in our results of operations and as a result volatility in our stock price.

29

Table of Contents

***Downturns in domestic or global economic conditions and other macroeconomic factors could harm our business and results of operations.***

Various macroeconomic factors influence our business and results of operations. These include the volume of student loan originations in the United States, together with tuition costs and student enrollment rates, the default rate of student loan borrowers, which is impacted by domestic and global economic conditions, rates of unemployment and similar factors, and the growth in Medicare expenditures resulting from changes in healthcare costs. Changes in these factors could lead to a reduction in overall recovery rates by our clients, which in turn could adversely affect our business, financial condition and results of operations. In addition, during the global financial crisis beginning in 2008, the market for securitized student loan portfolios was disrupted, resulting in delays in the ability of some GA clients to resell rehabilitated student loans and as a result delaying our ability to recognize revenues from these rehabilitated loans.

***We may not be able to maintain or increase our profitability, and our recent financial results may not be indicative of our future financial results.***

We may not succeed in maintaining our profitability on a quarterly or annual basis and could incur quarterly or annual losses in future periods. We expect to incur additional operating expenses associated with being a public company and we intend to continue to increase our operating expenses as we grow our business. We also expect to continue to make investments in our proprietary technology platform and hire additional employees and subcontractors as we expand our healthcare recovery and other operations, thus incurring additional expenses. If our revenues do not increase to offset these increases in expenses, our operating results could be adversely affected. Our historical revenues and net income growth rates are not indicative of future growth rates.

***We may not be able to manage our growth effectively and our results of operations could be negatively affected.***

Our business has expanded significantly, especially in recent years with the expansion of our services in the healthcare market, and we intend to maintain our focus on growth. However, our continued focus on growth and the expansion of our business may place additional demands on our management, operations and financial resources and will require us to incur additional expenses. We cannot be sure that we will be able to manage our growth effectively. In order to successfully manage our growth, our expenses will increase to recruit, train and manage additional qualified employees and subcontractors and to expand and enhance our administrative infrastructure and continue to improve our management, financial and information systems and controls. If we cannot manage our growth effectively, our expenses may increase and our results of operations could be negatively affected.

***A failure of our operating systems or technology infrastructure, or those of our third-party vendors and subcontractors, could disrupt the operation of our business.***

A failure of our operating systems or technology infrastructure, or those of our third-party vendors and subcontractors, could disrupt our operations. Our operating systems and technology infrastructure are susceptible to damage or interruption from various causes, including acts of God and other natural disasters, power losses, computer systems failures, Internet and telecommunications or data network failures, operator error, computer viruses, losses of and corruption of data and similar events. The occurrence of any of these events could result in interruptions, delays or cessations in service to our clients, reduce the attractiveness of our recovery services to current or potential clients and adversely impact our financial condition and results of operations. While we have backup systems in many of our operating facilities, an extended outage of utility or network services may harm our ability to operate our business. Further, the situations we plan for and the amount of insurance coverage we maintain for losses as result of failures of our operating systems and infrastructure may not be adequate in any particular case.

***If our security measures are breached or fail and unauthorized access is obtained to our clients' confidential data, our services may be perceived as insecure, the attractiveness of our recovery services to current or potential clients may be reduced, and we may incur significant liabilities.***

Our recovery services involve the storage and transmission of confidential information relating to our clients and their customers, including health, financial, credit, payment and other personal or confidential information. Although our data security procedures are designed to protect against unauthorized access to confidential information, our computer systems, software and networks may be vulnerable to unauthorized access and disclosure of our clients' confidential information. Further, we may not effectively adapt our security measures to evolving security risks, address the security and privacy concerns of existing or potential clients as they change over time, or be compliant with federal, state, and local laws and regulations with respect to securing confidential information. Unauthorized access to confidential information relating to our clients and their customers could lead to reputational damage which could deter our clients and potential clients from selecting our recovery services, or result in termination of contracts with those clients affected by any such breach, regulatory action, and claims against us.

30

Table of Contents

In the event of any unauthorized access to personal or other confidential information, we may be required to expend significant resources to investigate and remediate vulnerabilities in our security procedures, and we may be subject to fines, penalties, litigation costs, and financial losses that are either not insured against or not fully covered through any insurance maintained by us. If one or more of such failures in our security and privacy measures were to occur, our business, financial condition and results of operations could suffer.

### Our business may be harmed if we lose members of our management team or other key employees.

We are highly dependent on members of our management team and other key employees and our future success depends in part on our ability to retain these people. Our inability to continue to attract and retain members of our management team and other key employees could adversely affect our business, financial condition and results of operations.

### The growth of our healthcare business will require us to hire and retain employees with specialized skills and failure to do so could harm our ability to grow our business.

The growth of our healthcare business will depend in part on our ability to recruit, train and manage additional qualified employees. Our healthcare-related operations require us to hire registered nurses and experts in Medicare coding. Finding, attracting and retaining employees with these skills is a critical component of providing our healthcare-related recovery and audit services, and our inability to staff these operations appropriately represents a risk to our healthcare service offering and associated revenues. An inability to hire qualified personnel, particularly to serve our healthcare clients, may restrain the growth of our business.

### We rely on subcontractors to provide services to our clients and the failure of subcontractors to perform as expected could harm our business operations and our relationships with our clients.

We engage subcontractors to provide certain services to our clients. These subcontractors participate to varying degrees in our recovery activities with regards to all of the services we provide. While most of our subcontractors provide specific services to us, we engage one subcontractor to provide all of the audit and recovery services under our contract with CMS within a portion of our region. According to CMS, the geographic area allocated to this subcontractor accounted for approximately 17% of total Medicare spending in our region in 2009. While we believe that we perform appropriate due diligence before we hire subcontractors, our subcontractors may not provide adequate service or otherwise comply with the terms set forth in their agreements. In the event a subcontractor provides deficient performance to one or more of our clients, any such client may reduce the volume of services we are providing under an existing contract or may terminate the relevant contract entirely and we may face claims for breach of contract. Any such disruption in our relations with our clients as a result of services provided by any of our subcontractors could adversely affect our revenues and operating results.

### If our software vendors or utility and network providers fail to deliver or perform as expected our business operations could be adversely affected.

Our recovery services depend in part on third-party providers, including software vendors and utility and network providers. Our ability to service our clients depends on these third-party providers meeting our expectations and contractual obligations in a timely and effective manner. Our business could be materially and adversely affected, and we might incur significant additional liabilities, if the services provided by these third-party providers do not meet our expectations or if they terminate or refuse to renew their relationships with us on similar contractual terms.

### We are subject to extensive regulations regarding the use and disclosure of confidential personal information and failure to comply with these regulations could cause us to incur liabilities and expenses.

We are subject to a wide array of federal and state laws and regulations regarding the use and disclosure of confidential personal information and security. For example, the federal Health Insurance Portability and Accountability Act of 1996, as amended, or HIPAA, and related state laws subject us to substantial restrictions and requirements with respect to the use and disclosure of the personal health information that we obtain in connection with our audit and recovery services under our contract with CMS and we must establish administrative, physical and technical safeguards to protect the confidentiality of this information. Similar protections extend to the type of personal financial and other information we acquire from our student loan, state tax and federal receivables clients. We are required to notify affected individuals and government agencies of data security breaches involving protected health and certain personally identifiable information. These laws and regulations also require that we develop, implement and maintain written, comprehensive information security programs containing safeguards that are appropriate to protect personally identifiable information or health information against unauthorized access, misuse, destruction or modification. Federal law generally does not preempt state law in the area of protection of personal information, and as a result we must also comply with state laws and regulations. Regulation of privacy, data use and security requires that we incur significant expenses, which could increase in the future as a result of additional regulations, all of which adversely affects our results of operations. Failure to comply with these laws and regulations can result in penalties and in some cases expose us to civil lawsuits.

31

Table of Contents

***Our student loan recovery business is subject to extensive regulation and consumer protection laws and our failure to comply with these regulations and laws may subject us to liability and result in significant costs.***

Our student loan recovery business is subject to regulation and oversight by various state and federal agencies, particularly in the area of consumer protection. The Fair Debt Collection Practices Act, or FDCPA, and related state laws provide specific guidelines that we must follow in communicating with holders of student loans and regulates the manner in which we can recover defaulted student loans. Some state attorney generals have been active in this area of consumer protection regulation. We are subject, and may be subject in the future, to inquiries and audits from state and federal regulators, as well as frequent litigation from private plaintiffs regarding compliance under the FDCPA and related state regulations. We are also subject to the Fair Credit Reporting Act, or FCRA, which regulates consumer credit reporting and may impose liability on us to the extent adverse credit information reported to a credit bureau is false or inaccurate. Our compliance with the FDCPA, FCRA and other federal and state regulations that affect our student loan recovery business may result in significant costs, including litigation costs. We may also become subject to regulations promulgated by the United States Consumer Financial Protection Bureau, or CFPB, which was established in July 2011 as part of the Dodd-Frank Act to, among other things, establish regulations regarding consumer financial protection laws. In July 2012, the CFPB announced that regulations would be forthcoming that may impact our student loan recovery business and compliance with these regulations may increase our costs. Changes to existing regulations or the adoption of new regulations could adversely affect our business and results of operations if we are not able to adapt our services and client relationships to meet the new regulatory structure.

***The requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain executive management and qualified board members.***

As a public company, we are subject to the reporting requirements of the Securities Exchange Act of 1934, or the Exchange Act, the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, the Dodd-Frank Act and other applicable securities rules and regulations. Compliance with these rules and regulations has increased our legal and financial compliance costs, made some activities more difficult, time-consuming or costly and increased or will continue to increase demand on our systems and resources, particularly after we are no longer an "emerging growth company." The Exchange Act requires, among other things, that we file annual, quarterly and current reports with respect to our business and operating results. The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and, if required, improve our disclosure controls and procedures and internal control over financial reporting to meet this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could adversely affect our business and operating results. Although we have already hired additional employees to comply with these requirements, we may need to hire more employees in the future or engage outside consultants, which will increase our costs and expenses.

We also expect that being a public company will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors could also make it more difficult for us to attract and retain qualified members of our board of directors, particularly to serve on our audit committee and compensation committee, and qualified executive officers.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We will continue to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us and our business may be adversely affected.

However, for as long as we remain an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. We may take advantage of these reporting exemptions until we are no longer an "emerging growth company."

32

Table of Contents

We will remain an "emerging growth company" for up to five years, although if the market value of our common stock that is held by non-affiliates exceeds $700 million as of any July 31 before that time, our revenues exceed $1 billion, or we issue more than $1 billion in non-convertible debt in a three-year period, we would cease to be an "emerging growth company" as of the following January 31.

As a result of disclosure of information as a public company, our business and financial condition have become more visible, which we believe may result in threatened or actual litigation, including by competitors and other third parties. If such claims are successful, our business operations and financial results could be adversely affected, and even if the claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and adversely affect our business operations and financial results. These factors could also make it more difficult for us to attract and retain qualified employees, executive officers and members of our board of directors.

***Failure to achieve and maintain effective internal controls in accordance with Section 404 of Sarbanes-Oxley would impair our ability to produce accurate and reliable financial statements, which would harm our stock price.***

We are subject to reporting obligations under Section 404 of the Sarbanes-Oxley Act that require us to include a management report on our internal control over financial reporting in our annual report, which contains management's assessment of the effectiveness of our internal control over financial reporting. These requirements will first apply to our annual report on Form 10-K for the year ending December 31, 2013 and complying with these requirements can be difficult. For example, in June 2012, our independent registered public accounting firm determined that we had incorrectly accounted for our mandatorily redeemable preferred stock, which required audit adjusting entries for the three-year period ended December 31, 2011. Our failure to detect this error was deemed to be a deficiency in internal control and this deficiency was considered to be a material weakness. To address this situation, our independent registered public accounting firm recommended that the Company emphasize the importance of thoroughly researching all new accounting policies and revisiting accounting policies set for existing transactions when changes in the business or reporting requirements occur or are expected to occur. To prevent issues like these in the future, we have bolstered our technical accounting expertise and, where appropriate, engaged outside consultants with specialized knowledge.

Our management may conclude that our internal control over our financial reporting is not effective. As we only recently became a public company following the completion of our initial public offering on August 15, 2012, we have limited accounting personnel and other resources with which to address our internal controls and procedures. If we fail to timely achieve and maintain the adequacy of our internal control over financial reporting, we may not be able to produce reliable financial reports or help prevent fraud. Our failure to achieve and maintain effective internal control over financial reporting could prevent us from filing our timely periodic reports on a timely basis, which could result in the loss of investor confidence in the reliability of our financial statements, harm our business and negatively impact the trading price of our common stock.

We are required to disclose changes made in our internal controls and procedures on a quarterly basis. However, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until the later of the year following our first annual report required to be filed with the SEC, or the date we are no longer an "emerging growth company" as defined in the JOBS Act, if we continue to take advantage of the exemptions contained in the JOBS Act. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our controls are documented, designed or operating. Our remediation efforts may not enable us to avoid a material weakness in the future.

***Litigation may result in substantial costs of defense, damages or settlement, any of which could subject us to significant costs and expenses.***

We are party to lawsuits in the normal course of business, particularly in connection with our student loan recovery services. For example, we are regularly subject to claims that we have violated the guidelines and procedures that must be followed under federal and state laws in communicating with consumer debtors. We may not ultimately prevail or otherwise be able to satisfactorily resolve any pending or future litigation, which may result in substantial costs of defense, damages or settlement. In the future, we may be required to alter our business practices or pay substantial damages or settlement costs as a result of litigation proceedings, which could adversely affect our business operations and results of operations.

***We typically face a long period to implement a new contract which may cause us to incur expenses before we receive revenues from new client relationships.***

If we are successful in obtaining an engagement with a new client or a new contract with an existing client, we typically have a subsequent long implementation period in which the services are planned in detail and we integrate our technology, processes and resources with the client's operations. If we enter into a contract with a new client, we typically

33

Table of Contents

will not receive revenues until implementation is completed and work under the contract actually begins. Our clients may also experience delays in obtaining approvals or delays associated with technology or system implementations, such as the delays experienced with the implementation of our RAC contract with CMS due to an appeal by competitors who were unsuccessful in bidding on the contract. Because we generally begin to hire new employees to provide services to a new client once a contract is signed, we may incur significant expenses associated with these additional hires before we receive corresponding revenues under any such new contract. If we are not successful in maintaining contractual commitments after the expenses we incur during our typically long implementation cycle, our results of operations could be adversely affected.

***If we are unable to adequately protect our proprietary technology, our competitive position could be harmed or we could be required to incur significant costs to enforce our rights.***

The success of our business depends in part upon our proprietary technology platform. We rely on a combination of copyright, patent, trademark, and trade secret laws, as well as on confidentiality procedures and non-compete agreements, to establish and protect our proprietary technology rights. The steps we have taken to deter misappropriation of our proprietary technology may be insufficient to protect our proprietary information. Any infringement or misappropriation of our patents, trademarks, trade secrets, or other intellectual property rights could adversely affect any competitive advantage we currently derive or may derive from our proprietary technology platform and we may incur significant costs associated with litigation may be necessary to enforce our intellectual property rights.

***Claims by others that we infringe their intellectual property could force us to incur significant costs or revise the way we conduct our business.***

Our competitors protect their proprietary rights by means of patents, trade secrets, copyrights, trademarks and other intellectual property. Any party asserting that we infringe, misappropriate or violate their intellectual property rights may force us to defend ourselves, and potentially our clients, against the alleged claim. These claims and any resulting lawsuit, if successful, could be time-consuming and expensive to defend, subject us to significant liability for damages or invalidation of our proprietary rights, prevent us from operating all or a portion of our business or force us to redesign our services or technology platform or cause an interruption or cessation of our business operations, any of which could adversely affect our business and operating results. In addition, any litigation relating to the infringement of intellectual property rights could harm our relationships with current and prospective clients. The risk of such claims and lawsuits could increase if we increase the size and scope of our services in our existing markets or expand into new markets.

***We may make acquisitions that prove unsuccessful, strain or divert our resources and harm our results of operations and stock price.***

We may consider acquisitions of other companies in our industry or in new markets. We may not be able to successfully complete any such acquisition and, if completed, any such acquisition may fail to achieve the intended financial results. We may not be able to successfully integrate any acquired businesses with our own and we may be unable to maintain our standards, controls and policies. Further, acquisitions may place additional constraints on our resources by diverting the attention of our management from other business concerns. Moreover, any acquisition may result in a potentially dilutive issuance of equity securities, the incurrence of additional debt and amortization of expenses related to intangible assets, all of which could adversely affect our results of operations and stock price.

***Our current or future indebtedness could adversely affect our business and financial condition and reduce the funds available to us for other purposes, and our failure to comply with the covenants contained in our credit agreement could result in an event of default that could adversely affect our results of operations.***

As of September 30, 2012, our total debt was $150.5 million. For the year ended December 31, 2011, our consolidated interest expense was approximately $13.5 million. Our ability to make scheduled payments or to refinance our debt obligations and to fund our other liquidity needs depends on our financial and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot make assurances that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness and to fund our other liquidity needs. If our cash flows and capital resources are insufficient to fund our debt service obligations and allow us to maintain compliance with the covenants under our credit agreement or to fund our other liquidity needs, we may be forced to reduce or delay capital expenditures, sell assets or operations, seek additional capital or restructure or refinance our indebtedness. We cannot ensure that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled debt service obligations or that these actions would be permitted under the terms of our existing or future debt agreements, including our credit agreement. If we cannot make scheduled payments on our debt, we will be in default and, as a result, our debt holders could declare all outstanding principal and interest to be due and payable, the lenders under our credit agreement could terminate their commitments to lend us money and foreclose against the assets securing our borrowings and we could be forced into bankruptcy or liquidation.

34

Table of Contents

Our debt agreements contain, and any agreements to refinance our debt likely will contain, financial and restrictive covenants that limit our ability to incur additional debt, including to finance future operations or other capital needs, and to engage in other activities that we may believe are in our long-term best interests, including to dispose of or acquire assets. Our failure to comply with these covenants may result in an event of default, which, if not cured or waived, could accelerate the maturity of our indebtedness or result in modifications to our credit terms. If our indebtedness is accelerated, we may not have sufficient cash resources to satisfy our debt obligations and we may not be able to continue our operations as planned.

***We are classified as a "controlled company" and, as a result, we rely on exemptions from certain corporate governance requirements. As a result, you do not have the same protections afforded to stockholders of companies that are subject to such requirements.***

Parthenon Capital Partners controls a majority of our common stock. As a result, we are a "controlled company" within the meaning of the applicable stock exchange corporate governance standards. Under the rules of the NASDAQ Global Select Market, or NASDAQ, a company of which more than 50% of the outstanding voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain stock exchange corporate governance requirements, including:

- the requirement that a majority of the board of directors consists of independent directors;

- the requirement that nominating and corporate governance matters be decided solely by independent directors; and

- the requirement that employee and officer compensation matters be decided solely by independent directors.

We utilize each of these exemptions. As a result, we do not have a majority of independent directors and our nominating and corporate governance and compensation functions are not decided solely by independent directors. Accordingly, you do not have the same protections afforded to stockholders of companies that are subject to all of the stock exchange corporate governance requirements.

***The price of our common stock could be volatile.***

Before our initial public offering that closed on August 15, 2012, there was not a public market for our common stock. Because we only recently became a public company, the overall market and the price of our common stock may fluctuate greatly. The trading price of our common stock may be significantly affected by various factors, including: quarterly fluctuations in our operating results; the financial projections we may provide to the public, any changes in those projections or our failure to meet those projections; changes in investors' and analysts' perception of the business risks and conditions of our business; our ability to meet the earnings estimates and other performance expectations of financial analysts or investors; unfavorable commentary or downgrades of our stock by equity research analysts; termination of lock-up agreements or other restrictions on the ability of our existing stockholders to sell their shares after this offering; changes in our capital structure, such as future issuances of debt or equity securities; lawsuits threatened or filed against us; strategic actions by us or our competitors, such as acquisitions or restructurings; new legislation or regulatory actions; changes in our relationship with any of our significant clients; fluctuations in the stock prices of our peer companies or in stock markets in general; and general economic conditions.

***Future sales, or the perception of future sales, of our common stock may lower our stock price.***

Sales of our common stock in the public market, or the perception that these sales could occur, could cause the market price of our common stock to decline. As of the completion of our initial public offering on August 15, 2012, approximately 45.3 million shares of our common stock were outstanding. Of such shares of common stock outstanding, approximately 35.0 million shares of our common stock are subject to lock-up agreements restricting the sale of those shares for 180 days from the date of our initial public offering unless otherwise extended or waived. Such shares are also subject to vesting requirements and the requirements of Rule 144 or Rule 701. In addition, certain holders of shares of common stock have the right, subject to certain exceptions and conditions, to require us to register their shares of common stock under the Securities Act, and they also have the right to participate in future registrations of securities by us. Registration of any of these outstanding shares of common stock would result in such shares becoming freely tradable without compliance with Rule 144 upon effectiveness of the registration statement.

***Our majority stockholder has the ability to control significant corporate activities and our majority stockholder's interests may not coincide with yours.***

Parthenon Capital Partners beneficially owns approximately 64.9% of our common stock as of September 30, 2012. As a result of its ownership, Parthenon Capital Partners, so long as it holds a majority of our outstanding shares, has the ability to control the outcome of matters submitted to a vote of stockholders and, through our board of directors, the ability to control decision-making with respect to our business direction and policies. Parthenon Capital Partners may have interests

35

Table of Contents

different from our other stockholders' interests, and may vote in a manner adverse to those interests. Matters over which Parthenon Capital Partners can, directly or indirectly, exercise control include:

- the election of our board of directors and the appointment and removal of our officers;

- mergers and other business combination transactions, including proposed transactions that would result in our stockholders receiving a premium price for their shares;

- other acquisitions or dispositions of businesses or assets;

- incurrence of indebtedness and the issuance of equity securities;

- repurchase of stock and payment of dividends; and

- the issuance of shares to management under our equity incentive plans.

Even if Parthenon Capital Partners' ownership of our shares falls below a majority, it may continue to be able to strongly influence or effectively control our decisions. In addition, Parthenon Capital Partners will have a contractual right to designate a number of directors proportionate to their stock ownership. Further, under our amended and restated certificate of incorporation, Parthenon Capital Partners does not have any obligation to present to us, and Parthenon Capital Partners may separately pursue, corporate opportunities of which they become aware, even if those opportunities are ones that we would have pursued if granted the opportunity.

***If securities analysts do not publish research or if securities analysts or other third parties publish inaccurate or unfavorable research about us, the price of our common stock could decline.***

The trading market for our common stock relies in part on the research and reports that securities analysts and other third parties choose to publish about us. We do not control these analysts or other third parties. The price of our common stock could decline if one or more securities analysts downgrade our common stock or if one or more securities analysts or other third parties publish inaccurate or unfavorable research about us or cease publishing reports about us.

***Anti-takeover provisions contained in our certificate of incorporation and bylaws could impair a takeover attempt that our stockholders may find beneficial.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that could have the effect of rendering more difficult or discouraging an acquisition deemed undesirable by our board of directors. Our corporate governance documents include the following provisions: establishing a classified board of directors so that not all members of our board are elected at one time; providing that directors may be removed by stockholders only for cause at such time as Parthenon Capital Partners no longer beneficially owns a majority of our outstanding shares; authorizing blank check preferred stock, which could be issued with voting, liquidation, dividend and other rights superior to our common stock; limiting the ability of our stockholders to call and bring business before special meetings and to take action by written consent in lieu of a meeting at such time as Parthenon Capital Partners no longer beneficially owns a majority of our outstanding shares; limiting our ability to engage in certain business combinations with any "interested stockholder," other than Parthenon Capital Partners, for a three-year period following the time that the stockholder became an interested stockholder; requiring advance notice of stockholder proposals for business to be conducted at meetings of our stockholders and for nominations of candidates for election to our board of directors; requiring a super-majority vote for certain amendments to our amended and restated certificate of incorporation and amended and restated bylaws after the time when Parthenon Capital Partners ceases to beneficially own a majority of our outstanding shares; and limiting the determination of the number of directors on our board of directors and, when Parthenon Capital Partners is no longer our majority stockholder, the filling of vacancies or newly created seats on the board, to our board of directors then in office. These provisions, alone or together, could have the effect of delaying or deterring a change in control, could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

## ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Sale of Unregistered Securities

In connection with the consummation of our IPO, we paid $0.9 million to FTP Securities LLC, or FT Partners, through the issuance of 103,500 shares of our common stock valued at $9.00 per share as consideration for financial advisory services provided by FT Partners. The securities issued were exempt from registration pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended.

### Repurchases

We repurchased 98,020 shares of common stock from certain members of management on July 3, 2012 for aggregate consideration of approximately $1.3 million.

### Use of Proceeds

On August 9, 2012, our registration statement on Form S-1 (File No. 333-182529) was declared effective by the Securities and Exchange Commission for our IPO pursuant to which 10,350,000 shares of our common stock were sold at an aggregate offering price of $93.1 million. The selling stockholders sold an aggregate of 8,426,000 shares of our common stock and we sold an aggregate of 1,924,000 shares of our common stock at a price to the public of $9.00 per share. The underwriters of the offering were Morgan Stanley & Co. LLC, Goldman Sachs & Co., Credit Suisse Securities (USA)

36

000046

Table of Contents

LLC, Wells Fargo Securities, LLC, William Blair & Company, L.L.C., and SunTrust Robinson Humphrey, Inc. The offering commenced as of August 9, 2012 and terminated on August 17, 2012 when the underwriters exercised their over-allotment option in full, resulting in net proceeds to us of approximately $12.8 million after deducting underwriting discounts and commissions and other offering expenses of approximately $4.4 million. We used the net proceeds from the offering to pay a fee of approximately $1.1 million outstanding in connection with the termination of our advisory services agreement with an affiliate of Parthenon Capital Partners and to pay a financial advisory services fee of approximately $0.9 million to FT Partners through the issuance of 103,500 shares of our common stock valued at $9.00 per share. The remainder of the net proceeds were invested in short and intermediate-term, interest bearing obligations pending their application for working capital and general corporate purposes. There has been no material change in the planned use of proceeds from our IPO as described in our final prospectus filed with the Securities and Exchange Commission on August 10, 2012 pursuant to Rule 424(b) (4).

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

Not applicable.

37

Table of Contents

**ITEM 6. EXHIBITS**

(A) Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a). |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a)/15d-14(a). |
| 32.1(1) | Certification of the Chief Executive Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2(1) | Certification of the Chief Financial Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS(2) | XBRL Instance Document |
| 101.SCH(2) | XBRL Taxonomy Extension Scheme |
| 101.CAL(2) | XBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF(2) | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB(2) | XBRL Taxonomy Extension Label Linkbase |
| 101.PRE(2) | XBRL Taxonomy Extension Presentation Linkbase |

(1) The material contained in Exhibit 32.1 and Exhibit 32.2 is not deemed "filed" with the SEC and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language contained in such filing, except to the extent that the registrant specifically incorporates it by reference

(2) In accordance with Rule 406T of Regulation S-T, the information furnished in these exhibits will not be deemed "filed" for purposes of Section 18 of the Exchange Act. Such exhibits will not be deemed to be incorporated by reference into any filing under the Securities Act or Exchange Act.

38

**Table of Contents**

**SIGNATURES**

Pursuant to the requirement of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: November 13, 2012

PERFORMANT FINANCIAL CORPORATION

By:   /s/ Lisa Im
      Lisa Im

*Chief Executive Officer (Principal Executive Officer) and Director*

By:   /s/ Hakan Orvell
      Hakan Orvell

*Chief Financial Officer (Principal Financial and Accounting Officer)*

39

000049

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a). |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a)/15d-14(a). |
| 32.1(1) | Certification of the Chief Executive Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2(1) | Certification of the Chief Financial Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS(2) | XBRL Instance Document |
| 101.SCH(2) | XBRL Taxonomy Extension Scheme |
| 101.CAL(2) | XBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF(2) | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB(2) | XBRL Taxonomy Extension Label Linkbase |
| 101.PRE(2) | XBRL Taxonomy Extension Presentation Linkbase |

(1) The material contained in Exhibit 32.1 and Exhibit 32.2 is not deemed "filed" with the SEC and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language contained in such filing, except to the extent that the registrant specifically incorporates it by reference

(2) In accordance with Rule 406T of Regulation S-T, the information furnished in these exhibits will not be deemed "filed" for purposes of Section 18 of the Exchange Act. Such exhibits will not be deemed to be incorporated by reference into any filing under the Securities Act or Exchange Act.

40

Table of Contents



**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**

I, Lisa Im, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Performant Financial Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2012

/s/ Lisa Im
_____
**Lisa Im**
**Chief Executive Officer**

**Exhibit 31.2**

### CERTIFICATION OF THE CHIEF FINANCIAL OFFICER
### PURSUANT TO
### SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)

I, Hakan Orvell, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Performant Financial Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2012

                    /s/ Hakan Orvell
_____
                    **Hakan Orvell**
               **Chief Financial Officer**

**EXHIBIT 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Lisa Im, Chief Executive Officer of Performant Financial Corporation, do hereby certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Performant Financial Corporation on Form 10-Q for the quarter ended September 30, 2012 to which this certification is attached fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Quarterly Report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Performant Financial Corporation

Date: November 13, 2012

By: _____ /s/ Lisa Im _____
     **Lisa Im**
     **Chief Executive Officer**

The foregoing certification is being furnished solely pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (Section 1350, Chapter 63 of Title 18, United States Code) and is not deemed filed with the Securities and Exchange Commission as part of the Form 10-Q or as a separate disclosure document and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

**EXHIBIT 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Hakan Orvell, Chief Financial Officer of Performant Financial Corporation, do hereby certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Performant Financial Corporation on Form 10-Q for the quarter ended September 30, 2012 to which this certification is attached fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Quarterly Report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Performant Financial Corporation

Date: November 13, 2012

By: _____ /s/ Hakan Orvell _____
                    **/s/ Hakan Orvell**
                    **Chief Financial Officer**

The foregoing certification is being furnished solely pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (Section 1350, Chapter 63 of Title 18, United States Code) and is not deemed filed with the Securities and Exchange Commission as part of the Form 10-Q or as a separate disclosure document and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT C

# Jan. 26, 2018 Invoice from Pillsbury to Performant

EXHIBIT REDACTED IN ITS ENTIRETY AND
REMOVED FROM PUBLICLY AVAILABLE VERSION

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT D

# Performant SEC Form 10-Q
# Filed Nov. 13, 2017

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

---

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2017**

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 001-35628**

---

# PERFORMANT FINANCIAL CORPORATION
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **20-0484934** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**Performant Financial Corporation**
**333 North Canyons Parkway**
**Livermore, CA 94551**
**(925) 960-4800**
**(Address, including zip code and telephone number, including area code of registrant's principal executive offices)**

Indicate by check mark whether the registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act). (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

☒ Emerging growth company

Table of Contents

☐ If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The number of shares of Common Stock outstanding as of November 13, 2017 was 50,961,377.

Table of Contents

**PERFORMANT FINANCIAL CORPORATION**
**QUARTERLY REPORT ON FORM 10-Q**
**FOR THE QUARTER ENDED SEPTEMBER 30, 2017**
**INDEX**

| | | Page |
|---|---|---|
| **PART I—Financial Information** | | |
| | | |
| Item 1. | Consolidated Financial Statements | |
| | Consolidated Balance Sheets September 30, 2017 (unaudited) and December 31, 2016 | 1 |
| | Consolidated Statements of Operations Three and Nine Months Ended September 30, 2017 and 2016 (unaudited) | 2 |
| | Consolidated Statements of Comprehensive Income (Loss) Three and Nine Months Ended September 30, 2017 and 2016 (unaudited) | 3 |
| | Consolidated Statements of Cash Flows Nine Months Ended September 30, 2017 and 2016 (unaudited) | 4 |
| | Notes to Consolidated Financial Statements Three and Nine Months Ended September 30, 2017 and 2016 (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 29 |
| Item 4. | Disclosure Controls and Procedures | 29 |
| | | |
| **PART II—Other Information** | | 30 |
| | | |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 40 |
| Item 3. | Defaults Upon Senior Securities | 40 |
| Item 4. | Mine Safety Disclosures | 40 |
| Item 5. | Other Information | 40 |
| Item 6. | Exhibits | 41 |
| Signatures | | 42 |

i

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Balance Sheets
(In thousands)

| | September 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| | (Unaudited) | | | |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 23,179 | $ | 32,982 |
| Restricted cash | | — | | 7,502 |
| Trade accounts receivable, net of allowance for doubtful accounts of $0 and $224, respectively | | 12,490 | | 11,484 |
| Deferred income taxes | | — | | 5,331 |
| Prepaid expenses and other current assets | | 14,222 | | 12,686 |
| Income tax receivable | | 1,454 | | 2,027 |
| Total current assets | | 51,345 | | 72,012 |
| Property, equipment, and leasehold improvements, net | | 21,393 | | 23,735 |
| Identifiable intangible assets, net | | 5,066 | | 5,895 |
| Goodwill | | 81,572 | | 82,522 |
| Deferred income taxes | | 3,534 | | — |
| Other assets | | 897 | | 914 |
| Total assets | $ | 163,807 | $ | 185,078 |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities: | | | | |
| Current maturities of notes payable, net of unamortized debt issuance costs of $138 and $1,294, respectively | $ | 1,512 | $ | 9,738 |
| Accrued salaries and benefits | | 5,640 | | 4,315 |
| Accounts payable | | 1,052 | | 628 |
| Other current liabilities | | 3,860 | | 4,409 |
| Estimated liability for appeals | | 19,145 | | 19,305 |
| Net payable to client | | 12,669 | | 13,074 |
| Total current liabilities | | 43,878 | | 51,469 |
| Notes payable, net of current portion and unamortized debt issuance costs of $3,549 and $272, respectively | | 38,801 | | 43,878 |
| Deferred income taxes | | — | | 1,130 |
| Other liabilities | | 2,099 | | 2,356 |
| Total liabilities | | 84,778 | | 98,833 |
| Commitments and contingencies | | | | |
| Stockholders' equity: | | | | |
| Common stock, $0.0001 par value. Authorized, 500,000 shares at September 30, 2017 and December 31, 2016; issued and outstanding 50,949 and 50,234 shares at September 30, 2017 and December 31, 2016, respectively | | 5 | | 5 |
| Additional paid-in capital | | 71,684 | | 65,650 |
| Retained earnings | | 7,340 | | 20,590 |
| Total stockholders' equity | | 79,029 | | 86,245 |
| Total liabilities and stockholders' equity | $ | 163,807 | $ | 185,078 |

*See accompanying notes to consolidated financial statements.*

1

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Operations
(In thousands, except per share amounts)
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Revenues | $ 29,744 | $ 31,195 | $ 98,760 | $ 107,548 |
| Operating expenses: | | | | |
| Salaries and benefits | 20,494 | 18,710 | 61,640 | 60,107 |
| Other operating expenses | 13,496 | 12,311 | 43,019 | 40,401 |
| Total operating expenses | 33,990 | 31,021 | 104,659 | 100,508 |
| Income (loss) from operations | (4,246) | 174 | (5,899) | 7,040 |
| Interest expense | (2,459) | (1,863) | (5,683) | (6,136) |
| Income (loss) before provision for (benefit from) income taxes | (6,705) | (1,689) | (11,582) | 904 |
| Provision for (benefit from) income taxes | 1,146 | (974) | 1,668 | 62 |
| Net income (loss) | $ (7,851) | $ (715) | $ (13,250) | $ 842 |
| Net income (loss) per share | | | | |
| Basic | $ (0.15) | $ (0.01) | $ (0.26) | $ 0.02 |
| Diluted | $ (0.15) | $ (0.01) | $ (0.26) | $ 0.02 |
| Weighted average shares | | | | |
| Basic | 50,852 | 50,200 | 50,581 | 49,974 |
| Diluted | 50,852 | 50,200 | 50,581 | 50,401 |

*See accompanying notes to consolidated financial statements.*

2

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Comprehensive Income (Loss)
(In thousands)
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Net income (loss) | $ (7,851) | $ (715) | $ (13,250) | $ 842 |
| Other comprehensive income: | | | | |
| Foreign currency translation adjustment | 1 | (1) | (4) | 24 |
| Comprehensive income (loss) | $ (7,850) | $ (716) | $ (13,254) | $ 866 |

*See accompanying notes to consolidated financial statements.*

3

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
(In thousands)
(Unaudited)

| | | Nine Months Ended September 30, | |
| --- | --- | --- | --- |
| | | 2017 | 2016 |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ | (13,250) | $ 842 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Loss on disposal of assets | | 67 | 12 |
| Impairment of goodwill and intangible assets | | 1,081 | — |
| Depreciation and amortization | | 8,381 | 10,098 |
| Deferred income taxes | | 667 | (2,455) |
| Stock-based compensation | | 3,027 | 3,546 |
| Interest expense from debt issuance costs | | 989 | 874 |
| Write-off unamortized debt issuance costs | | 1,049 | 468 |
| Interest expense paid in kind | | 331 | — |
| Changes in operating assets and liabilities: | | | |
| Trade accounts receivable | | (1,006) | 7,656 |
| Prepaid expenses and other current assets | | (1,536) | 55 |
| Income tax receivable | | 573 | (658) |
| Other assets | | 17 | 22 |
| Accrued salaries and benefits | | 1,325 | 3,757 |
| Accounts payable | | 424 | 152 |
| Other current liabilities | | (547) | (2,210) |
| Income taxes payable | | — | (895) |
| Estimated liability for appeals | | (160) | 438 |
| Net payable to client | | (405) | (981) |
| Other liabilities | | (257) | (230) |
| Net cash provided by operating activities | | 770 | 20,491 |
| **Cash flows from investing activities:** | | | |
| Purchase of property, equipment, and leasehold improvements | | (5,408) | (5,529) |
| Net cash used in investing activities | | (5,408) | (5,529) |
| **Cash flows from financing activities:** | | | |
| Repayment of notes payable | | (55,513) | (29,307) |
| Restricted cash for repayment of notes payable | | 7,502 | (7,507) |
| Debt issuance costs paid | | (858) | (800) |
| Taxes paid related to net share settlement of stock awards | | (382) | (261) |
| Proceeds from exercise of stock options | | 90 | 333 |
| Borrowings from notes payable | | 44,000 | — |
| Income tax benefit from employee stock options | | — | 103 |
| Payment of purchase obligation | | — | (427) |
| Net cash used in financing activities | | (5,161) | (37,866) |
| Effect of foreign currency exchange rate changes on cash | | (4) | 24 |
| Net decrease in cash and cash equivalents | | (9,803) | (22,880) |
| Cash and cash equivalents at beginning of period | | 32,982 | 71,182 |
| Cash and cash equivalents at end of period | $ | 23,179 | $ 48,302 |
| **Non-cash financing activities:** | | | |
| Recognition of warrant issued in debt financing | $ | 3,302 | $ — |
| **Supplemental disclosures of cash flow information:** | | | |

4

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
(In thousands)
(Unaudited)

| | | | |
|---|---|---|---|
| Cash paid for income taxes | $ | 540 | $ | 3,976 |
| Cash paid for interest | $ | 2,835 | $ | 4,797 |

*See accompanying notes to consolidated financial statements.*

5

Table of Contents

**PERFORMANT FINANCIAL CORPORATION AND SUBSIDIARIES**
Notes To Consolidated Financial Statements
For the Three and Nine Months Ended September 30, 2017 and 2016
(Unaudited)

## 1. Organization and Description of Business

### (a)  Basis of Presentation and Organization

The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. Generally Accepted Accounting Principles, or U.S. GAAP, for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and notes required by U.S. GAAP for complete financial statements. In the opinion of management, the unaudited interim financial statements furnished herein include all adjustments necessary (consisting only of normal recurring adjustments) for a fair presentation of our and our subsidiaries' financial position at September 30, 2017, the results of our operations for the three and nine months ended September 30, 2017 and 2016 and cash flows for the nine months ended September 30, 2017 and 2016. Interim financial statements are prepared on a basis consistent with our annual consolidated financial statements. The interim financial statements included herein should be read in conjunction with the consolidated financial statements and related notes included in our annual report on Form 10-K for the years ended December 31, 2016, 2015, and 2014.

The Company is a leading provider of technology-enabled audit, recovery, and analytics services in the United States. The Company's services help identify improper payments, and in some markets, restructure and recover delinquent or defaulted assets and improper payments for both government and private clients across different markets. The Company's clients typically operate in complex and regulated environments and outsource their recovery needs in order to reduce losses on billions of dollars of defaulted student loans, improper healthcare payments and delinquent state tax and federal treasury receivables. The Company generally provides services on an outsourced basis, where we handle many or all aspects of the clients' various processes.

The Company's consolidated financial statements include the operations of Performant Financial Corporation (PFC), its wholly owned subsidiary Performant Business Services, Inc., and its wholly owned subsidiaries Performant Recovery, Inc. (Recovery), Performant Technologies, Inc., and Performant Europe Ltd. PFC is a Delaware corporation headquartered in California and was formed in 2003. Performant Business Services, Inc. is a Nevada corporation founded in 1997. Recovery is a California corporation founded in 1976. Performant Technologies, Inc. is a California corporation that was formed in 2004. All significant intercompany balances and transactions have been eliminated in consolidation.

The Company is managed and operated as one business, with a single management team that reports to the Chief Executive Officer.

The preparation of the consolidated financial statements in conformity with U.S. GAAP, requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities, primarily accounts receivable, intangible assets, goodwill, estimated liability for appeals, accrued expenses, and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting periods. Our actual results could differ from those estimates.

### (b)  Revenues, Accounts Receivable, and Estimated Liability for Appeals

Revenue is recognized upon the collection of defaulted loan and debt payments. Loan rehabilitation revenue is recognized when the rehabilitated loans are sold (funded) by clients. Incentive revenue is recognized upon receipt of official notification of incentive award from customers. Under the Company's Medicare Recovery Audit Contractor, or RAC, contract with Centers for Medicare and Medicaid Services, or CMS, the Company recognizes revenues when the healthcare provider has paid CMS for a given claim or has agreed to an offset against other claims by the provider. Providers have the right to appeal a claim and may pursue additional appeals if the initial appeal is found in favor of CMS. The Company accrues an estimated liability for appeals at the time revenue is recognized based on the Company's estimate of the amount of revenue probable of being refunded to CMS following successful appeal. In addition, if the Company's estimate of the liability for appeals with respect to revenues recognized during a prior period changes, the Company increases or decreases current period accruals based on such change in estimated liability. At September 30, 2017, a total of $18.8 million was presented as an allowance against revenue, representing the Company's estimate of claims audited under the CMS contract that may be overturned. Of this, none was related to accounts receivable and $18.8 million was related to commissions which had already been received. In addition to the $18.8 million related to the RAC contract with CMS, the Company has accrued $0.3 million of additional estimated liability for appeals related to other healthcare contracts. The total accrued liability for appeals of $19.1 million has been presented in the

6

Table of Contents

caption estimated liability for appeals at September 30, 2017.  At December 31, 2016, the total appeals-related liability was $19.3 million. The $19.1 million balance at September 30, 2017 and $19.3 million at December 31, 2016, represent the Company's best estimate of the probable amount of losses related to appeals of claims for which commissions were previously collected. In addition to the $19.1 million amount accrued at September 30, 2017, the Company estimates that it is reasonably possible that it could be required to pay an additional amount up to approximately $5.4 million as a result of potentially successful appeals. To the extent that required payments by the Company exceed the amount accrued, revenues in the applicable period would be reduced by the amount of the excess. The zero allowance against accounts receivable at September 30, 2017 resulted from no customer receivables existing in an aged position which required a specific reserve; while the allowance at December 31, 2016 was $0.2 million.

### (c)   Net Payable to Client

The Company nets outstanding accounts receivable invoices from an audit and recovery contract against payables for overturned audits. The overturned audits are netted against current fees due on the invoice to the client when they are processed by the client's system. The "Net payable to client" balance of $12.7 million and $13.1 million at September 30, 2017 and December 31, 2016, respectively, represent the excess of payables for overturned audits. The Company expects that the net payable to client balance will be paid to the client within the next twelve months.

### (d)   Prepaid Expenses and Other Current Assets

At September 30, 2017, prepaid expenses and other current assets includes $5.6 million of amounts estimated to become due from subcontractors. The Company employs subcontractors to audit claims as part of an audit & recovery contract, and to the extent that audits by these subcontractors are overturned on appeal, the fees associated with such claims are contractually refundable to the Company. At September 30, 2017, the receivable associated with estimated future overturns of subcontractor audits was $5.6 million. In addition, at September 30, 2017, prepaid expenses and other current assets includes a net receivable of $3.7 million for subcontractor fees for already overturned audits refundable to the Company once the Company refunds its fees to the client as prime contractor. By comparison, at December 31, 2016, prepaid expenses and other current assets included $5.7 million of estimated future overturns of subcontractor audits, as well as a net receivable of $3.7 million for subcontractor fees for already overturned audits refundable to the Company once the Company refunds its fees to the client as prime contractor.

### (e)   Impairment of Goodwill and Long-Lived Assets

Goodwill and long-lived assets are evaluated for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets or intangibles may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to future undiscounted net cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. For the nine months ended September 30, 2017, an impairment expense of $1.1 million was recognized to account for the write-off of goodwill and intangible assets in one of our subsidiaries, Performant Europe Ltd., due to the Company's decision to wind down activity in this business. The expense has been included in other operating expenses in the consolidated statements of operations. There was no impairment expense for goodwill and long-lived assets for the nine months ended September 30, 2016.

### (f)   Restricted Cash

On August 3, 2017, $6.0 million of restricted cash was paid to the administrative agent for the benefit of the lenders under our Prior Credit Agreement. At September 30, 2017, and at December 31, 2016, restricted cash included in current assets on our consolidated balance sheet was $0.0 million and $7.5 million, respectively.

### (g)   New Accounting Pronouncements

*Recently Adopted Accounting Standards*

In November 2015, the FASB issued Accounting Standards Update (ASU) 2015-17, "Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes" ("ASU 2015-17"), which simplifies the reporting requirements of deferred taxes by requiring all organizations to classify all deferred tax assets and liabilities, along with any related valuation allowance, as noncurrent. The guidance is effective for public companies with annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. We adopted ASU-2015-17 during our first quarter of 2017 on a prospective basis.

7

Table of Contents

During the first quarter 2017, the Company adopted ASU 2016-09, "Improvements to Employee Share-Based Payment Accounting" (ASU 2016-09) on a prospective basis.  As a result of the adoption, the Company recognized $84 thousand of income tax expense for the nine months ended September 30, 2017.  These tax benefits, or shortfalls, were historically recorded in equity.  In addition, cash flows related to excess tax benefits, or shortfalls, are now classified as an operating activity.  Cash paid on employees' behalf related to shares withheld for tax purposes is classified as a financing activity, consistent with prior year's presentation.

*Recently Issued Accounting Standards*

In May 2014, the FASB issued an ASU that amends the FASB ASC by creating a new Topic 606, "Revenue from Contracts with Customers". The new guidance will supersede the revenue recognition requirements in Topic 605, "Revenue Recognition", and most industry-specific guidance on revenue recognition throughout the Industry Topics of the Codification. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply a five step model for recognizing and measuring revenue from contracts with customers. In addition, an entity should disclose sufficient qualitative and quantitative information to enable users of financial statements to understand the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The new revenue recognition guidance, including subsequent amendments, is effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period, with the option to early adopt the standard for annual periods beginning after December 15, 2016. We have not adopted this guidance early and are currently evaluating the effect on our consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, "Leases", which, for operating leases, requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. This new guidance is effective for annual reporting periods beginning after December 15, 2018 with early adoption permitted. We have not adopted this guidance early and are currently evaluating the effect on our consolidated financial statements.

In August 2016, the FASB issued ASU 2016-15, "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments" which provides guidance on the presentation of certain cash receipts and cash payments in the statement of cash flows in order to reduce diversity in existing practice. This new guidance is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2017, and early adoption is permitted. This new standard requires retrospective adoption, with a provision for impracticability. We have not adopted this guidance early and are currently evaluating the effect on our consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, "Simplifying the Test for Goodwill Impairment" to simplify the goodwill impairment testing process. The new standard eliminates Step 2 of the goodwill impairment test. If a company determines in Step 1 of the goodwill impairment test that the carrying value of goodwill is less than the fair value, an impairment in that amount should be recorded to the income statement, rather than proceeding to Step 2. This new guidance is effective for annual reporting periods, and interim periods with goodwill impairment tests within those years, beginning after December 15, 2019, and early adoption is permitted for testing periods after January 1, 2017. We have not adopted this guidance early and are currently evaluating the effect on our consolidated financial statements.

Table of Contents

**2. Property, Equipment, and Leasehold Improvements**

Property, equipment, and leasehold improvements consist of the following at September 30, 2017 and December 31, 2016 (in thousands):

|  | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Land | $ 1,122 | $ 1,122 |
| Building and leasehold improvements | 6,223 | 6,203 |
| Furniture and equipment | 5,706 | 5,656 |
| Computer hardware and software | 70,615 | 67,861 |
|  | 83,666 | 80,842 |
| Less accumulated depreciation and amortization | (62,273) | (57,107) |
| Property, equipment and leasehold improvements, net | $ 21,393 | $ 23,735 |

Depreciation expense of property, equipment and leasehold improvements was $2.5 million and $2.4 million for the three months ended September 30, 2017 and 2016, respectively, $7.7 million and $7.3 million for the nine months ended September 30, 2017 and 2016, respectively.

**3. Credit Agreement**

On March 19, 2012, we, through our wholly owned subsidiary, entered into a $147.5 million credit agreement, as amended and restated, with Madison Capital Funding LLC as administrative agent, ING Capital LLC as syndication agent, and other lenders party thereto (as amended, the "Prior Credit Agreement"). The senior credit facility consists of (i) a $57.0 million Term A loan that matured and was fully paid in March 2017, (ii) a $79.5 million Term B loan that matures in June 2018, and (iii) a $11.0 million revolving credit facility that expired and was fully paid in March 2017. On June 28, 2012, we amended the Credit Agreement to increase the amount of our borrowings under our Term B loan by $19.5 million.

On November 4, 2014, February 19, 2016, July 26, 2016, October 27, 2016, and March 22, 2017, the Prior Credit Agreement was further amended to, among other things, modify a number of existing covenants and add new covenants requiring the Company to maintain a minimum cash balance, comply with an interest coverage ratio and achieve minimum EBITDA levels. On May 3, 2017, we further amended the credit agreement (the "Eighth Amendment") to extend the maturity date of the Term B loan to June 19, 2018. As a result of this extension, regularly scheduled quarterly amortization payments of $247,500 were also extended through March 31, 2018, with the remaining outstanding principal amount due on the June 19, 2018 maturity date. Interest on the Term B loan charged under the credit agreement was also increased by 3.00% per annum, however the amount of such increased interest was payable in kind. Pursuant to the Eighth Amendment, the quarterly and annual financial reporting covenants were also modified to require that the Company's financial statements not contain a qualification, if required by GAAP, with respect to our ability to continue as a going concern.

On August 7, 2017, we, through our wholly-owned subsidiary Performant Business Services, Inc. (the "Borrower"), entered into a new credit agreement with ECMC Group, Inc. (the "New Credit Agreement"). The New Credit Agreement provides for a term loan facility in the initial amount of $44 million (the "Initial Term Loan") and for up to $15 million of additional term loans ("Additional Term Loans"; and together with the Initial Term Loan, the "Loans") which Additional Term Loans may be drawn until the second anniversary of the funding of the Initial Term Loans, subject to the satisfaction of customary conditions. On August 11, 2017, the Initial Term Loan was advanced (the "Closing Date") and the proceeds were applied to repay all outstanding amounts under the Prior Credit Agreement. On September 29, 2017, we entered into Amendment No. 1 to the New Credit Agreement to extend the initial interest payment due date to December 31, 2017. Approximately $2 million of contingent reimbursement obligations with respect to outstanding but undrawn letters of credit remain outstanding under the Prior Credit Agreement, however, those contingent reimbursement obligations will remain cash collateralized with the administrative agent.

The Loans will mature on the third anniversary of the Closing Date, however we will have the option to extend the maturity of the Loans for two additional one year periods, subject to the satisfaction of customary conditions. The Loans will bear interest at the one-month LIBOR rate (subject to a 1% per annum floor) plus a margin which may vary from 5.5% per annum to 10.0% per annum based on our total debt to EBITDA ratio. The Initial Term Loans will initially bear interest at LIBOR plus 7.0% per annum. We will be required to pay 5% of the original principal balance of the Loans annually in quarterly installments beginning March 31, 2018, and to offer to make mandatory prepayments of the Loans with a percentage of our excess cash flow which may vary between 75% and 0% depending on our total debt to EBITDA ratio. In addition to mandatory

9

Table of Contents

prepayments for excess cash flow, we will also be required to offer to prepay the Loans with the net cash proceeds of certain asset dispositions and with the issuance of debt not otherwise permitted under the New Credit Agreement.  Except in connection with a change of control and the payment of a 1% premium, we will not be permitted to voluntarily prepay the Loans until after the first anniversary of the Closing Date.  We will be permitted to prepay the Loans during the second year after the Closing Date if accompanied by a prepayment premium of 1%.  Thereafter, we will be permitted to prepay the Loans without any prepayment premium.

The New Credit Agreement contains certain restrictive financial covenants which became effective on the Closing Date. Such covenants require, among other things, that we meet a minimum fixed charge coverage ratio of 0.5 to 1.0 through December 31, 2019, 1.0 to 1.0 through June 30, 2020 (or until December 31, 2020 if the maturity date of the Loans is extended until the fourth anniversary of the Closing Date), 1.25 to 1.0 through June 30, 2021 if the maturity date of the Loans is extended until the fourth anniversary of the Closing Date and 1.25 to 1.0 through June 30, 2022 if the maturity date of the Loans is extended until the fifth anniversary of the Closing Date. In addition, we will be required to maintain, a maximum total debt to EBITDA ratio of 6.00 to 1.00. The New Credit Agreement also contains covenants that will restrict the Company and its subsidiaries' ability to incur certain types or amounts of indebtedness, incur liens on certain assets, make material changes in corporate structure or the nature of its business, dispose of material assets, engage in a change in control transaction, make certain foreign investments, enter into certain restrictive agreements, or engage in certain transactions with affiliates.

The obligations under the New Credit Agreement are secured by substantially all of our United States domestic subsidiaries' assets and are guaranteed by the Company and its United States domestic subsidiaries, other than the Borrower.

As a result of our entry into our New Credit Agreement, and the repayment of all amounts owed under the Prior Credit Agreement, we wrote off debt issuance costs related to the Prior Credit Agreement of approximately $1.0 million in August 2017.

Scheduled payments under the Agreement for the next five years and thereafter are as follows (in thousands):

| Year Ending December 31, | Amount | |
|---|---|---|
| Remainder of 2017 | $ | — |
| 2018 | | 2,200 |
| 2019 | | 2,200 |
| 2020 | | 39,600 |
| 2021 | | — |
| Thereafter | | — |
| Total | $ | 44,000 |

In consideration for, and concurrently with, the extension of the Initial Term Loan in accordance with the terms of the New Credit Agreement, we issued a warrant to the lender to purchase up to an aggregate of 3,863,326 shares of the Company's common stock (representing approximately up to 7.5% of our diluted common stock as calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) with an exercise price of $1.92 per share. Upon our election to borrow any of the Additional Term Loans, we will be required to issue additional warrants at the same exercise price to purchase up to an aggregate of 77,267 additional shares of common stock (which represents approximately 0.15% of our diluted common stock calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) for each $1,000,000 of such Additional Term Loans.

The Company has accounted for this warrant as an equity instrument since the Warrant is indexed to the Company's common shares and meets the criteria for classification in shareholders' equity. The relative fair value of the Warrant on the date of issuance was approximately $3.3 million and is treated as a discount to the debt. This amount will be amortized to interest expense under the effective interest method over the life of the Term Loan, which is a period of 36 months. The Company estimated the value of the Warrant using the Black-Scholes model. The key assumptions used to value the Warrant are as follows:

10

Table of Contents

| | | |
|---|---|---|
| Exercise price | $ | 1.92 |
| Share price on date of issuance | $ | 1.85 |
| Volatility | | 50.0% |
| Risk-free interest rate | | 1.83% |
| Expected dividend yield | | —% |
| Contractual term (in years) | | 5 |

In addition, at the closing of the Term Loan, the Company paid transaction costs of $0.6 million, which were recorded as a discount on the debt and will be amortized to interest expense using the effective interest method over the life of the initial Term Loan, which is a period of 36 months.

Outstanding debt obligations are as follows (in thousands):

| | | September 30, 2017 |
|---|---|---|
| Principal amount | $ | 44,000 |
| Less: unamortized discount and debt issuance costs | | (3,687) |
| Loan payable less unamortized discount and debt issuance costs | | 40,313 |
| Less: current maturities | | (1,512) |
| Long-term loan payable, net of current maturities | $ | 38,801 |

### 4. Commitments and Contingencies

We have entered into various non-cancelable operating lease agreements for certain of our office facilities and equipment with original lease periods expiring between 2017 and 2022. Certain of these arrangements have free rent periods and /or escalating rent payment provisions, and we recognize rent expense under such arrangements on a straight-line basis. In October 2017, we renewed our lease agreements for office space for approximately 50,000 square feet in Livermore, California.

Future minimum rental commitments under non-cancelable leases as of September 30, 2017 are as follows (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| Remainder of 2017 | $ | 393 |
| 2018 | | 2,223 |
| 2019 | | 2,158 |
| 2020 | | 2,109 |
| 2021 | | 1,377 |
| Thereafter | | 933 |
| Total | $ | 9,193 |

Operating lease expense was $0.6 million and $0.7 million for the three months ended September 30, 2017 and 2016, respectively, and was $2.0 million and $2.1 million for the nine months ended September 30, 2017 and 2016, respectively.

### 5. Stock-based Compensation

#### (a) Stock Options

Total stock-based compensation expense charged as salaries and benefits expense in the consolidated statements of operations was $0.7 million and $1.2 million for the three months ended September 30, 2017 and 2016, respectively, and $3.0 million and $3.5 million for the nine months ended September 30, 2017 and 2016, respectively.

11

000080

Table of Contents

The following table shows stock option activity for the nine months ended September 30, 2017:

| | Outstanding Options | Weighted average exercise price per share | Weighted average remaining contractual life (Years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Outstanding at December 31, 2016 | 3,506,529 | $ 7.32 | 5.04 | $ 1,367 |
| Granted | — | — | | |
| Forfeited | (159,310) | 5.38 | | |
| Exercised | (188,959) | 0.50 | | |
| Outstanding at September 30, 2017 | 3,158,260 | $ 7.83 | 4.41 | $ 613 |
| Vested, exercisable, expected to vest[1] at September 30, 2017 | 3,149,795 | $ 7.83 | 4.41 | $ 613 |
| Exercisable at September 30, 2017 | 2,980,079 | $ 7.98 | 4.24 | $ 610 |

(1) Options expected to vest reflect an estimated forfeiture rate.

The Company recognizes share-based compensation costs as expense on a straight-line basis over the option vesting period, which generally is four to five years.

### (b) Restricted Stock Units and Performance Stock Units

The following table summarizes restricted stock unit and performance stock unit activity for the nine months ended September 30, 2017:

| | Number of Awards | Weighted average grant date fair value per share |
|---|---|---|
| Outstanding at December 31, 2016 | 2,060,240 | $ 2.70 |
| Granted | 1,481,252 | 2.41 |
| Forfeited | (371,800) | 2.98 |
| Expired | (40,500) | 2.57 |
| Vested and converted to shares, net of units withheld for taxes | (533,872) | 2.73 |
| Units withheld for taxes | (209,743) | 2.73 |
| Outstanding at September 30, 2017 | 2,385,577 | $ 2.46 |
| Expected to vest at September 30, 2017 | 2,266,348 | $ 2.46 |

Restricted stock units and performance stock units granted under the Performant Financial Corporation 2012 Stock Incentive Plan generally vest over periods ranging from one to four years.

### 6. Income Taxes

Our effective income tax rate changed to a negative rate of (14.4)% for the nine months ended September 30, 2017 from 6.9% for the nine months ended September 30, 2016. The decrease in the effective tax rate is primarily due to more significant losses from operations generated in the nine months ended September 30, 2017 for which no tax benefit is recognized compared to the income tax expense recorded on income from operations for the nine months ended September 30, 2016.

We file income tax returns with the U.S. federal government and various state jurisdictions. We operate in a number of state and local jurisdictions, most of which have never audited our records. Accordingly, we are subject to state and local income tax examinations based upon the various statutes of limitations in each jurisdiction. For tax years before 2014, the Company is no longer subject to Federal and certain other state tax examinations. We are currently being examined by the Franchise Tax Board of California for tax years 2011 through 2014.

12

Table of Contents

**7. Earnings per Share**

For the three and nine months ended September 30, 2017 and 2016, basic income per share is calculated by dividing net income by the sum of the weighted average number of shares of Common Stock outstanding during the period. Diluted income per share is calculated by dividing net income by the weighted average number of shares of Common Stock and dilutive common share equivalents outstanding during the period. Common share equivalents consist of stock options, restricted stock units, and performance stock units. When there is a loss in the period, dilutive common share equivalents are excluded from the calculation of diluted earnings per share, as their effect would be anti-dilutive. For example, for the three months and nine months ended September 30, 2017, and the three months ended September 30, 2016, dilutive common share equivalents have been excluded, and diluted weighted average shares outstanding are the same as basic average shares outstanding. When there is net income in the period, the Company excludes stock options, restricted stock units, and performance stock units from the calculation of diluted earnings per share when the combined exercise price, unamortized fair value and excess tax benefits of the options exceed the average market price of the Company's common stock because their effect would be anti-dilutive. For the nine months ended September 30, 2016, the Company excluded 4,559,511 options from the calculation of diluted earnings per share because their effect would be anti-dilutive.

The following table reconciles the basic to diluted weighted average shares outstanding using the treasury stock method (shares in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2017** | **2016** | **2017** | **2016** |
| Weighted average shares outstanding – basic | 50,852 | 50,200 | 50,581 | 49,974 |
| Dilutive effect of stock options | — | — | — | 427 |
| Weighted average shares outstanding – diluted | 50,852 | 50,200 | 50,581 | 50,401 |

**8. Subsequent Events**

We have evaluated subsequent events through the date these consolidated financial statements were issued and there are no other events that have occurred that would require adjustments or disclosures to our consolidated financial statements.

13

Table of Contents

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*You should read the following discussion in conjunction with our condensed consolidated financial statements (unaudited) and related notes included elsewhere in this report. This report on Form 10-Q contains forward-looking statements that involve risks and uncertainties. The words "believe," "may," "will," "estimate," "continue," "anticipate," "design," "intend," "expect" and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in "Risk Factors" under Item 1A of Part II of this report. In light of these risks, uncertainties and assumptions, the forward-looking events and trends discussed in this report may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward-looking statements include, but are not limited to, statements about our: opportunities and expectations for growth in the student lending, healthcare and other markets; anticipated trends and challenges in our business and competition in the markets in which we operate; our client relationships and our ability to maintain such client relationships; our ability to maintain compliance with the covenants in our debt agreements; the adaptability of our technology platform to new markets and processes; our ability to invest in and utilize our data and analytics capabilities to expand our capabilities; the sufficiency of our appeals reserve; our growth strategy of expanding in our existing markets and considering strategic alliances or acquisitions; our ability to meet our liquidity and working capital needs; maintaining, protecting and enhancing our intellectual property; our expectations regarding future expenses; expected future financial performance; and our ability to comply with and adapt to industry regulations and compliance demands. The forward-looking statements in this report speak only as of the date hereof. We expressly disclaim any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.*

**Overview**

We provide technology-enabled audit, recovery and related analytics services in the United States. Our services help identify improper payments, and in some markets, restructure and recover delinquent or defaulted assets and improper payments for both government and private clients across different markets. Our clients typically operate in complex and regulated environments and outsource their recovery needs in order to reduce losses on billions of dollars of defaulted student loans, improper healthcare payments and delinquent state tax and federal treasury and other receivables. We generally provide our services on an outsourced basis, where we handle many or all aspects of our clients' various processes.

Our revenue model is generally success-based as we earn fees on the aggregate amount of improper payments that we identify on behalf of our clients that we either recover directly or enable our clients to recover. Our services do not require any significant upfront investments by our clients and offer our clients the opportunity to recover significant funds otherwise lost. Because our model is based upon the success of our efforts and the dollars we enable our clients to recover, our business objectives are aligned with those of our clients and we are generally not reliant on their spending budgets. Furthermore, our business model does not require significant capital expenditures and we do not purchase loans or obligations.

**Sources of Revenues**

We derive our revenues from services for clients in a variety of different markets. These markets include student lending and healthcare, as well as our other markets which include, but are not limited to, delinquent state taxes and federal Treasury and other receivables.

14

Table of Contents

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2017** | **2016** | **2017** | **2016** |
| | (in thousands) | | (in thousands) | |
| **Student Lending:** | | | | |
| Department of Education | $ 635 | $ 3,906 | $ 3,579 | $ 18,243 |
| Guaranty Agencies and Other | 19,178 | 19,891 | 68,242 | 63,964 |
| Total of Student Lending | 19,813 | 23,797 | 71,821 | 82,207 |
| **Healthcare:** | | | | |
| CMS RAC | 821 | 1,717 | 969 | 5,180 |
| Commercial | 1,806 | 1,262 | 5,393 | 3,878 |
| Total of Healthcare | 2,627 | 2,979 | 6,362 | 9,058 |
| **Other:** | 7,304 | 4,419 | 20,577 | 16,283 |
| Total Revenues | $ 29,744 | $ 31,195 | $ 98,760 | $ 107,548 |

*Student Lending*

We derive the majority of our revenues from the recovery of student loans. These revenues are contract-based and consist primarily of contingency fees based on a specified percentage of the amount we enable our clients to recover. Our contingency fee percentage for a particular recovery depends on the type of recovery facilitated. Our clients in the student loan recovery market mainly consist of several of the largest guaranty agencies, or GAs. In addition, we have a long history of also providing recovery services to the Department of Education. However, in December 2016, the Department of Education awarded contracts for student loan recovery services to seven contractors and we were not a recipient of one of these contract awards. We, along with 19 other contractors who did not receive contract awards from the Department of Education, filed protests with the GAO regarding the Department of Education's award of these contracts. In March 2017, the GAO upheld our protest. The Department of Education requested resubmittal of new contract proposals and is currently undergoing a re-evaluation process with respect to such proposals. The Department of Education has recently announced that it has completed its review and assessment for the award of the new contracts. However, we do not know when the awards of the new contracts will be made. Further, there may be appeals and challenges to the contract awards when granted, which could delay the actual start date for the new contracts. We have been one of the Department of Education's unrestricted student loan recovery contractors for more than 20 years until our prior contract expired in April 2015.

We believe the size and the composition of our student loan inventory at any point provides us with a degree of revenue visibility for our student loan revenues. Based on data compiled from over two decades of experience with the recovery of defaulted student loans, at the time we receive a placement of student loans, we are able to make a reasonably accurate estimate of the recovery outcomes likely to be derived from such placement and the revenues we are likely able to generate based on the anticipated recovery outcomes.

Our key metric in evaluating our student lending business is Placement Volume. Our Placement Volume represents the dollar volume of defaulted student loans first placed with us during the specified period by public and private clients for recovery. Placement Volume allows us to measure and track trends in the amount of inventory our clients in the student lending market are placing with us during any period. The revenues associated with the recovery of a portion of these loans may be recognized in subsequent accounting periods, which assists management in estimating future revenues and in allocating resources necessary to address current Placement Volumes.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2017** | **2016** | **2017** | **2016** |
| | (in thousands) | | (in thousands) | |
| **Student Lending Placement Volume:** | | | | |
| Department of Education | $ — | $ — | $ — | $ 5,082 |
| Guaranty Agencies and Other | 647,088 | 678,910 | 2,221,748 | 2,539,998 |
| **Total Student Lending Placement Volume** | $ 647,088 | $ 678,910 | $ 2,221,748 | $ 2,545,080 |

15

000084

Table of Contents

There are five potential outcomes to the student loan recovery process from which we generate revenues. These outcomes include: full repayment, recurring payments, rehabilitation, loan restructuring and wage garnishment. Of these five potential outcomes, our ability to rehabilitate defaulted student loans is the most significant component of our revenues in this market. Generally, a loan is considered successfully rehabilitated after the student loan borrower has made nine consecutive qualifying monthly payments and our client has notified us that it is recalling the loan. Once we have structured and implemented a repayment program for a defaulted borrower, we (i) earn a percentage of each periodic payment collected up to and including the final periodic payment prior to the loan being considered "rehabilitated" by our clients, and (ii) if the loan is "rehabilitated," then we are paid a one-time percentage of the total amount of the remaining unpaid balance, except that beginning in July 2015, our contract with the Department of Education has provided for a fixed fee of $1,710 for each rehabilitated loan. The fees we are paid vary by recovery outcome as well as by contract. In addition, under our contracts with our GA clients, we generally recognize revenue when our GA clients rehabilitate and recall the loans which has been placed with us. At times, our GA clients may be delayed in recalling loans or may wait to rehabilitate loans based on events that are not in our control. For non-government-supported student loans we are generally only paid contingency fees on two outcomes: full repayment or recurring repayments. The table below describes our typical fee structure for each of these five outcomes.

**Student Loan Recovery Outcomes**

| Full Repayment | Recurring Payments | Rehabilitation | Loan Restructuring | Wage Garnishment |
|---|---|---|---|---|
| • Repayment in full of the loan | • Regular structured payments, typically according to a renegotiated payment plan | • After a defaulted borrower has made nine consecutive recurring payments, the loan is eligible for rehabilitation | • Restructure and consolidate a number of outstanding loans into a single loan, typically with one monthly payment and an extended maturity | • If we are unable to obtain voluntary repayment, payments may be obtained through wage garnishment after certain administrative requirements are met |
| • We are paid a percentage of the full payment that is made | • We are paid a percentage of each payment | • We are paid based on a percentage of the overall value of the rehabilitated loan or for the Department of Education, a fixed fee | • We are paid based on a percentage of overall value of the restructured loan | • We are paid a percentage of each payment |

For certain guaranty agency, or GA, clients, we have entered into Master Service Agreements, or MSAs. Under these agreements, clients provided their entire inventory of outsourced loans or receivables to us for recovery on an exclusive basis, in contrast with traditional contracts that are split among various service providers. In certain circumstances, we engage subcontractors to assist in the recovery of a portion of the client's portfolio. We also receive success fees for the recovery of loans under MSAs and our revenues under MSA arrangements include fees earned by the activities of our subcontractors. On June 15, 2017, we received a termination notice from one of our significant GA clients, Great Lakes Higher Education Guaranty Corporation. The termination of this contract was based on Great Lake's decision to bundle its student loan servicing work, a service that we currently do not provide, along with its student loan recovery work to a single third party vendor. Since we received the initial termination notice from Great Lakes, we received additional notices from Great Lakes to allow us to continue to provide certain student loan services for three additional 30-day periods. In September 2017, we entered into a contract with Navient, who is now servicing the Great Lakes portfolio, to act as a recovery subcontractor for Navient. Under this arrangement, we expect to start recovery services for approximately 25% of the Great Lakes portfolio, and we believe we will have the opportunity to increase this percentage based on our performance. This contract also provides us with the right to service a small portion of an additional portfolio managed by Navient. This contract has no set term, and Navient has the right to terminate the contract at will.

In October 2014, the Department of Education announced a change in the structure for the payment of fees to recovery contractors upon rehabilitation of student loans under the existing recovery contract. The new fee structure provides for a fixed fee of $1,710 for each loan that is rehabilitated. Previously, the fee had been based on a percentage of the principal amount of the rehabilitated loan. The change to the fee structure became effective for student loans rehabilitated on or following July 1, 2015.

Further, the Bipartisan Budget Act of 2013 reduced the compensation paid to GAs for the rehabilitation of student loans, effective July 1, 2014. This "revenue enhancement" measure reduced the amount that GAs can charge borrowers from 18.5% to 16.0% of the outstanding loan balance, when a rehabilitated loan is sold by the GA and eliminated entirely the GAs retention of 18.5% of the outstanding loan balance as a fee for rehabilitation services. The reduction in compensation the GAs

16

Table of Contents

receive resulted in a decrease in the contingency fee percentage that we receive from the GAs for assisting in the rehabilitation of defaulted student loans.

*Healthcare*

We derive revenues from the healthcare market from our commercial healthcare contracts and our RAC contracts. For clients in both commercial and government healthcare markets, we are responsible for identifying incorrectly paid claims through both complex and automated forms of audit review. For our RAC contracts, we audit Medicare payments to detect improperly paid Part A and Part B Medicare claims. Revenues earned under the healthcare contracts are driven by the identification of improperly paid claims through both automated and manual review of such claims. We are paid contingency fees by our clients based on a percentage of the dollar amount of improper claims we identify that are recovered by our clients. We currently recognize revenue when the provider pays our client or incurs an offset against future claims. The revenues we recognize are net of our estimate of claims that we believe may be overturned by appeal following payment by the provider.

On October 5, 2017, we announced that we were awarded the Medicare Secondary Payer Commercial Repayment Center (CRC) contract by the Centers for Medicare and Medicaid. Under this agreement, we are responsible for identifying and recovering payments in situations where Medicare should not be the primary payer of healthcare claims because a beneficiary has other forms of insurance coverage, such as through an employer group health plan or certain other payers.

Our first RAC contract was wound down and then terminated in 2016 in connection with CMS's plan to award new contracts. On October 26, 2016, CMS awarded new RAC contracts and we received RAC contracts for audit Regions 1 and 5. The RAC contract award for Region 1 allows us to continue our audit of payments under Medicare's Part A and Part B for all provider types other than DMEPOS and home health and hospice within an 11 state region in the Northeast and Midwest. The Region 5 RAC contract provides for the post-payment review of DMEPOS and home health and hospice claims nationally. While audit and recovery activity under the new contracts commenced in April 2017, there is uncertainty regarding the scope of audit that will be permitted by CMS under the new RAC contracts. In connection with the wind down of our first RAC contract, CMS adopted a series of contract transition procedures and other restrictions, beginning in 2013, that limited the types of claims we are permitted to audit and our ability to request medical records for audit and CMS suspended our ability to perform any audit services for certain periods of time, thus materially adversely affecting our revenues under that contract. In May 2016, CMS announced that the recovery audit contractors would not be able to request documents from providers for audit after May 16, 2016 and would not be able to submit claims for improper payments after July 29, 2016, effectively terminating additional revenue generating activity under our first RAC contract. Revenues for the year ended December 31, 2016 from our first RAC contract were $5.7 million, compared with $12.5 million for 2015 and $29.2 million in 2014. To date we have not recognized significant revenues from the newly awarded RAC contracts meaning that these new contracts will not have a significant impact on 2017 revenues, although we have incurred start-up related expenses during 2017.

In connection with our first RAC contract, CMS announced a settlement offer to pay hospitals 68% of what they have billed Medicare to settle a backlog of pending appeals challenging Medicare's denials of reimbursement for certain types of short-term care. The implication of this settlement offer related to claims for which fees have already been paid to recovery auditors under existing RAC contracts is unclear at this time, but we may be obligated to repay certain amounts that we previously received from CMS depending on the final terms of any such settlement. We accrue an estimated liability for appeals based on the amount of commissions received which are subject to appeal and which we estimate are probable of being returned to providers following successful appeal. The $18.8 million balance as of September 30, 2017, represents our best estimate of the probable amount we may be required to refund related to appeals of claims for which commissions were previously collected. We estimate that it is reasonably possible that we could be required to pay an additional amount up to approximately $5.4 million as a result of potentially successful appeals in excess of the amount we accrued as of September 30, 2017.

In connection with the award of our first RAC contract, we outsourced certain aspects of our healthcare recovery process to three different subcontractors. Two of these subcontractors provided a specific service to us in connection with our claims recovery process, with the third subcontractor, whose services were terminated in December 2016, formerly providing all of the audit and recovery services for claims within a portion of our region. We recognize all of the revenues generated by the claims recovered through our subcontractor relationships, and we recognize the fees that we pay to these subcontractors in our expenses.

For our commercial healthcare business, our business strategy is focused on utilizing our technology-enabled services platform to provide audit, analytical, and in some cases, recovery services for private healthcare payors. We have entered into contracts with several private payors, although these contracts are in the early stage of implementation. Revenues from our

17

Table of Contents

commercial healthcare clients were $1.8 million for the quarter ended September 30, 2017, compared to revenues of $1.3 million that we earned from our commercial healthcare clients in the quarter ended September 30, 2016.

### Other

We also derive revenues from the recovery of delinquent state taxes, and federal Treasury and other receivables, specialty administrative customer care functions, default aversion services for certain clients including financial institutions and the licensing of hosted technology solutions to certain clients. For our hosted technology services, we license our system and integrate our technology into our clients' operations, for which we are paid a licensing fee. Our revenues for these services include contingency fees, fees based on dedicated headcount to our clients and hosted technology licensing fees.

### Costs and Expenses

We generally report two categories of operating expenses: salaries and benefits and other operating expense. Salaries and benefits expenses consist primarily of salaries and performance incentives paid and benefits provided to our employees. Other operating expense includes expenses related to our use of subcontractors, other production related expenses, including costs associated with data processing, retrieval of medical records, printing and mailing services, amortization and other outside services, as well as general corporate and administrative expenses. We expect a significant portion of our expenses to increase as we grow our business. However, we expect certain expenses, including our corporate and general administrative expenses, to grow at a slower rate than our revenues over the long term. As a result, we expect our overall expenses to modestly decline as a percentage of revenues.

### Factors Affecting Our Operating Results

Our results of operations are influenced by a number of factors, including allocation of placement volume, claim recovery volume, contingency fees, regulatory matters, client retention and macroeconomic factors.

#### Allocation of Placement Volume

Our clients have the right to unilaterally set and increase or reduce the volume of defaulted student loans or other receivables that we service at any given time. In addition, many of our recovery contracts for student loans and other receivables are not exclusive, with our clients retaining multiple service providers to service portions of their portfolios. Accordingly, the number of delinquent student loans or other receivables that are placed with us may vary from time to time, which may have a significant effect on the amount and timing of our revenues. We believe the major factors that influence the number of placements we receive from our clients in the student loan market include our performance under our existing contracts and our ability to perform well against competitors for a particular client. To the extent that we perform well under our existing contracts and differentiate our services from those of our competitors, we may receive a relatively greater number of placements under these existing contracts and may improve our ability to obtain future contracts from these clients and other potential clients. Further, delays in placement volume, as well as acceleration of placement volume, from any of our large clients may cause our revenues and operating results to vary from quarter to quarter.

Typically, we are able to anticipate with reasonable accuracy the timing and volume of placements of defaulted student loans and other receivables based on historical patterns and regular communication with our clients. Occasionally, however, placements are delayed due to factors outside of our control.

#### Contingency Fees

Our revenues consist primarily of contract-based contingency fees. The contingency fee percentages that we earn are set by our clients or agreed upon during the bid process, and may change from time to time either under the terms of existing contracts or pursuant to the terms of contract renewals. For example, the fees that we earned under our contractual arrangement with the Department of Education were subject to unilateral change by the Department of Education as a result of the Department of Education's decision to have its recovery vendors promote IBR to defaulted student loans. In connection with the implementation of the IBR program, the Department of Education reduced the contingency fee rate that we receive for rehabilitating student loans by approximately 13% effective March 1, 2013.

18

Table of Contents

Further, the Department of Education changed its fee structure to a fixed recovery fee of $1,710 for each rehabilitated loan, effective as of July 1, 2015. The fixed recovery fee is payable for each loan that is rehabilitated and replaced a recovery fee structure that historically had been based on a percentage of the balance of the rehabilitated loan.

### Regulatory Matters

Each of the markets which we serve is highly regulated. Accordingly, changes in regulations that affect the types of loans, receivables and claims that we are able to service or the manner in which any such delinquent loans, receivables and claims can be recovered will affect our revenues and results of operations. For example, the passage of the Student Aid and Fiscal Responsibility Act, or SAFRA, in 2010 had the effect of transferring the origination of all government-supported student loans to the Department of Education, thereby ending all student loan originations guaranteed by the GAs. Loans guaranteed by the GAs represented approximately 70% of government-supported student loans originated in 2009. While the GAs will continue to service existing outstanding student loans for years to come, this legislation will over time shift the portfolio of defaulted student loans toward the Department of Education for which we are no longer a contractor (subject to resolution of our recently upheld protest). In addition, our entry into the healthcare market was facilitated by passage of the Tax Relief and Health Care Act of 2006, which mandated CMS to contract with private firms to audit Medicare claims in an effort to increase the recovery of improper Medicare payments. Any changes to the regulations that affect the student loan industry or the recovery of defaulted student loans or the Medicare program generally or the audit and recovery of Medicare claims could have a significant impact on our revenues and results of operations.

### Client Retention

Our revenues from the student loan market depend on our ability to maintain our contracts with some of the largest providers of student loans. In 2016 and 2015, three providers of student loans each accounted for more than 10% of our revenues and they collectively accounted for 55% of our total revenues in each year. Our contract with the Department of Education, which generated 16% of our revenues in 2016, expired in April 2015 and we were not selected as a vendor on the new contract announced in December 2016. We, along with 19 other contractors who did not receive contract awards from the Department of Education, filed protests regarding the Department of Education's award of these contracts. In March 2017, our protest was upheld. The Department of Education requested resubmittal of new contract proposals and is currently undergoing a re-evaluation process with respect to such proposals. The Department of Education recently announced that it has completed its review and assessment for the award of the new contracts. However, we do not know when the award of the new contracts will be made. Further, there may be further appeals and challenges to the contract awards when granted, which could delay the actual start date for the new contracts. If we are not successful in obtaining a new contract as a result of a conclusive award process, the absence of a contract with the Department of Education will have a material adverse effect on our financial condition and results of operations in 2018 and beyond. Our contracts with our other large clients entitle them to unilaterally terminate their contractual relationship with us at any time without penalty. In June 2017, one of our principal customers, Great Lakes Higher Education Guaranty Corporation, notified us that it is terminating our student loan recovery contract. If we lose one of our other significant clients, including if one of our significant clients is consolidated by an entity that does not use our services, if the terms of compensation for our services change or if there is a reduction in the level of placements provided by any of these clients, our revenues could decline.

The award of our two new RAC contracts in October 2016 has removed the uncertainty related to the retention of our relationship with CMS. However, while audit and recovery activity under the new contracts has commenced, the scope of our permitted audit activity remains uncertain. To date, we have not recognized significant revenues from the newly awarded RAC contracts.

### Macroeconomic Factors

Certain macroeconomic factors influence our business and results of operations. These include the increasing volume of student loan originations in the U.S. as a result of increased tuition costs and student enrollment, the default rate of student loan borrowers, the growth in Medicare expenditures resulting from increasing healthcare costs, as well as the fiscal budget tightening of federal, state and local governments as a result of general economic weakness and lower tax revenues.

## Critical Accounting Policies

Our consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States, or GAAP. The preparation of these consolidated financial statements requires us to make estimates and

000088

Table of Contents

assumptions that affect the reported amounts of assets, liabilities, revenues, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. In many instances, we could have reasonably used different accounting estimates, and in other instances changes in the accounting estimates are reasonably likely to occur from period-to-period. Accordingly, actual results could differ significantly from the estimates made by our management. To the extent that there are material differences between these estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

### Revenue Recognition

The majority of our contracts are contingency fee based. We recognize revenues on these contingency fee based contracts when third-party payors remit payments to our clients or remit payments to us on behalf of our clients, and, consequently, the contingency is deemed to have been satisfied. Under our RAC contracts with CMS, we recognize revenues when the healthcare provider has paid CMS for a claim or has agreed to an offset against other claims by the provider. Healthcare providers have the right to appeal a claim and may pursue additional level of appeals if the initial appeal is found in favor of CMS. We accrue an estimated liability for appeals at the time revenue is recognized based on our estimate of the amount of revenue probable of being returned to CMS following successful appeal based on historical data and other trends relating to such appeals. In addition, if our estimate of liability for appeals with respect to revenues recognized during a prior period changes, we increase or decrease the estimated liability for appeals in the current period.

This estimated liability for appeals is an offset to revenues on our income statement. Resolution of appeals can take a very long time to resolve and there is a significant backlog in the system for resolving appeals, as over the course of our existing RAC contract, healthcare providers have increased their pursuit of appeals beyond the first and second levels of appeal to the third level of appeal, where cases are heard by administrative law judges, or ALJs. In our experience, decisions at the third level of appeal are the least favorable as ALJs exercise greater discretion and there is less predictability in the ALJ decisions as compared to appeals at the first or second levels. This increase of ALJ appeals and backlog of claims at the third level of appeal is the primary reason our total estimated liability for appeals (consisting of the estimated liability for appeals plus the contra-accounts-receivable estimated allowance for appeals) has remained at a consistent level despite decreasing revenue from CMS. The balance of the estimated liability for appeals remained at $18.8 million as of September 30, 2017 primarily due to the relatively slow pace of the decisions at the ALJ level. In addition to the $18.8 million related to the RAC contract with CMS, the Company has accrued $0.3 million of additional estimated liability for appeals related to other healthcare contracts. The total accrued liability for appeals is therefore $19.1 million at September 30, 2017.

The $19.1 million balance as of September 30, 2017, represents our best estimate of the probable amount of losses related to appeals of claims for which commissions were previously collected. We estimate that it is reasonably possible that we could be required to pay up to an additional approximately $5.4 million as a result of potentially successful appeals. To the extent that required payments by us related to successful appeals exceed the amount accrued, revenues in the applicable period would be reduced by the amount of the excess.

In May 2014, the Financial Accounting Standards Board ("FASB") issued an ASU that amends the FASB ASC by creating a new Topic 606, *Revenue from Contracts with Customers*. The new guidance will supersede the revenue recognition requirements in Topic 605, *Revenue Recognition*, and most industry-specific guidance on revenue recognition throughout the Industry Topics of the Codification. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply a five step model for recognizing and measuring revenue from contracts with customers. In addition, an entity should disclose sufficient qualitative and quantitative information to enable users of financial statements to understand the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The new revenue recognition guidance, including subsequent amendments, is effective for annual reporting periods beginning on or after December 15, 2017, including interim periods within that reporting period, with the option to early adopt the standard for annual periods beginning on or after December 15, 2016.

We are currently in the process of finalizing our assessment of the impact from the adoption of this guidance on our consolidated financial statements. As part of this process, we are considering our major revenue streams and evaluating our significant contracts therein for potential changes in the amounts and timing of revenue recognition under the new guidance. Based on the work performed to date, we have determined that the following areas are of primary focus: consideration of termination rights and resulting impact on the duration of a contract, applicability of treatment as variable consideration for refund rights and certain incentive payments, including the impact of constraints, applicability of the variable

20

000089

Table of Contents

consideration allocation exception to allocate purchase consideration to performance obligations considered to be a series, and ability to use the 'right to invoice' practical expedient for measuring satisfaction of performance obligations within certain contracts. We are also in the process of finalizing our evaluation of our various commission and bonus programs to identify costs that may be subject to potential deferral and amortization as costs to obtain a contract. In addition, we are evaluating the disclosure requirements of the new guidance, subject to the above determinations on areas most likely to be impacted by our adoption. We expect to have our evaluation, including the selection of an adoption method, completed by the end of 2017. We will adopt the new revenue recognition guidance in the first quarter of 2018.

### Goodwill

We periodically review the carrying value of intangible assets not subject to amortization, including goodwill, to determine whether an impairment may exist. GAAP requires that goodwill and certain intangible assets not subject to amortization be assessed annually for impairment using fair value measurement techniques.

We assess goodwill for impairment on an annual basis as of November 30 of each year or more frequently if an event occurs or changes in circumstances would more likely than not reduce the fair value of a reporting unit below its carrying amount. We have the option to perform a qualitative assessment to determine if an impairment is more likely than not to have occurred. If we can support the conclusion that it is more likely than not that the fair value of a reporting unit is greater than its carrying amount, then we would not need to perform the two-step impairment test. If we cannot support such a conclusion, or we do not elect to perform the qualitative assessment, then the first step of the goodwill impairment test is used to identify potential impairment by comparing the fair value of a reporting unit with its carrying amount, including goodwill. We performed a qualitative assessment of whether it is more likely than not that the reporting unit fair value is less than its carrying amount as of June 30, 2017, and concluded that based on our decision to wind down the activity of Performant Europe Ltd., the fair value is more likely than not less than its carrying amount. Accordingly, the goodwill balance for the healthcare audit acquisition was $0.9 million, and we recognized a goodwill impairment loss of this amount as of June 30, 2017. Based on our qualitative analysis, there was no need to perform an additional impairment test. We performed a qualitative assessment of whether it is more likely than not that the reporting unit fair value is less than its carrying amount as of September 30, 2017, and concluded that there was no need to perform an impairment test.

### Impairments of Depreciable Intangible Assets

The balance of depreciable intangible assets was $5.1 million as of September 30, 2017. We evaluate depreciable intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Depreciable intangible assets consist of client contracts and related relationships, and are being amortized over their estimated useful life, which is generally 20 years. We evaluate the client contracts intangible at the individual contract level. The recoverability of such assets is measured by a comparison of the carrying amount of the assets to future undiscounted net cash flows expected to be generated by the assets. If the assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. For the nine months ended September 30, 2017, an impairment expense of $0.1 million was recognized to account for the impairment charge in Performant Europe Ltd. due to the Company's decision to wind down this subsidiary, and has been included in other operating expenses in the consolidated statements of operations. For the year ended December 31, 2016, an impairment expense of $15.4 million was recognized relating to the Department of Education customer relationship and was presented as a separate caption in the consolidated statements of operations.

### Recent Accounting Pronouncements

See "Recent Accounting Pronouncements" in Note 1(g) of the Consolidated Financial Statements included in Part I - Item 1 of this report.

21

Table of Contents

**Results of Operations**

*Three Months Ended September 30, 2017 compared to the Three Months Ended September 30, 2016*

The following table represents our historical operating results for the periods presented:

| | Three Months Ended September 30, | | | |
| | 2017 | 2016 | $ Change | % Change |
|---|---|---|---|---|
| | | | (in thousands) | |
| **Consolidated Statement of Operations Data:** | | | | |
| Revenues | $ 29,744 | $ 31,195 | $ (1,451) | (5)% |
| Operating expenses: | | | | |
| Salaries and benefits | 20,494 | 18,710 | 1,784 | 10 % |
| Other operating expenses | 13,496 | 12,311 | 1,185 | 10 % |
| Total operating expenses | 33,990 | 31,021 | 2,969 | 10 % |
| Income (loss) from operations | (4,246) | 174 | (4,420) | (2,540)% |
| Interest expense | (2,459) | (1,863) | 596 | 32 % |
| Loss before provision for (benefit from) income taxes | (6,705) | (1,689) | 5,016 | 297 % |
| Provision for (benefit from) income taxes | 1,146 | (974) | 2,120 | 218 % |
| Net loss | $ (7,851) | $ (715) | $ 7,136 | 998 % |

*Revenues*

Revenues were $29.7 million for the three months ended September 30, 2017, a decrease of approximately 5%, compared to revenues of $31.2 million for the three months ended September 30, 2016.

Student lending revenues were $19.8 million for the three months ended September 30, 2017, representing a decrease of $4.0 million, or 17%, compared to the three months ended September 30, 2016. The decrease was primarily a result of the reduction of revenues from the Department of Education as we have not received new placements of student loans from the Department of Education since our contact expired in April 2015.

Healthcare revenues were $2.6 million for the three months ended September 30, 2017, representing a decrease of $0.4 million, or 13%, compared to the three months ended September 30, 2016. This decrease was due primarily to the wind down of our first RAC contract and that we have not yet recognized significant revenues under our new RAC contracts.

*Salaries and Benefits*

Salaries and benefits expense was $20.5 million for the three months ended September 30, 2017, an increase of $1.8 million, or 10%, compared to salaries and benefits expense of $18.7 million for the three months ended September 30, 2016. The increase in salaries and benefits expense was primarily due to increased headcount.

*Other Operating Expenses*

Other operating expenses were $13.5 million for the three months ended September 30, 2017, an increase of $1.2 million, or 10%, compared to other operating expenses of $12.3 million for the three months ended September 30, 2016. The increase in other operating expenses was primarily due to higher third party collection fees.

*Income (loss) from Operations*

Loss from operations was $4.2 million for the three months ended September 30, 2017, compared to income from operations of $0.2 million for the three months ended September 30, 2016, representing a decrease of $4.4 million or 2,540%. The decrease was primarily the result of lower revenues and increased salaries and benefits and other operating expenses.

22

Table of Contents

*Interest Expense*

Interest expense was $2.5 million for the three months ended September 30, 2017, compared to $1.9 million for the three months ended September 30, 2016. Interest expense increased by approximately $0.6 million or 32% due to a $1.0 million write-off of our unamortized debt issuance costs under our Prior Credit Agreement.

*Income Taxes*

We recognized an income tax expense of $1.1 million for the three months ended September 30, 2017, compared to an income tax benefit of $1.0 million for the three months ended September 30, 2016. Our effective income tax rate decreased to a negative rate of (17.1)% for the three months ended September 30, 2017, from 57.7% for the three months ended September 30, 2016. The decrease in the effective tax rate is primarily due to more significant losses from operations generated in the three months ended September 30, 2017 for which no tax benefit is recognized compared to the income tax benefit recorded on the loss from operations for the three months ended September 30, 2016.

*Net Loss*

As a result of the factors described above, net loss was $7.9 million for the three months ended September 30, 2017, which represented an increase of $7.1 million, or 998% compared to net loss of $0.7 million for the three months ended September 30, 2016.

*Nine Months Ended September 30, 2017 compared to the Nine Months Ended September 30, 2016*

The following table represents our historical operating results for the periods presented:

| | | Nine Months Ended September 30, | | |
|---|---|---|---|---|
| | **2017** | **2016** | **$ Change** | **% Change** |
| | | (in thousands) | | |
| **Consolidated Statement of Operations Data:** | | | | |
| Revenues | $ 98,760 | $ 107,548 | $ (8,788) | (8)% |
| Operating expenses: | | | | |
| Salaries and benefits | 61,640 | 60,107 | 1,533 | 3 % |
| Other operating expenses | 43,019 | 40,401 | 2,618 | 6 % |
| Total operating expenses | 104,659 | 100,508 | 4,151 | 4 % |
| Income (loss) from operations | (5,899) | 7,040 | (12,939) | (184)% |
| Interest expense | (5,683) | (6,136) | (453) | (7)% |
| Income (loss) before provision for (benefit from) income taxes | (11,582) | 904 | (12,486) | (1,381)% |
| Provision for income taxes | 1,668 | 62 | 1,606 | 2,590 % |
| Net income (loss) | $ (13,250) | $ 842 | $ (14,092) | (1,674)% |

*Revenues*

Revenues were $98.8 million for the nine months ended September 30, 2017, a decrease of approximately 8%, compared to revenues of $107.5 million for the nine months ended September 30, 2016.

Student lending revenues were $71.8 million for the nine months ended September 30, 2017, representing a decrease of $10.4 million, or 13%, compared to the nine months ended September 30, 2016. The decrease was primarily a result of the reduction of revenues from the Department of Education due to the lack of placements of new student loans from the Department of Education since our contract expired in April 2015, which was partially offset by an increase in the number of borrowers that are participating in the rehabilitation programs with our Guaranty Agency clients.

Healthcare revenues were $6.4 million for the nine months ended September 30, 2017, representing a decrease of $2.7 million, or 30%, compared to the nine months ended September 30, 2016. This decrease was due primarily to the CMS RAC

23

Table of Contents

contract transition, partially offset by an approximately $1.5 million increase in revenues from commercial healthcare customers.

*Salaries and Benefits*

Salaries and benefits expense was $61.6 million for the nine months ended September 30, 2017, an increase of $1.5 million, or 3%, compared to salaries and benefits expense of $60.1 million for the nine months ended September 30, 2016. This increase in salaries and benefits expense was primarily due to increased headcount**.**

*Other Operating Expenses*

Other operating expenses were $43.0 million for the nine months ended September 30, 2017, an increase of $2.6 million, or 6%, compared to other operating expenses of $40.4 million for the nine months ended September 30, 2016. The increase in other operating expenses was primarily due to higher outside services consulting expenses and third party collection fees, which was offset by lower amortization related to a $15.4 million Department of Education customer relationship intangible impairment charge in 2016.

*Income (Loss) from Operations*

Loss from operations was $5.9 million for the nine months ended September 30, 2017, compared to income from operations of $7.0 million for the nine months ended September 30, 2016, representing a decrease of $12.9 million which was primarily due to the reduction in revenues as discussed above.

*Interest Expense*

Interest expense was $5.7 million for the nine months ended September 30, 2017, compared to $6.1 million for the nine months ended September 30, 2016. Interest expense decreased $0.5 million due to repayments of principal under our previous credit agreement, resulting in a lower outstanding balance.

*Income Taxes*

We recognized an income tax expense of $1.7 million for the nine months ended September 30, 2017, compared to an income tax expense of $0.1 million for the nine months ended September 30, 2016. Our effective income tax decreased to a negative rate of (14.4)% for the nine months ended September 30, 2017, from 6.9% for the nine months ended September 30, 2016. The decrease in the effective tax rate is primarily due to more significant losses from operations generated in the nine months ended September 30, 2017 for which no tax benefit is recognized compared to the income tax expense recorded on income from operations for the nine months ended September 30, 2016.

*Net Income (Loss)*

As a result of the factors described above, net loss was $13.3 million for the nine months ended September 30, 2017, which represented a decrease of $14.1 million, or 1,674% compared to net income of $0.8 million for the nine months ended September 30, 2016.

**Adjusted EBITDA and Adjusted Net Income**

To provide investors with additional information regarding our financial results, we have disclosed in the table below adjusted EBITDA and adjusted net income, both of which are non-GAAP financial measures. We have provided a reconciliation below of adjusted EBITDA to net income and adjusted net income to net income, the most directly comparable GAAP financial measure to these non-GAAP financial measures.

We have included adjusted EBITDA and adjusted net income in this report because they are key measures used by our management and board of directors to understand and evaluate our core operating performance and trends and to prepare and approve our annual budget. Accordingly, we believe that adjusted EBITDA and adjusted net income provide useful information to investors and analysts in understanding and evaluating our operating results in the same manner as our management and board of directors.

24

Table of Contents

Our use of adjusted EBITDA and adjusted net income has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and adjusted EBITDA does not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- adjusted EBITDA does not reflect interest expense on our indebtedness;

- adjusted EBITDA does not reflect changes in, or cash requirements for, our working capital needs;

- adjusted EBITDA does not reflect tax payments;

- adjusted EBITDA and adjusted net income do not reflect the potentially dilutive impact of equity-based compensation;

- adjusted EBITDA and adjusted net income do not reflect the impact of certain non-operating expenses resulting from matters we do not consider to be indicative of our core operating performance; and

- other companies may calculate adjusted EBITDA and adjusted net income differently than we do, which reduces its usefulness as a comparative measure.

Because of these limitations, you should consider adjusted EBITDA and adjusted net income alongside other financial performance measures, including net income and our other GAAP results. The following tables present a reconciliation of adjusted EBITDA and adjusted net income for each of the periods indicated:

25

Table of Contents

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| | (in thousands) | | (in thousands) | |
| **Adjusted EBITDA:** | | | | |
| Net income (loss) | $ (7,851) | $ (715) | $ (13,250) | $ 842 |
| Provision for (benefit from) income taxes | 1,146 | (974) | 1,668 | 62 |
| Interest expense | 2,459 | 1,863 | 5,683 | 6,136 |
| Transaction expenses [1] | 132 | — | 576 | — |
| Restructuring and other expenses [5] | — | 26 | — | 309 |
| Depreciation and amortization | 2,713 | 3,292 | 8,381 | 10,098 |
| Impairment of goodwill and customer relationship [3] | — | — | 1,081 | — |
| Stock-based compensation | 737 | 1,206 | 3,027 | 3,546 |
| Adjusted EBITDA | $ (664) | $ 4,698 | $ 7,166 | $ 20,993 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| | (in thousands) | | (in thousands) | |
| **Adjusted Net Income (Loss):** | | | | |
| Net income (loss) | $ (7,851) | $ (715) | $ (13,250) | $ 842 |
| Transaction expenses [1] | 132 | — | 576 | — |
| Stock-based compensation [2] | 737 | 1,206 | 3,027 | 3,546 |
| Amortization of intangibles [2] | 203 | 931 | 691 | 2,800 |
| Impairment of goodwill and customer relationship [3] | — | — | 1,081 | — |
| Deferred financing amortization costs [4] | 1,343 | 324 | 2,039 | 1,342 |
| Restructuring and other expenses [5] | — | 26 | — | 309 |
| Tax adjustments [6] | (966) | (995) | (2,966) | (3,199) |
| Adjusted Net Income (Loss) | $ (6,402) | $ 777 | $ (8,802) | $ 5,640 |

(1) Represents costs and expenses related to the refinancing of our existing indebtedness.

(2) Represents amortization of capitalized expenses related to the acquisition of Performant by an affiliate of Parthenon Capital Partners in 2004, and also an acquisition in the first quarter of 2012 to enhance our analytics capabilities.

(3) Represents goodwill and impairment charges related to our Performant Europe Ltd. subsidiary.

(4) Represents amortization of capitalized financing costs related to our New Credit Agreement, and the write-off of deferred financing costs related to our Prior Credit Agreement in August 2017.

(5) Represents restructuring costs and severance and termination expenses incurred in connection with termination of employees and consultants.

(6) Represents tax adjustments assuming a marginal tax rate of 40%.

**Liquidity and Capital Resources**

Our primary source of liquidity is cash on hand and cash flows from operations. Cash and cash equivalents totaled $23.2 million as of September 30, 2017, and consists primarily of cash on deposit with banks. Due to our operating cash flows and our existing cash and cash equivalents and our ability to restructure both our variable and fixed expenses, we believe that we have the ability to meet our working capital and capital expenditure needs for the foreseeable future.

000095

Table of Contents

The $9.8 million decrease in the balance of our cash and cash equivalents from December 31, 2016, was primarily due to principal repayments of $55.5 million on our long-term debt offset by new debt of $44.0 million.

### Cash flows from operating activities

Cash provided by operating activities was $0.8 million for the nine months ended September 30, 2017, and included an increase in accrued salaries and benefits of $1.3 million. Cash provided by operating activities in the nine months ended September 30, 2016 was $20.5 million.

### Cash flows from investing activities

Cash used in investing activities of $5.4 million for the nine months ended September 30, 2017 was mainly for capital expenditures related to information technology, data storage, hardware, telecommunication systems and security enhancements to our information technology systems. Cash used in investing activities in the nine months ended September 30, 2016 was $5.5 million.

### Cash flows from financing activities

Cash used in financing activities of $5.2 million for the nine months ended September 30, 2017 was primarily attributable to repayments of principal of $55.5 million on long-term debt under our Prior Credit Agreement, which was offset by a $44.0 million increase in borrowings from notes payable under our New Credit Agreement and $7.5 million in repayments of principal from restricted cash. Cash used in financing activities in the nine months ended September 30, 2016 was $37.9 million.

### Restricted Cash

On August 3, 2017, $6.0 million of restricted cash was paid to the administrative agent for the benefit of the lenders under our Prior Credit Agreement. As of September 30, 2017, we had $0.0 million in restricted cash.

### Estimated liability for appeals and net payable to client

The September 30, 2017 balances of $19.1 million and $12.7 million for the estimated liability for appeals and the net payable to client, respectively, represent obligations that we expect to pay in the near term, although it is difficult to predict the precise timing of the associated cash outflows as they are dependent on the processing and resolution of audit appeals.

### Long-term Debt

On March 19, 2012, we, through our wholly owned subsidiary, entered into a $147.5 million credit agreement, as amended and restated, with Madison Capital Funding LLC as administrative agent, ING Capital LLC as syndication agent, and other lenders party thereto (as amended, the "Prior Credit Agreement"). The senior credit facility consists of (i) a $57.0 million Term A loan that matured and was fully paid in March 2017, (ii) a $79.5 million Term B loan that matures in June 2018, and (iii) a $11.0 million revolving credit facility that expired and was fully paid in March 2017. On June 28, 2012, we amended the Credit Agreement to increase the amount of our borrowings under our Term B loan by $19.5 million.

On November 4, 2014, February 19, 2016, July 26, 2016, October 27, 2016, and March 22, 2017, the Prior Credit Agreement was further amended to, among other things, modify a number of existing covenants and add new covenants requiring the Company to maintain a minimum cash balance, comply with an interest coverage ratio and achieve minimum EBITDA levels. On May 3, 2017, we further amended the credit agreement (the "Eighth Amendment") to extend the maturity date of the Term B loan to June 19, 2018. As a result of this extension, regularly scheduled quarterly amortization payments of $247,500 were also extended through March 31, 2018, with the remaining outstanding principal amount being due on the June 19, 2018 maturity date. Interest on the Term B loan charged under the credit agreement was also increased by 3.00% per annum, however the amount of such increased interest will be payable in kind. Pursuant to the Eighth Amendment, the quarterly and annual financial reporting covenants were also modified to require that the Company's financial statements not contain a qualification, if required by GAAP, with respect to our ability to continue as a going concern.

On August 7, 2017, we, through our wholly-owned subsidiary Performant Business Services, Inc. (the "Borrower"), entered into a new credit agreement with ECMC Group, Inc. (the "New Credit Agreement"). The New Credit Agreement provides for a term loan facility in the initial amount of $44 million (the "Initial Term Loan") and for up to $15 million of additional term loans ("Additional Term Loans"; and together with the Initial Term Loan, the "Loans") which Additional Term

27

Table of Contents

Loans may be drawn until the second anniversary of the funding of the Initial Term Loans, subject to the satisfaction of customary conditions.  On August 11, 2017, the Initial Term Loan was advanced (the "Closing Date") and the proceeds were applied to repay all outstanding amounts under the Prior Credit Agreement.  On September 29, 2017, we entered into Amendment No. 1 to the New Credit Agreement to extend the initial interest payment due date to December 31, 2017.  Approximately $2 million of contingent reimbursement obligations with respect to outstanding but undrawn letters of credit remain outstanding under the Prior Credit Agreement, however, those contingent reimbursement obligations will remain cash collateralized with the administrative agent.

The Loans will mature on the third anniversary of the Closing Date, however we will have the option to extend the maturity of the Loans for two additional one year periods, subject to the satisfaction of customary conditions.  The Loans will bear interest at the one-month LIBOR rate (subject to a 1% per annum floor) plus a margin which may vary from 5.5% per annum to 10.0% per annum based on our total debt to EBITDA ratio.  The Initial Term Loans will initially bear interest at LIBOR plus 7.0% per annum.  We will be required to pay 5% of the original principal balance of the Loans annually in quarterly installments and to offer to make mandatory prepayments of the Loans with a percentage of our excess cash flow which may vary between 75% and 0% depending on our total debt to EBITDA ratio.  In addition to mandatory prepayments for excess cash flow, we will also be required to offer to prepay the Loans with the net cash proceeds of certain asset dispositions and with the issuance of debt not otherwise permitted under the New Credit Agreement.  Except in connection with a change of control and the payment of a 1% premium, we will not be permitted to voluntarily prepay the Loans until after the first anniversary of the Closing Date.  We will be permitted to prepay the Loans during the second year after the Closing Date if accompanied by a prepayment premium of 1%.  Thereafter, we will be permitted to prepay the Loans without any prepayment premium.

The New Credit Agreement contains certain restrictive financial covenants which became effective on the Closing Date. Such covenants, will require, among other things, that we meet a minimum fixed charge coverage ratio of 0.5 to 1.0 through December 31, 2019, 1.0 to 1.0 through June 30, 2020 (or until December 31, 2020 if the maturity date of the Loans is extended until the fourth anniversary of the Closing Date), 1.25 to 1.0 through June 30, 2021 if the maturity date of the Loans is extended until the fourth anniversary of the Closing Date and 1.25 to 1.0 through June 30, 2022 if the maturity date of the Loans is extended until the fifth anniversary of the Closing Date. In addition, we will be required to maintain a maximum total debt to EBITDA ratio of 6.00 to 1.00. The New Credit Agreement also contains covenants that will restrict our and our subsidiaries' ability to incur certain types or amounts of indebtedness, incur liens on certain assets, make material changes in corporate structure or the nature of its business, dispose of material assets, engage in a change in control transaction, make certain foreign investments, enter into certain restrictive agreements, or engage in certain transactions with affiliates.

The obligations under the New Credit Agreement are secured by substantially all of our United States domestic subsidiaries' assets and are guaranteed by the Company and its United States domestic subsidiaries, other than the Borrower.

As a result of our entry into our New Credit Agreement, and the repayment of all amounts owed under the Prior Credit Agreement, we wrote off debt issuance costs related to the Prior Credit Agreement of approximately $1.0 million in August 2017.

In consideration for, and concurrently with, the extension of the Initial Term Loan in accordance with the terms of the New Credit Agreement, we issued a warrant to the lender to purchase up to an aggregate of 3,863,326 shares of the Company's common stock (representing approximately up to 7.5% of our diluted common stock as calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) with an exercise price of $1.92 per share. Upon our election to borrow any of the Additional Term Loans, we will be required to issue additional warrants at the same exercise price to purchase up to an aggregate of 77,267 additional shares of common stock (which represents approximately 0.15% of our diluted common stock calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) for each $1,000,000 of such Additional Term Loans.

The New Credit Agreement also requires us to meet certain financial covenants, including maintaining a total debt to EBITDA ratio and a fixed charge coverage ratio, as such terms are defined in our credit agreement. These financial covenants are tested at the end of each year, quarter or month, as applicable. The table below further describes these financial covenants, as well as our current status under these covenants as of September 30, 2017.

| Financial Covenant | Covenant Requirement | Actual Ratio at September 30, 2017 |
|---|---|---|
| Total debt to EBITDA ratio (maximum) | 6.00 to 1.00 | 3.39 |
| Fixed charge coverage ratio (minimum) | 0.5 to 1.0 | 0.94 |

28

Table of Contents

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We do not hold or issue financial instruments for trading purposes. We conduct all of our business in U.S. currency and therefore do not have any material direct foreign currency risk. We do have exposure to changes in interest rates with respect to the borrowings under our senior secured credit facility, which bear interest at a variable rate based on LIBOR. For example, if the interest rate on our borrowings increased 100 basis points (1%) from the credit facility floor of 1.0%, our annual interest expense would increase by approximately $0.4 million.

While we currently hold our excess cash in an operating account, in the future we may invest all or a portion of our excess cash in short-term investments, including money market accounts, where returns may reflect current interest rates. As a result, market interest rate changes impact our interest expense and interest income. This impact will depend on variables such as the magnitude of interest rate changes and the level of our borrowings under our credit facility or excess cash balances.

**ITEM 4. DISCLOSURE CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We maintain a system of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and the Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

Management, with the participation of our Chief Executive Officer and our Chief Accounting Officer, has evaluated the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Exchange Act, as of the fiscal quarter covered by this Quarterly Report on Form 10-Q. Based on that evaluation, our Chief Executive Officer and Chief Accounting Officer concluded that our disclosure controls and procedures were functioning effectively at the reasonable assurance level as of September 30, 2017.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting during the quarter ended September 30, 2017, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

000098

Table of Contents

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are involved in various legal proceedings that arise from our normal business operations. These actions generally derive from our student loan recovery services, and generally assert claims for violations of the Fair Debt Collection Practices Act or similar federal and state consumer credit laws. While litigation is inherently unpredictable, we believe that none of these legal proceedings, individually or collectively, will have a material adverse effect on our financial condition or our results of operations.

### ITEM 1A. RISK FACTORS

Our business, financial condition, results of operations and liquidity are subject to various risks and uncertainties, including those described below, and as a result, the trading price of our common stock could decline.

#### Risks Related to Our Business

***Revenues generated from our three largest clients represented 55% of our revenues in both 2016 and 2015 and our relationships with two of these clients, the Department of Education and Great Lakes Higher Education Guaranty Corporation, have been terminated. Any termination of or deterioration in our relationship with any of our other significant clients would result in a further decline in our revenues.***

We have derived a substantial majority of our revenues from a limited number of clients, including the Department of Education, and several Guaranty Agencies. Revenues from our three largest clients represented 55% of our revenues for the year ended December 31, 2016 and 55% of our revenues for the year ended December 31, 2015. The Department of Education was responsible for approximately 16% of our revenues for the year ended December 31, 2016 and the Department of Education announced in December 2016 that we were not selected as one of the contractors under its new student loan recovery contract. While our protest of this contract decision was recently upheld by the GAO, there is no assurance that this decision will result in our ultimately obtaining a contract award. The Department of Education has requested resubmittal of new contract proposals and is currently undergoing a re-evaluation process with respect to such proposals. The Department of Education has recently announced that it has completed its review and assessment for the award of the new contracts. However, we do not know when the awards of the new contracts will be made. During 2016, we had numerous relationships with GAs in the U.S. including Great Lakes Higher Education Guaranty Corporation and Pennsylvania Higher Education Assistance Authority, which were responsible for 24% and 16%, respectively, of our revenues for the year ended December 31, 2016. On June 15, 2017, we received a 30-day termination notice, with respect to our contract with Great Lakes Higher Education Guaranty Corporation. The termination of this contract was based on Great Lakes' decision to bundle its student loan servicing work, a service that we currently do not provide, along with its student loan recovery work to a single third party vendor.

If we are not ultimately successful in obtaining a new contract award from the Department of Education in the bid re-evaluation process referred to above, our business will become even more dependent on our business relationships with our GA clients and there is no assurance that we will be able to maintain these relationships. All of our contracts with our significant clients are subject to periodic renewal and re-bidding processes and if we lose one of these clients or if the terms of our relationships with any of these clients become less favorable to us, our revenues would decline, which would harm our business, financial condition and results of operations.

***Many of our contracts with our clients for the recovery of student loans and other receivables are not exclusive and do not commit our clients to provide specified volumes of business. In addition, the terms of these contracts may be changed unilaterally and on short notice by our clients. As a consequence, there is no assurance that we will be able to maintain our revenues and operating results.***

Substantially all of our existing contracts for the recovery of student loans and other receivables, which represented approximately 94% of our revenues for the nine months ended September 30, 2017 and 92% of our revenues in the year ended December 31, 2016, enable our clients to unilaterally terminate their contractual relationship with us at any time without penalty, potentially leading to loss of business or renegotiation of terms. These include our contracts with Great Lakes Higher Education Guaranty Corporation and Pennsylvania Higher Education Assistance Authority, which were responsible for 24% and 16%, respectively, of our revenues for the year ended December 31, 2016. As stated above, in June 2017, Great Lakes Higher Education Guaranty Corporation gave us notice of the termination of our contract. Further, most of our contracts in these markets allow our clients to unilaterally change the volume of loans and other receivables that are placed with us or the

30

Table of Contents

payment terms at any given time. In addition, most of our contracts are not exclusive, with our clients retaining multiple service providers with whom we must compete for placements of loans or other obligations. Therefore, despite our contractual relationships with our clients, our contracts do not provide assurance that we will generate a minimum amount of revenues or that we will receive a specific volume of placements.

Our revenues and operating results would be negatively affected if our student loan and receivables clients, which include our five largest clients in 2016 and four of our five largest clients in 2015, reduce the volume of student loan placements provided to us, modify the terms of service, including the success fees we are able to earn upon recovery of defaulted student loans, or any of these clients establish more favorable relationships with our competitors. For example, effective July 1, 2015, the Department of Education implemented a fixed fee of $1,710 payable for each loan that is rehabilitated in place of a recovery fee that historically had been based on a percentage of the balance of the rehabilitated loan. Further, in December 2016, the Department of Education announced the award of seven new contracts and we did not receive one of the new awards. We, along with 19 other contractors who did not receive contract awards from the Department of Education, filed protests with the GAO regarding the Department of Education's award of these contracts. While our protest of this contract decision was recently upheld by the GAO, there is no assurance that this decision will result in our ultimately obtaining a contract award. If we are not successful in obtaining a contract award from the Department of Education through this process, the volume of student loan placements to us will be significantly harmed, which will result in a material negative impact on our results of operations and cash flows and our ability to repay or refinance our indebtedness.

***The Department of Education, our longstanding and significant client, recently announced that we would not receive a new contract for the recovery of student loans. While we were successful with the protest we filed in connection with the original contract decision, if we are not successful in obtaining a contract award from the Department of Education through this process, our results of operations and cash flows will be harmed and it will be more difficult for us to repay or refinance our indebtedness.***

We have had a more than 25 year relationship with the Department of Education as a key contractor in the recovery of student loans and this relationship has been responsible for a significant portion of our annual revenues. Our revenues from the Department of Education were $21.9 million in 2016, $37.9 million in 2015 and $53.2 million in 2014, representing 15.5%, 23.8% and 27.2% of our revenues, respectively. Further, we expected the Department of Education to become an increasingly important client because all federally-supported student loans have been originated by the Department of Education since 2010, meaning that there will be no further growth in student loans held by the GAs. Our most recent contract with the Department of Education expired in April 2015, and we have not received new placements of student loans from the Department of Education since that time pending the award of new contracts.

In December 2016, the Department of Education announced the award of seven new contracts and we did not receive one of the new awards. We, along with 19 other contractors who did not receive contract awards from the Department of Education, filed protests with the GAO regarding the Department of Education's award of these contracts. In March 2017, the GAO upheld this protest. The Department of Education requested resubmittal of new contract proposals and is currently undergoing a re-evaluation process with respect to such proposals. The Department of Education has recently announced that it has completed its review and assessment for the award of the new contracts. However, we do not know when the award of the new contracts will be made. Further, there may be further appeals and challenges to the contract awards when granted, which could delay the actual start date for the new contracts. If we are not successful in obtaining a new contract as a result of a conclusive award process, the absence of a contract with the Department of Education will have a material adverse effect on our financial condition and results of operations in 2018 and beyond.

***Over the course of our first RAC contract, there has been an increase in the number of appeals by healthcare providers to the third, or ALJ, level of appeal relating to claims we have audited, and there can be no assurance that our estimated liability for such appeals will be adequate.***

Under our RAC contract with CMS, we recognize revenues when the healthcare provider has paid CMS for a claim or has agreed to an offset against other claims by the provider. Healthcare providers have the right to appeal a claim and may pursue additional levels of appeal if the initial appeal is found in favor of CMS. We accrue an estimated liability for appeals at the time revenue is recognized based on our estimate of the amount of revenue probable of being refunded to CMS following successful appeal based on historical data and other trends relating to such appeals. In addition, if our estimate of liability for appeals with respect to revenues recognized during a prior period changes, we increase or decrease the estimated liability reserve in the current period. Over the course of our first RAC contract, healthcare providers have increased their pursuit of appeals beyond the first and second levels of appeal to the third level of appeal, where cases are heard by administrative law judges, or ALJs. In our experience, decisions at the third level of appeal are the least favorable as ALJs exercise greater discretion and there is less predictability in the ALJ decisions as compared to appeals at the first or second levels. The pursuit

31

Table of Contents

of third level appeals by healthcare providers has also resulted in a backlog of claims at that level of appeal. This increase of ALJ appeals and backlog of claims at the third level of appeal is the primary reason our total estimated liability for appeals (consisting of the estimated liability for appeals plus the contra-accounts-receivable estimated allowance for appeals) has grown from a balance of $16.4 million at December 31, 2013 to $18.6 million as of December 31, 2014 to $19.0 million as of both December 31, 2015, and December 31, 2016, and decreased to $18.8 million as of September 30, 2017. Our estimates for our appeal reserve are subject to uncertainties, and accordingly we may underestimate the number of successful appeals or the financial impact of successful appeals in a given year or period. To the extent that the amount of commissions that we are required to return to CMS as a result of successful appeals exceeds our estimated appeals reserve, our revenues in the applicable period will be reduced by the amount of such excess. If we underestimate the amount of commissions that are subject to successful appeal, our revenues in future periods could be adversely affected. In addition, each of the subcontractors we engaged to assist in the recovery services under our RAC contract are similarly obligated to refund fees that they received from claims that are later overturned on appeal. To the extent any of our subcontractors fail to refund amounts that are due upon an appeal relating to claims that they were responsible for, we may be obligated to pay such amounts directly to CMS, which could have a material impact on our financial position.

Further, in August 2014 CMS offered to pay hospitals 68% of what they have billed Medicare to settle a backlog of pending appeals challenging Medicare's denials of reimbursement for certain types of short-term care. The implication of these settlement offers related to claims for which recovery auditors have already been paid under the first RAC contracts remain uncertain at this time. Any payments we are required to make to CMS under our first RAC contract in connection with such settlement offers may be significant and in excess of the amount we have reserved for appeals, which could have a material negative impact our financial position and liquidity.

***Limitations on the scope of recovery services we can provide under our new RAC contract will have a material impact on our revenues and these limitations may continue under the newly awarded RAC contracts.***

Our ability to make claims under the first RAC contract was limited during each of the last three years by restrictions imposed on the scope of our audit activities and by contract transition rules announced by CMS that involved periodic suspension of audit activities. These limitations had a material adverse effect on our revenues and operating results. Our revenues from CMS during the nine months ended September 30, 2017 were $1.0 million compared to $5.2 million during the same period in 2016. While we have been awarded two new RAC contracts, we are uncertain about the scope of permitted audit and if the scope of audit is not increased, our revenues and the value of the new RAC contracts will be constrained. In addition, we expect there will be an approximately four to six-month period from the date that we are permitted to start performing recovery services until we start to recognize revenues under our new RAC contracts. Accordingly, the start date of April 2017 for the new RAC contracts means that these new contracts will not have a significant impact on our 2017 revenues, although we will incur related start-up expenses in 2017.

***Our ability to derive revenues under our new RAC contract will depend in part on the number and types of potentially improper claims that we are allowed to pursue by CMS, and our results of operations may be harmed if the scope of claims that we are allowed to pursue and be compensated for is limited.***

Under CMS's Medicare recovery audit program, RAC contractors have not been permitted to seek the recovery of an improper claim unless that particular type of claim has been pre-approved by CMS to ensure compliance with applicable Medicare payment policies, as well as national and local coverage determinations. As work under the first RAC contract progressed, CMS placed increasing restrictions on the scope of audits permitted by RAC contractors and has not indicated that those restrictions will be relaxed when work commences under the newly awarded RAC contracts. Accordingly, the long-term growth of the revenues we derive under our two newly awarded RAC contracts will also depend in significant part on the scope of potentially improper claims that we are allowed to pursue.

In particular, in September 2013, CMS implemented rules that prevent RAC contractors from being able to review and audit (i) whether inpatient care delivered to patients with hospital stays lasting less than two midnights was medically necessary and therefore deserving of the higher reimbursement levels under Medicare Part A or (ii) whether inpatient treatment was medically necessary for admissions spanning more than two midnights. In connection with these restrictions, hospitals cannot bill CMS for outpatient services on hospital stays lasting less than two midnights during such period.  Fees associated with recoveries initiated by us based upon improper claims for inpatient reimbursement of these short stays had represented a substantial portion of the revenues we have earned under our RAC contract. The continued suspension of this type of review activity has had and may continue to have a material adverse effect on our future healthcare revenues and operating results, depending on a variety of factors including, among other things, CMS's evaluation of provider compliance with the new rules, the rules ultimately adopted by CMS with respect to medical necessity reviews of Medicare reimbursement claims associated

32

Table of Contents

with short stay inpatient admissions and, more generally, the scope of improper claims that CMS allows us to pursue and our ability to successfully identify improper claims within the permitted scope.

***We face significant competition in connection with obtaining, retaining and performing under our client contracts, and an inability to compete effectively in the future could harm our relationships with our clients, which would impact our ability to maintain our revenues and operating results.***

We operate in very competitive markets. In providing our services to the student loan and other receivables markets, we face competition from many other companies. Initially, we compete with these companies to be one of typically several firms engaged to provide recovery services to a particular client and, if we are successful in being engaged, we then face continuing competition from the client's other retained firms based on the client's benchmarking of the recovery rates of its several firms. In addition, those recovery vendors who produce the highest recovery rates from a client often will be allocated additional placements and in some cases additional success fees. Accordingly, maintaining high levels of recovery performance, and doing so in a cost-effective manner, are important factors in our ability to maintain and grow our revenues and net income and the failure to achieve these objectives could harm our business, financial condition and results of operations. Some of our current and potential competitors in the markets in which we operate may have greater financial, marketing, technological or other resources than we do. The ability of any of our competitors and potential competitors to adopt new and effective technology to better serve our markets may allow them to gain market strength. Increasing levels of competition in the future may result in lower recovery fees, lower volumes of contracted recovery services or higher costs for resources. Any inability to compete effectively in the markets that we serve could adversely affect our business, financial condition and results of operations.

***The U.S. federal government accounts for a significant portion of our revenues, and any loss of business from, or change in our relationship with, the U.S. federal government would result in a significant decrease in our revenues and operating results.***

We have historically derived and are likely to continue to derive a significant portion of our revenues from the U.S. federal government. For the year ended December 31, 2016, revenues under contracts with the U.S. federal government accounted for approximately 24% of our total revenues. The continuation and exercise of renewal options on government contracts and any new government contracts are, among other things, contingent upon the availability of adequate funding for the applicable federal government agency. Changes in federal government spending could directly affect our financial performance.

For example, the Bipartisan Budget Act of 2013 reduced the compensation paid to GAs for the rehabilitation of student loans, effective July 1, 2014. This "revenue enhancement" measure reduced from 18.5% to 16.0% of the outstanding loan balance, the amount that GAs can charge borrowers when a rehabilitated loan is sold by the GA and eliminated entirely the GAs retention of 18.5% of the outstanding loan balance as a fee for rehabilitation services. The reduction in compensation the GAs receive resulted in a decrease of approximately 25.0% in the contingency fee percentage that we receive from the GAs for assisting in the rehabilitation of defaulted student loans. The loss of business from the U.S. federal government, or significant policy changes or financial pressures within the agencies of the U.S. federal government that we serve would result in a significant decrease in our revenues, which would adversely affect our business, financial condition and results of operations.

***Future legislative or regulatory changes affecting the markets in which we operate could impair our business and operations.***

The two principal markets in which we provide our recovery services, government-supported student loans and the Medicare program, are a subject of significant legislative and regulatory focus and we cannot anticipate how future changes in government policy may affect our business and operations. For example, SAFRA significantly changed the structure of the government-supported student loan market by assigning responsibility for all new government-supported student loan originations to the Department of Education, rather than originations by private institutions and backed by one of 30 government-supported GAs. This legislation, and any future changes in the legislation and regulations that govern these markets, may require us to adapt our business to the new circumstances and we may be unable to do so in a manner that does not adversely affect our business and operations.

33

Table of Contents

*The reduction in the number of government-supported student loans originated by our GA clients may result in a lower amount of student loans that we are able to rehabilitate, and may result in the consolidation among the GAs, either of which would decrease our revenues.*

As a result of SAFRA, which terminated the ability of the GAs to originate government-supported student loans, the overall number of defaulted student loans that we are able to service on behalf of our GA clients has begun to decline. Further, we are seeing a larger amount of defaulted student loans within our GA client portfolios that have previously been rehabilitated, which, according to current regulations, prevents us from rehabilitating any such student loan for a second time. This overall reduction in the number of defaulted student loans in our GA client portfolios, and the larger percentage of defaulted student loans that have been previously rehabilitated, may result in a decreased revenues from our GA clients, which could negatively impact our business, financial condition and results of operations.

Further, some have speculated that there may be consolidation among the remaining GAs. This speculation has heightened as a result of the reduction of fees that the GAs will receive for rehabilitating student loans as a result of the Bipartisan Budget Act of 2013. If GAs that are our clients are combined with GAs with whom we do not have a relationship, we could suffer a loss of business. Two of our GA clients were each responsible for more than 10% of our total revenues in the year ended December 31, 2016: Great Lakes Higher Education Guaranty Corporation and Pennsylvania Higher Education Assistance Authority were responsible for 24% and 16%, respectively, of revenues for the year ended December 31, 2016. The consolidation of our GA clients with others and the failure to provide recovery services to the consolidated entity could decrease our revenues, which could negatively impact our business, financial condition and results of operations.

*Our results of operations may fluctuate on a quarterly or annual basis and cause volatility in the price of our stock.*

Our revenues and operating results could vary significantly from period-to-period and may fail to match our past performance because of a variety of factors, some of which are outside of our control. Any of these factors could cause the price of our common stock to fluctuate. Factors that could contribute to the variability of our operating results include:

- the amount of defaulted student loans and other receivables that our clients place with us for recovery;

- the timing of placements of student loans and other receivables which are entirely in the discretion of our clients;

- the schedules of government agencies for awarding contracts including the result of our recent successful appeal against the Department of Education's contract award decision;

- our ability to successfully identify improper Medicare claims and the number and type of potentially improper claims that CMS authorizes us to pursue under our RAC contact;

- the loss or gain of significant clients or changes in the contingency fee rates or other significant terms of our business arrangements with our significant clients;

- technological and operational issues that may affect our clients and regulatory changes in the markets we service; and

- general industry and macroeconomic conditions.

*Downturns in domestic or global economic conditions and other macroeconomic factors could harm our business and results of operations.*

Various macroeconomic factors influence our business and results of operations. These include the volume of student loan originations in the United States, together with tuition costs and student enrollment rates, the default rate of student loan borrowers, which is impacted by domestic and global economic conditions, rates of unemployment and similar factors, and the growth in Medicare expenditures resulting from changes in healthcare costs. For example, during the global financial crisis beginning in 2008, the market for securitized student loan portfolios was disrupted, resulting in delays in the ability of some GA clients to resell rehabilitated student loans and, as a result, delays our ability to recognize revenues from these rehabilitated loans. Changes in the overall economy could lead to a reduction in overall recovery rates by our clients, which in turn could adversely affect our business, financial condition and results of operations.

*We may not be able to manage our potential growth effectively and our results of operations could be negatively affected.*

Our newly awarded RAC contracts provide the potential opportunity to restore the growth in our business. However, our focus on growth and the expansion of our business may place additional demands on our management, operations and financial resources and will require us to incur additional expenses. We cannot be sure that we will be able to manage our

Table of Contents

performance under any significant new contracts effectively. In order to successfully perform under any significant new contracts, our expenses will increase to recruit, train and manage additional qualified employees and subcontractors and to expand and enhance our administrative infrastructure and continue to improve our management, financial and information systems and controls. If we cannot manage our growth effectively, our expenses may increase and our results of operations could be negatively affected.

***Our indebtedness could adversely affect our business and financial condition and reduce the funds available to us for other purposes, and our failure to comply with the covenants contained in our credit agreement could result in an event of default that could adversely affect our results of operations.***

Our ability to make scheduled payments and to fund our other liquidity needs depends on our financial and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We cannot make assurances that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal and interest on our indebtedness and to fund our other liquidity needs. If our cash flows and capital resources are insufficient to fund our debt service obligations and allow us to maintain compliance with the covenants under our credit agreement or to fund our other liquidity needs, we may be forced to reduce or delay capital expenditures, sell assets or operations, seek additional capital or restructure or refinance our indebtedness. We cannot ensure that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled debt service obligations or that these actions would be permitted under the terms of our existing or future debt agreements, including our credit agreement. If we cannot make scheduled payments on our debt, we will be in default and, as a result, our debt holders could declare all outstanding principal and interest to be due and payable, the lenders under our credit agreement could terminate their commitments to lend us money and foreclose against the assets securing our borrowings and we could be forced into bankruptcy or liquidation.

Our debt agreements contain, and any agreements to refinance our debt likely will contain, certain financial and restrictive covenants that limit our ability to incur additional debt, including to finance future operations or other capital needs, and to engage in other activities that we may believe are in our long-term best interests, including to dispose of or acquire assets. Our failure to comply with these covenants may result in an event of default, which, if not cured or waived, could accelerate the maturity of our indebtedness or result in modifications to our credit terms. If our indebtedness is accelerated, we may not have sufficient cash resources to satisfy our debt obligations and we may not be able to continue our operations as planned.

***A failure of our operating systems or technology infrastructure, or those of our third-party vendors and subcontractors, could disrupt the operation of our business.***

A failure of our operating systems or technology infrastructure, or those of our third-party vendors and subcontractors, could disrupt our operations. Our operating systems and technology infrastructure are susceptible to damage or interruption from various causes, including acts of God and other natural disasters, power losses, computer systems failures, Internet and telecommunications or data network failures, operator error, computer viruses, losses of and corruption of data and similar events. The occurrence of any of these events could result in interruptions, delays or cessations in service to our clients, reduce the attractiveness of our recovery services to current or potential clients and adversely impact our financial condition and results of operations. While we have backup systems in many of our operating facilities, an extended outage of utility or network services may harm our ability to operate our business. Further, the situations we plan for and the amount of insurance coverage we maintain for losses as result of failures of our operating systems and infrastructure may not be adequate in any particular case.

***If our security measures are breached or fail and unauthorized access is obtained to our clients' confidential data, our services may be perceived as insecure, the attractiveness of our recovery services to current or potential clients may be reduced, and we may incur significant liabilities.***

Our recovery services involve the storage and transmission of confidential information relating to our clients and their customers, including health, financial, credit, payment and other personal or confidential information. Although our data security procedures are designed to protect against unauthorized access to confidential information, our computer systems, software and networks may be vulnerable to unauthorized access and disclosure of our clients' confidential information. Further, we may not effectively adapt our security measures to evolving security risks, address the security and privacy concerns of existing or potential clients as they change over time, or be compliant with federal, state, and local laws and regulations with respect to securing confidential information. Unauthorized access to confidential information relating to our clients and their customers could lead to reputational damage which could deter our clients and potential clients from selecting

Table of Contents

our recovery services, or result in termination of contracts with those clients affected by any such breach, regulatory action, and claims against us.

In the event of any unauthorized access to personal or other confidential information, we may be required to expend significant resources to investigate and remediate vulnerabilities in our security procedures, and we may be subject to fines, penalties, litigation costs, and financial losses that are either not insured against or not fully covered through any insurance maintained by us. If one or more of such failures in our security and privacy measures were to occur, our business, financial condition and results of operations could suffer.

***Our business may be harmed if we lose members of our management team or other key employees.***

We are highly dependent on members of our management team and other key employees and our future success depends in part on our ability to retain these people. Our inability to continue to attract and retain members of our management team and other key employees could adversely affect our business, financial condition and results of operations.

***The growth of our healthcare business will require us to hire and retain employees with specialized skills and failure to do so could harm our ability to grow our business.***

The growth of our healthcare business will depend in part on our ability to recruit, train and manage additional qualified employees. Our healthcare-related operations require us to hire registered nurses and experts in Medicare coding. Finding, attracting and retaining employees with these skills is a critical component of providing our healthcare-related recovery and audit services, and our inability to staff these operations appropriately represents a risk to our healthcare service offering and associated revenues. An inability to hire qualified personnel, particularly to serve our healthcare clients, may restrain the growth of our business.

***We rely on subcontractors to provide services to our clients and the failure of subcontractors to perform as expected could harm our business operations and our relationships with our clients.***

We engage subcontractors to provide certain services to our clients. These subcontractors participate to varying degrees in our recovery activities with regards to all of the services we provide. While we believe that we perform appropriate due diligence before we hire subcontractors, our subcontractors may not provide adequate service or otherwise comply with the terms set forth in their agreements. In the event a subcontractor provides deficient performance to one or more of our clients, any such client may reduce the volume of services we are providing under an existing contract or may terminate the relevant contract entirely and we may face claims for breach of contract. Any such disruption in our relations with our clients as a result of services provided by any of our subcontractors could adversely affect our revenues and operating results.

***If our software vendors or utility and network providers fail to deliver or perform as expected our business operations could be adversely affected.***

Our recovery services depend in part on third-party providers, including software vendors and utility and network providers. Our ability to service our clients depends on these third-party providers meeting our expectations and contractual obligations in a timely and effective manner. Our business could be materially and adversely affected, and we might incur significant additional liabilities, if the services provided by these third-party providers do not meet our expectations or if they terminate or refuse to renew their relationships with us on similar contractual terms.

***We are subject to extensive regulations regarding the use and disclosure of confidential personal information and failure to comply with these regulations could cause us to incur liabilities and expenses.***

We are subject to a wide array of federal and state laws and regulations regarding the use and disclosure of confidential personal information and security. For example, the federal Health Insurance Portability and Accountability Act of 1996, as amended, or HIPAA, and related state laws subject us to substantial restrictions and requirements with respect to the use and disclosure of the personal health information that we obtain in connection with our audit and recovery services under our contract with CMS and we must establish administrative, physical and technical safeguards to protect the confidentiality of this information. Similar protections extend to the type of personal financial and other information we acquire from our student loan, state tax and federal receivables clients. We are required to notify affected individuals and government agencies of data security breaches involving protected health and certain personally identifiable information. These laws and regulations also require that we develop, implement and maintain written, comprehensive information security programs containing safeguards that are appropriate to protect personally identifiable information or health information against unauthorized access, misuse, destruction or modification. Federal law generally does not preempt state law in the area of protection of personal information,

36

000105

Table of Contents

and as a result we must also comply with state laws and regulations. Regulation of privacy, data use and security requires that we incur significant expenses, which could increase in the future as a result of additional regulations, all of which adversely affects our results of operations. Failure to comply with these laws and regulations can result in penalties and in some cases expose us to civil lawsuits.

***Our student loan recovery business is subject to extensive regulation and consumer protection laws and our failure to comply with these regulations and laws may subject us to liability and result in significant costs.***

Our student loan recovery business is subject to regulation and oversight by various state and federal agencies, particularly in the area of consumer protection. The Fair Debt Collection Practices Act, or FDCPA, and related state laws provide specific guidelines that we must follow in communicating with holders of student loans and regulates the manner in which we can recover defaulted student loans. Some state attorney generals have been active in this area of consumer protection regulation. We are subject, and may be subject in the future, to inquiries and audits from state and federal regulators, as well as frequent litigation from private plaintiffs regarding compliance under the FDCPA and related state regulations. We are also subject to the Fair Credit Reporting Act, or FCRA, which regulates consumer credit reporting and may impose liability on us to the extent adverse credit information reported to a credit bureau is false or inaccurate. Our compliance with the FDCPA, FCRA and other federal and state regulations that affect our student loan recovery business may result in significant costs, including litigation costs. We may also become subject to regulations promulgated by the United States Consumer Financial Protection Bureau, or CFPB, which was established in July 2011 as part of the Dodd-Frank Act to, among other things, establish regulations regarding consumer financial protection laws. In addition, the CFPB has investigatory and enforcement authority with respect to whether persons are engaged in unlawful acts or practices in connection with the collection of consumer debts.

***Litigation may result in substantial costs of defense, damages or settlement, any of which could subject us to significant costs and expenses.***

We are party to lawsuits in the normal course of business, particularly in connection with our student loan recovery services. For example, we are regularly subject to claims that we have violated the guidelines and procedures that must be followed under federal and state laws in communicating with consumer debtors. We may not ultimately prevail or otherwise be able to satisfactorily resolve any pending or future litigation, which may result in substantial costs of defense, damages or settlement. In the future, we may be required to alter our business practices or pay substantial damages or settlement costs as a result of litigation proceedings, which could adversely affect our business operations and results of operations.

***We typically face a long period to implement a new contract which may cause us to incur expenses before we receive revenues from new client relationships.***

If we are successful in obtaining an engagement with a new client or a new contract with an existing client, we typically have a subsequent long implementation period in which the services are planned in detail and we integrate our technology, processes and resources with the client's operations. If we enter into a contract with a new client, we typically will not receive revenues until implementation is completed and work under the contract actually begins. Our clients may also experience delays in obtaining approvals or delays associated with technology or system implementations, such as the delays experienced with the implementation of our first RAC contract with CMS due to an appeal by competitors who were unsuccessful in bidding on the contract. Because we generally begin to hire new employees to provide services to a new client once a contract is signed, we may incur significant expenses associated with these additional hires before we receive corresponding revenues under any such new contract. If we are not successful in maintaining contractual commitments after the expenses we incur during our typically long implementation cycle, our results of operations could be adversely affected.

***If we are unable to adequately protect our proprietary technology, our competitive position could be harmed or we could be required to incur significant costs to enforce our rights.***

The success of our business depends in part upon our proprietary technology platform. We rely on a combination of copyright, patent, trademark, and trade secret laws, as well as on confidentiality procedures and non-compete agreements, to establish and protect our proprietary technology rights. The steps we have taken to deter misappropriation of our proprietary technology may be insufficient to protect our proprietary information. In particular, we may not be able to protect our trade secrets, know-how and other proprietary information adequately. Although we use reasonable efforts to protect this proprietary information and technology, our employees, consultants and other parties may unintentionally or willfully disclose our information or technology to competitors. Enforcing a claim that a third party illegally obtained and is using any of our proprietary information or technology is expensive and time consuming, and the outcome is unpredictable. We rely, in part, on non-disclosure, confidentiality and invention assignment agreements with our employees, consultants and other parties to

000106

Table of Contents

protect our trade secrets, know-how and other intellectual property and proprietary information. These agreements may not be self-executing, or they may be breached and we may not have adequate remedies for such breach. Moreover, third parties may independently develop similar or equivalent proprietary information or otherwise gain access to our trade secrets, know-how and other proprietary information. Any infringement, misappropriation or other violation of our patents, trademarks, copyrights, trade secrets, or other intellectual property rights could adversely affect any competitive advantage we currently derive or may derive from our proprietary technology platform and we may incur significant costs associated with litigation that may be necessary to enforce our intellectual property rights.

***Claims by others that we infringe their intellectual property could force us to incur significant costs or revise the way we conduct our business.***

Our competitors protect their proprietary rights by means of patents, trade secrets, copyrights, trademarks and other intellectual property. Any party asserting that we infringe, misappropriate or violate their intellectual property rights may force us to defend ourselves, and potentially our clients, against the alleged claim. These claims and any resulting lawsuit, if successful, could be time-consuming and expensive to defend, subject us to significant liability for damages or invalidation of our proprietary rights, prevent us from operating all or a portion of our business or force us to redesign our services or technology platform or cause an interruption or cessation of our business operations, any of which could adversely affect our business and operating results. In addition, any litigation relating to the infringement of intellectual property rights could harm our relationships with current and prospective clients. The risk of such claims and lawsuits could increase if we increase the size and scope of our services in our existing markets or expand into new markets.

***We may make acquisitions that prove unsuccessful, strain or divert our resources and harm our results of operations and stock price.***

We may consider acquisitions of other companies in our industry or in new markets. We may not be able to successfully complete any such acquisition and, if completed, any such acquisition may fail to achieve the intended financial results. We may not be able to successfully integrate any acquired businesses with our own and we may be unable to maintain our standards, controls and policies. Further, acquisitions may place additional constraints on our resources by diverting the attention of our management from other business concerns. Moreover, any acquisition may result in a potentially dilutive issuance of equity securities, the incurrence of additional debt and amortization of expenses related to intangible assets, all of which could adversely affect our results of operations and stock price.

***The price of our common stock could be volatile, and you may not be able to sell your shares at or above the public offering price.***

Since our initial public offering in August 2012, the price of our common stock, as reported by NASDAQ Global Select Market, has ranged from a low sales price of $1.50 on March 16, 2017 to a high sales price of $14.09 on March 4, 2013. The trading price of our common stock may be significantly affected by various factors, including: quarterly fluctuations in our operating results; the financial projections we may provide to the public, any changes in those projections or our failure to meet those projections; changes in investors' and analysts' perception of the business risks and conditions of our business; our ability to meet the earnings estimates and other performance expectations of financial analysts or investors; unfavorable commentary or downgrades of our stock by equity research analysts; changes in our capital structure, such as future issuances of debt or equity securities; our success or failure to obtain new contract awards; lawsuits threatened or filed against us; strategic actions by us or our competitors, such as acquisitions or restructurings; new legislation or regulatory actions; changes in our relationship with any of our significant clients; fluctuations in the stock prices of our peer companies or in stock markets in general; and general economic conditions.

***Our significant stockholders have the ability to influence significant corporate activities and our significant stockholders' interests may not coincide with yours.***

Parthenon Capital Partners and Invesco Ltd. beneficially owned approximately 26.5% and 17.4% of our common stock, respectively, as of September 30, 2017. As a result of their ownership, Parthenon Capital Partners and Invesco Ltd. have the ability to influence the outcome of matters submitted to a vote of stockholders and, through our board of directors, the ability to influence decision-making with respect to our business direction and policies. Parthenon Capital Partners and Invesco Ltd. may have interests different from our other stockholders' interests, and may vote in a manner adverse to those interests. Matters over which Parthenon Capital Partners and Invesco Ltd. can, directly or indirectly, exercise influence include:

- mergers and other business combination transactions, including proposed transactions that would result in our stockholders receiving a premium price for their shares;

38

Table of Contents

- other acquisitions or dispositions of businesses or assets;

- incurrence of indebtedness and the issuance of equity securities;

- repurchase of stock and payment of dividends; and

- the issuance of shares to management under our equity incentive plans.

In addition, Parthenon Capital Partners has a contractual right to designate a number of directors proportionate to its stock ownership. Further, under our amended and restated certificate of incorporation, Parthenon Capital Partners does not have any obligation to present to us, and Parthenon Capital Partners may separately pursue, corporate opportunities of which it becomes aware, even if those opportunities are ones that we would have pursued if granted the opportunity.

***Anti-takeover provisions contained in our certificate of incorporation and bylaws could impair a takeover attempt that our stockholders may find beneficial.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that could have the effect of rendering more difficult or discouraging an acquisition deemed undesirable by our board of directors. Our corporate governance documents include the following provisions: establishing a classified board of directors so that not all members of our board are elected at one time; providing that directors may be removed by stockholders only for cause; authorizing blank check preferred stock, which could be issued with voting, liquidation, dividend and other rights superior to our common stock; limiting the ability of our stockholders to call and bring business before special meetings and to take action by written consent in lieu of a meeting; limiting our ability to engage in certain business combinations with any "interested stockholder," other than Parthenon Capital Partners, for a three-year period following the time that the stockholder became an interested stockholder; requiring advance notice of stockholder proposals for business to be conducted at meetings of our stockholders and for nominations of candidates for election to our board of directors; requiring a super majority vote for certain amendments to our amended and restated certificate of incorporation and amended and restated bylaws; and limiting the determination of the number of directors on our board of directors and the filling of vacancies or newly created seats on the board, to our board of directors then in office. These provisions, alone or together, could have the effect of delaying or deterring a change in control, could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

000108

Table of Contents

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

*Sale of Unregistered Securities*

On August 7, 2017, in consideration for, and concurrently with, the extension of the loans in accordance with the terms of our new credit agreement with ECMC Group, Inc., we issued a warrant to ECMC to purchase up to an aggregate of 3,863,326 shares of the Company's common stock (representing approximately up to 7.5% of the our diluted common stock as calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) with an exercise price of $1.92 per share. The warrant was issued in a private placement exempt from registration under the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof. Upon our election to borrow any of the additional term loans under the new credit agreement, we will be required to issue additional warrants at the same exercise price to purchase up to an aggregate of 77,267 additional shares of common stock (which represents approximately 0.15% of the diluted common stock calculated using the "treasury stock" method as defined under GAAP for the most recent fiscal quarter) for each $1,000,000 of such additional term loans. Subsequent to the closing of our new credit agreement, we executed a registration rights agreement with ECMC Group, Inc. and we filed a registration statement to register the resale of shares of our common stock acquired upon exercise of the warrants described above.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

     **None.**

**ITEM 4. MINE SAFETY DISCLOSURES**

     **None**

**ITEM 5. OTHER INFORMATION**

     **None**

000109

Table of Contents

**ITEM 6. EXHIBITS**

(A) Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Amendment No. 1 to Credit Agreement, dated as of September 29, 2017, by and among Performant Business Services, Inc. |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) |
| 31.2 | Certification of the Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) |
| 32.1[1] | Certification of the Chief Executive Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2[1] | Certification of the Principal Financial Officer pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS[2] | XBRL Instance Document |
| 101.SCH[2] | XBRL Taxonomy Extension Scheme |
| 101.CAL[2] | XBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF[2] | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB[2] | XBRL Taxonomy Extension Label Linkbase |
| 101.PRE[2] | XBRL Taxonomy Extension Presentation Linkbase |

---

(1)     The material contained in Exhibit 32.1 and Exhibit 32.2 is not deemed "filed" with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language contained in such filing, except to the extent that the registrant specifically incorporates it by reference.

(2)     In accordance with Rule 406T of Regulation S-T, the information furnished in these exhibits will not be deemed "filed" for purposes of Section 18 of the Exchange Act. Such exhibits will not be deemed to be incorporated by reference into any filing under the Securities Act or Exchange Act.

Table of Contents

**SIGNATURES**

Pursuant to the requirement of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

PERFORMANT FINANCIAL CORPORATION

Date: November 13, 2017

By:  /s/ Lisa Im

Lisa Im

*Chief Executive Officer (Principal Executive Officer)*

By:  /s/ Ian Johnston

Ian Johnston

*Vice President and Chief Accounting Officer*

42

Exhibit 10.1

# FIRST AMENDMENT TO
# CREDIT AGREEMENT

THIS FIRST AMENDMENT TO CREDIT AGREEMENT, dated as of September 29, 2017 (the "Amendment"), is by and among Performant Business Services, Inc., a Nevada corporation (the "Borrower") and ECMC Group, Inc., a Delaware non-profit corporation (the "Lender").

RECITALS:

A.    The Borrower and Lender are parties to that certain Credit Agreement dated as of August 7, 2017 (the "Credit Agreement"), pursuant to which the Lender has made a loan and may make additional loans to the Borrower.

B.    The Borrower and Lender desire to extend the date the first interest payment is due under the Credit Agreement by amendment of the Credit Agreement pursuant to Section 9.1 of the Credit Agreement.

NOW, THEREFORE, in consideration of the above recitals and other good and valuable consideration, the receipt of which is hereby acknowledged, the Borrower and Lender hereby agree as follows:

1. Defined terms. All capitalized terms used in this Amendment shall have the meanings set forth in the Credit Agreement, as amended hereby, except where the context otherwise requires or as otherwise provided herein.

2. Amendments. Section 2.5.2 of the Credit Agreement is hereby deleted and replaced in its entirety with the following:

Accrued interest on each Loan shall initially be payable in arrears on the last day of the fourth Fiscal Quarter of 2017 (December 31, 2017), and thereafter, on the last day of each subsequent Fiscal Quarter, upon a prepayment of such Loan in accordance with Section 2.7 and at maturity in cash; provided that if the last day of a Fiscal Quarter would otherwise end on a day that is not a Business Day, interest shall be paid on the preceding Business Day. After maturity and at the election of Lender at any time an Event of Default exists, all accrued interest on all Loans shall be payable in cash on written demand at the rates specified in Section 2.5.1.

3. Conditions to Effectiveness. This Amendment shall become effective as of the date first above written (the "Effective Date") when, and only when this Amendment has been executed on behalf of each of the Lender and the Borrower and delivered by each to the other party, and the Lender shall have received counterparts of a Reaffirmation in form satisfactory to the Lender, dated as of even date herewith, executed by the Guarantors.

4. Representations, Warranties and Covenants. To induce the Lender to enter into this Amendment, the Borrower hereby represents and warrants to the Lender on the date hereof as follows:

1

000112

(a) the execution, delivery and performance by the Borrower of this Amendment does not and will not (i) require any consent or approval of any government agency or authority (other than any approval which has been obtained and is in full force and effect), (ii) conflict with (x) any provision of applicable law, (y) the charter, by-laws or other organizational documents of Borrower or any other Loan Party or (z) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon Borrower or any other Loan Party or any of their respective properties or (iii) require, or result in, the creation or imposition of any Lien on any asset of Borrower, any Subsidiary or any other Loan Party (other than Liens in favor of Lender created pursuant to the Collateral Documents) in each case of the foregoing clauses (i), (ii) and (ii), except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b) the representations and warranties contained in the Credit Agreement (as may be amended by this Amendment) are true and correct as of the date hereof as though made on that date, except to the extent such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(c) the Credit Agreement, as amended by this Amendment, is the legal, valid and binding obligation of the Borrower and is enforceable against the Borrower in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

(d) after giving effect to this Amendment, there does not exist any Default or Event of Default.

5. <u>Reference to and Effect on the Loan Documents</u>.

(a) From and after the date of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference to the "Credit Agreement", "thereunder", "thereof", "therein" or words of like import referring to the Credit Agreement in any other Loan Document shall mean and be a reference to the Credit Agreement, as amended hereby.

(b) Except as specifically set forth above, the Credit Agreement and each additional Loan Document remains in full force and effect and is hereby ratified and confirmed.

(c) The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of the Lender under the Credit Agreement or any other Loan Document nor constitute a waiver of any provision of the Credit Agreement or any such other Loan Document.

6. <u>Entire Agreement</u>. The Credit Agreement, as amended by this Amendment, collectively sets forth the entire understanding and agreements of the parties hereto in relation to the subject matter hereof and supersede any prior negotiations and agreements between the parties relative to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Credit Agreement or any other Loan Document, as

000113

amended by this Amendment, shall bind any party hereto, and none of the Lender or the Borrower have relied on any such promise, condition, representation or warranty.

7. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

8. <u>Enforceability</u>. Should any one or more of the provisions of this Amendment be determined to be illegal or unenforceable as to one or more of the parties hereto, all other provisions nevertheless shall remain effective and binding on the parties hereto.

9. <u>Governing Law; Jurisdiction; Venue; Jury Trial</u>. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES. THIS AMENDMENT SHALL BE SUBJECT TO THE JURISDICTION, VENUE, AND JURY TRIAL PROVISIONS OF THE CREDIT AGREEMENT.

10. <u>Headings; Recitals</u>. Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose. The Recitals hereto are incorporated herein by reference.

11. <u>Successors and Assigns</u>. This Amendment shall be binding upon and inure to the benefit of the Borrower and the Lender, and their respective, permitted, successors, assigns.

*[Signature page to follow]*

3

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

PERFORMANT BUSINESS SERVICES, INC.

By:   /s/ Lisa Im

Title:   Chief Executive Officer


ECMC Group, Inc.
As Lender

By:   /s/ Greg Van Guilder

Title:   CFO/CIO

*[Signature page to First Amendment to Credit Agreement]*

Exhibit 10.1

# **REAFFIRMATION**

Each of the undersigned, Guarantors under that certain Guarantee and Collateral Agreement dated as of August 11, 2017 (the "GCA"), hereby consents to the terms of that certain First Amendment to Credit Agreement dated as of September 29, 2017 (the "First Amendment") to which this Reaffirmation is attached, between ECMC Group, Inc. and Performant Business Services, Inc., and hereby acknowledges that the obligations of each of the undersigned under the GCA and the other Loan Documents (as defined in the Credit Agreement) to which any of them is a party, continue in full force and effect from and after the Effective Date (as defined in the First Amendment) of the First Amendment after giving effect to the First Amendment.

Dated as of September 29, 2017.

PERFORMANT FINANCIAL CORPORATION, a Delaware corporation
By: /s/ Lisa Im
Name:   Lisa Im
Title:   Chief Executive Officer
PERFORMANT RECOVERY, INC., a California corporation
By: /s/ Lisa Im
Name:   Lisa Im
Title:   Chief Executive Officer
PERFORMANT TECHNOLOGIES, INC., a California corporation
By: /s/ Lisa Im
Name:   Lisa Im
Title:   Chief Executive Officer

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER PURSUANT TO
SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**

I, Lisa Im, certify that:

1.       I have reviewed this Quarterly Report on Form 10-Q of Performant Financial Corporation;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)       Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2017

_____
                **/s/ Lisa Im**
                **Lisa Im**
        **Chief Executive Officer**

000117

**Exhibit 31.2**

## CERTIFICATION

I, Ian Johnston, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Performant Financial Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2017

**/s/ Ian Johnston**

**Ian Johnston**

**Vice President and Chief Accounting Officer (Principal Financial Officer)**

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Lisa Im, Chief Executive Officer of Performant Financial Corporation, do hereby certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Performant Financial Corporation on Form 10-Q for the quarter ended September 30, 2017 to which this certification is attached fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Quarterly Report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Performant Financial Corporation

Date: November 13, 2017

By:  _____/s/ Lisa Im_____

     **Lisa Im**
    **Chief Executive Officer**

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Ian Johnston, Vice President and Chief Accounting Officer (Principal Financial Officer) of Performant Financial Corporation, do hereby certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Performant Financial Corporation on Form 10-Q for the quarter ended September 30, 2017 to which this certification is attached fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Quarterly Report on Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Performant Financial Corporation

Date: November 13, 2017

By:  **/s/ Ian Johnston**

_____

**Ian Johnston**
**Vice President and Chief Accounting Officer (Principal
Financial Officer)**

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT E

# ConServe Pre-Filing Notice



Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800 | Los Angeles, CA 90017-5406 | tel 213.488.7100 | fax 213.629.1033

February 12, 2018

Todd J. Canni
tel 213.488.7213
todd.canni@pillsburylaw.com

**BY FACSIMILE TO** *202-305-2062, 202-357-6401, and 202-357-6507*

**BY ELECTRONIC MAIL TO** nationalcourts.bidprotest@usdoj.gov

Clerk of Court
U.S. Court of Federal Claims
717 Madison Place, NW
Washington, DC 20439
Fax: (202) 357-6507
CFC_Bidprotests@ao.uscourts.gov

Patty Queen-Harper
Contracting Officer
U.S. Department of Education
patty.queen-harper@ed.gov

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530
nationalcourts.bidprotest@usdoj.gov

Thomas Leo McGovern, III
thomas.mcgovern@hoganlovells.com
David Thomas Ralston, Jr.
dralston@foley.com

Re:     **Pre-filing Notice of Protest**

Dear Sir or Madam:

On behalf of Continental Service Group, Inc. ("ConServe"), and in accordance with Appendix C of the Rules of the United States Court of Federal Claims ("RCFC"), we hereby notify the United States Department of Justice, the Clerk of the United States Court of Federal Claims, and the U.S. Department of Education's contracting officer that ConServe intends to file a protest at the Court on February 13, 2018. The information required by Appendix C is provided below:

(a)     Plaintiff ConServe is a privately held corporation 100% owned, directly or indirectly, by Mark E. Davitt. No publicly held corporations, directly or indirectly, own 10% or more of the stock of ConServe.

(b)     The procuring agency is the U.S. Department of Education ("ED") and the solicitation number at issue is ED-FSA-16-R-0009.

(c)     The contracting officer is Ms. Patty Queen-Harper, and she may be contacted at (404) 682-3288 or patty.queen-harper@ed.gov.

February 12, 2018
Pre-filing Notice of Protest
Page 2

(d)     The principal agency attorney who represented the agency in ConServe's prior protest of the same procurement before the Government Accountability Office ("GAO") was Mr. Jose Otero.  Mr. Otero may be contacted at 202-453-6478 or jose.otero@ed.gov.

(e)     ConServe will file, simultaneously with its Complaint, a motion for preliminary injunctive relief pursuant to RCFC 65.

(f)     ConServe has not discussed the need for a temporary restraining order or preliminary injunctive relief with counsel from the Department of Justice.

(g)     This action was not preceded by the filing of a protest before the GAO. But, ConServe filed a protest at the GAO challenging earlier award decisions under this solicitation.  ConServe's protest before the GAO was docketed as GAO file number B-414220.5, .28, and was withdrawn when ConServe filed an earlier protest at the Court of Federal Claims.  The earlier Court of Federal Claims protest was docketed as Case Number 17-0449 and is pending before Judge Wheeler.

(h)     ConServe will file a motion for entry of a protective order.  The prior GAO protest was covered by a GAO protective order.  ConServe will also move to file its initial papers under seal.

As required by Appendix C, ConServe is providing copies of this pre-filing notice to the Clerk of the United States Court of Federal Claims, the Department of Justice - Commercial Litigation Branch - Civil Division, and to ED's contracting officer.  As a courtesy, ConServe is also providing a copy of this notice to agency counsel.

Respectfully submitted,


/s/ Todd J. Canni
Todd J. Canni
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7213
(213) 629-1033 (fax)
todd.canni@pillsburylaw.com

*Attorney of Record for Continental Service Group, Inc.*

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT F

# Feb. 15, 2018 E-mail from M. McGill to T. Canni

**Pettit, Thomas A.**

**Subject:**                       FW: Department of Education Matter

**From:** McGill, Michael D.
**Sent:** Thursday, February 15, 2018 5:48 PM
**To:** Todd J. ' 'Canni
**Subject:** Department of Education Matter

Todd,

Earlier this week, you filed a notice at the Court of Federal Claims indicating that Pillsbury intends to file a complaint challenging the Department of Education's awards to Performant and Windham.  I understand from Lisa Im, Performant's Chief Executive Officer, that your firm represents Performant.  Do you have time to discuss tomorrow?

Regards,
Mike

**Michael McGill**
Partner

**Hogan Lovells US LLP**
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

Tel:    +1 202 637 5600
Direct:  +1 202 637 8862
Fax:    +1 202 637 5910
Email:  michael.mcgill@hoganlovells.com
       www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

000125

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT G

# Feb. 19, 2018 E-mail from
# J. McKay to A. Turnbull

**Pettit, Thomas A.**

---

**Subject:**                          FW: Call to discuss DOE contract

**From:** McKay, Jack [mailto:jack.mckay@pillsburylaw.com]
**Sent:** Monday, February 19, 2018 9:31 PM
**To:** McGill, Michael D.; Canni, Todd J.; Turnbull, Albert W.
**Subject:** Call to discuss DOE contract

Al—I think Mike McGill has given you a heads-up that I would be writing to set up a call to discuss the issues surrounding the recent DOE contract award to Performant and the protest by Conserv and others.

I discussed with Mike on Friday setting up a call for tomorrow, Tuesday.  While I am out of town tomorrow, I can be available in the afternoon.  However, I have learned that my partner Todd Canni, who represents Conserv, will be flying from California on Tuesday to be here for a hearing on the matter on Wednesday and cannot participate in a call until Wednesday afternoon once the hearing is concluded.  I know Mike wants to be on the call and I would like for Todd to participate as well.

Please let me know if Wednesday afternoon would work for a call.

Best regards, Jack

**Jack McKay | Senior Partner**
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW | Washington, DC 20036-3006
t 202.663.8439 | m 202.744.8935
jack.mckay@pillsburylaw.com | website bio

ABU DHABI   AUSTIN   BEIJING   DUBAI   HONG KONG   HOUSTON   LONDON
LOS ANGELES   MIAMI   NASHVILLE   NEW YORK   NORTHERN VIRGINIA
PALM BEACH   SACRAMENTO   SAN DIEGO   SAN DIEGO NORTH COUNTY
SAN FRANCISCO   SHANGHAI   SILICON VALLEY   TOKYO   WASHINGTON, DC

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770, Option 1, immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

000127

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT H

# Feb. 21, 2018 Letter from
# M. McGill to T. Canni



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

February 21, 2018

**VIA U.S. MAIL AND ELECTRONIC MAIL**

Todd J. Canni
Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
todd.canni@pillsburylaw.com

Re:     Concurrent Conflict of Interest: *FMS Investment Corp., et al. v. United States and Performant Recovery, Inc., et al.*, Nos. 18-cv-204C *et al.*, U.S. Court of Federal Claims

Dear Mr. Canni:

We represent Performant Recovery, Inc. in the consolidated U.S. Court of Federal Claims (the "COFC") bid protests referenced above.  These protests challenge the U.S. Department of Education's (the "Department") decision to award debt collection contracts to Performant and Windham Professionals, Inc. under solicitation number ED-FSA-16-R-0009 (the "RFP").

We understand that Performant Recovery, Inc. 1/ and its parent company, Performant Financial Corporation, 2/ are current clients of your firm, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). 3/  Various Pillsbury lawyers, including Blair White, advise Performant regarding various corporate and other general legal matters, and have done so regularly for over five years. Enclosed with this letter is the most recent invoice for work Pillsbury is performing for Performant. 4/

Notwithstanding Performant's status as a current client of your firm, you recently have taken actions directly adverse to Performant's interests in your capacity as counsel for Continental Service Group, Inc. ("ConServe"), an unsuccessful offeror in the procurement at

---

1/      Until 2012, Performant Recovery, Inc. was named Diversified Collection Services, Inc.
2/      Performant Recovery, Inc. and its parent company are referred to collectively as "Performant" throughout this letter.
3/      Encl. A, Performant-Pillsbury Engagement Letter.
4/      Encl. B, Jan. 26, 2018 Invoice from Pillsbury to Performant.

issue in the COFC bid protests.  In January, you discussed the Department's award decisions with the media in a manner detrimental to Performant and its interests, stating:

> It simply does not make sense that the agency would choose to work with lower-rated [companies] with marginal ratings that do not have an exceptional past performance record.  While we continue to await more facts, we are deeply troubled by the optics and appearance issues associated with the agency's award decisions . . . . It is beyond dispute that the [agency's] decisions have, at a minimum, created the appearance of a conflict of interest.  ***Given the fact that Performant was not a highly rated [company] and, in fact, was rated fairly low . . . the agency will be under intense scrutiny and will need to explain how suddenly these ratings changed so significantly to allow Performant to leap frog over so many other qualified [companies].*** 5/

On February 12, 2018, you submitted to the U.S. Department of Justice and the COFC a notice of your intent to file a bid protest on behalf of ConServe.  This pre-filing notice indicated that the anticipated protest would challenge the Department's award decisions under the RFP, including its award to Performant.

On February 15, 2018, we notified you by email that Performant is a current client of Pillsbury and requested to speak with you regarding your firm's representation of ConServe in this litigation.  We participated in a conference call with you and Pillsbury senior partner Jack McKay on February 16, 2018.  At that time, we verbally advised you that Performant views Pillsbury's representation of ConServe in this matter as a concurrent conflict of interest and that Performant does not waive that conflict.  Mr. McKay confirmed Pillsbury's longstanding representation of Performant and acknowledged that the company has not provided Pillsbury with an advance conflicts waiver, nor has it otherwise waived the instant conflict.  At Mr. McKay's request, we agreed to participate in a follow-up conversation between Mr. McKay and Hogan Lovells' ethics counsel, Al Turnbull, the following week.  To our surprise, however, you proceeded to file a bid protest complaint and protective order applications at the COFC just minutes after we concluded our call on February 16.  6/  Despite having knowledge of your firm's conflict of interest in this matter, your bid protest complaint challenges the Department's

---

5/      Danielle Douglas-Gabriel, *Education Dep't awards debt-collection contract to company with ties to DeVos*, The Washington Post, Jan. 12, 2018, https://www.washingtonpost.com/news/grade-point/wp/2018/01/11/education-dept-awards-debt-collection-contract-to-company-with-ties-to-devos/?utm_term=.95932b0a0f31 (emphasis added).  Insofar as Pillsbury alleges that the Department's award to Performant is tainted by a conflict of interest associated with debt financing that Performant secured with Pillsbury's legal advice, Pillsbury's conflict of interest is all the more egregious.

6/      *Cont'l Serv. Grp., Inc. v. United States*, No. 18-cv-246 (Fed. Cl. filed Feb. 16, 2018) (consolidated with No. 18-cv-204 *et al.* (Fed. Cl.)).

000130

decision to select Performant's proposal for award and seeks to enjoin Performant's performance of the awarded contract.

Pursuant to Rule 1.7(b)(1) of the District of Columbia Rules of Professional Conduct, 7/ Pillsbury's representation of ConServe in this matter is directly adverse to its current client, Performant, thus creating a concurrent conflict of interest. 8/ As you are aware, Performant has not waived, and does not waive, that conflict. Accordingly, Performant demands that you and Pillsbury (1) refrain from making any further public statements criticizing the Department's award to Performant or otherwise disparaging Performant, and (2) immediately withdraw from your representation of ConServe in this litigation. 9/

Please advise by close of business on Friday, February 23, 2018 whether or not your firm intends to withdraw from its representation of ConServe in this matter.

---

7/   "Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if . . . [t]hat matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter even though that client is unrepresented or represented by a different lawyer." D.C. Rules of Prof'l Conduct ("DCRPC") R. 1.7(b)(1). Paragraph (c) provides that a lawyer may only represent a client under such circumstances where, *inter alia*, each potentially affected client provides informed consent to the representation "after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." *Id*. R. 1.7(c)(1). *See also id.* R. 1.7 cmt. 34 ("All of the references in Rule 1.7 and its accompanying Comment to the limitation upon a 'lawyer' must be read in light of the imputed disqualification provisions of Rule 1.10, which affect lawyers practicing in a firm.").

8/   *See In re Butterfield*, 851 A.2d 513 (D.C. Ct. App. 2004) (concurring with the D.C. Court of Appeals Board on Professional Responsibility's conclusion (D.C. Bar Docket No. 264-99) that the respondent attorney violated Rule 1.7(b)(1) when he represented Raytheon Corp. in protesting a planned contract award to Lockheed Martin Systems Integration ("Lockheed") because Lockheed was also a firm client even though the firm did not represent Lockheed in the same matter and ordering a 30-day suspension of the attorney).

9/   DCRPC R. 1.7 cmt. 33 ("If . . . a conflict arises under paragraph (b) and informed and uncoerced consent is not or cannot be obtained pursuant to paragraph (c), then the lawyer should withdraw from the representation.").

3

Sincerely,

Michael McGill
Partner
HOGAN LOVELLS US LLP
michael.mcgill@hoganlovells.com
202-637-8862

Enclosures

cc:     Lisa Im, Performant Chief Executive Officer
        Blair White, Pillsbury

4

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT I

# Harris, Wiltshire & Grannis LLP Notice of Representation



Thomas B. Mason
(202) 730-1302
tmason@hwglaw.com

February 23, 2018

**<u>Via Email (michael.mcgill@hoganlovells.com)</u>**
Michael McGill, Esquire
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Re:   *FMS Investment Corp., et al. v. United States, Defendant, and Performant Recovery, Inc., et al.,  Defendant-Intervenors*, Nos. 18-204C, 18-206C, 18-207C, 18-208C, 18-211C, 18-214C, 18-216C, 18-220C, 18-229C, 18-238C, 18-239C, 18-245C, 18-246C, 1-248C, 18-251C, 18-252C, 18-261C and 18-275C (Consolidated).

Dear Mr. McGill:

I write to advise you that our firm has been retained to represent Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury') with regard to the subject matter of your letter to Jack McKay dated February 21, 2018.

We are reviewing your letter and working to get you a response next week.  In the meantime, Pillsbury and its client Continental Service Group, Inc., are willing at any time to resume discussions about potential ways in which to resolve the concerns of Performant Financial Corporation, also, as you note, a Pillsbury client.

Please call me if you have any questions concerning the matters discussed in this letter. Thank you.

Sincerely yours,

Thomas B. Mason

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT J

# Feb. 25, 2018 E-mail from
# T. Mason to M. McGill

**Pettit, Thomas A.**

**Subject:**                                    FW: ConServe/Performant Financial Matter


-----Original Message-----
From: Tom Mason [mailto:TMason@hwglaw.com]
Sent: Sunday, February 25, 2018 9:54 AM
To: McGill, Michael D.
Cc: Turnbull, Albert W.; Tom Mason; McKay, Jack
Subject: Re: ConServe/Performant Financial Matter

Mike, thank you for this note.  I am sorry for the delay in responding.


We are working on our response and think that we can meet the timetable that you outline below.  There is a possibility that we will need until Thursday but I will let you on Wednesday if that is the case.  And thank you for graciously offering the accommodation that you already have.


Jack and I would like to come by and talk with you and with Al either Monday or Tuesday.  Monday is a bit tight for me and the only times that will work is 10:30 to noon.  Tuesday is wide open between 10:30 and 4.  We don't propose to discuss the rules or substance, we would like to talk about potential solutions.  We would like to be able to throw out ideas and discuss them. To make that productive, we propose that our discussions be off-the-record.


In any event, for me, it is always great to see Al; we have been through a lot together and had a lot fun doing it.


Tom


_____
From: McGill, Michael D. <michael.mcgill@hoganlovells.com>
Sent: Friday, February 23, 2018 5:25 PM
To: Tom Mason
Cc: Turnbull, Albert W.
Subject: RE: ConServe/Performant Financial Matter



Tom,

Thank you for alerting us to your retention.  We would ask that you respond by close of business on Wednesday, February 28.  If you are able to do so, we will delay, without prejudice to Performant's rights, taking any further action until after we have received and reviewed your response.  In the interim, Al and I would be happy to discuss the situation early next week.

Regards,
Mike

000136

Michael McGill
Partner
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

Tel:

+1 202 637 5600

Direct:

+1 202 637 8862

Fax:

+1 202 637 5910

Email:

michael.mcgill@hoganlovells.com<mailto:michael.mcgill@hoganlovells.com>


www.hoganlovells.com<http://www.hoganlovells.com/>

Please consider the environment before printing this e-mail.



From: Tom Mason [mailto:TMason@hwglaw.com]
Sent: Friday, February 23, 2018 2:55 PM
To: McGill, Michael D.
Cc: Tom Mason
Subject: ConServe/Performant Financial Matter

Mike, please see the attached. Best regards, Tom


_____

About Hogan Lovells
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP.
For more information, see www.hoganlovells.com<http://www.hoganlovells.com>.

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it
may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by
return email and delete this email (and any attachments) from your system.

2

000137

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT K

# Feb. 27, 2018 Letter from T. Mason to M. McGill



Thomas B. Mason
(202) 730-1302
tmason@hwglaw.com

February 27, 2018

**Vial Email (michael.mcgill@hoganlovells.com)**
Michael McGill
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C. 20004

     Re:   *FMS Investment Corp., et al. v. United States, Defendant, and Performant Recovery, Inc., et al., Defendant-Intervenors*, Nos. 18-204C, 18-206C, 18-207C, 18-208C, 18-211C, 18-214C, 18-216C, 18-220C, 18-229C, 18-238C, 18-239C, 18-245C, 18-246C, 1-248C, 18-251C, 18-252C, 18-261C and 18-275C (Consolidated).

Dear Mike:

     I write in response to your note of February 25, 2018, on behalf of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").  It is our genuine desire that the parties reach an amicable resolution of this unfortunate development, and we are committed to working with you in good faith with this goal in mind.  In your note, you expressed that your client does not "see any benefit to meeting to discuss 'potential solutions' that do not involve Pillsbury withdrawing from the Court of Federal Claims action [and that] the only solution that is acceptable to our mutual client is Pillsbury's withdrawal from the matter as soon as possible."  We were disappointed that our offer to meet and discuss this matter was not accepted and respectfully ask you and your client to reconsider this position.

     We believe that it is in no one's interest to pursue a contested disqualification motion.  But, even if that is your client's ultimate decision, we feel it would be beneficial for you and your client to hear our views before taking any drastic measures that could harm one or both of our clients.  Additionally, we are mindful of the fact that a disqualification motion will disrupt the Court's proceedings.  We think it is incumbent upon the lawyers for all parties to do our very best to avoid adding this matter to the court's already busy docket.

     At a meeting, we are prepared to address potential compromise solutions as well as the underlying law and rules.  In the latter regard, we believe that the analysis as presented in your letter of February 21 to Mr. McKay is incomplete and inconsistent with the facts and law and the likely outcome should you proceed.  Indeed, the analysis relies upon readily distinguishable

Michael McGill, Esquire
February 27, 2018
Page 2 of 2

authority, does not address all of the relevant rules, both under the D.C. Rules of Professional Conduct and other applicable ethics codes, and omits appropriate consideration of context and circumstances.  Up until the recent awards, Performant supported the arguments that ConServe made against the Department of Education's handling of the procurement and benefitted from ConServe's work.  ConServe's core efforts and arguments to ensure its proposal was treated fairly and consistent with law have not materially changed.  Under all of these circumstances, the law and facts do not require Pillsbury to abandon ConServe after some 14 months and leave it searching for new counsel in the midst of on-going litigation with tight deadlines.

These are just a few of the issues we would like to share and discuss with you in person.[1] We do not believe letter writing will be productive in bringing about an amicable resolution, but felt that we should outline for you our perspective and thoughts on this unfortunate matter.  We remain eager to meet with you, as soon as is possible, and exhaust all steps before bringing our current disagreement to the court.

Sincerely yours,

Thomas B. Mason

---

[1] We also had hoped to bring to your attention, in person, that Performant Recovery's assertion of a conflict by virtue of its ties to Performant Financial is inconsistent with the former's representations to the Court in multiple actions that it was a standalone company with no parent.  *FMS Investment Corp. v. United States*, No. 1:18-cv-00204 (February 13, 2018) (DE 15-1); *Progressive Financial Services v. United States*, No. 1:17-cv-00558-TCV (April 26, 2017) (DE 20-1).

Civil Action Nos. 18-204C, *et al.*
*FMS Corp., et al., v. United States & Performant Recovery, Inc., et al.*
Exhibits Accompanying Performant Recovery, Inc.'s Motion to Disqualify

# EXHIBIT L

# Report and Recommendation of the Board on Professional Responsibility

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

|                           |   |                       |
|---------------------------|---|-----------------------|
|                           | : |                       |
| In the Matter of:         | : |                       |
|                           | : |                       |
| WILLIAM H. BUTTERFIELD,   | : | Bar Docket No. 264-99 |
|                           | : |                       |
| Respondent.               | : |                       |

REPORT AND RECOMMENDATION OF THE BOARD
ON PROFESSIONAL RESPONSIBILITY

This matter comes before the Board on Professional Responsibility (the "Board") on review of the Report of Hearing Committee Number Ten, which concluded that Respondent had violated Rule 1.7(b)(1) of the D.C. Rules of Professional Conduct ("Rules") and recommended that Respondent be suspended from the practice of law for thirty days and that his reinstatement be conditioned on completion of a course on professional responsibility approved by Bar Counsel.  The Board concurs in the recommendation of the Hearing Committee both as to violation and as to sanction.

This case presents a straightforward law firm conflict of interest situation.  Respondent refused to acknowledge and resolve a conflict requiring waivers from two affected clients and proceeded to represent a new client in a matter in which its interests were adverse to the interests of an existing law firm client.  Respondent's law firm routinely failed to utilize its conflict identification system and it failed to take effective action to address the conflict.  When the conflict was ultimately disclosed, the firm's existing client terminated the firm and lodged with Bar Counsel the complaint which initiated this proceeding.

000142

## I. PROCEDURAL BACKGROUND

Respondent is a member of the District of Columbia Bar, having been admitted on May 25, 1970.  Bar Counsel filed a petition initiating formal disciplinary proceedings on May 30, 2000.  Bar Counsel charged that Respondent violated Rule 1.7(b)(1) (representation of one client, without the consent of both clients, adverse to the position taken by another client in the same matter); Rule 1.7(b)(3) (representation of one client, without the consent of both clients, where the representation of another client will be or is likely to be adversely affected by such representation); and Rule 1.10(a) (knowing representation of a client when another firm lawyer would be prohibited from doing so by Rule 1.7).

The Hearing Committee conducted hearings on September 18, and October 16, 2000.  Bar Counsel submitted exhibits and called as witnesses Maryanne Lavan, Vice President and General Counsel of Lockheed Systems Integration ("Lockheed"), the complaining party; two of Respondent's current law partners, Peter M. Kilcullen and Walter Wilson; one former partner, Patricia Wittie; and Ms. Brenda Touhey.  (Respondent's former partner Thomas Touhey, who represented Lockheed, became sick and died within months after the conflicting representation occurred.)  Respondent testified at the request of the Hearing Committee, and the Hearing Committee's report was issued on February 25, 2002.  Respondent excepted to the Report, both as to the violations findings and as to sanction.

Oral argument was heard before the Board on September 5, 2002.

## II.  FINDINGS OF FACT

The Hearing Committee Report includes comprehensive and detailed findings of fact, which are supported by the record.  We adopt the Hearing Committee's findings and present them here, as supplemented where necessary by our own findings.[1]

1.      In 1999, Respondent was an equity participant in the law firm of Kilcullen, Wilson & Kilcullen, Chartered (the "Firm"), a Washington, D.C. law firm specializing in government contracts matters.[2]  Between January and May 1999, when the situation at issue arose, the Firm consisted of approximately twelve lawyers, ten of whom were principals.  The bulk of the Firm's work involved matters in which the United States was the adverse party.  The Firm did, however, represent clients in bid protests and other matters in which commercial entities were adverse to one another.  At the time of the hearing, Respondent was a partner in the law firm of Bell, Boyd & Lloyd, as were Peter Kilcullen and Walter Wilson, the name partners in the Firm.

2.      Representation of the New Client Raytheon.  For a period of time prior to April 1999, Respondent had been trying to acquire Raytheon Corporation ("Raytheon") as a Firm client for government contracts work.  On or about April 14, 1999, Respondent was contacted by Raytheon about filing a bid protest against a proposal by the Federal Aviation Administration ("FAA") to grant a sole source contract to Lockheed.  At the time of this contact, Respondent was in Louisville on other business.  Since bid protests have to be filed within ten days of the award of the contract, Respondent alerted Cyrus Phillips, one of his partners, so that the Firm

---

[1]  We have reviewed, but do not recite, the Hearing Committee's citations to the record.  Pursuant to Board Rule 13.7, we make certain additional findings of fact, based on "clear and convincing" evidence in the record.  These additional findings are accompanied by citations to the record.

[2]  The Firm was a chartered entity, not a partnership.  For convenient reference, however, we refer to its members as "partners."

000144

would be in a position to handle the protest if Raytheon should decide to go forward.  Mr. Phillips commenced working on the Raytheon matter on Thursday, April 15, 1999, and Respondent started working on the Raytheon matter on Friday, April 16, when he returned to the office.

3.      There is no evidence that Respondent knew at the time he was contacted by Raytheon that other members of the Firm, namely Thomas Touhey and Patricia Wittie, represented Lockheed in unrelated matters.  Respondent took no action, however, before he commenced work for Raytheon to determine whether the representation of Raytheon would create a conflict of interest.

4.      Despite the facts that, as outlined later in these findings, Respondent knew on April 16 that the Firm represented Lockheed and that two of his partners objected strenuously as early as May 4, Respondent continued to work on the protest through early May and ultimately filed the protest on May 21.  He testified that, throughout this period, he was not certain that Raytheon would actually authorize the filing of the protest.  Governmental contractors often make decisions as to whether to file a protest at the last minute, but because of time pressure associated with the ten-day deadline, Respondent needed to prepare the protest while Raytheon was deciding whether to file.  The protest filed on May 21 sought the "termination of the single source award to Lockheed."  B.C. Ex. 4(b) at 22.[3]  The protest was settled shortly thereafter without the termination of the award to Lockheed.

5.      <u>Kilcullen, Wilson & Kilcullen's Conflict Clearance Procedures</u>.  The Firm had a written conflict identification procedure which it had developed in response to its malpractice insurance carrier's request.  It also had an "ad hoc" or "oral" method of clearing conflicts.  Under

---

[3] "B.C. Ex." is used to designate Bar Counsel's exhibits.

4

the written system, attorneys undertaking a new client or new matter completed an "Opening a New Client or Matter" form calling for information concerning the new client and parties who might be adverse.  The information on the form was input into the Firm's database which was also used for billing.

6.     The Firm's database was maintained by Peter Kilcullen's secretary, who could, if requested, search the database to determine whether a potential new client might create a conflict of interest.  Tr.-2 at 45-51.[4]  It appears, however, that the members of the Firm did not routinely call for a search of the database when a new matter or client was undertaken.  Id. at 51-53.

7.     Respondent did not have this database checked in this case, nor was it his practice to have the database checked for new clients or matters.  Id. at 88.  Indeed, Respondent himself did not prepare the case opening form for the Raytheon matter; the form was completed by a secretary who did not fill in the portions of the form designed to reveal conflicts; the "Description of Matter" and "Other Parties/Conflict Information" topics were left blank.  As submitted, the form included only Raytheon's name, "Raytheon Systems Company," its address, and the designation of Respondent as "Billing Attorney."  B.C. Ex. 4(a); Tr.-2 at 57-59.  The data was not even entered into the Firm's database until May 12, 1999, only nine days before the protest was filed, and almost a month after work had commenced.  As evidenced by this case, the Firm did not require attorneys to complete the form before undertaking work for a new client or on a new matter.  Tr.-2 at 59-62.  The form was not distributed within the Firm, nor was any e-mail or other documentary process used to identify conflicts.  Tr.-1 at 31, 183-84.[5]

---

[4]  "Tr.-2" is used to designate the transcript of the hearing on October 16, 2000.

[5]  "Tr.-1" is used to designate the transcript of the hearing on September 18, 2000.

000146

8.     The Firm's lawyers utilized their daily communications within the office as the primary method of identifying conflicts.  Tr.-2 at 17-20.  Mr. Kilcullen testified that the principal means of addressing a potential conflict situation was an "oral" or "word of mouth" notification procedure.  Respondent concurred, stating that, to the extent the Firm had a conflict checking system, "it was 99% word of mouth."  Id. at 79.  Mr. Wilson testified that the Firm relied on word of mouth notification of new clients and matters.  He said he would not call the Firm's conflict identification process a "system because that implied there was some sort of rule or written rule that you had to do that."  Id. at 20.

9.     The Conflict of Interest.  When Respondent returned to his office on Friday, April 16, he found a note from Mr. Touhey stating he believed there was a conflict with Mr. Touhey's representation of Lockheed.  Respondent immediately sought out Mr. Touhey and discussed the matter.  During that conversation, Mr. Touhey expressed concern that Respondent's undertaking the Raytheon work would be a conflict since Mr. Touhey represented Lockheed.  Respondent testified that the "whole premise" of this meeting was that Lockheed was a client of the Firm and that representation of Raytheon adverse to Lockheed created a problem.  Id. at 115-16.

10.     Respondent testified that Mr. Touhey was very vague as to the Lockheed matters on which he was working and could not name the attorney(s) at Lockheed he would contact about the conflict.  E.g. Tr.-1 at 11-12; B.C. Ex. 8(l).  Respondent states that he was not convinced, after the conversation on April 16, that there was a conflict.  B.C. Ex. 8(l).  Respondent knew, however, that Mr. Touhey had represented Lockheed in connection with a matter before the Armed Services Board of Contract Appeals ("ASBCA"), which was still pending but dormant.  Tr.-2 at 91.  Respondent stated that Mr. Touhey "hoped that if the pending case was unsuccessful, he was hopeful of getting retained to process the appeal."  Id.

6

Respondent testified that he did not understand Mr. Touhey to be "putting a stake in the ground" that there was a conflict.  Id. at 93.  Respondent acknowledges, however, that the April 16 conversation did not resolve the issue.  Tr.-1 at 12; Tr.-2 at 90, 93.  In his memorandum of June 1, 1999, he concluded his description of this discussion as follows:

> In any event, this first meeting with Tom (which lasted probably 15 minutes at most) did not resolve anything.  I still believe Tom felt there was a conflict, and I made it clear that I did not believe there was one.

B.C. Ex. 2.  Notwithstanding that a potential conflict had been identified, Respondent continued to work on the Raytheon protest, logging 6.5 hours on April 16 and 4.0 hours on April 18.  B.C. Ex. 9.

11.     Respondent testified that on Monday, April 19, the next business day, Mr. Touhey came into Respondent's office and told him that he, Mr. Touhey, was "backing off."  Tr.-2 at 93-96; B.C. Ex. 8(l).  In his June 1, 1999 memorandum to Walter Wilson, Respondent described this conversation as follows:

> 4.  The very next business day (which I believe was Monday, April 19), Tom came into my office.  He stood directly in front of my desk and told me, point blank, that he was withdrawing his objection.  I believe the exact phrase he used was that he was "backing off."  I repeat, Tom told me to my face that he had no objection to our representation of Raytheon.

B.C. Ex. 2.  On cross-examination, Respondent acknowledged that on April 19, Mr. Touhey did not say (a) there was no conflict, or (b) that Lockheed had ceased to be a Firm client, or (c) that the pending ASBCA matter had been resolved, or (d) that he (Mr. Touhey) had obtained a waiver from Lockheed, or (e) that he (Mr. Touhey) was withdrawing from the representation of Lockheed.  Tr.-2 at 118-19.

12.     Respondent agreed with a Hearing Committee member's characterization of his position as follows:

000148

HEARING COMMITTEE MEMBER O'MALLEY:

***

Is it a fair summary of your testimony, and I think that this is perhaps your fundamental position, I'm asking, is this a fair summary of it, that on April 16 and April 19, after your discussions with Mr. Touhey, while it appeared to you that Lockheed was a current client of Mr. Touhey, and that's what he was concerned about, that if, the client contact partner in the firm, decided and told you that there was not a problem, and he was backing off, that was all you needed to enable you to proceed.

THE WITNESS:  That's exactly what I'm saying.

Tr.-2 at 97-98.

13.     Respondent made no inquiry whether Lockheed was no longer a client, whether the case had been resolved, or whether Mr. Touhey had cleared the conflict with Lockheed.  Id. at 118-20.

14.     Mr. Wilson supported Respondent's testimony.  He testified that Mr. Touhey told him on the same day, April 19, there was no conflict and that he did not even know who to contact at Lockheed to seek a waiver.  Tr.-1 at 259.  Mr. Wilson testified that he did not question Mr. Touhey further and made no independent effort to determine whether there was a conflict. Id. at 260.

15.     Ms. Wittie, a partner in the Firm at the time this matter arose, described a different version of events.  In a memorandum of May 14, 1999, she wrote that Mr. Touhey had left the first conversation with Respondent with the belief that Respondent had not yet landed the Raytheon representation.  B.C. Ex. 6(e).  Ms. Wittie testified that Mr. Touhey told her, when she called him at home on May 2 to advise that Respondent was working on the protest, that he thought that Respondent had only been approached about the possibility of representing Raytheon and that he had not commenced work.  Ms. Wittie stated that Mr. Touhey first learned

8

that Respondent was actually working for Raytheon when she called Mr. Touhey on the evening of May 2 to discuss the conflict.  Tr.-1 at 35-36.

16.      Ms. Wittie had learned of Respondent's work for Raytheon when she found him in the office on May 2, a Sunday, and asked what he was doing.  Respondent told her that he was working on a possible protest by Raytheon against the award of a sole-source contract to Lockheed.  She testified that she was "astonished" by this information since she represented Danish Aerotech in a matter where Raytheon was adverse.  Id. at 33, 34.  She testified that she advised Respondent that his representation of Raytheon was a conflict with Danish Aerotech. Ms. Wittie stated she was also surprised that Respondent was working on a protest against Lockheed since she and Mr. Touhey were then currently working for Lockheed.  Ms. Wittie testified that Respondent told her that he understood "there might be a problem because of Lockheed and Tom Touhey."  Id. at 33.

17.      During their call on the evening of May 2, Ms. Wittie and Mr. Touhey agreed to raise the conflict issue with Respondent early the following week.  Ms. Wittie was in a deposition on Monday, May 3.  On Tuesday, May 4, she and Mr. Touhey met with Respondent. Id. at 35, 38.  According to Ms. Wittie, Respondent stated that "he was aware that Lockheed was on the other side, or would be potentially on that other side, but that this was potentially a huge piece of business that he couldn't afford to lose," Id. at 38-39.  He said that "if it was necessary he would leave the Firm."  Id.  Respondent also "said that he would not disclose to Raytheon that there was work in-house on behalf of Lockheed because it would be the kiss of death."  Id. at 37-39.  Respondent acknowledges that he was angry and he does not dispute that he may have used those words, but denies that they were used in an exclusive money context and asserts that he

9

could not advise Raytheon of the conflict because of the short time remaining before the protest was to be filed.  Id. at 20; B.C. Ex. 10 at 2.

18.      The Raytheon-Danish Aerotech Conflict.  Ms. Wittie was adamant in her position that the representation of Raytheon was a conflict with respect to Danish Aerotech as well as with Lockheed and she insisted on the Firm obtaining the necessary waivers.  She also believed that Respondent needed to obtain a waiver from Raytheon first, before she could ask Danish Aerotech for a waiver, since any unauthorized disclosure of the Raytheon work might be revealing a client confidence or secret without consent.

19.      On May 7, Respondent called his contact at Raytheon, Philip Radoff, to clear the Danish Aerotech matter.  He followed the call with a confirming e-mail that indicated that he had advised Mr. Radoff of the conflict "in the interests of full disclosure."  See B.C. Ex. 8(b); see also Tr.-1 at 51-52.  The e-mail indicates that Respondent thought the conflict "was speculative, remote and wholly unrelated to anything I was doing," and that he "saw no conflict," although he acknowledged that Danish Aerotech and Raytheon were negotiating a contract and the negotiations were difficult and could result in litigation.[6]  B.C. Ex. 8(b).  Once Respondent received Raytheon's consent, Ms. Wittie obtained a waiver from Danish Aerotech. Notwithstanding his discussion with Raytheon about the Danish Aerotech conflict, Respondent never advised Raytheon that the Firm represented Lockheed.

---

[6]  The e-mail response from Raytheon indicated that it would have preferred Respondent to have cleared the conflict before undertaking the Raytheon work.  Specifically, Phillip Radoff, Vice President-Legal, Raytheon, wrote:

> During the course of your present engagement (and any future engagement) on our behalf, we recommend that your firm screen future business prospects for interests potentially adverse to those of Raytheon and advise us before agreeing to go forward.

B.C. Ex. 8(e).

20.   <u>The Lockheed Representation</u>.   After their meeting with Respondent on May 4, Mr. Touhey and Ms. Wittie met with Mr. Kilcullen and Mr. Wilson to discuss the conflict. Mr. Kilcullen asked Mr. Touhey to prepare a memorandum setting forth the matters in which the Firm represented Lockheed.   Mr. Touhey identified three Lockheed divisions which he represented:   Electronic Sector-Long Island Operations; Government Electronic Systems Division; and a "division in Syracuse, New York, the name of which I do not know."  B.C. Ex. 6(a).  He listed four pending cases:  (1) a claim against the Maritime Administration, which was pending but might be settled; (2) the defense of a subcontractor claim, which was "inactive but could come back at any time" B.C. Ex. 8(a); (3) the defense of another subcontractor claim; and (4) an ASBCA case awaiting decision which might involve an appeal.  Mr. Touhey sent copies of this memorandum to Mr. Kilcullen, Mr. Wilson, Ms. Wittie and Respondent.

21.   On May 8, Mr. Touhey sent another memorandum to Mr. Kilcullen and to Mr. Wilson, with copies to Ms. Wittie, and Respondent.  Here, he stated that "Lockheed has been my strongest client and greatest revenue generator for ten years."  B.C. Ex. 6(c).  He wrote that he thought the Lockheed Air Traffic Control System, located in Gaithersburg, was most likely the division of Lockheed that would be the subject of the Raytheon protest.  Acknowledging that he did no work for that division, he observed that:

> The fact that I have not worked for the Gaithersburg division doesn't really matter since Lockheed is one corporation.[7]  In other words, I would have a conflict regardless of which division is performing the ATM contract.  I am in the same position as Bill in that, if I tell them [Lockheed] we represent Raytheon in a matter against them, they will almost surely fire me.

---

[7]  This statement was later confirmed by Ms. Lavan, who testified that each of Lockheed's operating divisions were divisions and not subsidiaries or affiliates.  Lockheed is one corporation.

000152

Id.; B.C. Ex. 8(c).  Mr. Touhey's conclusion on this point was as follows:  "The bottom line is that, if we are going to protest an award of a contract to Lockheed, I need to find a new home and I need to do so quickly."  B.C. Ex. 6(c); B.C. Ex. 8(c).

22.    The Firm's billing records indicate that, prior to March 1999, the Firm had little time on Lockheed matters.  Prior to that month, Mr. Touhey and Ms. Wittie recorded only a few hours per month to Lockheed matters.  In March, however, Mr. Touhey and Ms. Wittie recorded approximately 40 hours to Lockheed matters, in April they recorded approximately 26 hours, and in May they recorded 42.5 hours.  B.C. Ex. 3.

23.    Mr. Touhey had not been retained initially by Lockheed itself.  Rather, he had been retained by companies which Lockheed had acquired over the years, principally Heritage Unisys.  Lockheed had continued to employ him for those matters after the acquisitions.  There was no evidence that Lockheed had retained Mr. Touhey or Ms. Wittie for any new matters.

24.    Mr. Kilcullen testified that, until this conflict arose, he did not know that Lockheed was a client of the Firm.  He subsequently learned that it was, but believed that the work for Lockheed was "de minimis" and that Mr. Touhey was "baby sitting" some cases.[8]  Tr.-1 at 203, 208.  Mr. Wilson also stated that he was not aware that Lockheed was a client.

25.    The limited nature of Mr. Touhey's work for Lockheed was supported by the complainant, Ms. Lavan.  She testified that the matters handled by Mr. Touhey related to a business Lockheed had terminated.  Only one matter, the MATCALs case, a claim against the Maritime Administration, generated any significant interest within Lockheed.[9]

---

[8]  When he received billings to Lockheed, however, he learned that billings in April increased.  Tr.-1 at 203-06.

[9]  The case apparently required Lockheed to establish a reserve and there was some interest in the company in knowing whether the reserve had to be maintained.  Tr.-1 at 122, 126.

000153

26.    <u>The Debate within the Firm</u>.   During the days following receipt of Mr. Touhey's

memorandum of May 8, 1999, Mr. Kilcullen attempted to resolve this dispute, urging both

Respondent and Mr. Touhey to contact their respective clients.   Mr. Wilson also encouraged both

of them to contact their clients; he prepared a draft of a letter they might use.

27.    Respondent took the position that there was no conflict and thus no need to

contact Raytheon.   He was of the view, which he has maintained throughout these proceedings,

that Mr. Touhey had "backed-off" at the crucial point in his representation of Raytheon and that,

in light of the protest deadline, he could not disclose the conflict and seek Raytheon's consent.

28.    Ms. Wittie was steadfast in her view that there was a conflict and that it had to be

cleared by Lockheed.   While Respondent maintains that Mr. Touhey "backed off" on April 19,

he acknowledges that as of May 4, Mr. Touhey shared Ms. Wittie's view.   Tr.-2 at 97.   Mr.

Touhey's wife testified that he was very upset with developments at the Firm during this period

and was concerned about his relationship with Lockheed.   In a Memorandum sent to Messrs.

Kilcullen and Wilson dated May 23, 1999, shortly after the protest was filed, Mr. Touhey stated:

> During my year and one half with the firm, we have had two conflict of
> interest problems which have, or have threatened to, drive attorneys from
> the law firm.   It is not over yet …
>
> In twenty-nine years of private law practice, I have never had this problem
> before.   The reason is simple.   None of the firms that I was a member of
> before, including the one I managed, ever took a case where there was
> even a hint of a conflict between clients.   The problem is very easy to
> avoid.   Compliance with ethical rules is much easier than not complying
> with them.     The consequences of non-compliance are completely
> predictable as our experience in the last year and one half has shown.   The
> consequences of future non-compliance will be much worse.   The firm is
> only as good as its reputation, and its reputation is in danger.   The
> attorneys who leave the firm because of this . . . are obligated to tell
> people why they did.     They are not going to say that they were
> substandard performers.   They are going to say that the ethical standards
> of the firm were not up to theirs.   This is not something which we can
> afford.

000154

B.C. Ex. 12.

29.     Respondent and Mr. Kilcullen thought that, if Mr. Touhey and Ms. Wittie were concerned about the conflict, they should contact Lockheed.   Mr. Touhey, with Ms. Wittie's support, maintained that he could not disclose the conflict to Lockheed without Raytheon's consent.  They felt that the prospect that Raytheon might file a protest was a client confidence or secret which could not be disclosed without consent.  Respondent took the position that he did not understand why Mr. Touhey or Ms. Wittie could not contact Lockheed.  Mr. Kilcullen shared that view.

30.     While acknowledging that there might be a conflict of interest, neither Mr. Kilcullen nor Mr. Wilson took effective action to address the matter.  Neither thought it was his responsibility to contact either Raytheon or Lockheed in order to explore whether they would waive the conflict.  It appears that Mr. Kilcullen believed that (a) there was no conflict (or that the problem would solve itself) if Raytheon ultimately decided not to file the protest,[10] (b) since Raytheon was using the protest as a means of achieving another objective, the interests of Lockheed and Raytheon were not really adverse, (c) since the Lockheed matters were largely dormant and Mr. Touhey did not know whom to contact, they did not need to obtain Lockheed's consent, or (d) that Mr. Touhey was in the best position to make the call as to whether there was a conflict since he would suffer the economic consequences.

31.     In an e-mail to Mr. Wilson, dated June 4, 1999, Mr. Kilcullen stated:

> This is essentially a situation where our "representation" of Lockheed was "minimal and passive."   We were awaiting a decision on 2 cases. Moreover, we had no "point of contact" within Lockheed to clarify the situation for us.  We proceeded in good faith to represent Raytheon on the

---

[10]   Respondent acknowledges that his preparations of drafts and telephone conferences with Raytheon were all adverse to Lockheed.  Tr.-2 at 178-79.

14

> basis that any conflict was non-existent or de minimus.  At  this point we owe a "duty of loyalty" to Raytheon to see the protest through, . . .

B.C. Ex. 8(p).  Mr. Kilcullen also testified that, if he had had to choose between Raytheon and Lockheed, he would have chosen Raytheon because it would have "provide[d] the greatest potential revenue to the firm."  B.C. Ex. 8(f).

32.    Mr. Kilcullen also noted that either Mr. Touhey or Respondent could have resigned from the Firm "if they wanted to continue either to represent those clients [Raytheon and Lockheed] or contact them and say, I could not represent you."  Tr.-1 at 247.  He testified that he "just didn't feel that I could make that choice for them for their livelihood."  Id.  He did state, however, that he told Mr. Touhey that, if Mr. Touhey lost Lockheed as a client, Mr. Kilcullen would take steps to minimize the impact on Mr. Touhey's compensation.  He had advised Mr. Touhey that "if you thought that you may have collected, say, $50,000 from Lockheed for the rest of the year, we will take that into account – not necessarily mathematically, but we'll take it into account … ."  Tr.-2 at 64.[11]

33.    Mr. Wilson's views paralleled those of Mr. Kilcullen.  He thought they had to clear the conflict or drop one of the clients, but also did not feel it was his role to resolve the issue or contact the clients.  Indeed, Mr. Wilson appeared to believe that there was no "active" representation of Lockheed, but neither he nor Mr. Kilcullen checked any billing or other records.  Tr.-1 at 298-300.  (At the hearing, Mr. Wilson acknowledged that a conflict would exist if a client was awaiting a decision and the attorney expected to represent the client in any appeals.)

---

[11]  Partners in the Firm were compensated largely on the amount of revenue they generated.  The partners shared the operating costs equally, but their income was a reflection of the revenue generated.

000156

34.     The Committee concluded that Mr. Wilson wanted nothing to do with the dispute and hoped that Mr. Touhey and Respondent would solve the problem.  H.C. Report at 17.  Both Mr. Wilson and Mr. Kilcullen thought that "Pat Wittie was stirring the pot" and that without her agitation this matter would never have arisen.  Tr.-1 at 197.

35.     <u>The Raytheon Protest</u>.  Respondent filed the protest on behalf of Raytheon on May 21, 1999.  It challenged the "propriety of a non-competitive, single source award by the FAA to Lockheed Corporation."  B.C. Ex. 4(b) at 2-3.  The relief sought was termination of the award to Lockheed.  The protest further requested that the FAA either award the contract to Raytheon or conduct an expedited competition between Raytheon and Lockheed.

36.     By letter of June 2, 1999, Respondent and counsel for the FAA advised the Office of Dispute Resolution for Acquisition that the parties had reached an agreement in principle to resolve the protest.  B.C. Ex. 4(c).  The protest was dismissed by order of June 11, 1999 as part of Raytheon's settlement agreement with the FAA.  B.C. Ex. 8(s); B.C. Ex. 8(t).

37.     <u>Post Filing Events</u>.  Once the protest was filed, Ms. Wittie insisted that the Firm had to advise Lockheed.  On May 24, Mr. Touhey called Susan Jaffe at the Gaithersburg offices of Lockheed, with whom he had been working on some matters.  She told Mr. Touhey that she was aware of the filing and suggested he call Roger Hoover, General Counsel of Lockheed's Information Services division, and Ms. Lavan.  Tr.-1 at 64.  Mr. Touhey called Mr. Hoover and left a message, but, since he did not know Ms. Lavan, he asked Ms. Wittie to contact her.  Ms. Wittie knew Ms. Lavan from Bar activities.

38.     Ms. Wittie called Ms. Lavan on May 25 and told her that Respondent had filed the protest on behalf of Raytheon over Mr. Touhey's and her objections.  Ms. Lavan told Ms. Wittie that she was surprised since she was aware of at least one matter the Firm was handling

000157

for Lockheed.[12]  Ms. Lavan stated that she thought the filing of the protest was a clear conflict and that no one had asked for Lockheed's consent.

39.     Ms. Lavan testified at the hearing that she understood the difficulties law firms faced in dealing with large clients whose interests might be adverse and did not like to withhold consent when Lockheed was not adversely affected.  She intimated that she might have consented to Respondent's representation of Raytheon had she been asked in advance.

40.     After discussing the matter with other lawyers at Lockheed, Ms. Lavan called Ms. Wittie back and told her that the Firm's action was a clear conflict and that the firm had forced Lockheed's hand.  Tr.-1 at 133.  One option considered at Lockheed was to raise the conflict in the protest.  Id. at 131.

41.     On May 24, 1999, Ms. Wittie resigned from the Firm because of what she believed was its unethical conduct.  B.C. Ex. 6(f).  She had no plans as to how she might continue her practice.  The Firm offered to allow her to use her office while she decided what to do.

42.     On May 27, 1999, Mr. Touhey sent a Memorandum to Mr. Wilson, with a copy to all the members of the Firm, advising them that (a) he and Ms. Wittie had disclosed the Raytheon representation to Lockheed, (b) Mr. Maneker, Lockheed's General Counsel, was shocked and angry, (c) Ms. Lavan had advised that she was withdrawing all business from the Firm and was considering suing the Firm for damages and possibly filing a complaint with Bar Counsel, and (d) this result was precisely what he had predicted would happen.  Mr. Touhey stated that he saw no alternative to his own withdrawal from the Firm.  He continued:

---

[12]  Ms. Wittie reminded her of the other matters the Firm was handling.

> Regardless of the value of the [Lockheed] account, any other course of action will destroy my reputation in the aerospace industry which has accounted for most of my revenue for my entire career.  Even when I do resign, I doubt that the damage to my own reputation can ever be repaired.  . . . I doubt that my career can be perpetuated; but I have no choice but to try.  I don't see how I can even try if I remain associated with this law firm.  In other words, regardless of whether I survive it, I need to make a definitive statement that I did not contribute to this debacle, which I did not, and that I do not approve of it.

B.C. Ex. 4(g) at 1.  Mr. Touhey stated that he intended to resign, prepared a letter of resignation, and contacted lawyers in other firms.  He never actually resigned from the Firm.  He was hospitalized on August 18 and died in September.

43.     On May 28, Ms. Lavan faxed a letter to Mr. Kilcullen discharging the Firm.  In that letter, she reiterated her statements to Ms. Wittie.  She wrote that Lockheed believed that the conflict in filing the Raytheon protest was clear and that it was considering several options, including suing for damages and filing a complaint with Bar Counsel.  Respondent proposed sending a letter to Ms. Lavan, which he had drafted, protesting the Firm's innocence and offering to make a joint submission to Bar Counsel.[13]

44.     Mr. Wilson did not respond to Ms. Lavan's discharge letter.  He did send an e-mail to Mr. Kilcullen, who was in Europe, advising him of developments.  On his return, Mr. Kilcullen wrote to Ms. Lavan apologizing and advising her that he was "sensitive" to her concerns and "mindful of the seriousness" of her allegations.  B.C. Ex. 8(q).  His letter continued:  "I assure you that the firm does have conflicts review procedures in place, and as a direct result of your letter, we are thoroughly reviewing them to insure that all of our clients are

---

[13]  Mr. Wilson had assumed responsibility for this matter because Mr. Kilcullen was in Europe attending to family matters.

000159

fairly and loyally represented."   Id.   On the same date, Mr. Kilcullen notified the Firm's insurance carrier that Lockheed had asserted a claim that the Firm had violated the ethics rules.[14]

45.   On July 7, 1999, Ms. Lavan filed a complaint with the Office of Bar Counsel.  On July 10, Mr. Kilcullen advised Ms. Wittie that, because of the complaint, she would have to vacate the offices she was occupying immediately.   Mr. Kilcullen indicated that she was responsible for the complaint, a view that he maintained during the hearing and that Mr. Wilson and Respondent shared.  On July 13, Ms. Wittie left the premises and relocated to new offices.

46.   <u>Hearing Committee's Credibility Determinations</u>.  One important issue is whether Mr. Touhey in fact on April 19 "backed off" from his initial position on April 16 that there was or may be a conflict with his representation of Lockheed.   As will be seen, the Hearing Committee did not find it necessary to reach a definitive conclusion on this point.  The Hearing Committee explicitly rejected as not credible Mr. Wilson's testimony that he was told by Mr. Touhey there was no conflict.  H.C. Report at 25.

47.   The Committee found Mr. Wilson's testimony unreliable and lacking in credibility.  The Committee stated:

> The Committee finds Mr. Wilson's testimony troublesome.  He was halting and uncertain, frequently noting that he was not good with dates and often was unable to remember whether he had seen various documents, although conceding that if he had been copied he probably saw the document.  In sum, his testimony was not forthcoming and the Committee does not have any confidence in his responses, particularly those relating to efforts to resolve the problem.

H.C. Report at 17.

48.   The Hearing Committee was skeptical of Respondent's testimony that Mr. Touhey retreated from his position that the Raytheon representation presented a conflict.  The Committee

---

[14]  There is no evidence in the record that the Firm actually did anything in response to Ms. Lavan's letter other than notify its insurance carrier.

000160

found that testimony "difficult to reconcile with the rest of the evidence in this record." Id. at 24. The Committee found his assertion inconsistent with testimony by Ms. Wittie and Mr. Touhey's wife, and contradicted by Mr. Touhey's memoranda of May 4, 8, and 23. Id. The Committee found Respondent's testimony on this issue "problematic," but concluded in its evaluation of sanctions that Respondent "honestly thought that Mr. Touhey had told him he could proceed with the Raytheon protest." Id. at 36.

49.      The Committee found that Respondent's reluctance to notify Raytheon about the conflict was not motivated by a need to protect Raytheon in light of the approaching protest filing deadline, as Respondent had testified, but rather that the "more credible explanation" is that he was motivated by a concern that he might lose Raytheon as a client. Id. at 28. These observations by the Hearing Committee are important to our recommendation as to sanction, but we agree with the Committee that the question of violation does not turn on whether Mr. Touhey "backed off" his position that there was a conflict.[15]

## III.  ANALYSIS

The Hearing Committee found that Respondent violated Rule 1.7(b)(1) and (2); that he did not violate Rule 1.7(b)(3); and that Rule 1.10(a), which it found also to be violated, imposed no obligations in addition to those imposed by Rule 1.7.  Bar Counsel filed no exceptions. Respondent excepted both as to the violations, findings and as to sanction.

Rule 1.10(a).  We conclude that the Hearing Committee was correct in its understanding of Rule 1.10(a).  Rule 1.10(a) implements the important principle that for conflict purposes, a firm is viewed as one lawyer, i.e., no lawyer in a firm may ethically represent a client which any other lawyer in the firm would be prohibited from representing.  Accordingly, Rule 1.10(a) is

---

[15]  The Hearing Committee recommended that Bar Counsel's Motion to Strike an affidavit submitted by Respondent with his Reply Brief be granted.  We concur, grant Bar Counsel's motion and strike it from the record.  Board Rule 7.14(a).

000161

violated when a lawyer in a firm "knowingly" represents a client which another lawyer in the firm could not ethically represent.

While it makes no difference to the outcome here, since he soon became aware of the conflict, we do not necessarily agree with the Hearing Committee's observation that Respondent did not violate Rules 1.7 and 1.10 until he became aware that the Firm represented Lockheed. H.C. Report at 23. Comment 11 to Rule 1.7 is relevant to this question:

> . . . Unless a lawyer is aware that representing one client involves seeking a result to which another client is opposed, Rule 1.7 is not violated by a representation that eventuates in the lawyer's unwittingly taking a position for one client adverse to the interests of another client. The test to be applied here is one of reasonableness and may turn on whether the lawyer has an effective conflict checking system in place.

The District of Columbia's version of Rule 1.10 applies when the lawyer "knowingly" engages in a conflicting representation.[16] We think it clear, however, in light of comment 11 quoted above, that lawyers cannot avoid the consequences of Rule 1.10 by ignoring the Firm's internal conflict clearance procedures.

Here, Respondent commenced the representation of Raytheon without doing anything to determine whether there was a conflict. He did not telephone or e-mail his partners nor did he consult the Firm's database which, though not sophisticated, would have identified Lockheed as a Firm client. Respondent was made aware of the conflict by Mr. Touhey on Friday, April 16, 1999, two days after being contacted by Raytheon. At that point, Respondent had actual knowledge that one of his partners represented Lockheed in a matter pending before the ASBCA. Even if Respondent's testimony that Mr. Touhey "backed off" on Monday, April 19 were

---

[16] California Rule 3-310 (Avoiding the Representation of Adverse Interests) and Illinois Rule 1.8 (Conflict of Interest: Prohibited Transactions) each refers to "when the lawyer knows or reasonably should know" about the conflict. See Cal.Rules of Prof'l Conduct R. 3-310 (2000); Ill. Rules of Prof'l Conduct R. 1.8 (2002).

000162

accepted,[17] there is no question that Respondent was cognizant of the conflict by May 2, when he was confronted by Ms. Wittie and Mr. Touhey.  After May 2, 1999, Respondent continued to work on the Raytheon matter, and refused requests of Mr. Touhey and Ms. Wittie that he disclose the conflict to Raytheon and seek a waiver.  Therefore, after May 2, 1999, if not before, Respondent "knowingly" represented Raytheon in a conflict situation.

Rule 1.7(b)(1).  There is no dispute that Respondent represented Raytheon in a matter in which it was taking a position adverse to the position of Lockheed, another Firm client.[18]  We concur with the Hearing Committee that Respondent's arguments in defense have no merit.

Respondent accuses the Hearing Committee of blending what he sees as two distinct time periods.  The first period runs from April 16, 1999, when the representation of Raytheon commenced, to May 2, 1999, when he spoke with Ms. Wittie about the Raytheon representation; this period includes the "gap" after Mr. Touhey allegedly "backed off" on April 19.  The second time period starts on May 2, 1999, when – even accepting Respondent's position that Mr. Touhey had "backed off" on April 19 – it was clear that Ms. Wittie and Mr. Touhey believed there was a conflict.

April 16 - May 2.  Unlike the Hearing Committee, we find that Respondent violated Rule 1.7(b)(1) starting on April 16 and continuing during the period after the alleged conversation in which Mr. Touhey "backed off."  We do so because in our view, Respondent – once he knew the Firm represented Lockheed – was not permitted to rely on statements by Mr. Touhey which – even  as testified to by Respondent – did not provide Respondent with the information necessary to determine that there was no conflict.

---

[17]  As noted, the Hearing Committee concluded that this testimony was "difficult to reconcile" with the other evidence in the record.  H.C. Report at 24.

[18]  Respondent acknowledges this.  See Finding of Fact 28, n.7.

000163

All of Respondent's arguments are predicated on his factual assertion that Mr. Touhey on April 19 retreated from his position that the representation of Raytheon created a conflict with Lockheed.  Respondent's Reply Brief at 1-16.  The Hearing Committee did not accept or reject that assertion, although it was skeptical.  We share the Hearing Committee's skepticism of Respondent's testimony.  We also conclude that Respondent's representation of Raytheon after his first conversation with Mr. Touhey on April 16 and after his conversation on April 19 violated Rules 1.10(a) and 1.7(b)(1).

Respondent contends that this case presents the novel issue of whether he was entitled to rely on Mr. Touhey's statement that he was "backing off."  Specifically, Respondent poses the issues as follows:

> HEARING COMMITTEE MEMBER O'MALLEY:  . . .  Is it a fair summary of your testimony, and I think that this is perhaps your fundamental position, I'm asking, is this a fair summary of it, that on April 16 and April 19, after your discussions with Mr. Touhey, while it appeared to you that Lockheed Martin was a current client of Mr. Touhey, and that's what he was concerned about, that if, the client contact partner in the firm, decided and told you that there was not a problem, and he was backing off, that was all you needed to enable you to proceed.
>
> THE WITNESS:  That's exactly what I'm saying.
>
> HEARING COMMITTEE MEMBER O'MALLEY:  The representation of Raytheon.
>
> THE WITNESS:  That's exactly what I'm saying.
>
> HEARING COMMITTEE MEMBER O'MALLEY:   That is your fundamental position?
>
> THE WITNESS:  Yes, sir.  Like I said, maybe I'm wrong.  I don't know.
>
> But that that stage, I didn't feel like I had to go check the database or the billing records.
>
> He was the guy that would know.  I certainly didn't know.

000164

Respondent's Brief at 11; Tr.-2 at 97-98.

The Hearing Committee correctly noted that there was nothing in the record to suggest that Mr. Touhey had authority to waive any conflict on behalf of Lockheed, and the testimony of all witnesses is clear that Mr. Touhey had not obtained a waiver from Lockheed. Further, as the Hearing Committee observes, Mr. Touhey would have risked running afoul of Rule 1.8 had he sought and received authority from Lockheed to waive conflicts on its behalf. H.C. Report at 26.

Certainly, a prudent attorney would not have taken Mr. Touhey's alleged statements at face value. As of April 19, Respondent understood from the conversation of two days before that Mr. Touhey represented Lockheed in a matter which though dormant was pending before the ASBCA. Lockheed was a Firm client. Had Respondent taken minimal conflict identification steps he would have learned that the Firm had recent billings to Lockheed on two matters. B.C. Ex. 3 (Invoices dated 2/16/99 (MARAD $2,696.34), 3/5/99 (MARAD $2,206.77), 4/13/99 (MARAD $6,439.42 and TASC $1,363.56)). Presumably, he would also have learned what Mr. Touhey stated in his May 4, 1999 memorandum, i.e., that the Firm represented three Lockheed divisions on four matters. B.C. Ex. 6(a). With that knowledge, Respondent would have known he could not ethically proceed unless and until he had waivers both from Lockheed and from Raytheon. Even if he had taken Mr. Touhey's alleged statement to mean that Mr. Touhey has obtained a waiver from Lockheed – or had somehow waived the conflict himself – Respondent was required to obtain a waiver from Raytheon.[19]

---

[19] It is not clear that Respondent understood this. At the hearing, he stated:

> Q: So you thought the rules provided that you could take a position that was adverse to another client?
> Mr. Butterfield: As long as that attorney had told me that it was okay to do so, which is what he did.

Tr.-2 at 189-90.

000165

Respondent cannot seriously contend that another lawyer's mistake would relieve him of the duty to avoid conflicts.  At most, Mr. Touhey's "backing off," if it occurred, made the conflict more difficult for Respondent, Mr. Touhey and the Firm to resolve.  Again, without the appropriate waivers from both clients, Mr. Touhey could not ethically represent Lockheed and Respondent could not ethically represent Raytheon.

Post-May 2, 1999.  Respondent contends that his post-May 2, 1999 representation falls within the Rule 1.7(d) provision for conflicts not reasonably foreseeable at the outset of a representation.  Respondent's Brief at 26-28.  Rule 1.7(d) provides:

> If a conflict not reasonably foreseeable at the outset of a representation arises under paragraph (b)(1) after the representation commences, and is not waived under paragraph (c), a lawyer need not withdraw from any representation unless the conflict also arises under paragraph (b)(2), (b)(3), or (b)(4).  (Amended, Oct. 15, 1996, effective Nov. 1, 1996.)

This rule offers no defense to Respondent, for several reasons.  First, this conflict was "reasonably foreseeable" from the outset of the representation.  It was disclosed to Respondent on April 16, 1999 and Respondent did nothing to flesh out or verify Mr. Touhey's statement – assuming it was made – that he was backing off.  Comment 22 is unequivocal that a conflict is not unforeseeable simply because it is not identified:

> . . . Where a conflict is not foreseeable at the outset of representation and arises only under Rule 1.7(b)(1), a lawyer should seek consent to the conflict at the time that the conflict becomes evident, but if such consent is not given by the opposing party in the matter, the lawyer need not withdraw.  In determining whether a conflict is reasonably foreseeable, the test is an objective one.  In determining the reasonableness of a lawyer's conduct, such factors as whether the lawyer (or lawyer's firm) has an adequate conflict-checking system in place, must be considered.

Further, Rule 1.7(d) by its terms comes into play only if the affected clients refuse to grant waivers.  Respondent refused to seek a waiver from Raytheon.  Mr. Touhey and Ms. Wittie did not seek a waiver from Lockheed.[20]  Plainly, Respondent cannot invoke Rule 1.7(d).

As a separate argument, Respondent contended before the Hearing Committee that by May 4, 2002, when according to him Mr. Touhey changed his position, Raytheon's protest deadline was so close that "Raytheon would have nowhere to go for adequate representation." Respondent's Reply Brief at 3.  The Hearing Committee Report states that it "tend[ed] to believe" that Respondent's real reason for not advising Raytheon of the conflict was his concern about losing a potentially lucrative client.  H.C. Report at 28.

Rule 1.7(b) is unequivocal and unambiguous.  Its clear instruction that conflicts must be avoided is supported by Rule 1.16(a)(1), which requires a lawyer to withdraw from a representation if it "will result in violation of the Rules of Professional Conduct."  As soon as he was aware of the conflict, Respondent was obliged to provide notice to Raytheon and seek a waiver, and to withdraw if waivers could not be obtained.  He should have provided such notice on April 16 when Mr. Touhey first raised the issue.  Instead, he logged more hours for his new client over the weekend.

Rule 1.7(b)(3).  This rule prohibits a lawyer from representing a client when that representation "will be or is likely to be adversely affected by the representation of another client."  The Hearing Committee concluded that Bar Counsel did not establish that the work for Raytheon affected the work for Lockheed on unrelated matters being performed at the time by Mr. Touhey and Ms. Wittie.

---

[20]  Mr. Touhey and Ms. Wittie were understandably reluctant to advise Lockheed of the protest work for Raytheon without Raytheon's consent.  No protest had been filed, and since Raytheon had not decided whether to file a protest, the Firm's representation of Raytheon was not public information.  Raytheon might well have regarded the fact that it was contemplating a protest as a secret or confidence protected by Rule 1.6.  The Firm could not advise Lockheed about this representation without Raytheon's consent.

000167

We note, however, that the test is not just whether the representation of Lockheed was in fact adversely affected by the representation of Raytheon.  The test is whether the representation of Lockheed was "likely to be adversely affected."  But even under this standard, the record fails to establish a violation.  There is nothing to suggest that the Firm's representation of Lockheed on the matters it currently handled was likely to be adversely affected by its representation of Raytheon.

Rule 1.7(b)(2).  Bar Counsel's Specification of Charges did not enumerate Rule 1.7(b)(2), which prohibits a representation which "will be or is likely to be adversely affected by representation of another client."  Citing the Board Report In re Hutchinson, Bar Docket No. 86-82 (BPR Jan. 25, 1985), Bar Counsel contended nonetheless that the Hearing Committee was authorized to find a violation of Rule 1.7(b)(2) and the Hearing Committee did so.  H.C. Report at 27.[21]  The violation here was in refusing to disclose to Raytheon that the Firm represented Lockheed.  Disclosure to Raytheon was required by Rule 1.7(b)(3) to avoid a violation of Rule 1.7(b)(1), as well as by Rule 1.7(b)(2).  As to the latter rule, disclosure of conflicts was part of his obligation to Raytheon, his new client.  When Respondent failed to advise it that the Firm

---

[21]   Bar Counsel argued that Respondent would not be prejudiced by such a finding since it was based on identical facts as were alleged and proved.  Clearly the specifications charged Respondent with the facts which give rise to a Rule 1.7(b)(2) violation.  This issue was identified in a colloquy between the Committee and Assistant Bar Counsel in her closing argument. Tr.-2 at 163-166.  It was alluded to again at the conclusion of Respondent's closing. Id. at 190-91.  Bar Counsel made its argument under the In re Hutchinson Board Report in its post-Hearing Brief.  Bar Counsel's Post Hearing Brief at 35, n.15.  Respondent did not object to the inclusion of this charge at any time before the Hearing Committee.  In his exceptions to the Report, he stated that his main objection was to the sanction; he did not raise this issue before the Board.

  The question was not decided in In re Hutchinson, 534 A.2d 919 (D.C. 1987) (en banc), cited by Bar Counsel, and the Court's recent decision in In re Slattery, 767 A.2d 203 (D.C. 2001), is controlling precedent.  Clearly, the Specification alleged the facts necessary for a Rule 1.7(b)(2) violation, including the failure to advise, and obtain a waiver from, Raytheon.  Specification, ¶ 8.  While the Specification did not reference Rule 1.7(b)(2), it put Respondent on notice that failure to notify Raytheon was part of the violation alleged.  Although Board Rule 7.1 specifies that the Specification must identify the rules alleged to be violated, Board Rule 7.19 allows the Hearing Committee to consider additional charges "after giving respondent reasonable notice and an opportunity to answer."  We believe that such notice was given here and that consideration of Rule 1.7(b)(2) does not offend either Board Rules or due process, as explicated by the Court in In re Slattery, supra.

000168

also represented Lockheed, he violated his duty to Raytheon.  Without the necessary waivers, the Firm could not properly represent Raytheon in the protest.  The Firm's representation of Lockheed gave Lockheed the opportunity, since waivers had not been obtained, to seek the disqualification of Respondent as counsel for Raytheon in the protest, clearly an adverse affect within the meaning of Rule 1.7(b)(2).  Although it makes no difference as to sanction, we concur in the conclusion that Respondent violated Rule 1.7(b)(2).

## IV.  SANCTION

The Hearing Committee recommended a thirty (30) day suspension, the sanction urged by Bar Counsel.  We agree that this is the appropriate sanction.

The Hearing Committee reviewed the necessary factors, i.e., (a) nature of the violation, (b) mitigating or aggravating circumstances, (c) the need to protect the public, the courts and the legal profession, and (d) the moral fitness of the attorney.  E.g., In re Ryan, 670 A.2d 375, 380 (D.C. 1996); In re Hutchinson, 534 A.2d at 924.[22]  The Hearing Committee noted its obligation not to recommend a disposition which would foster inconsistent discipline for comparable conduct.  D.C. Bar R. XI, § 9(g).

(a)    Nature of the Violation.  This is a serious violation of Rule 1.7(b)(1).  It was, in the Hearing Committee's words, "manifest and explicit."  H.C. Report at 33.  The conflict was identified (through no efforts of Respondent) on April 16, 1999, at the outset of the representation, and he plunged ahead anyway.  Respondent prepared, and ultimately filed, a protest on Raytheon's behalf which sought the termination of a government contract held by another Firm client, Lockheed.  We will treat aggravating factors below, but it is apparent from

---

[22]   See also In re Jackson, 650 A.2d 675, 678, 679 (D.C. 1994) (per curiam) ("factors traditionally used": (a) prior discipline, (b) seriousness of the conduct, (c) prejudice to client, (d) violation of other provisions, (e) conduct involving dishonesty/misrepresentation, (f) Respondent's acknowledgment of wrongful conduct).

000169

the record that Respondent acted with full knowledge of the facts showing the conflict and that he did so over the strong protest of at least two of his partners, Mr. Touhey and Ms. Wittie.

(b)   Mitigating and Aggravating Circumstances.   The Hearing Committee found lack of prejudice to the clients, Raytheon and Lockheed, to be the only mitigating circumstance.   To this we would add that Respondent has no prior discipline, and that he cooperated with Bar Counsel.

Respondent contends that there are several additional mitigating circumstances: . . . that there was no moral turpitude on his part; that the facts presented a matter of first impression; that, as found by the Hearing Committee, he "honestly thought" Mr. Touhey told him he could proceed with the protest; and that, as also found by the Hearing Committee, he believed he was "acting in accordance with the Rules."   Respondent's Brief at 30.   We do not accept these as substantial mitigating factors.

The absence of moral turpitude is not a mitigating factor as to a Rule 1.7 violation.   Once Respondent knew about the Firm's representation of Lockheed, his ethical duties were clear. Rule 1.7, as made applicable here to Respondent's representation of Raytheon by Rule 1.10, required Respondent to refrain from representing Raytheon without waivers from Raytheon and Lockheed as soon as he knew the Firm represented Lockheed.   While the Court has considered a respondent's altruistic purpose as mitigation in a previous conflict case, In re Shay, 756 A.2d 465, 480-81 (D.C. 2000), the Hearing Committee found that his reluctance to advise Raytheon on the conflict was based on his concern about losing a new, potentially profitable client.   While there is no moral turpitude here, nor is there any altruistic purpose.

The "first impression" argument is similarly unavailing, as is the Hearing Committee's conclusion that Respondent "honestly thought" Mr. Touhey told him he could proceed with the

000170

protest.  First, these purported mitigating factors are predicated on Respondent's contention that Mr. Touhey "backed off" on April 19, a factual contention which the Hearing Committee found "problematic."  H.C. Report at 36.  While the Hearing Committee did not reject that contention outright, it clearly did not accept it.  Further, accepting these points as a mitigating factor would lend credence to Respondent's legal contention that he was free, after learning of the Lockheed representation from Mr. Touhey two days before, to accept Mr. Touhey's allegedly new position at face value, without further inquiry.  We believe that Respondent was required to do more, i.e., to determine (a) whether Lockheed was a current, active client, (b) whether Mr. Touhey had obtained a waiver from Lockheed, or (c) whether Mr. Touhey had terminated Lockheed as a client in an ethically permissible manner.[23]

Similarly, the fact that Respondent believed he was acting in accordance with the Rules cannot be given substantial mitigating weight.  Attorneys are required to understand and comply with the Rules of Professional Conduct.  The conflict here was straightforward and unambiguous.  That Respondent may have failed to fully comprehend the conflict rules as applicable here is, if anything, a factor in aggravation.

As the Hearing Committee found, there are substantial aggravating circumstances. Respondent utterly failed to utilize the Firm's database to determine the nature and extent of the Lockheed representation.  He adamantly refused to inform Raytheon about the conflict, notwithstanding the fact that the conflict would give Lockheed the opportunity to seek Respondent's disqualification in the protest.  He persisted in his refusal to take responsible action on the conflict notwithstanding the turmoil it was causing within the Firm, as evidenced by

---

[23]  The "hot potato" rule limits the ability of a firm to terminate a client in order to "solve" a conflict situation.  See Rule 1.16 and D.C. Legal Ethics Opinion No. 272, Conflicts of Interest:  "Hot Potato."

000171

Mr. Touhey's May 8 memorandum indicating he would need to leave the Firm if the protest was filed and the departure of Ms. Wittie.  B.C. Ex. 6(c).

As did the Hearing Committee, we find Respondent's treatment of the Danish Aerotech conflict to be an aggravating circumstance.  H.C. Report at 35.  He did nothing to identify the conflict, and only sought the waiver after Ms. Wittie insisted that he do so.  Further, his disclosure was either quite deceptive in its conclusion or reflected a considerable lack of understanding of conflicts.  In a memo to Raytheon summarizing his disclosure, Respondent stated as follows:

> Phil, this will reduce to writing our conversation this morning on the topic of conflicts.
>
> On Sunday, May 2 – when I was in here redrafting the FAA protest – I happened into a conversation with Pat Wittie, who is a new member of this firm.  Pat joined the firm on January 1 of this year.
>
> When she learned I was working for Raytheon, she raised a conflicts issue.  Apparently, Pat is providing counsel to a Denmark company – Danish Aerotech – which is in the process of negotiating a contract with Raytheon.  According to her the negotiations are ongoing but "difficult"; the negotiations may at some point in time "crater"; and that litigation could perhaps then ensue.  I believe the Raytheon unit with which they are negotiating is Raytheon Missiles Systems.
>
> I told her this was speculative, remote and wholly unrelated to anything I was doing.  In short, I told her that I saw no conflict, and that is my strongly held position to this day.
>
> In the interests of full disclosure, however, I brought it to your attention.

B.C. Ex. 8(b).  The facts recited in the letter show a clear, existing conflict.  Rule 1.7(b)(1) applies to matters which are not related; there was nothing speculative or remote about the conflict.  Respondent's disclosure was not voluntary, as implied by the

letter, but rather was mandatory, since a waiver from Raytheon (and Danish Aerotech) was necessary for Respondent to continue working for Raytheon on the protest.[24]

Further, the Board finds it a significant and an aggravating circumstance that at the time of this disclosure, Respondent was fully aware of the Lockheed conflict and refused to disclose it. He disclosed one conflicting representation but failed to disclose the other, apparently because he feared that disclosure of the Lockheed conflict, which may have seemed more immediate, would result in his losing the protest work.

(c)  <u>Protection of the Public, the Courts and the Legal Profession</u>.  The Hearing Committee was appropriately concerned about Respondent's continuing inability to understand the conflict rules. The Hearing Committee cited Respondent's failure to comprehend that Rule 1.6, protecting client confidences and secrets, would prevent Mr. Touhey and Ms. Wittie from disclosing the Raytheon protest work to Lockheed without Raytheon's knowledge and consent. H.C. Report at 35. This, plus Respondent's head-in-the-sand response to the conflict, suggested to the Committee that the same or similar misconduct might occur in the future.

Respondent's contentions in his own defense in this proceeding should not be held against him in evaluating the appropriate sanction. But it is equally important that the sanction be designed to deter future violations. Respondent's actions at the time suggest a possibility of recurrence. Respondent was adamant in his refusal to deal with the Lockheed conflict. He exposed Raytheon to the possibility of a motion to disqualify him in the protest. His actions wreaked havoc within the Firm, forcing the departure of Ms. Wittie and causing Mr. Touhey also to decide to leave. All this was because he did not want to risk offending Raytheon, a new client

---

[24] Notably, Raytheon's response was to admonish Respondent to make disclosures in advance of taking on potential conflicting work. <u>See</u> Finding of Fact ¶ 17, n.3, <u>supra</u>.

he could not afford to lose, according to the Hearing Committee's conclusion, which is amply supported in the record.

The sanction in this case must be of sufficient severity to impress upon Respondent and other members of the Bar that the conflict rules must be followed scrupulously, notwithstanding that they at times do require attorneys to make hard choices with adverse personal financial impact.

(d)   <u>Moral Fitness</u>.  We agree with the Hearing Committee that the misconduct here does not reflect upon Respondent's moral fitness.   We cannot second guess the Hearing Committee's conclusion that Respondent honestly believed Mr. Touhey had "backed off" and that he believed his conduct did not violate the Rules of Professional Responsibility.  As noted above, however, we do conclude that his failure at the time to better understand the conflict rules, and his stubborn refusal to heed the vociferous complaints by Ms. Wittie and Mr. Touhey that he was in violation, are factors which need to be addressed in our sanction recommendation.

(e)   <u>Consistency with Sanctions in Comparable Cases</u>.  We agree that, in light of the nature of the violation and aggravating circumstances, a suspensory sanction should be imposed.

The Hearing Committee relied upon the Court's rulings in <u>In re McLain</u>, 671 A.2d 951 (D.C. 1996) and <u>In re Ramos</u>, No. 85-1644 (D.C. Sept. 16, 1986).  The Court in <u>In re McLain</u>, ordered a ninety-day suspension for a respondent found to have violated the predecessor to Rule 1.8(a) when he borrowed money from clients, which he failed to repay, without advising them of the conflict, that his interests differed from theirs, or that they should seek advice from another attorney as to the transaction.  <u>In re McLain</u>, 671 A.2d at 953-54.  In <u>In re Ramos</u>, the Court imposed a six-month suspension on a respondent, without discipline for a similar violation, who

000174

encouraged one client to invest in another client without disclosing that he represented both clients.  In re Ramos, supra.

Bar Counsel acknowledged to the Hearing Committee that there were no District of Columbia cases involving similar facts and cited, in addition to McLain and Ramos, other conflict cases in which suspensory sanctions were imposed.  See Bar Counsel's Post Hearing Brief at 38.  These cases include In re Shay, 756 A.2d at 465 (ninety-day suspension for conflict and dishonesty but for altruistic purpose); In re Jones-Terrell, 712 A.2d 496 (D.C. 1998) (sixty-day suspension for conflict and other violations, including dishonesty, in representation of elderly, invalid client); In re James, 452 A.2d 163 (1982), cert. denied, 460 U.S. 1038 (1983) (two-year suspension for conflict and dishonesty).

Public censure has also been imposed for conflict violations, particularly in earlier cases. In re McGarvey, M-129-82 (D.C. Dec. 9, 1982) (public censure for conflict in representation of church); In re Hughes, M-80-81 (D.C. Oct. 28, 1981) (public censure for conflict and other violations for representation of both parties in a divorce proceeding).  Informal admonition has been imposed in one conflict of interest case which has little bearing here.  See In re Sofaer, 728 A.2d 625 (D.C. 1999) (former government attorney representation of party in connection with matter the same or substantially related to matter in which he participated while in the government).

In a recent case, In re Cohen, Bar Docket No. 280-97 (BPR July 31, 2002), the Board recommended a thirty-day suspension for a conflict of interest violation, occurring in the context of law firm practice, accompanied by a violation of Rule 5.1 resulting from conduct by a subordinate attorney in withdrawing a client's trademark application without authority, in violation of Rules 3.3(a) and 8.4(c).  In In re Cohen, the respondent and his firm had come to

34

favor one client over another client in a joint representation in a trademark matter after disputes arose between the clients.  Id.  Continuing to represent both clients, Respondent's associate had withdrawn the trademark application of the disfavored client.  Id.  Suspension was recommended notwithstanding that, as here, there was ultimately no prejudice to the disfavored client, and, again like this case, the respondent had had no prior discipline and had cooperated with Bar Counsel.  Id.

Based on its conclusion that the case involved a serious conflict of interest violation, finding no matters in aggravation and considering Respondent's lack of prior discipline and cooperation with Bar Counsel as matters in mitigation, the Board recommended a short, thirty-day suspension.[25]  Id.  We believe there is a substantial similarity between the misconduct here and that in In re Cohen.  Both involved serious – and obvious – conflict situations.  In each, one firm client was preferred over another based at least in part on economic considerations.[26]  Both cases presented first-time violations by experienced, senior attorneys.

Our recommendation here, like the Hearing Committee's, is a thirty-day suspension. Notwithstanding that this case presents matters in aggravation not present in In re Cohen, we believe that a thirty-day suspension is sufficient to protect the interests of the court, the public and the legal profession.

---

[25] Noting that the conflict violation was accompanied by Rule 5.1 violations, the Board stated in In re Cohen that it would recommend a thirty-day suspension based on the conflict violations alone.  In re Cohen, Bar Docket No. 280-97 at 50.

[26] In re Cohen, the preferred client had been responsible for paying the firm's bills.  In re Cohen, Bar Docket No. 280-97, at 8.

000176

## V.  CONCLUSION

For the reasons stated herein, the Board respectfully recommends that Respondent be suspended for thirty days.  The suspension should be deemed to commence for reinstatement purposes when Respondent submits the affidavit required by D.C. Bar Rule XI, § 14(g).


BOARD ON PROFESSIONAL RESPONSIBILITY



By:
                    Timothy J. Bloomfield



Dated:  June 10, 2003



All members of the Board concur in this Report and Recommendation, except Ms. Fort who has filed a concurring and dissenting statement in which Ms. Holleran Rivera joins.

000177