## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

_____

|  |  |  |
|---|---|---|
| FMS INVESTMENT CORP., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action Nos. 18-204C, *et al.* |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant, | ) | ███████████████████ |
| and | ) | |
| | ) | |
| PERFORMANT RECOVERY, INC., *et al*., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

## DEFENDANT-INTERVENOR PERFORMANT RECOVERY, INC'S
## MOTION FOR PARTIAL SUMMARY DISMISSAL

Pursuant to Rules 7(b) and 12 of the Rules of the United States Court of Federal Claims

("RCFC"), Defendant-Intervenor Performant Recovery, Inc. ("Performant Recovery"), through

its undersigned counsel, respectfully moves to dismiss counts and allegations included in the

complaints of Account Control Technology, Inc.; Continental Service Group, Inc.; FMS

Investment Corp.; Gatestone & Co. International, Inc.; Collecto, Inc.; Progressive Financial

Services, Inc.; and Value Recovery Holding, LLC in the above-captioned consolidated protests.

These seven plaintiffs argue that the U.S. Department of Education (the "Department"), in

awarding the contracts at issue here, extended preferential treatment to Performant Recovery and

that Department officials were motivated by bias, bad faith, and/or conflicts of interest due to an

alleged financial connection between one of Performant Recovery's affiliates and the Department's Secretary, Elisabeth DeVos (the "Secretary").

As set forth in the accompanying memorandum of points and authorities, the plaintiffs' allegations suggesting improper preferential treatment based on a financial tie between the Secretary and Performant Recovery are untimely, speculative, inaccurate, and fail to state claims upon which relief may be granted.  Performant Recovery, therefore, respectfully requests that the Court grant this motion and dismiss the relevant portions of these seven plaintiffs' complaints.

Dated: March 15, 2018                          Respectfully submitted,

*Of Counsel*:                                  /s/ Michael McGill
                                               Michael McGill
Thomas L. McGovern III                         HOGAN LOVELLS US LLP
Christine Reynolds                             555 Thirteenth Street NW
Thomas A. Pettit                               Washington, DC 20004
HOGAN LOVELLS US LLP                           Telephone:  (202) 637-8862
                                               Facsimile:  (202) 637-5910
                                               michael.mcgill@hoganlovells.com

                                               *Counsel of Record for*
                                               *Performant Recovery, Inc.*

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

|  |  |  |
|---|---|---|
| FMS INVESTMENT CORP., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action Nos. 18-204C, *et al.* |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant, | ) | ████████████ |
| and | ) | |
| | ) | |
| PERFORMANT RECOVERY, INC., *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-INTERVENOR PERFORMANT RECOVERY, INC'S MOTION FOR PARTIAL SUMMARY DISMISSAL

Dated: March 15, 2018

Respectfully submitted,

*Of Counsel*:

Thomas L. McGovern III
Christine Reynolds
Thomas A. Pettit
HOGAN LOVELLS US LLP

/s/ Michael McGill
Michael McGill
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone:  (202) 637-8862
Facsimile:  (202) 637-5910
michael.mcgill@hoganlovells.com

*Counsel of Record for*
*Performant Recovery, Inc.*

# TABLE OF CONTENTS

INTRODUCTION…………………………….…………………………………………….…..1

BACKGROUND……………………………………………………………………………...4

    A. Overview of Cabinet nominee ethics requirements…………………………...…………..4

    B. The Secretary's disclosure of her financial interests, including her nominal investment in Performant Recovery's affiliate, and the Government's examination of those disclosures…………………………………………………………………………………7

    C. Prior to the Department's award decisions, Performant refinanced its debt held by Madison Capital, eliminating any ties between Performant and the Secretary………….11

ARGUMENT…………………………………………………………………………………12

    A. By failing to protest earlier, the plaintiffs waived their right to challenge the Secretary's prior indirect investment in Performant Recovery's affiliate..…………………………..15

    B. The plaintiffs' allegations related to Secretary DeVos fail to include any facts that would entitle the plaintiffs to a legal remedy and should be dismissed pursuant to RCFC 12(b)(6)……………………………………………………………………………..18

        1. The Court applies a heightened pleading standard to allegations of agency bias and bad faith…………………………………………………………………………...19

        2. The plaintiffs' speculative allegations fail to state a claim that overcomes the presumption that both Secretary DeVos and the Department's procurement officials acted with regularity……………………………………………………………21

        3. Publicly available information demonstrates that Secretary DeVos could not have held any interest in any Performant company after August 2017, fully refuting the plaintiffs' speculative allegations.…………………………...………………………24

        4. FMS's novel assertion that Performant Recovery suffered from an organizational conflict of interest fails to state a claim…………………………………………...26

CONCLUSION…………………………………………………………………………….28

# TABLE OF AUTHORITIES

**CASES**

*Ak. Airlines, Inc. v. Johnson*,
   8 F.3d 791 (Fed. Cir. 1993) ............................................................................... 20, 23

*Am-Pro Protective Agency, Inc. v. United States*,
   281 F.3d 1234 (Fed. Cir. 2002) ............................................................................... 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 19

*Blue & Gold Fleet L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) ......................................................................... 15, 18

*Bowers Inv. Co., LLC v. United States*,
   104 Fed. Cl. 246 (2011) ............................................................................... 4, 7, 9, 25

*Bradley v. Chiron Corp.*,
   136 F.3d 1317 (Fed. Cir. 1998) ............................................................................. 19

*Brock v. United States*,
   No. 11-176C, 2012 WL 2057036 (Fed. Cl. June 7, 2012) ...................................... 20

*COMINT Sys. Corp. v. United States*,
   700 F.3d 1377 (Fed. Cir. 2012) ......................................................................... 15, 18

*Concourse Grp., LLC v. United States*,
   131 Fed. Cl. 26 (2017) ............................................................................... 15, 16, 18

*CRAssociates, Inc. v. United States*,
   102 Fed. Cl. 698 (2011) ......................................................................................... 15

*D.V. Gonzalez Elec. & Gen. Contractors, Inc. v. United States*,
   55 Fed. Cl. 447 (2003) ............................................................................. 21, 22, 23, 24

*Guy v. United States*,
   608 F.2d 867 (Ct. Cl. 1979) ............................................................................. 20, 23

*Hoffman v. United States*,
   16 Cl. Ct. 406 (1989) ............................................................................................. 20

*Hoffman v. United States*,
    894 F.2d 380 (Fed. Cir. 1990) ................................................................ 20, 21, 23

*Ingham Reg'l Med. Ctr. v. United States*,
    126 Fed. Cl. 1 (2016) .................................................................................... 19, 23

*Kalvar Corp., Inc. v. United States*,
    543 F.2d 1298 (Ct. Cl. 1976) ....................................................................... 20, 23

*Lindsay v. United States*,
    295 F.3d 1252 (Fed. Cir. 2002) .......................................................................... 19

*McTech Corp. v. United States*,
    105 Fed. Cl. 726 (2012) ..................................................................................... 15

*Schism v. United States*,
    316 F.3d 1259 (Fed. Cir. 2002) ....................................................................... 20, 23

*Shamrock Foods Co. v. United States*,
    92 Fed. Cl. 339 (2010) ........................................................................................ 19

*T&M Distribs., Inc. v. United States*,
    185 F.3d 1279 (Fed. Cir. 1999) ..................................................................... 22, 24

*Terry v. United States*,
    103 Fed. Cl. 645 (2012) ........................................................................... 19, 24, 27

**STATUTES**

18 U.S.C. § 208(a) ...................................................................................................... 8

18 U.S.C. § 208(b)(1) .................................................................................................. 8

18 U.S.C. § 208(b)(2) .................................................................................................. 8

5 U.S.C. App'x 4 § 101(b)(1) ..................................................................................... 4

5 U.S.C. App'x 4 § 102(a)(1)(A) ................................................................................ 5

5 U.S.C. App'x 4 § 102(a)(1)(B) ................................................................................ 5

5 U.S.C. App'x 4 § 102(a)(3) ...................................................................................... 5

5 U.S.C. App'x 4 § 103(c) ....................................................................................... 4, 6

5 U.S.C. App'x 4 § 103(d) ........................................................................................... 6

5 U.S.C. App'x 4 §§ 101-111 ..................................................................................... 4

**RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS**

12(b)(6) ............................................................................................................... *passim*

Rule 12 ...................................................................................................................... 3, 5

Rule 7(b) ............................................................................................................... 1, 3, 1

**REGULATIONS**

EDAR 3452.209-71(a)(1) ........................................................................... 27

EDAR 3452.209-71(a)(2) ........................................................................... 27

FAR 3.601(a) ...................................................................................................... 21

**LEGISLATIVE HISTORY**

163 Cong. Rec. S408-409 (daily ed. Jan. 24, 2017) ...................................... 9

## INTRODUCTION

Several plaintiffs have leveled unfounded allegations about the nature of a financial interest Secretary of Education Elisabeth DeVos (the "Secretary" or "Secretary DeVos") previously held in Performant Business Services, Inc., an affiliate of Performant Recovery, Inc. 1/ ("Performant Recovery"), and the impact that financial interest may or may not have had on this procurement. These allegations can best be described as "much ado about nothing." There is no evidence of bias or bad faith on the part of Secretary DeVos or the agency officials who conducted this procurement, and there are no actual or apparent conflicts of interest. Tellingly, only seven of the 19 plaintiffs in this litigation have raised this issue in their complaints. These seven plaintiffs, however, have contrived a colorful conspiracy theory involving unethical government officials who flagrantly disregarded their obligations due to an attenuated financial interest that the Secretary previously held in one of Performant Recovery's corporate affiliates. The real story is much more mundane and far from nefarious.

Through her family's considerable financial holdings, Secretary DeVos previously held a relatively nominal, indirect debt interest in Performant Business Services, Inc., an affiliate of the awardee, Performant Recovery. As part of her confirmation process and in accordance with various statutory and regulatory requirements, the Secretary disclosed all of her investments, 2/ and the Office of Government Ethics ("OGE") and the Department's Designated Agency Ethics Officials investigated them. The Secretary entered into an ethics agreement with OGE and the Department and committed to divest herself of certain interests, including her investment in the

---

1/      Throughout this brief, references to "Performant" refer to the Performant corporate family generally. Specific members of that corporate family are identified by name as appropriate.
2/      Performant did not know that Secretary DeVos (then a nominee) held any interest (indirect or otherwise) in any Performant company until a reporter contacted Performant in January 2017 to inquire about information included in her public financial disclosures.

specific Madison Capital Funding ("Madison Capital") fund on which the plaintiffs are focused, within 90 days of her confirmation.  The United States Senate considered the Secretary's investments and ethics agreement during her confirmation proceedings, and the Senate chose to confirm the Secretary's nomination.  The plaintiffs are asking this Court to second guess the decisions of the Senate and OGE, but they have presented nothing to justify doing so.

The plaintiffs conveniently neglect to acknowledge two critical facts.  ***First***, Performant Recovery's parent company refinanced its debt in August 2017 in the normal course of its business because that debt was coming due.  This substantial refinancing extinguished the interest the prior lenders, including Madison Capital, held in any of the Performant companies. Insofar as Secretary DeVos held an interest in Performant Business Services, Inc. (or any other Performant company) through the company's prior lenders, that interest ceased to exist no later than August 11, 2017, long before the Department completed its evaluations and awarded the contract to Performant Recovery that is at issue in this litigation.  ***Second***, in her formal ethics agreement submitted to OGE and the U.S. Senate and released to the public, the Secretary committed to divest her interest in the fund that held debt in Performant Business Services, Inc. no later than May 8, 2017.  Given this Court's presumption of regularity and the repercussions to which the Secretary would be subject for non-compliance with her commitment to divest, the Court should assume that the Secretary complied with her commitment and no longer held any interest in Performant Business Services, Inc. as of May 8, 2017.  The Court also should assume, based on the same presumption of regularity and the plaintiffs' failure to allege facts to rebut it, that the Department's procurement officials acted ethically and were not motivated by bias, bad faith, or anything other than achieving the best value for the Government.  The bottom line, however, is that regardless of whether the Secretary's indirect investment in the debt of

Performant Recovery's affiliate was extinguished through the Secretary's divestitures by May 8, 2017 or through Performant's refinancing on August 11, 2017, ***there is no question, based on publicly available information, that the Secretary could not have held any interest in Performant Recovery or any of its affiliates after August 2017, over six months before the Department selected Performant Recovery's proposal for award***.

Moreover, the plaintiffs' claims related to Secretary DeVos are untimely.  All seven plaintiffs unquestionably knew, or should have known, of the Secretary's prior financial interest in Performant Business Services, Inc. ***as of early January 2017***, over a year before filing their complaints in this action.  Nevertheless, each plaintiff sat on its concern for over a year.  This Court's precedent, as explained below, makes clear that the plaintiffs have waived their rights to belatedly raise these allegations now.

This memorandum of points and authorities, submitted pursuant to Rules 7(b) and 12 of the Rules of the United States Court of Federal Claims ("RCFC"), supports Performant Recovery's motion to dismiss the counts of plaintiffs' complaints alleging that bias, bad faith, and conflicts of interest resulted in the selection of Performant Recovery's proposal for award. As discussed more fully below, none of the plaintiffs' claims related to Secretary DeVos can survive scrutiny under RCFC 12(b)(6).  In the interest of judicial efficiency and economy, the following portions of the relevant plaintiffs' complaints, which have been waived and otherwise fail to state a claim upon which relief can be granted, should be dismissed:

1) Account Control Technology, Inc. ("ACT"):  Counts III and IV;

2) Continental Service Group, Inc. ("ConServe"):  Count IV;

3) FMS Investment Corp. ("FMS"):  Count VI;

4) Gatestone & Co. International, Inc. ("Gatestone"):  Count II;

5) Collecto, Inc. ("Collecto")  (no counts identified in complaint);

6) Progressive Financial Services, Inc. ("Progressive"):   Counts IV and VII; and

7) Value Recovery Holding, LLC ("Value"):  Count V.

## BACKGROUND

As part of the rigorous confirmation process that every Cabinet-level nominee faces, Secretary DeVos underwent a comprehensive ethics review prior to the Senate confirming her as head of the Department.  During that process—which began in November 2016, three months prior to her confirmation—the Secretary disclosed, described, and agreed to promptly divest her indirect debt investment in Performant Business Services, Inc.  The publicly available record on which the plaintiffs rely indicates that the appropriate government officials within OGE thoroughly reviewed **all** of the Secretary's investments and concluded that, once the Secretary liquidated certain investments, which was required to occur by May 8, 2017, the Secretary would have **no** conflicts of interest.

### A.    Overview of Cabinet nominee ethics requirements

With certain exceptions not applicable here, the Ethics in Government Act of 1978, as amended, 3/ requires presidential Cabinet nominees who must be confirmed by the Senate to file a financial disclosure with the Director of the OGE 4/ within five days of the date on which the President transmits the nomination to the Senate. 5/  Pursuant to OGE's policies, "filing is . . . a two-step process." 6/  That process begins when the nominee submits his or her draft Public

---

3/      5 U.S.C. App'x 4 §§ 101-111.

4/      *Id.* § 103(c).

5/      *Id.* § 101(b)(1).

6/      Ex. A, Letter from OGE Dir. Walter Shaub to Sen. Patricia Murray, Ranking Member Health, Educ., Labor & Pension Comm. ("Letter from OGE Dir."), at App'x 000003.  Although this letter was neither included nor referenced in the plaintiffs' complaints, the Court should take judicial notice of this process in considering this motion to dismiss.  *See, e.g.*, *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253 (2011) ("In deciding whether to dismiss a complaint

4

Financial Disclosure Report ("OGE Form 278e") to OGE through *Integrity*, OGE's online filing

system. 7/  Upon receipt of the financial disclosures, "[e]thics officials review the draft financial

disclosure report, ask follow-up questions, and provide instructions for revising the report." 8/

The financial disclosures required of the Secretary and other Cabinet-level nominees are

comprehensive.  As mandated by statute, nominees must disclose, in addition to multiple other

categories of information, the "source, type, and amount or value of income . . . from any source

(other than from current employment by the United States Government)"; 9/ the "source and type

of income which consists of dividends, rents, interest, and capital gains, received during the

preceding calendar year which exceeds $200 in amount or value," as well as an indication of the

approximate dollar amount of that income within specified ranges; 10/ and the identity and

category of value of "any interest in property held during the preceding calendar year in a trade

or business, or for investment or the production of income, which has a fair market value which

exceeds $1,000 as of the close of the preceding calendar year," with limited exceptions. 11/

The next step in the process is the formation of an ethics agreement with the nominee.

Once the financial disclosure report is finalized, "OGE and agency ethics officials analyze the

information contained in the report to identify potential conflicts of interest with the duties of the

---

under Rule 12(b)(6), courts are not limited to the four corners from the complaint.  For example, courts may also consider matters incorporated by reference or integral to the claim, other matters appearing in the record of the case, ***and matters of public record of which the court can take judicial notice***.") (emphasis added) (internal citations and quotations omitted).

7/      Ex. A, Letter from OGE Dir., at App'x 000002.
8/      *Id.* at App'x 000002-000003.
9/      5 U.S.C. App'x 4 § 102(a)(1)(A).
10/     *Id.* § 102(a)(1)(B).
11/     *Id.* § 102(a)(3).  The exceptions are "any personal liability owed to the reporting individual by a spouse, or by a parent, brother, sister, or child of the reporting individual or of the reporting individual's spouse, or any deposits aggregating $5,000 or less in a personal savings account." *Id.*

position for which the nominee is being nominated." 12/  These officials then "work together to prepare an ethics agreement," 13/ which "outlines the specific steps a nominee will take to avoid conflicts of interest identified in his or her financial disclosure report." 14/  A nominee must "agree to take the steps outlined in the agreement to resolve his or her conflicts of interest; for example, resignation of positions, divestiture of holdings, or recusal." 15/

The filing process concludes when OGE has "precleared (tentatively approved)" the report, which occurs once OGE "is satisfied that the report is complete and the ethics agreement has resolved all ethics issues." 16/  The nominee "log[s] back into the system and formally file[s] the report by certifying that the information in the finalized report is correct." 17/  After the report is finalized and certified, OGE "shall forward a copy of the report of each nominee to the congressional committee considering the nomination." 18/  "[U]ntil OGE has precleared a nominee's financial disclosure report, the nominee cannot comply with the legal requirement under 5 U.S.C. app. § 101(b)(2)." 19/

Importantly, this entire ethics clearance process is transparent—all of this information, including the financial disclosures and the ethics agreement, must be made available to the public. 20/

---

12/    Ex. A, Letter from OGE Dir., at App'x 000003.
13/    *Id.*
14/    *Id.* at App'x 000004.
15/    *Id.*
16/    *Id.*
17/    *Id.* at App'x 000003.
18/    5 U.S.C. App'x 4 § 103(c); *see also* Ex. A, Letter from OGE Dir., at App'x 000003 ("OGE then certifies the report and sends the report to the Senate.").
19/    Ex. A, Letter from OGE Dir., at App'x 000003-000004.
20/    5 U.S.C. App'x 4 § 103(d) ("Reports required to be filed under this title by the Director of the Office of Government Ethics shall be filed in the Office of Government Ethics and, immediately after being filed, shall be made available to the public in accordance with this title.").

**B.      The Secretary's disclosure of her financial interests, including her nominal investment in Performant Recovery's affiliate, and the Government's examination of those disclosures**

Public allegations related to Secretary DeVos's prior interest in Performant Recovery's affiliate are not new.  These matters were fully disclosed and addressed during the Secretary's ethics review.  President Donald Trump nominated the Secretary on November 23, 2016. 21/  In accordance with the legal process outlined above, the Secretary presumably filed her draft financial disclosure no later than November 30, 2016, five business days after her nomination. On January 19, 2017, the Secretary finalized and filed OGE Form 278e. 22/  The Secretary's disclosures were subject to a rigorous review process spanning 50 days.  As explained above, OGE does not approve and certify a nominee's disclosure unless and until OGE "*is satisfied that the report is complete and the ethics agreement has resolved all ethics issues*." 23/

The Secretary's final certified and approved disclosure report, which is available to the public, reveals that she was invested in a single fund that held debt (as opposed to equity) in the Performant Financial Corporation family. 24/  The Secretary's indirect investment in that fund,

---

21/      Ex. B, Sec'y DeVos Senate Confirmation Disclosure Rep. Part 1, at App'x 000007.  As with Director Shaub's letter to Senator Murray, the complaints neither include nor reference this report, but the Court should take judicial notice of it and the Secretary's confirmation date because the report is a publicly available government record, the accuracy of which cannot reasonably be questioned.  *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253 (2011).

22/      Ex. C, Sec'y DeVos OGE Form 278e, at App'x 000031.

23/      Ex. A, Letter from OGE Dir., at App'x 000004 (emphasis added).

24/      Ex. C, Sec'y DeVos OGE Form 278e at App'x 000052 # 20.6.1 and associated endnote at App'x 000097-000101; *id.* at App'x 000075 # 45.1.4.18.1.1 and associated endnotes at App'x 000123-000124.  Some of the plaintiffs cite a *Washington Post* article that claims a different fund, "LMF WF Portfolio, a limited liability company that once counted DeVos as an investor," had invested in Performant.  Danielle Douglas-Gabriel, *Educ. Dep't awards debt-collection contract to co. with ties to DeVos*, Washington Post (Jan. 12, 2018), https://www.washingtonpost.com/news/grade-point/wp/2018/01/11/education-dept-awards-debt-collection-contract-to-company-with-ties-to-devos/?utm_term=.3fd133f98110.  This claim appears to be based on a misunderstanding of the author of that article.  In any event, as explained below, the Secretary's ethics agreement required her to liquidate her investments in

MCF CLO IV, LLC, was made through RDV Corporation 25/ and Family Trust 8 26/ and

obtained through Madison Capital. 27/  Performant did not know that Secretary DeVos held any

interest (direct or indirect) in any Performant company until after her financial disclosures were

made available to the public. 28/

    Also on January 19, 2017, the Secretary signed an ethics agreement in which she detailed

"the steps that [she would] take to avoid any actual or apparent conflict of interest in the event

[she were] confirmed for the position of Secretary of the U.S. Department of Education." 29/

She acknowledged that, in accordance with 18 U.S.C. § 208(a), she would not "participate

personally and substantially in any particular matter in which [she] know[s] that [she has] a

financial interest directly and predictably affected by the matter" without "first obtain[ing] a

written waiver, pursuant to 18 U.S.C. § 208(b)(1)" or an exemption under 18 U.S.C.

§ 208(b)(2). 30/  In accordance with those requirements and to ensure that she would avoid

conflicts of interest, she pledged that she would "divest [her] interests in the entities listed in

---

that fund.  ACT chose to repeatedly reference "102" investments that would create conflicts of interest.  ACT Compl. ¶¶ 111, 118, 121.  These references are misleading at best; the complaints raised by the plaintiffs do not relate to 102 investments, but rather to a single investment, *i.e.*, the Secretary's prior investment in MCF CLO IV, LLC.

25/    Ex. C, Sec'y DeVos OGE Form 278e, at App'x 000038 # 20 (identifying RDV Corporation as the investment vehicle for investment # 20.6.1, MCF CLO IV, LLC).  RDV is a firm formed by the DeVos family to perform a variety of functions, including "investment management, estate planning, tax and personal services, and foundation administration."  Ex. D, *Co. Overview of RDV Corp.*, Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=12617787 (last visited Feb. 18, 2018), at App'x 000140.

26/    Ex. C, Sec'y DeVos OGE Form 278e, at App'x 000073 # 45 (identifying Family Trust 8 as the investment vehicle for investment # 45.1.18.1.1, MCF CLO IV, LLC).

27/    *Id.* at App'x 000052 # 20.6.1 and associated endnote at App'x 000097-000101; *id.* at App'x 000075 # 45.1.4.18.1.1 and associated endnote at App'x 000123-000124 (explaining that these investments were obtained from Madison Capital).

28/    Performant first learned of the Secretary's investments through a call from a reporter inquiring about information obtained through the Secretary's disclosures.

29/    Ex. E, Sec'y DeVos Ethics Agreement, at App'x 000142.

30/    *Id.*

Attachment A." 31/  That attachment specifically identified all investments obtained through

Madison Capital, including the MCF CLO IV, LLC fund. 32/  The Secretary, therefore, was

obligated to divest her interest in this fund—the sole investment through which she previously

held an interest in Performant Business Services, Inc.—*no later than May 8, 2017*.

The Secretary's disclosure and ethics agreement were considered during her Senate

confirmation hearing.  For example, Senate Committee on Health, Education, Labor and

Pensions ("HELP") Chairman Alexander summarized OGE's determinations as follows:

> Finally, they are throwing around conflict-of-interest accusations. As I just
> mentioned—let me mention it again. Last week, Mrs. DeVos signed an
> agreement with the Independent Office of Government Ethics. The job of
> that office is to review the financial holdings of any Cabinet nominee and
> identify any conflicts of interest. They identified 102 because the DeVos's
> have a lot of money. Mrs. DeVos agreed to sell all 102 of those assets.
> **According to the letter of agreement between the Office of
> Government Ethics and the independent ethics officer in the
> Education Department, who is already in the Department, Mrs.
> DeVos is not,** *after she divests herself of those items, which she has 90
> days to do—she has no conflicts of interest*.
>
> She has also filled out the same financial disclosure forms that are
> fundamentally like the ones we Senators fill out. People know where we
> get our money. They know what we own. They know what we owe. We
> know that about her.
>
> We also know that the independent Office of Government Ethics has said
> she will have no conflicts and that she has agreed to that. 33/

---

31/      *Id.*
32/      *Id.* at App'x 000144, lines 25, 27, and 28.
33/      163 Cong. Rec. S408-409 (daily ed. Jan. 24, 2017) (statement of Sen. Alexander)
(emphasis added).  Although this fact was not included in the complaints, the Court should take
judicial notice of this statement.  *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253
(2011).

All of these facts related to the Secretary's prior indirect investment in Performant Business

Services, Inc. were considered by OGE and were provided to the Senate for review, and the

Senate relied upon OGE's report in confirming the Secretary's nomination. 34/

     In sum, Secretary DeVos's finalized and certified OGE Form 278e reveals that she did

not hold any direct financial interests in Performant Recovery, the Performant company that was

one of the awardees in the procurement at issue.  Her only investments relating to any entities in

the Performant corporate family were investments in a single fund, MCF CLO IV, LLC, that

held a debt interest in Performant Business Services, Inc., which is an affiliate of Performant

Recovery. 35/  The Secretary agreed to liquidate her investment in that fund no later than 90 days

after her confirmation, *i.e.*, no later than May 2017.  There is no indication that she did not

comply with her public agreement to do so.

---

34/    The plaintiffs take liberties with the facts in describing the Secretary's vetting process.
For instance, ACT describes a letter sent to then-nominee DeVos purportedly from "the Senate
Committee on Health, Education, Labor, and Pensions ('HELP')."  ACT Compl. ¶ 113.  ACT
glosses over the fact that this letter was sent not by the HELP Committee, but rather by a
subgroup of the Democrat Senators sitting on the HELP Committee.  *Compare* ACT Ex. 19 with
*Members*, Sen. HELP Comm., https://www.help.senate.gov/about/members (last visited Feb. 28,
2018).

35/    Ex. C, Sec'y DeVos OGE Form 278e, at App'x 000097-000101, 000123-000124
(identifying MCF CLO IV, LLC as a fund in which the Secretary has invested and establishing
that MCF CLO IV, LLC invested in Performant Business Services); *see also* Ex. F, Performant
Fin. Corp. Nov. 14, 2012 SEC Form 10-Q (Excerpt), full report available at
https://www.sec.gov/Archives/edgar/data/1550695/000119312512468366/d404623d10q.htm, at
App'x 000152 ("On March 19, 2012, we, ***through our wholly owned subsidiary***, entered into a
$147.5 million credit agreement with Madison Capital Funding LLC as administrative
agent . . . .") (emphasis added); Ex. G, Performant Fin. Corp. Aug. 17, 2017 SEC Form 8-K, at
App'x 000155 (explaining that ECMC Group, Inc. and ***Performant Business Services, Inc.***
"entered into a new credit agreement" under which ECMC would issue a loan to Performant
Business Services "to repay all outstanding amounts owed under [its] prior credit agreement
entered into ***on March 19, 2012, with Madison Capital Funding LLC as administrative agent***")
(emphasis added).

**C.     Prior to the Department's award decisions, Performant refinanced its debt held by Madison Capital, eliminating any ties between Performant and the Secretary.**

In August 2017, Performant refinanced its outstanding debt.  Performant's refinancing was done in the normal course of business because its existing debt was scheduled to come due and was not driven in any way by Secretary DeVos's prior investment through Madison Capital. 36/  Performant Financial Corporation's August 11, 2017 form 8-K and its November 13, 2017 form 10-Q—both of which were filed with the U.S. Securities and Exchange Commission ("SEC") as required and are readily available online—described in detail Performant Financial Corporation's prior relationship with Madison Capital and the termination of that relationship through the refinancing.  Specifically, the 8-K revealed that:

> On August 7, 2017, we, through one of our wholly-owned subsidiaries, entered into a new credit agreement with ECMC Group, Inc. ('ECMC') (the 'New Credit Agreement').  The New Credit Agreement provides for a term loan facility in the initial amount of $44 million (the 'Initial Term Loan') and for up to $15 million of additional term loans . . . . ***On August 11, 2017, the Initial Term Loan was advanced, the proceeds of which were applied to repay*** <u>***all outstanding amounts***</u> ***owed under our prior credit agreement entered into on March 19, 2012, with Madison Capital Funding LLC as administrative agent, ING Capital LLC as syndication agent and other lenders party thereto.*** 37/

Performant Financial Corporation's 10-K included similar information. 38/

---

36/     *See, e.g.*, Ex. H, Daniel Seiden, *Bid Protest: DeVos Ties to Contractor Rebutted as New Protest is Pondered*, 109 FCR (BNA) 82 (Jan. 23, 2018), at App'x 000158-000160 (explaining that "'Performant completely refinanced its debt mid-summer 2017 in the ordinary course of business—as the debt term had come due'") (quoting Lisa Im, Chairwoman of Performant's Board of Directors and Chief Executive Officer).

37/     Ex. G, Performant Fin. Corp.'s Aug. 17, 2017 8-K, at App'x 000155, available at https://www.sec.gov/Archives/edgar/data/1550695/000155069517000032/a8-kecmccreditagreement.htm (emphasis added).

38/     Ex. I, Performant Fin. Corp.'s Nov. 13, 2017 10-Q (Excerpt), at App'x 000163, full report available at https://www.sec.gov/Archives/edgar/data/1550695/000155069517000042/a10q09302017.htm (explaining that the proceeds from the company's new credit agreement with ECMC Group, Inc.

It is indisputable that, as of August 11, 2017, over six months before the awards at issue, 39/ any interest the Secretary held in Performant through Madison Capital-related investments was extinguished by Performant's refinancing of the debt. 40/

## ARGUMENT

Although Plaintiffs ACT, FMS, ConServe, Gatestone, Collecto, Progressive, and Value frame their counts related to Secretary DeVos in slightly different ways, they all raise the same general allegation—insisting that the Department's decision to award a contract to Performant Recovery was rooted in bias and bad faith stemming from an alleged conflict of interest that the plaintiffs try to impute from Secretary DeVos to the procurement officials involved in this acquisition.  All of these plaintiffs contend that the Secretary's indirect holding of a debt investment in Performant Recovery's affiliate influenced the actions of the Source Selection Authority and other procurement officials.  ACT goes so far as to allege that the Department "improperly favored Performant [Recovery] in its evaluation and award decision," 41/ and FMS argues that the Department's award to Performant Recovery "suffered from material,

---

"were applied to repay all outstanding amounts under the Prior Credit Agreement [with Madison Capital Funding LLC]").

39/      The Factors 1 and 2 consensus evaluations were completed by September 15, 2017, and Factor 3 evaluations were completed by September 11, 2017. The award decision was made on January 10, 2018.

40/      Plaintiffs ConServe and FMS expressly acknowledge this in their complaints.  *See* ConServe Compl. ¶ 100 (emphasis added) (quoting Daniel Seiden, *Bid Protest: DeVos Ties to Contractor Rebutted as New Protest is Pondered*, 109 FCR (BNA) 82 (Jan. 23, 2018), http://news.bna.com/fclu/FCLNWB/split_display.adp?fedfx1=127269572&vname=fcrnotallissues&split=0); FMS Compl. at 2 (acknowledging that the Secretary's alleged interest in Performant "reportedly was divested in August 2017").  ACT apparently is unaware of this development.

41/      ACT Compl. ¶ 124; *see also id.* ¶ 150 (speculating that "ED treated offerors unequally in its evaluation by, *inter alia*, favoring Performant [Recovery] as an awardee based on its apparent connection to Secretary of Education, Betsy DeVos"); *id.* (adding that "[t]he highly public nature of Ms. DeVos's confirmation proceedings made it such that ED FSA personnel could not have been unaware of their new boss's and her family's financial interests in Performant").

12

unexamined financial conflicts of interest" stemming from the Secretary's former

investments. 42/  Gatestone insists that the Department awarded a contract to Performant

Recovery solely due to the (inaccurate) "fact" that the Secretary allegedly holds $147 million of

Performant's debt. 43/  ConServe contends that it is "reasonably concerned about the appearance

of a continuing conflict of interest" based on the Secretary's purported connection to Performant

Recovery. 44/  Collecto alleges only that the Secretary "presumably had divested this investment

when taking office, but other members of her family may, however, still be investors in

Performant." 45/  And Progressive—ignoring the fact that the corrective action involved a new

evaluation—argues that the only explanation for the change to Performant Recovery's past

performance rating following corrective action is that the Department "deviated from the

evaluation criteria and substantially relaxed its evaluation scheme for Performant [Recovery] so

---

42/      FMS Compl. at 50.

43/      Gatestone Compl. ¶ 86 (characterizing its argument as challenging the agency's alleged
application of unstated evaluation criteria).  Gatestone's assertion that Performant Recovery
owes the Secretary $147 million is, of course, wrong.  Performant Recovery owes the Secretary
absolutely nothing.

44/      ConServe Compl. ¶ 101.  As explained in Performant Recovery's March 2, 2018 motion
to disqualify ConServe counsel, ConServe's allegations regarding Secretary DeVos are all the
more troubling because ConServe's counsel, Pillsbury Winthrop Shaw Pittman LLP, has
advised, and continues to advise, Performant on a variety of investment matters, including a
decision to refinance with ECMC the debt in which Secretary DeVos allegedly had a financial
interest.  *See* ECF No. 110, Performant Recovery Mot. to Disqualify Pillsbury as Counsel for
ConServe, at 12.

45/      Collecto Compl. ¶ 16.  Collecto's suggestion that financial interests held by Secretary
DeVos's family members could create a conflict of interest, notwithstanding the Secretary's
ethics agreement, is nonsense and reflects a lack of understanding of the statutory and OGE
standards concerning the financial interests of Executive Branch officials.  Those standards
encompass financial interests held by family members, and thus, the vetting of the Secretary
through her confirmation process necessarily involved disclosure and assessment of her family's
financial holdings and divestitures, where necessary.  Moreover, Collecto's empty speculation
fails to identity what interest Collecto is concerned about or identify any evidence that the
Department officials involved in this procurement knew about that unidentified interest such that
they allegedly could have been biased in favor of Performant.  How could these individuals be
influenced by something of which they have no knowledge?  Collecto piles speculation on top of
speculation without considering whether its theory even makes sense.  It does not.

that it could make an award to a company which was a previous investment vehicle for the [Secretary]." <u>46</u>/  Value makes similar arguments. <u>47</u>/

All of these claims amount to allegations of bias and bad faith aimed at the Department of Education officials who conducted this procurement, and all of them are subject to dismissal for two distinct reasons.

*First*, the plaintiffs' own complaints and accompanying exhibits demonstrate that the plaintiffs knew, or should have known, about the basis (or bases) for their claims as of early 2017 and thus should have filed protests challenging these alleged conflicts long ago, and in any event before the close of the Department's bidding process.  Because the plaintiffs failed to do so, under this Court's precedent, their allegations are waived and should be dismissed.

*Second*, in the event the Court finds that the plaintiffs' allegations related to Secretary DeVos are timely, the Court should still dismiss them for failure to state a claim.  The plaintiffs' arguments are wholly speculative, inconsistent with the presumption that Secretary DeVos and the procurement officials involved acted with regularity, and otherwise insufficient to withstand scrutiny under RCFC 12(b)(6).  This is especially true given that publicly available information proves that the Secretary was required to divest the indirect debt investment at issue no later than May 8, 2017, and that even assuming for the sake of argument that she did not do so, Performant paid off the relevant debt through a major refinancing in August 2017.  These facts (of which the Court should take judicial notice) readily disprove the plaintiffs' entire theory that the Department's procurement officials may have selected Performant Recovery for award to curry favor with the Secretary by benefiting her financially or for any reason other than the relative merits of Performant Recovery's proposal.

---

<u>46</u>/     Progressive Compl. ¶ 16.
<u>47</u>/     Value Compl. ¶¶ 58-61.

### A.    By failing to protest earlier, the plaintiffs waived their right to challenge the Secretary's prior indirect investment in Performant Recovery's affiliate.

All of the plaintiffs' allegations regarding the Secretary's former interest in Performant Recovery's affiliate fail because the plaintiffs did not timely raise these claims.  In the Federal Circuit's seminal *Blue & Gold Fleet* decision, the court held that a protester that "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 48/  Five years later, the court clarified that "[t]he same policy underlying *Blue & Gold* supports its extension to *all* pre-award situations." 49/  And this Court has elaborated that the waiver rule "applies broadly in bid protests to *all situations* where the protesting party had the opportunity to raise its claim before the award of the contract." 50/  Indeed, this Court has specifically held that a protester generally waives its right to challenge a potential conflict of interest—and, by extension, bias allegedly stemming from a conflict—where the protester knows the bases for its complaint but fails to raise them prior to the close of the bidding process. 51/  The Court will not entertain a protester's argument that it could not have known about an agency's failure to properly address an alleged conflict until after contract award where the protester "'knew about the alleged [conflict] from the start, but failed to assert it, via protest, prior to the award.'" 52/

---

48/    *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

49/    *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (emphasis added).

50/    *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26, 29 (2017) (Wheeler, J.) (emphasis added) (citing *COMINT*, 700 F.3d at 1382).

51/    *Id.*

52/    *Id.* at 30 n.3 (quoting *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011)); *cf. McTech Corp. v. United States*, 105 Fed. Cl. 726, 732 (2012) (denying motion to dismiss a pre-award protest asserting OCI allegations because "the rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and

15

It is indisputable that *all* of the protesters raising allegations related to Secretary DeVos—ConServe, ACT, FMS, Gatestone, Collecto, Progressive, and Value—knew or should have known of the facts pertinent to their allegations no later than January 2017.  They certainly knew that Performant Recovery was competing in this procurement in light of the company's January 2017 protest of the Department's original awards, and they knew, or should have known, of the Secretary's prior indirect investment in Performant Recovery's affiliate as of January 2017 through the Secretary's public financial disclosures and a *Washington Post* article discussing the disclosures.

ConServe, ACT, and FMS describe at length the alleged concerns certain Senators publicly expressed about the potential for conflicts of interest arising through the Secretary's financial holdings, which were and are relatively robust for a Cabinet-level nominee/member. 53/  Further, these Senators raised questions specifically about the Secretary's indirect debt investment in Performant, as referenced in widely circulated news articles from January 2017. 54/  ConServe even acknowledges that the Secretary's investments, including those at issue here, were "well documented in the media." 55/  ACT and ConServe reveal they knew about the Secretary's interest in RDV Corporation as of January 19, 2017, the day the

---

mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award") (quoting *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011)).  In *Concourse*, the Court noted that under the protester's logic, it only became aware of the agency's failure to mitigate an alleged OCI when the agency awarded the contract.  The Court flatly rejected that argument, explaining that "[t]his is not the law.  If it were, then protesters . . . could simply sit on their rights until they knew whether or not they had won the contract." 131 Fed. Cl. at 30 n.3.

53/     The questions of these Senators were not limited to those related to Performant.

54/     ConServe Compl. ¶ 98 (citing *Washington Post* and *Politico* articles from Jan. 17, 2017 and Jan. 20, 2017, respectively); ACT Compl. ¶ 121 (same); FMS Compl. ¶ 52 (citing the *Washington Post* article).

55/     ConServe Compl. ¶ 98.

Secretary filed her OGE Form 278e describing her interest in that entity, 56/ and they attach as exhibits to their complaints all ten of the Secretary's Periodic Public Financial Disclosure Reports (OGE Form 278-T)—several of which the Secretary filed well before revised proposals were due in this procurement, and all of which she submitted long before the Department made its new award decisions. 57/ Both ConServe and ACT also reference a January 27, 2017 letter from certain members of HELP describing "concern" with the Secretary's investments related to Performant. 58/

Despite having knowledge of the Secretary's indirect financial interest in Performant Recovery's affiliate and of Performant Recovery's status as a bidder in this procurement, none of the plaintiffs raised concerns about Performant Recovery's involvement until *after* the Department announced its award decisions. Given that final proposals were not due until June 20, 2017, the plaintiffs had more than sufficient time to raise their claims in the five-month span between learning of these alleged conflicts in January 2017 and the close of the bidding process. 59/ If it truly was "not clear" to the plaintiffs that "all of the [Secretary's] conflicts of interest ha[d] been fully addressed," 60/ as ConServe claims, it was incumbent upon them to file protests challenging those alleged conflicts *prior to award*.

---

56/     *Id*. ¶¶ 87-88; ACT Compl. ¶¶ 111-112. Value's complaint also expressly notes that "[t]he Secretary's investment in Performant was revealed in [OGE Form 278e]" and provides a link to that document. Value Compl. at 26 n.3.

57/     *See* ConServe Compl. Exs. 6-15; ACT Compl. Ex. 18.

58/     ACT Compl. ¶ 113; ConServe Compl. ¶ 89 ("While you have agreed to divest from financial interests linked to Performant, we remain concerned by your continued financial interests in RDV Corporation, which appears [*sic*] to be connected to Performant through MCF CLO IV, LMF WF Portfolio II, LMF WF Portfolio III, and/or other funds managed by Madison Capital Funding.'") (quoting Jan. 27, 2017 letter from Sen. HELP Comm.).

59/     RFP Am. 0008.

60/     ConServe Compl. ¶ 91.

In sum, the plaintiffs' failure to timely challenge the Secretary's previous financial interest in Performant, "despite the opportunity . . . and [their] easy access to the knowledge upon which [they] now rel[y]," 61/ precludes their attempts to press these bogus claims as post-award protest grounds.  The plaintiffs "cannot now 'come forward with [their objections] to restart the bidding process,' and get a second bite at the apple." 62/  Because the plaintiffs have waived their right to raise these arguments, the Court should dismiss them. 63/

**B.**      **The plaintiffs' allegations related to Secretary DeVos fail to include any facts that would entitle the plaintiffs to a legal remedy and should be dismissed pursuant to RCFC 12(b)(6).**

Even if the Court finds the protesters have not waived their arguments related to Secretary DeVos, the Court should dismiss the claims for the alternative reason that these thinly veiled allegations of bias and bad faith fail to state a claim for which relief can be granted.  No doubt aware of the heavy burden of proof that attaches to claims of agency bias or bad faith, the plaintiffs are careful to avoid characterizing their arguments as such.  Notwithstanding their artful framing of their allegations, however, the plaintiffs undeniably are asserting that the Department's evaluation team and/or Source Selection Authority abandoned their ethical obligations in the hope of pleasing Secretary DeVos.  The plaintiffs' threadbare allegations are far too speculative to withstand scrutiny under this Court's rules and precedent.  Moreover, publicly available information thoroughly refutes the plaintiffs' theory that the procurement officials may have been influenced by Secretary DeVos's prior investment, as there is no doubt

---

61/    *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26, 30 (2017) (Wheeler, J.).

62/    *COMINT*, 700 F.3d at 1383 (quoting *Blue & Gold Fleet*, 492 F.3d at 1314).

63/    *Id.* (dismissing protester's OCI claims under RCFC 12(b)(6) where the facts giving rise to those claims "were 'easily recognizable or obvious,'" but protester failed to timely raise them prior to award) (citation omitted).

that the public was well aware that the Secretary did not hold any interest in any Performant

company when the agency was conducting its evaluations and making its award decisions.

> ### 1.   The Court applies a heightened pleading standard to allegations of agency bias and bad faith.

Under this Court's rules, a protester's complaint must be sufficiently well-pled, meaning

that it must include "more than labels and conclusions" 64/ or "'[c]onclusory assertions of law

and unwarranted inferences of fact.'" 65/  The complaint "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" 66/  This means that the

plaintiff must "'plead[] factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged'" 67/—a standard that requires "'more than a

sheer possibility that a defendant has acted unlawfully.'" 68/  A protest ground should be

dismissed under RCFC 12(b)(6) where the protester does not meet these standards and therefore

"fail[s] to state a claim upon which relief can be granted," 69/ that is, "'when the facts asserted

by the claimant do not entitle [it] to a legal remedy.'" 70/

A protester's allegations of agency bias or bad faith must, like any other allegation,

satisfy these threshold pleading standards.  In addition, protesters accusing government officials

---

64/   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

65/   *Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1, 20 (2016) (quoting *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998)) (dismissing all of plaintiff's claims pursuant to RCFC 12(b)(6) upon finding that plaintiff failed to adequately plead its claims).

66/   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing Fed. R. Civ. P. 12(b)(6)) (quoting *Bell Atl. Corp*., 550 U.S. at 570); *see also Unisys Corp. v. United States*, 89 Fed. Cl. 126, 136 (2009) (dismissing certain of protester's claims under RCFC 12(b)(6)).

67/   *Terry v. United States*, 103 Fed. Cl. 645, 651 (2012) (quoting *Ashcroft* , 556 U.S. at 1949).

68/   *Id.* (quoting *Ashcroft*, 556 U.S. at 1949).

69/   RCFC 12(b)(6).

70/   *Shamrock Foods Co. v. United States*, 92 Fed. Cl. 339, 343 (2010) (noting that this principle is "well-settled") (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

of such improper conduct must allege facts sufficient to overcome the long-standing legal

principle 71/ that those officials are presumed "to perform their duties correctly, fairly, in good

faith, and in accordance with law and governing regulations." 72/  To overcome this

presumption, a plaintiff must provide "well-nigh irrefragable proof" of improper agency

conduct. 73/  The term "well-nigh irrefragable proof" means "evidence that 'cannot be refuted or

disproved; incontrovertible, incontestable, indisputable, irrefutable, undeniable.'" 74/

Allegations based on "mere innuendo and speculation" do not meet this standard. 75/  Moreover,

this Court has held that an allegation that a government official was influenced by the potential

bias of a supervisory official higher "in the chain of command" is insufficient to overcome the

presumption of regularity.  76/  In other words, "*[m]ere contentions of imputed bias do not*

*constitute proof*." 77/

       To survive a motion to dismiss under RCFC 12(b)(6), a complaint alleging agency bias or

bad faith must include sufficient factual allegations that, if ultimately proven, would defeat the

---

71/    This principle is recognized by both this Court and the Federal Circuit.  *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (characterizing the presumption of regularity as a long-standing rule and citing cases dating back to the 1950s).

72/    *Schism v. United States*, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (citing *Ak. Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993); *see also Hoffman v. United States*, 894 F.2d 380, 385 (Fed. Cir. 1990) ("[P]ublic officials[] are presumed to 'discharge their duties correctively, lawfully, and in good faith.'") (quoting *Guy v. United States*, 608 F.2d 867, 870 (Ct. Cl. 1979)); *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301-02 (Ct. Cl. 1976) ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in the discharge of their duties.  The court has always been loath to find to the contrary, and it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing.") (internal quotations omitted).

73/    *See, e.g.*, *Am-Pro Protective Agency*, 281 F.3d at 1239 (identifying the standard as "well-nigh irrefragable proof").

74/    *Id.* at 1240 (quoting Oxford English Dictionary 93 (2d ed. 1991)).

75/    *Brock v. United States*, No. 11-176C, 2012 WL 2057036, at *10 (Fed. Cl. June 7, 2012).

76/    *Hoffman v. United States*, 16 Cl. Ct. 406, 410 (1989), *aff'd*, 894 F.2d 380 (granting motion to dismiss under RCFC 12(b)(6) where the plaintiff alleged that a government official was influenced by a supervisor's bias).

77/    *Id.* at 410 (emphasis added).

presumption of regularity long enjoyed by government officials. 78/  All seven of the plaintiffs

here have fallen far short of meeting this standard.

> **2.      The plaintiffs' speculative allegations fail to state a claim that overcomes
> the presumption that both Secretary DeVos and the Department's
> procurement officials acted with regularity.**

The plaintiffs' allegations are based on sheer speculation that the Secretary **might** not

have complied with her ethics agreement and that the procurement officials who conducted this

acquisition **might** have heard about and been swayed by publicly available information detailing

the Secretary's indirect investment in a Performant Recovery affiliate. 79/  Allowing the

plaintiffs' claims to proceed based on bald speculation would require this Court to disregard the

presumption of regularity, which, as noted above, provides that government officials are

presumed to act in good faith. 80/  The Federal Circuit has observed that "conjectural

assumptions regarding the factors that could have motivated [a government official]" to take a

specific action "do not rebut th[e] presumption [of regularity]." 81/  That court also has

cautioned that the Court of Federal Claims should not even allow a bad faith allegation to reach

---

78/      *D.V. Gonzalez Elec. & Gen. Contractors, Inc. v. United States*, 55 Fed. Cl. 447, 457
(2003) ("Therefore, in order for Count II to survive defendant's motion to dismiss for failure to
state a claim, plaintiff must allege facts which if proved would" be sufficient to overcome the
"general presumption that government officials act conscientiously and in good faith.").

79/      FMS cites the FAR 3.601(a) requirement that agencies avoid awarding a contract to "'a
business concern or other organization owned or substantially owned or controlled by one or
more Government employees.'"  FMS Compl. ¶ 168 (quoting FAR 3.601(a)).  There is no issue
under FAR 3.601 (or any other FAR provision) here because the Secretary unquestionably did
not hold any investments in, much less "own[] or substantially own[] or control[]," any part of
Performant at the time of award—a fact FMS admits.  FAR 3.601(a); FMS Compl. at 2.  As
described above, any interest the Secretary held in any Performant entity was extinguished long
before the Department made its award decisions.

80/      If these types of speculative arguments are given any credence, disappointed bidders will
be encouraged to speculate that presidential nominees and other government officials have not
complied with their commitments to divest certain financial holdings, even where, as is the case
here, there is *no evidence* that the government official had any involvement in a specific
procurement.

81/      *Hoffman v. United States*, 894 F.2d 380, 385 (Fed. Cir. 1990).

the discovery phase "merely to satisfy [the plaintiff's] speculative hope" of finding "some evidence that might tend to support a claim." 82/ And as this Court has recognized, for a bias complaint to survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts which, if proved, would be sufficient to overcome the "general presumption that government officials act conscientiously and in good faith." 83/

The plaintiffs are asking this Court to reject the longstanding presumption of regularity. This Court's precedent, however, does not allow plaintiffs to presume that the Secretary and Department officials have ***not*** complied with their ethical obligations.  Indeed, the Court's precedent requires just the opposite.  And the plaintiffs would have this Court assume these government officials acted unethically even though ***the very materials the plaintiffs submitted with their complaints*** demonstrate that the Secretary disclosed her investments, the appropriate ethics officials carefully and thoroughly reviewed them, the Secretary agreed to liquidate all investments identified in her disclosures that could conceivably create conflicts of interest in this procurement, and the Secretary likely would be subject to serious repercussions for failing to do so. 84/  At the time the Secretary was required to divest the investments identified in her ethics

---

82/     *T&M Distribs., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999) (affirming COFC's decision granting the government's motion for summary judgment).

83/     *D.V. Gonzalez*, 55 Fed. Cl. at 457.

84/     Although all of the plaintiffs' allegations are equally baseless, ConServe's speculation is especially blatant.  After spending paragraphs of its complaint describing its unsubstantiated allegation that the Secretary "may" not have appropriately divested her financial interests as required by her ethics agreement, ConServe admits that a recent article reported that Performant had "'completely refinanced its debt'" and that its "'new lender is a private client partner who has no relations to Ms. DeVos or anyone related to [her].'"  ConServe Compl. ¶ 100 (emphasis added) (quoting Daniel Seiden, *Bid Protest: DeVos Ties to Contractor Rebutted as New Protest is Pondered*, 109 FCR (BNA) 82 (Jan. 23, 2018), http://news.bna.com/fclu/FCLNWB/split_display.adp?fedfx1=127269572&vname=fcrnotallissues&split=0).  But even after flatly acknowledging that its own allegations about the Secretary's former financial interest in Performant Recovery's affiliate ***are completely unfounded*** and refuted by Performant's debt refinancing that occurred months prior to the award, ConServe continues to speculate that there

agreement, she was a government official and therefore was presumed to "perform [her] duties correctly, fairly, in good faith, and in accordance with law and governing regulations." 85/ There is no evidence (and the plaintiffs have cited none) that the Secretary failed to comply with her obligation to divest those investments, including the investment through which she held an indirect debt interest in Performant Recovery's affiliate. 86/

Likewise, there is no evidence whatsoever that the Department's decision to award a contract to Performant Recovery was motivated by bias or that the relevant procurement officials acted in bad faith—and the plaintiffs certainly have not alleged any facts that, even if proven, would be sufficient to overcome the presumption that those individuals "act[ed] conscientiously and in good faith." 87/   The plaintiffs also have not provided any basis for this Court to believe that the procurement officials were actually aware of the Secretary's former investment in Performant Recovery's affiliate or any other evidence suggesting that these officials were

---

remains "reasonabl[e] concern[]" about the appearance of a continuing conflict of interest.  *Id.* ¶ 101.  ConServe's concern is based entirely on conjecture, given the proof that the investments with which ConServe was concerned *no longer exist*.  Such speculation is insufficient to state a claim for relief and is precisely the sort of unfounded allegation that is susceptible to dismissal under RCFC 12(b)(6).  *Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1, 20 (2016) (dismissing all of plaintiff's claims pursuant to RCFC 12(b)(6) upon finding that plaintiff failed to adequately plead its claims, explaining that "'unwarranted inferences of fact'" cannot support a claim) (citation omitted).

85/   *Schism v. United States*, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (citing *Ak. Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993); *see also Hoffman*, 894 F.2d at 385 ("[P]ublic officials[] are presumed to 'discharge their duties correctively, lawfully, and in good faith.'") (quoting *Guy v. United States*, 608 F.2d 867, 870 (Ct. Cl. 1979)); *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301-02 (Ct. Cl. 1976) ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in the discharge of their duties.  The court has always been loath to find to the contrary, and it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing.") (internal quotations omitted).

86/   Collecto even concedes that Secretary DeVos presumably divested her indirect debt interest in Performant Recovery's affiliate.  Collecto Compl. ¶ 16.

87/   *D.V. Gonzalez*, 55 Fed. Cl. at 457.

motivated by that information or some desire to curry favor with the Secretary by improperly steering an award to Performant Recovery.

The plaintiffs have failed to allege facts that would show that Secretary DeVos and the Department's procurement officials did not comply with their ethical obligations, and in fact, their arguments fly in the face of this Court's longstanding presumption of regularity. Their allegations, therefore, fail to state a claim. Now that these plaintiffs have moved to supplement the administrative record, it is clear they leveled the allegations related to Secretary DeVos in the hopes of creating a cloud of doubt surrounding this procurement and possibly obtaining discovery that is far broader than they otherwise would be allowed. To this end, the plaintiffs apparently seek to embark on a fishing expedition to satisfy their "speculative hope" of finding "some evidence that might tend to support a claim" of agency bias. 88/ This Court's precedent, however, makes clear that such unfounded, bald allegations fail to state a claim and thus cannot provide a basis to expose the Government to burdensome and unnecessary discovery requests. 89/

### 3. Publicly available information demonstrates that Secretary DeVos could not have held any interest in any Performant company after August 2017, fully refuting the plaintiffs' speculative allegations.

As discussed above, it is well established that a plaintiff's mere conjecture that agency officials failed to execute their obligations in an ethical manner is inadequate to state a claim upon which relief can be granted, 90/ and because the plaintiffs' allegations are speculative at best, this Court should dismiss them on that basis alone. Importantly, however, there is another

---

88/     *T&M Distribs., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999).

89/     *D.V. Gonzalez*, 55 Fed. Cl. at 457.

77/     *Terry v. United States*, 103 Fed. Cl. 645, 653 (2012) (observing that "[c]onclusory assertions and speculation are insufficient to suggest bad faith" and dismissing plaintiff's "conclusory and speculative allegations" of bad faith).

reason the Court should dismiss these allegations now—publicly available information disproves

the plaintiffs' conjecture by demonstrating that (a) the Secretary was obligated to divest her

interest in Performant Recovery's affiliate long before the Department completed its evaluations

and made its new award decisions, and (b) Performant refinanced the debt in which the Secretary

previously held an interest, severing any perceived ties between the Secretary and Performant

long before the Department selected Performant Recovery's proposal for award. 91/

The plaintiffs have cherry-picked the public information they speculate the Department's

procurement officials might have read and acted upon (*i.e.*, information concerning the

Secretary's prior investment) and ignored the rest of the story that was available to these

officials.  While publicly available information described the Secretary's indirect investments in

Performant Recovery's affiliate, information ***equally available to the public*** (*e.g.*, media reports

and the Secretary's ethics agreement) revealed that she ***committed to divest those assets*** by May

8, 2017—long before the Department's evaluation and award decisions.  None of the plaintiffs

meaningfully address the fact that Secretary DeVos formally committed to divest the interest in

Performant's affiliate by May 2017.  It is obvious why the plaintiffs gloss over this critical fact,

as it completely undermines their narrative.  If they did acknowledge this key point, they also

would have to admit that insofar as any procurement officials knew about the Secretary's

financial disclosures, they also knew about her related ethics agreement through which she

---

91/     When considering a motion to dismiss under RCFC 12(b)(6), this Court is "not limited to the four corners [of] the complaint." *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253 (2011).  Instead, the Court "may also consider matters incorporated by reference or integral to the claim, other matters appearing in the record of the case, ***and matters of public record of which the court can take judicial notice***." *Id*. (emphasis added).  Here, as explained in this motion, publicly available information demonstrates that well before the Department's award decisions, Performant terminated the debt instrument in which Secretary DeVos previously held an indirect interest.  The Court should take judicial notice of this public information, which confirms that the plaintiffs' allegations related to the Secretary are baseless and therefore is highly relevant to the Court's consideration of whether to grant Performant's motion to dismiss.

committed to divest certain of those interests, including the indirect debt investment in

Performant Business Services, Inc.  Further, Performant's publicly available securities filings, as

well as news sources, 92/ revealed that as of last summer, Performant had refinanced its debt and

no longer had *any* connection to the debt instruments in which the Secretary previously held an

indirect interest—a fact two of the plaintiffs even acknowledge. 93/  The Department's

procurement officials could not have been influenced or motivated by an interest the Secretary

held in a Performant company because she held no such interest.

In sum, Performant's refinancing and the Secretary's commitment to divest her indirect

interest in Performant Recovery's affiliate refute the plaintiffs' allegations that the Secretary

and/or Department officials were motivated by bias, bad faith, and conflicts of interest in

awarding a contract to Performant Recovery.

### 4. FMS's novel assertion that Performant Recovery suffered from an organizational conflict of interest fails to state a claim.

Finally, FMS raises a unique argument related to Secretary DeVos that also fails to state a

claim.  FMS argues that Performant Recovery was required to "disclose the nature of its

relationship with Secretary DeVos" in its proposal based the organizational conflict of interest

("OCI") provision in the solicitation, adding that Performant Recovery's alleged failure to do

so 94/ constitutes "an omission of a material fact and a corresponding material

---

92/    *See, e.g.*, Ex. H, Daniel Seiden, *Bid Protest: DeVos Ties to Contractor Rebutted as New Protest is Pondered*, 109 FCR (BNA) 82 (Jan. 23, 2018), at App'x 000161-00163.

93/    ConServe Compl. ¶ 100; FMS Compl. at 2 (acknowledging that the Secretary's financial interest "reportedly was divested in August 2017").  Thus, ACT's statement that "publicly available information does not demonstrate that Ms. DeVos divested from her interests in Performant," ACT Compl. ¶ 117, is simply wrong.  Public information long available to all of the plaintiffs, including ACT, demonstrates exactly that.

94/    FMS does not have access to Performant Recovery's proposal, and its comments on the contents of that proposal are entirely speculative.

representation." 95/  Even accepting FMS's allegations as true, FMS's protest ground fails to

state a claim upon which relief could be granted, as neither the FAR nor applicable Department

acquisition regulations required Performant Recovery to disclose the Secretary's alleged interest

in its affiliate. 96/  In arguing that Performant Recovery suffered from an OCI it was required to

disclose, FMS confuses the Secretary's financial interests (which are the predicate for FMS's and

the other plaintiffs' bias and bad faith allegations) with Performant Recovery's financial

interests. ***Performant Recovery does not have, and has never had, any financial interests that***

***would create an actual or potential conflict of interest relevant to this procurement.***  And,

importantly, FMS has not alleged facts that would create an OCI for Performant Recovery and

therefore trigger the obligation for Performant to disclose such a conflict in its proposal.

(Tellingly, no other plaintiff claims that Performant suffers from an OCI.)  Because FMS has

failed to "plead[] factual content that allows the court to draw the reasonable inference that

[Performant Recovery] is liable for the misconduct alleged," the Court should dismiss this

allegation. 97/

---

95/      FMS Compl. ¶ 173.

96/      The Department of Education Acquisition Regulation ("EDAR") conflict of interest
clause, which was included in the RFP, *see* RFP at 65-67, pertains to OCIs.  The clause states
that "[t]he contractor, subcontractor, employee, or consultant, has certified that, to the best of its
knowledge and belief, there are no relevant facts or circumstances that could give rise to an
organizational or personal conflict of interest (see FAR Subpart 9.5 for organizational conflicts
of interest) (or apparent conflict of interest) for the organization or any of its staff, and that the
contractor, subcontractor, employee, or consultant has disclosed all such relevant information if
such a conflict of interest appears to exist to a reasonable person with knowledge of the relevant
facts (or if such a person would question the impartiality of the contractor, subcontractor,
employee, or consultant)."  EDAR 3452.209-71(a)(1).  The clause then provides examples of
potential conflicts, including those involving unequal access to information, biased ground rules,
or impaired objectivity.  *Id.*  The clause also requires offerors to disclose any such actual or
potential conflicts "regardless of their opinion that such a conflict or potential conflict (or
apparent conflict of interest) would not impair their objectivity."  *Id.* 3452.209-71(a)(2).

97/      *Terry v. United States*, 103 Fed. Cl. 645, 651 (2012) (internal citation omitted).

**CONCLUSION**

None of the plaintiffs timely raised claims challenging the Secretary's former financial interest in Performant Recovery's affiliate.  Moreover, none has alleged any facts that, taken as true, suggest that any agency bias, bad faith, or conflicts of interest affected the Department's award decisions in any way.  Accordingly, the Court should grant Performant Recovery's motion to dismiss these aspects of the plaintiffs' complaints.


Dated: March 15, 2018                          Respectfully submitted,


*Of Counsel*:                                  /s/ Michael McGill
                                               Michael McGill
Thomas L. McGovern III                         HOGAN LOVELLS US LLP
Christine Reynolds                             555 Thirteenth Street NW
Thomas A. Pettit                               Washington, DC 20004
HOGAN LOVELLS US LLP                           Telephone:  (202) 637-8862
                                               Facsimile:  (202) 637-5910
                                               michael.mcgill@hoganlovells.com

                                               *Counsel of Record for*
                                               *Performant Recovery, Inc.*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST**

_____
)
FMS INVESTMENT CORP., *et al.*,                    )
)
Plaintiffs,                    )
)
v.                                                                     )
)          Civil Action Nos. 18-204C, *et al.*
THE UNITED STATES,                                    )          Judge Thomas C. Wheeler
)
Defendant,                    )
and                                                                 )
)
PERFORMANT RECOVERY, INC., *et al.*,     )
)
Defendant-Intervenors.     )
_____)

## ORDER

Pursuant to Rules 7(b) and 12 of the United States Court of Federal Claims, Defendant-Intervenor Performant Recovery, Inc. ("Performant Recovery") has moved for partial summary dismissal of certain of the above-captioned bid protests.  Having considered the motion, as well as all other relevant materials, it is hereby

ORDERED that Performant Recovery's motion for partial summary dismissal be and hereby is GRANTED.

_____
Thomas C. Wheeler, Judge

Dated: _____